ROBERT F. SCOULAR (SBN 85293)
robert.scoular@dentons.com
JOHN A. MOE, II (SBN 66893)
john.moe@dentons.com
NORMAN ASPIS (SBN 313466)
norman.aspis@dentons.com
601 South Figueroa Street, Suite 2500
Los Angeles, California 90017-5704
Telephone:    213 623 9300
Facsimile:    213 623 9924

Attorneys for Defendant, Counter/Crossclaimant
YOGI SECURITIES HOLDINGS, LLC

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA -- LOS ANGELES DIVISION**

| | |
|---|---|
| In re,<br><br>CRESTLLOYD, LLC,<br><br>               Debtor. | Case No. 2:21-bk-18205-DS<br><br>Chapter 11<br><br>Adv. No. 2:22-ap-01125-DS |
| INFERNO INVESTMENT, INC., a Quebec corporation,<br><br>               Plaintiff,<br><br>v.<br><br>CRESTLLOYD, LLC, a California limited liability company; HANKEY CAPITAL, LLC, a California limited liability company; YOGI SECURITIES HOLDINGS, LLC, a Nevada limited liability company; and HILLDUN CORPORATION, a New York corporation,<br><br>               Defendants. | **OPPOSITION OF COUNTER/CROSSCLAIMANT YOGI SECURITIES HOLDINGS, LLC TO MOTION OF CROSS-DEFENDANT HANKEY CAPITAL, LLC TO DISMISS FIRST AMENDED COUNTER CLAIM AND CROSSCLAIM OF YOGI SECURITIES HOLDINGS, LLC**<br><br>Original Hearing:<br>Date:    December 1, 2022<br><br>Rescheduled Hearing:<br>Date:    December 15, 2022<br>Time:   11:30am<br>Place:  Department 1639<br>Judge:  The Hon. Deborah J. Saltzman<br><br>Action Filed:  June 9, 2022 |
| YOGI SECURITIES HOLDINGS, LLC, a Nevada limited liability company,<br><br>          Counter/Crossclaimant,<br><br>v.<br><br>CRESTLLOYD, LLC, a California Limited Liability Company; HANKEY CAPITAL, LLC, a California limited liability company; and HILLDUN CORPORATION, a New York corporation,<br><br>          Counter/Cross-Defendants. | |

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

# <u>TABLE OF CONTENTS</u>

**Page**

I.      INTRODUCTION ............................................................................ 1

        A.      Response to Hankey's Introduction ........................................... 5

II.     STATEMENT OF FACTS .................................................................. 7

        A.      The Yogi Loans ................................................................... 7

        B.      The Hankey Loans ................................................................ 10

III.    THE STANDARD OF REVIEW .......................................................... 12

IV.     THE CLAIMS ASSERTED BY YOGI AGAINST HANKEY ........................ 13

        A.      The Third Claim for Declaratory Relief Sufficiently States a Claim for Subordination ............................................................ 13

        B.      The Fourth Claim for Relief Sufficiently States a Claim for Equitable Subordination ....................................................... 21

        C.      The Fifth Claim for Declaratory Relief Sufficiently States a Claim for Subordination ....................................................... 24

        D.      The Sixth Claim for Relief Sufficiently States a Claim for Equitable Subordination ....................................................... 24

        E.      The Seventh Claim for Relief for an Accounting ......................... 24

        F.      The Eighth Claim for Declaratory Relief Sufficiently States a Claim for Subordination ....................................................... 25

        G.      The Ninth Claim Sufficiently States a Claim for Equitable Subordination .......... 26

        H.      The Tenth Claim for Relief Declaratory Relief Sufficiently States a Claim for Subordination ............................................. 26

        I.      The Eleventh Claim for Relief Sufficiently States a Claim for Equitable Subordination ....................................................... 27

        J.      The Twelfth Claim for Relief Sufficiently States a Claim for Disallowance of Hankey's Alleged Secured Claim 18-1 ................. 27

        K.      The Thirteenth Claim for Relief for Recharacterization ................ 29

V.      CONCLUSION ................................................................................ 30

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Aarons*,
No. 2:19-bk-18316-NB, 2022 WL 3444730 (Bankr. C.D. Cal. 2022) ....................................18

*Atkinson v. Foote*,
44 Cal. App. 149 (1919)....................................................................................................19, 20

*Bank of New York Mellon v. Citibank, N.A.*,
8 Cal. App. 5th 935 (2017)................................................................................................18, 19

*Behm v. Fireside Thrift Co.*,
272 Cal. App. 2d 15 (1969)........................................................................................................9

*Benjamin v. Diamond (In re Mobile Steel Co.)*,
563 F.2d 692 (5th Cir. 1977)....................................................................................................22

*Boyette v. Algonquin Gas Transmission Co.*,
952 F. Supp. 192 (S.D.N.Y. 1997)...........................................................................................26

*De Los Angeles Gomez v. Bank of America, N.A.*,
642 F. App'x 670 (9th Cir. 2016)..............................................................................................18

*Friery v. Sutter Buttes Sav. Bank*,
61 Cal. App. 4th 869 (1998)......................................................................................................18

*Gluskin v. Atlantic Savings & Loan Assn.*,
32 Cal. App. 3d 307 (1973)..............................................................................15, 16, 18, 19

*Gluskin, Lennar Northeast Partners v. Buice*,
49 Cal. App. 4th 1576 (1996)............................................................................................. *passim*

*In re GOCO Realty Fund I*,
151 B.R. 241 (Bankr. N.D. Cal. 1993).....................................................................................29

*Jones v. Sacramento Sav. & Loan Ass'n*,
248 Cal. App. 2d 522 (1967)......................................................................................................9

*In re Kansas City Journal-Post Co.*,
144 F.2d 791 (8th Cir. 1944).....................................................................................................21

*McNamara-Blad v. Ass'n of Pro. Flight Attendants*,
275 F.3d 1165 (9th Cir. 2002)...................................................................................................12

*MDFC Loan Corp. v. Greenbrier Plaza Partners*,
21 Cal. App. 4th 1045 (1994), *as modified*, (Feb. 2, 1994) ......................................................28

*Middlebrook – Anderson Co. v. Southwest Sav. & Loan Assn.*,
18 Cal. App. 3d 1023 (1971)................................................................................................ *passim*

*In re Millette*,
186 F.3d 638 (5th Cir. 1999)....................................................................................................29

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

*Pepper v. Litton*,
    308 U.S. 295 (1935)................................................................................21

*Porter v. Jones*,
    319 F.3d 483 (9th Cir. 2003)................................................................12

*Prudence Realization Corp. v. Geist*,
    316 U.S. 89 (1942)................................................................................21

*Resolution Trust Corp. v. BVS Dev., Inc*,
    42 F.3d 1206 (9th Cir. 1994)..............................................11, 12, 18, 25

*Sagana v. Tenorio*,
    384 F.3d 731 (9th Cir. 2004)................................................................12

*Savings & Loan Soc. v. Burnett*,
    106 Cal. 514 (1895)..............................................................................19

*Shroyer v. New Cingular Wireless Servs., Inc.*,
    622 F.3d 1035 (9th Cir. 2010)..............................................................12

*Skinner v. Switzer*,
    562 U.S. 521 (2011)..............................................................................12

*In re Sunset Bay Associates*,
    944 F.2d 1503 (9th Cir.1991)...............................................................14

*Tapia v. Demartini*,
    77 Cal. 383 (1888) .........................................................................19, 20

*U.S. v. Noland*,
    517 U.S. 535 (1996)..............................................................................22

*Wilkerson v. Mobil Oil Corp.*,
    941 F. Supp. 614 (E.D. Tex. 1996) .................................................26, 27

**Statutes**

11 United States Code
    § 510(c)................................................................................................21

California Civil Code
    § 2792..................................................................................................10
    § 2938..................................................................................................28
    § 2938(a)........................................................................................28, 29
    § 2938(b)........................................................................................27, 28

**Rules and Regulations**

Federal Rules of Bankruptcy Procedure
    Rule 7001......................................................................................12, 13

Federal Rules of Civil Procedure
    Rule 8(a)(2) .........................................................................................12

iii

**Other Authorities**

*5 Miller & Starr California Real Estate Digest*
  § 13:11 (4th ed. 2022) ................................................................................................................10

*2 Moore's Federal Practice* – Civil
  § 12.34 (2018) ..............................................................................................................................12

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

iv

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

## MEMORANDUM OF POINTS AND AUTHORITIES

Counter/Crossclaimant Yogi Securities Holdings, LLC ("Yogi") files this Opposition to Cross-Defendant Hankey Capital, LLC's ("Hankey") *Motion To Dismiss First Amended Counterclaim And Crossclaim Of Yogi Securities Holdings, LLC* [Dkt. No. 94] (the "Motion").

### I.

### INTRODUCTION

The *First Amended Counterclaim And Crossclaim of Yogi Securities Holdings, LLC For Declaratory Relief, An Accounting, Equitable Subordination, Disallowance Of Claims And Recharacterization Of Claims* [Dkt. No. 55] (the "Crossclaim"), seeks *as it pertains to Hankey*:

- Declaratory relief as to the validity, priority and extent of liens asserted by Hankey against the proceeds of the sale of real property called "The One," at 944 Airole Way, Los Angeles, California (the "Property");

- Equitable subordination of all or part of Hankey's Claim No. 20 filed for $122,638,623.41 (Crossclaim, ¶ 46.b), to Yogi's Claim No. 27 filed for $24,385,366.77 (Crossclaim, ¶ 46.c);

- An accounting as to disbursements made by Hankey allegedly in connection with construction of improvements to the Property and an overall accounting of the amount of the obligation due Hankey on its Claim;

- An objection seeking the disallowance of Hankey's Claim No. 18 as a secured claim; and

- Recharacterization of all or part of Hankey's Claim No. 20.

In its Motion, Hankey asserts that every Claim asserted by Yogi against Hankey fails to state a valid claim. In response to Hankey's arguments, Yogi withdraws, without prejudice, the Seventh Claim for Relief for an accounting as to Hankey, and the Thirteenth Claim for Relief for recharacterization as to Hankey. Hankey's Motion as to the other Claims against Hankey should be denied as all such Claims are properly plead.

The pertinent facts underlying Yogi's allegations in its Crossclaim are:

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

1.      Yogi's $30,188,235 Promissory Note (Exhibit H)[1] was executed on October 16, 2018, before Hankey's Construction Loan Agreement (Exhibit S) was executed on October 25, 2018; thereafter, in accordance with an agreement by Crestlloyd with Yogi and by Crestlloyd with Hankey,[2] Yogi recorded its Deed Of Trust And Assignment Of Rents on November 7, 2018 (Exhibit I) (the "Yogi 11/7/18 Deed Of Trust"), one day after Hankey's Deed Of Trust, Security Agreement And Fixture Filing With Assignments Of Rents was recorded on November 6, 2018 (Exhibit X) (the "Hankey 11/6/18 Deed Of Trust"). The basis for Yogi to record its deed of trust one day after Hankey recorded its deed of trust is alleged in paragraph 94 of Yogi's Crossclaim:

- Hankey knew that Yogi was making a loan to Crestlloyd;
- Hankey's loan to Crestlloyd was to be used for construction of improvements to the Property;
- *Hankey knew that Yogi would record its lien after Hankey recorded its lien* only on condition that Hankey's loan to Crestlloyd would be used to construct improvements to the Property; and
- Hankey would control disbursements to pay for construction of improvements to the Property.

2.      Hankey was actively engaged in funds control disbursements to Crestlloyd to construct improvements to the Property (Crossclaim, ¶ 95). Since filing its Crossclaim, Yogi's continuing investigation has confirmed that Hankey was in *complete control* of the disbursements.[3] Despite being in complete control of all disbursements: (1) Hankey did not ensure that all disbursements were used for construction of improvements to the Property (Crossclaim, ¶ 95) (except for $6,000,000 that the Construction Loan Agreement allocated for payment to Crestlloyd's principals (Exhibit S, p. 16, section 6.15)) and (2) in the later phases of construction, Hankey did

---

[1] All references to Exhibits are to Exhibits attached to the Crossclaim.

[2] If it is deemed necessary to include this allegation in its Crossclaim, Yogi requests leave to file a Second Amended Crossclaim so that such fact is included in the Crossclaim.

[3] If it is deemed necessary to include this allegation in its Crossclaim, Yogi requests leave to file a Second Amended Crossclaim so that such fact is included in the Crossclaim.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

not timely deliver ("slow paid") construction loan disbursements to Crestlloyd, which slowed construction to the detriment of Crestlloyd and the other secured lenders and to the benefit of Hankey by, *inter alia*, increasing interest accruing and default interest (Crossclaim, ¶ 127). In fact, as set forth below, Hankey's subsequent execution of a First Modification Of Construction Loan (Exhibit AA) further enabled Hankey's control over the disbursement process.

3.      Hankey -- without notice to Yogi (and apparently without notice to Inferno Investment) -- substantially increased its $82,500,000 loan to $91,000,000 (Crossclaim, ¶¶ 31-36), including the execution by Hankey and Crestlloyd of a Modification To Deed Of Trust (Exhibit BB) that was **never recorded**, and the execution of a second Profit Participation Agreement (Exhibit CC), of which a notice (*i.e.*, a Memorandum Of Agreement) was **not recorded either**.[4] The second Profit Participation Agreement increased Hankey's profit participation by another $5,000,000+ if the Property sold for $100,000,000 or more, increasing Hankey's potential profit participation to as much as $8,500,000 if the Property was sold for $200,000,000 based on the first and second Profit Participation Agreements (Exhibits V and CC).

- Hankey made sure that the Hankey 11/6/18 Deed Of Trust and a Memorandum Of Agreement (Exhibits X and W) were recorded as to the original $82,500,000 loan and Hankey made sure that a Modification Of Deed Of Trust and Memorandum Of Agreement (Exhibits FF[5] and HH) were recorded on the subsequent second substantial increase of the loan to $106,000,000.

- *Hankey recorded nothing in connection with the increase on or about December 10, 2019, to $91,000,000 or the increased profit participation (Crossclaim, ¶¶ 32-36).*

---

[4] A Memorandum Of Agreement (Exhibit HH) was recorded after a third Profit Participation Agreement (Exhibit GG) was executed on August 20, 2020.

[5] As set forth in the Crossclaim (¶ 38), the Modification Of Deed Of Trust was recorded on August 31, 2020, as Instrument No. 2020-1030024.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

- As set forth in the Crossclaim (¶ 38), the *Modification Of Deed Of Trust recorded August 31, 2020 provided the first notice of a funding increase beyond the original $82,500,000 provided by Hankey to Crestlloyd.*

The only conclusion that can be reached is that a decision was made by Hankey to keep *secret* and not to record the Modification Of Deed Of Trust (Exhibit FF) or Memorandum Of Agreement (Exhibit HH) on the increased loan and the increased profit participation that took place in December 2019.

If Yogi had been informed of the proposed increase to $91,00,000, it could have taken action to protect itself.

4.    Hankey then further increased its $91,000,000 loan to $106,000,000, with the execution of an Amended And Restated Promissory Note (Exhibit DD), and the recording of a Modification Of Deed Of Trust (Exhibit FF) on or about August 20, 2020, which made of record the increase of the $82,500,000 Promissory Note to $106,000,000, only then recording a Memorandum Of Agreement (Exhibit GG) on Hankey's second and third Profit Participation Agreements[6] reflecting the profit participation of $5,000,000+ if the Property sold for $100,000,000 or more (Crossclaim ¶¶ 37-40).

In summary: Hankey substantially and drastically increased its loan to Crestlloyd, twice failing to either tell Yogi and/or obtain its consent before the increases occurred. And no subordination was ever sought or obtained from Yogi for these material changes in risk (Crossclaim, ¶¶ 31, 35, 36, 40 & 41).

---

[6] The second Profit Participation Agreement states as follows:

> If, at any time, during the term of the Loan, or subsequent to Borrower's repayment of the Loan, the Property is sold . . . for a purchase price in excess of One Hundred Million and no/100 Dollars ($100,000,000), Lender shall be entitled to receive, from the sale proceeds, a Lender Profit Participation Payment in the amount equal to the lesser of (a) five percent (5% of the gross sales price for the Property which exceeds $100,000,000, or Five Million and No/100 Dollars ($5,000,000). The parties further acknowledge that this Agreement . . . supplements the First Profit Participation Agreement.

Both the second and third Profit Participation Agreement contain the same increase.

**A.    Response to Hankey's Introduction**

Hankey makes several assertions in the Motion's "Introduction" (Motion, p. 1, l. 2 – p. 2, l. 23) that are incorrect.

**1.    Agreement on Recordation of Liens**

Contrary to Hankey's assertion of law in its Introduction (p. 1, ll. 16-19), the duties owed by a senior lender to a junior lender under a formal subordination do not differ from the duties owed by a senior lender to a junior lender when the lender obtains priority over the junior lender under an agreement by the junior lender to record after the senior lender; as explained below, *subordination can be achieved by either an express subordination agreement or by priority of recording.* As noted above, in accordance with the agreement by Crestlloyd with Hankey and the agreement by Crestlloyd with Yogi, Yogi agreed to record its lien *after* Hankey recorded its lien, and Hankey knew that Yogi would record its lien after Hankey recorded its lien, *exemplified by Hankey recording its lien on November 6th and Yogi recording its lien on November 7th.* Apparently, Hankey would have this Court believe that the two recordation dates were pure happenstance. Such an assertion is nonsensical. It is difficult to believe that Hankey would have moved forward with its $82,000,000 construction loan if Yogi had recorded first.

Contrary to Hankey's assertions in its Introduction (Motion, p. 1, ll. 19-22), Hankey was not free to drastically increase its $82,500,000 loan to $91,000,000, then to $106,000,000, without notice to Yogi.

**2.    Hankey's Obligation to Monitor Disbursements for Construction**

Hankey's argument (Motion, p. 2, ll. 1-2) that it had no obligation to monitor the disbursements for construction are belied by the following:

- The language in the Construction Loan Agreement *and* Exhibit D attached to the Construction Loan Agreement (Exhibit S) makes clear the comprehensive control Hankey had over disbursements. Attached Exhibit MM quoting from the Construction Loan Agreement and Exhibit D to the Construction Loan Agreement, demonstrates the

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

scope and breadth of Hankey's control over disbursements as set forth in Exhibit S.[7]

- Hankey's control was further *increased* with Crestlloyd's execution of the First Modification Of Construction Loan Agreement (Exhibit AA, p. 2, § 1.1) in favor of Hankey that gave Hankey more rights, as follows:

> 2.9 Funds Control. Until such time as the Loan has been paid in full, Borrower shall allow Lender's funds control agent weekly access to the Property so as to facilitate the processing of loan advances.

- In fact, as set forth above, further continuing investigation confirms that Hankey was in complete control of disbursements to construct improvements to the Property.

### 3.    Argument on Placing Additional Debt on the Property

Hankey argues (Motion, p. 2, ll. 4-7) that because Yogi's $30,188,250 Secured Promissory Note with Crestlloyd has a provision (Exhibit H, p. 7, § 16) that prohibits the Borrower from encumbering the Property with senior encumbrances of no more than $115,000,000, Hankey was free – without notice to Yogi – to increase its loans. Hankey misreads this provision.

First, the provision is not that Hankey may encumber the Property by up to $115,000,000, but that the borrower (Crestlloyd) cannot encumber the Property with debt senior to Yogi by more than $115,000,000. Section 16 states: "Borrower agree[s] that at no time while any portion of the Note remain[s] unpaid shall senior indebtedness . . . (ii) encumbering the Airole Property exceed $115,000,000.00. . ."

Second, neither Hankey's $82,500,000 Promissory Note (Exhibit T) nor Hankey's 11/5/18 Deed Of Trust (Exhibit X) has any provision that the principal amount of Hankey's loan can be increased. To the contrary, at paragraph 6.15 of Hankey's Construction Loan Agreement (Exhibit X), the Agreement states that "The Loan is a business loan transaction in the *stated amount . . .*" (emphasis added). And the Hankey 11/6/18 Deed Of Trust (Exhibit X) does *not* state that the deed of trust secures future advances of additional principal amounts.

Third, Hankey's argument should be of no avail to Hankey by reason of the fact that IF Inferno has a senior priority lien, Hankey and Inferno assert the amount due is $148,540,729

---

[7] All exhibits attached to the Crossclaim are incorporated by reference into the Crossclaim as though set forth in full at the citation.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

($122,638,623.41 [Hankey Claim No. 20-1], $5,000,000 [Hankey Claim No. 18.1] and $20,902,106.12 [Inferno Claim No. 11.1]), *far beyond $115,000,000.*

### 4.    Equitable Subordination

Hankey argues that "egregious" conduct is required to assert a Claim for equitable subordination (Motion, p. 2, ll. 14-16). As Hankey admits, "egregious" conduct includes "overreaching" (Motion, p.13, l.17). Here, neither Hankey's Promissory Note nor Hankey's 11/6/18 Deed Of Trust has anything about Hankey increasing the principal amount of its loan, yet Hankey secretly increased its loan to $91,000,000, which is best exemplified by the fact that when the loan was increased to $91,000,000 and Hankey's profit participation was increased by $5,000,000, neither the Modification Of Deed Of Trust (Exhibit BB) nor a Memorandum Of Agreement (*see* the Memoranda recorded on the first and third Profit Participation Agreements, Exhibits W and HH) were recorded. Secret actions certainly qualify as "overreaching" conduct.

## II.

## STATEMENT OF FACTS

### A.    The Yogi Loans

Yogi has gone into great detail in its Crossclaim to explain the facts that support its requests to determine the priority, extent and validity of liens between the competing alleged secured lenders. In fact, in paragraphs 20-27 of the Crossclaim, Yogi provides significant detail concerning Yogi's loans in general, and the $30,188,235 loan, in particular, that were secured by the Property. (Crossclaim, p. 5, l. 25-p. 6, l. 4.)

Hankey makes several assertions as to Yogi's loans:

### 1.    The Original Notes Were Amended and Incorporated

Hankey asserts (Motion, p. 3, ll. 5-7) that "[o]ver $19.5 million of the Loan proceeds [of the $30,188,235 Secured Promissory Note] are said to have already been disbursed under two Notes issued in 2017 and 2018 . . . which were cancelled and superseded" by the $30,188,235 Secured Promissory Note. *That is incorrect.* The $30,188,235 Secured Promissory Note (Exhibit H) reads:

> Lender has already advanced $17,499,900.00 under a Promissory Note dated May 22, 2018 and $2,188,235.00 under a Promissory Note dated August 9, 2017 as amended previously, executed by Borrower in favor of Lender.

1   The prior Notes were not "cancelled," but were amended and incorporated into the $30,188,235
2   Secured Promissory Note.

3       **2.      The Two Original Notes Were Both Secured**

4       Hankey asserts (Motion, p. 3, ll. 8-9) that "[t]he Prior Notes were not secured by the Airole
5   Property, nor is there any indication . . . that they were secured by any other collateral." Yogi
6   focused its Crossclaim on the $30,188,235 Secured Promissory Note, not the two Notes that were
7   amended and incorporated <u>into</u> the $30,188,230 Secured Promissory Note. In fact, the $17,499,900
8   Promissory Note was secured by the Property, and the $2,188,235 Promissory Note was secured
9   by the Hillcrest Property owned by Crestlloyd.[8] To the extent it is deemed important to go into the
10  background as to the two Notes that were amended and incorporated into the $30,188,235 Secured
11  Promissory Note, Yogi requests the opportunity to amend its Crossclaim to include such facts.

12      **3.      Yogi Did Advance $30,188,236**

13      Hankey asserts (Motion, p. 3, ll. 12-15) that "the only amounts advanced by Yogi under the
14  Yogi Loan are $4,500,100 and up to $5,200,000 . . ." In fact, as already indicated above,
15  $17,499,900 and $2,188,235 had been advanced to Crestlloyd.

16      **4.      Yogi's Loan Was a Business Loan**

17      Hankey argues (Motion, p. 3, l. 15) that "there are no restrictions on the Debtor's use of
18  these Loan proceeds" as it pertains to the Yogi $30,188,235 Promissory Note. That is correct,
19  because *the $30,188,235 Secured Promissory Note was not a construction loan*, but a business loan,
20  as set forth in section 14 of the $30,188,235 Promissory Note (Exhibit H, § 14). The Yogi loan
21  documents do *not* contain the detailed requirements that Hankey's Construction Loan Agreement
22  and Hankey's Exhibit D attached to the Construction Loan Agreement require.

23      **5.      Yogi Recorded Its Deed of Trust After Hankey Recorded Its Deed of Trust**

24      Hankey argues (Motion, p. 4, ll. 5-16) about the recordation of Hankey's 11/6/18 Deed Of
25  Trust one day before Yogi recorded its 11/7/18 Deed Of Trust.

26

27

28  ---
    [8] The Hillcrest Property is defined in the Crossclaim at ¶ 21 (page 6, lines 7-8).

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

As already noted, and as set forth in paragraph 94 of the Crossclaim, Yogi recorded its deed of trust one day after Hankey recorded its deed of trust, because: (1) Hankey knew that Yogi was making a Loan to the Debtors; (2) Hankey's Loan was to be used for construction of improvements to the Property; (3) Hankey knew that Yogi would record its lien after Hankey recorded its lien on condition that Hankey's Loan was for construction of improvements to the Property; and (4) Hankey would control disbursements to pay for construction of improvements. Hankey knew Yogi was making a loan to the debtor and Hankey knew Yogi would record its lien after Hankey recorded its lien. As noted, the duties owed by a first lienholder to a second lienholder under a formal subordination agreement do not differ from the duties owned by first lienholder to a second lienholder when the first lienholder obtains priority over the second lienholder, when the second lienholder agreed to record after the first lienholder.

**6.        Consideration Was Not Required for the $5,200,000 Loan**

Hankey notes (Motion, p. 5, ll. 1-9) that Marbella Construction, Inc. and 1369 Londonderry Estate, LLC executed and delivered a $5,200,000 Secured Promissory Note (Exhibit M) in favor of Yogi Securities, on which Crestlloyd later executed deeds of trust, *further* securing repayment of that obligation with the Property. (Crossclaim ¶¶ 24-27). Hankey's Motion asserts that Yogi Securities has unclean hands because it entered into the Fourth Deed Of Trust (Exhibit O) with Crestlloyd, under which the Property was added as security. Hankey's argument suggests, with no support,[9] that the Fourth Deed Of Trust (Exhibit O) was invalid or inappropriate because Crestlloyd received no consideration for pledging the Property as security.

However, if a secured debt or obligation is supported by valid consideration, there is no requirement that a deed of trust provided by an unrelated third party to secure the obligation be supported by independent consideration to the third party.

> [A] deed of trust that secures an enforceable obligation is enforceable
> even though there is no consideration for the deed of trust. There is no

---

[9] Hankey cites *Behm v. Fireside Thrift Co.*, 272 Cal. App. 2d 15, 21 (1969) and *Jones v. Sacramento Sav. & Loan Ass'n*, 248 Cal. App. 2d 522, 528-29 (1967) for the proposition that a party with unclean hands cannot seek subordination. However, neither *Behm* nor *Jones* addresses Hankey's assertion that an unrelated party to a loan cannot pledge property as security for a loan without consideration.

Dentons US LLP
601 South Figueroa Street, Suite 2500
Los Angeles, California 90017-5704
213 623 9300

requirement that consideration be given for the deed of trust as long as the deed of trust secures an underlying obligation and there is consideration for the obligation.

\*        \*        \*

. . . [A] deed of trust may be given by (a) guarantor as a lien on the property of the guarantor as security for the debt of another, as long as the debt being secured is clearly identified in the deed of trust. Because there is a valid secured obligation, the deed of trust is enforceable against the property of the trustor-guarantor upon the debtor's default even though there is no consideration to the guarantor.

5 Miller & Starr Cal. Real. Est. § 13:11 (4th ed. 2022). This is consistent with the law of suretyship in California, providing that there is no requirement for separate consideration to support a guaranty which is entered into at the same time as the underlying obligation or at the time the creditor accepts the underlying obligation. Cal. Civ. Code § 2792.

Here, in exchange for a loan, Marbella and Londonderry executed and delivered a Secured Promissory Note (Exhibit M) in favor of Yogi Securities that was secured by a Fourth Amendment Of Note And Deed Of Trust. (Exhibit O) Given that this allegation must be taken as true at this stage in the proceeding, there is nothing to suggest the underlying Secured Promissory Note is invalid or lacks consideration. Crestlloyd, which was not a party to the Secured Promissory Note, could pledge its property through the Fourth Amendment Of Note And Deed Of Trust to secure a valid and enforceable promissory note without consideration. Hankey's assertion that this transaction was somehow inappropriate because Crestlloyd did not receive consideration for the pledge of security is incorrect.

In addition, the loan was paid off upon the sale of the Hillcrest Property and the lien released against the Property. (Crossclaim ¶ 44.)

**B.    The Hankey Loans**

Yogi's Crossclaim goes into detail on the Hankey loans (Crossclaim, ¶ 28-41, p. 8, l. 23-p. 11, l. 24), reviewing the initial $82,500,000 Promissory Note (Exhibit T), after which Hankey increased its loan to $91,000,000 by way of an Amended And Restated Promissory Note (Exhibit Z), underlining nothing, giving no notice. As set forth in the Crossclaim:

No documents were recorded in connection with the December 2019 Note or the December 2019-PP Agreement, no Memorandum of Agreement or any other document was recorded to provide notice on the December 2019

10

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

PP Agreement, and no document was recorded to provide notice of the increased $91,000,000 allegedly secured by the unrecorded Modification Of Deed Of Trust . . . (Crossclaim, Exhibit BB). (Crossclaim ¶ 35).

Hankey then further increased its loan to $106,000,000 by way of an Amended And Restated Promissory Note (Exhibit DD) and Hankey's recorded Modification Of Deed Of Trust (Exhibit FF).

As set forth in paragraphs 31, 36, 40 and 41 of its Crossclaim, Yogi never agreed to subordinate its secured position to the substantial and drastic increase in the principal amounts of Hankey's loan, and Yogi was never informed of such increases, until after the loans were increased to $106,000,000.

As set forth in the Crossclaim, Yogi goes into detail, quoting the terms of the Construction Loan Agreement and Exhibit D attached to the Construction Loan Agreement (Exhibit S), which includes a Disbursement Plan. As already noted, attached Exhibit MM is a more comprehensive listing of all the provisions in the Construction Loan Agreement and Exhibit D to the Construction Loan Agreement, than set forth in the Crossclaim (¶¶ 89-93), on Hankey's control of disbursements. Those obligations and requirements are *all-encompassing*.[10]

Hankey argues that Yogi cannot assert claims against Hankey based on Hankey's failure to follow its own detailed requirements for disbursing loan funds to construct improvements to the Property (as required by the Construction Loan Agreement and Exhibit D to the Construction Loan Agreement) because of a sentence buried in section 3.4 of the Construction Loan Agreement that states that after disbursements have been delivered to the Borrower, "Lender has no obligation to monitor or determine Borrower's use or application of the disbursements." Because of *the language throughout the Construction Loan Agreement*, and *Exhibit D attached to the Construction Loan Agreement,* and *the fact that Hankey completely controlled the disbursements*, this exculpatory sentence is hardly sufficient to render meaningless the comprehensive provisions of the Agreement and Exhibit D or Hankey's actions.

---

[10] In addition, as already set forth above, evidence came to light after the Crossclaim was filed confirming that Hankey completely controlled the disbursements.

1    When a construction "lender actively undertakes such a role" of "monitoring" a project

2    (whether it agreed to or not initially), the lender is responsible to do so. *Middlebrook – Anderson*

3    *Co. v. Southwest Sav. & Loan Assn.,* 18 Cal. App. 3d 1023, 1029 (1971) ("the lender voluntarily

4    undertook to control disbursements"); *see also, Resolution Trust Corp. v. BVS Dev., Inc,* 42 F.3d

5    1206, 1214-1215 (9th Cir. 1994) ("The duty of a lender to supervise the use of loan funds arises

6    . . . perhaps from the knowledge that the seller is relying on such monitoring . . . [and] the lender

7    actively undertakes such role"). Here the Crossclaim alleges that Hankey did undertake the control

8    of disbursements (Crossclaim, ¶ 95) and abused and leveraged that control towards the demise of

9    the project (Crossclaim, ¶¶ 127-128) (differentiating the facts from *Resolution Trust*).

10    ### III.

11    ### **THE STANDARD OF REVIEW**

12    When evaluating a motion to dismiss, the court must (1) construe the complaint in a light

13    favorable to the non-movant, (2) accept the factual allegations in the complaint as true, and (3) draw

14    all reasonable inferences in favor of the plaintiff. *2 Moore's Federal Practice* – Civil § 12.34

15    (2018). In ruling on a motion to dismiss, the court is not adjudicating whether a plaintiff will

16    ultimately prevail on the merits of the complaint, it is only determining if the plaintiff is entitled to

17    offer evidence to support the claims. *Skinner v. Switzer*, 562 U.S. 521, 529-30 (2011).

18    "To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), a complaint

19    generally must satisfy only the minimal notice pleading requirements of Rule 8(a)(2)." *Porter v.*

20    *Jones*, 319 F.3d 483, 494 (9th Cir. 2003). Rule 8(a)(2) requires only that the complaint include "a

21    short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ.

22    P. 8(a)(2). "All that is required is that the plaintiff give 'fair notice' of the claim and its basis."

23    *Sagana v. Tenorio*, 384 F.3d 731, 736 (9th Cir. 2004). Moreover, a court must "take all allegations

24    of material fact as true and construe them in the light most favorable to the nonmoving party."

25    *McNamara-Blad v. Ass'n of Pro. Flight Attendants*, 275 F.3d 1165, 1169 (9th Cir. 2002). A court

26    may dismiss a claim "only where there is no cognizable legal theory" or there is an absence of

27    "sufficient factual matter to state a facially plausible claim to relief." *Shroyer v. New Cingular*

28    *Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010) (internal citations omitted).

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

**IV.**

**THE CLAIMS ASSERTED BY YOGI AGAINST HANKEY**

**A.    The Third Claim for Declaratory Relief Sufficiently States a Claim for Subordination**

Rule 7001 of the Federal Rules of Bankruptcy Procedure authorizes adversary proceedings as follows:

> (2)    *a proceeding to determine the validity, priority, or extent of a lien or other interest in property . . .*
>
> * * *
>
> (7)     a proceeding to obtain an injunction or *other equitable relief . . .*
>
> (8)    a proceeding *to subordinate any allowed claim or interest . . .*
>
> (9)    *a proceeding to obtain a declaratory judgement relating to any of the foregoing . . ."* (Emphasis added.)

Clearly, Bankruptcy Rule 7001 authorizes filing of an adversary claim for declaratory relief to resolve creditor disputes over the validity, priority or extent of liens. The key issue in this case is the validity, priority, and extent of liens asserted by Hankey, Yogi and Inferno. The Third, Fifth, Eight and Tenth Claims For Relief sufficiently allege claims for declaratory relief as to the validity, priority or extent of liens among the competing lienholders.

Hankey asserts that Yogi's Third Claim for Declaratory Relief is insufficient as a matter of law, despite the standard of "notice pleading," noting that Yogi mistakenly did not include a reference to paragraph 94 of the Crossclaim (quoted at page 2, lines 11-18 of this Opposition).[11]

Hankey's arguments and Yogi's responses are as follows.

First, Hankey asserts that Yogi "consented" to additional senior secured lending against the Property up to a maximum $115,000,000. As already noted in above, nowhere did Yogi waive any rights it had, as a subordinating lender, to be given notice of the drastically increased loans and liens, and neither Hankey's $82,500,000 Promissory Note, nor Hankey's Construction Loan Agreement, nor Hankey's 11/16/18 Deed Of Trust indicates that Hankey can increase the principal

---

[11] To the extent it may be deemed that paragraph 94 needs to be incorporated into the Third Claim for Relief (as it is in other Claims), Yogi requests the opportunity to file a Second Amended Crossclaim to incorporate paragraph 94 as part of the Third Claim for Relief.

1    amount of its loan. This is especially true because – contrary to assertions in its Motion (Motion,

2    p. 10, ll. 4-10) – Yogi asserts that Hankey knew that Yogi was subordinating its loan to Hankey's

3    loan. (Crossclaim ¶ 94).

4         Second, Hankey asserts that "subordination may be appropriate if a junior lender was in a

5    senior position but entered into a subordination agreement with the senior lender, and actions taken

6    by the senior lender materially prejudice the junior lender's position." (Motion p.11, ll.4-5). Hankey

7    also asserts there was no subordination agreement between Hankey and Yogi. That is not correct.

8    As set forth in *Middlebrook-Anderson Co, supra*:

> [T]he duties owed by a lender to a seller under a formal subordination
> agreement do not differ from the duties owed by a lender to a seller
> when the lender obtains priority over the seller under an agreement
> by the seller to record after the lender.
>
>     * * *
>
> [T]here is no justification, legal or otherwise, which would call for a
> different result whether the seller in a joint transaction records first
> and then agrees that his lien will be subordinated or whether he
> agrees that the lender may achieve priority through first recording.

15    18 Cal. App. 3d 1023, 1029–30, 1034 (1971) (followed by *In re Sunset Bay Associates*, 944 F.2d

16    1503, 1513 (9th Cir.1991).

17         In *Middlebrook*, a buyer purchased several lots of property and funded the purchase price

18    in part by a purchase money loan made by the seller. *Id*. at 1026. The seller agreed that its purchase

19    money deed of trust would be junior to a construction loan made on a future date. *Id.* Once the

20    construction loan was consummated, the seller agreed to let the construction lender obtain priority

21    over the seller's deed of trust by priority of recording as opposed to a formal subordination

22    agreement. *Id*. at 1027. The construction lender allegedly let the buyer use loan proceeds for

23    purposes other than construction, and when the loan funds ran out, the buyer abandoned the project,

24    and the property was ultimately purchased by the construction lender at a foreclosure sale. The

25    seller's causes of action were based on the failure of the construction lender to disburse funds only

26    for construction purposes, but such cause of action hinged on the argument by the seller that

27    "seller's agreement to take a second trust deed constituted a subordination agreement or an

28    agreement in the nature of a subordination agreement." *Id*. at 1029.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

The *Middlebrook* court agreed with the seller and held that "the duties owed by a lender to a seller under a formal subordination agreement do not differ from the duties owed by a lender to a seller when the lender obtains priority over the seller under an agreement by the seller to record after the lender." *Id.* Where priority is established by some means other than the basic priority concept of "first in time, first in priority," there is an agreement regarding subordination that is tantamount to entering into a formal subordination agreement. *Id.* at 1030.

Hankey's Motion tries to pigeonhole the reach of *Middlebrook-Anderson Co.* to disputes between property sellers and lenders based on public policy. However, (i) there is no such proscribing language in the case, and (ii) the public policy of promoting construction and the trust in investment in California construction projects holds for all parties that delay recording to allow a construction lender to jump ahead *for a construction project.*

The seminal case regarding these issues is *Gluskin v. Atlantic Savings & Loan Assn.*, 32 Cal. App. 3d 307 (1973). In *Gluskin*, a seller sold land to a buyer for $400,000 and took back a note for $175,000 secured by a deed of trust on the property. *Id.* at 310. The buyer secured two construction loans to build houses on the property. *Id.* at 311. The seller agreed to subordinate its deed of trust to the construction lender's deeds of trust. *Id.* at 310. Due to a poor market for housing sales, the buyer and the construction lender restructured the larger of the construction lender's two notes, including an increase in the interest rate from 6.25% to 10% and a shortening of the maturity date from 30 years to 10 months with a large balloon payment. *Id.* at 312. The buyer ultimately defaulted and the construction lender bought the property at a foreclosure sale. *Id.* The seller objected that the changes were made in "utter disregard" of its rights as the junior lienholder. *Id.* It sought declaratory relief that its lien was superior to the deeds of trust held by the construction lender. *Id.* at 309.

The *Gluskin* court held in favor of the seller, reversing the trial court's judgment. Recognizing the vulnerable position of the subordinating seller, the court held that public policy required protection of subordinating sellers. *Id.* at 314. Because of these policy considerations, "a lender and a borrower may not bilaterally make a material modification in the loan to which the

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

1   seller has subordinated, without the knowledge and consent of the seller to that modification, if the

2   modification materially affects the seller's rights." *Id.*

3       The court went on to state that although there is no general obligation of a lender to protect

4   a subordinating seller from the risk of a buyer's default, *the requirement of fair dealing prohibits*

5   *conduct between a lender and a buyer that results in destruction of a seller's interest. Id.* at 315:

6               We hold that . . . *other considerations* are found in public policy which
                requires protection of subordinating sellers and that a lender and a borrower
7               may not bilaterally make a material modification in the loan to which the
                seller has subordinated, without the knowledge and consent of the seller to
8               that modification, if the modification materially affects the seller's rights . . .
                If dispute results from an unconsented to modification it is of course a
9               question of fact whether the modification materially affected the rights of
                the subordinated seller.
10                                          * * *
11              The absence of malevolent purpose does not of itself immunize the buyer
                and the lender. If, however, innocently, their bilateral agreement or conduct
12              so modifies the terms of the senior loan that the risk that it will become a
                subject of default is materially increased, then the buyer and the lender may
13              subject themselves to liability to the seller if they proceed without the latter's
                consent, and if the seller's otherwise junior loan is to be adversely affected.

14              (Emphasis added.)

15      The court found that the seller had not consented to the modification, and its "substantial

16  and drastic" modifications clearly enhanced the likelihood of a default by the buyer and the

17  consequent foreclosure. *Id* at 317.

18      Here, Yogi did not consent to Hankey's modifications, and the "substantial and drastic"

19  increase in Hankey's loan clearly enhanced the likelihood of a default (which Hankey declared)

20  and a foreclosure (which Hankey commenced). (Crossclaim, ¶ 127).

21      Of the cases evolving from *Gluskin*, *Lennar Northeast Partners v. Buice*, 49 Cal. App. 4th

22  1576 (1996), is the most factually similar to the present case. *Lennar* involved a priority dispute

23  between two hard money lenders due to modifications made to the senior loan. *Id.* at 1580-81. The

24  changes included an increase to the principal amount of the loan and the interest rate. *Id.* at 1584.

25  The court specifically acknowledged that

26              when the obligation is increased, by an increase in the principal amount or
                an increase in the interest rate, the junior lienholder's position is worsened.
27              The effect of the modifications taken together was to increase substantially
                the amount of secured debt that was senior to Lennar's lien . . . Indisputably,

28

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

1    this change adversely affected Lennar's rights as a junior lienholder and the value of its security. *Id.* at 1585 (internal citations omitted).

2    *Lennar* clearly held that in a priority dispute among two hard money lenders, where the

3    senior lender makes modifications that substantially impair the security of the junior lienholder, the

4    modifications do not have priority over the junior lien. *Id.* at 1588. The *Lennar* court stopped short

5    of applying the rule from *Gluskin* whereby the senior lienholder would have suffered a *total* loss of

6    its priority, but only because the equities in *Lennar* required only a loss of priority in the

7    modification. *Id.* at 1588-89. Thus, while *Lennar* did not decide whether a hard money lender would

8    receive the same protection as a subordinating seller regarding having its junior lien made prior to

9    the *entire* lien of the senior lienholder, it certainly did decide that a hard money lender in junior

10   position will have its lien made prior to the modifications of a hard money lender in senior position

11   where such modifications are substantial, such as an increase in principal. *Id.*

12   The facts in the present case mirror those of *Lennar*. Hankey and Yogi, two hard money

13   lenders, made loans secured by the Property. Hankey, in senior position, modified its loan to

14   increase the principal amount. In doing so, Hankey substantially impaired Yogi's junior lien. Thus,

15   Yogi's junior lien has priority *over Hankey's modification*. As in *Lennar*, "[d]enying priority only

16   to the modification restores [Yogi] – at a minimum – the same position as before: the position it

17   bargained for by agreeing to accept a second lien on the property as security for its loan." *Id.* at

18   1588.

19   Hankey might argue that a subordination agreement was not entered into and that *Lennar* is

20   therefore distinguishable. Any such argument would be incorrect -- it would miss the mark both

21   factually and legally. From a factual perspective, the typical incentive for entering into a

22   subordination agreement – a purchase money lender subordinating its lien to a construction lender

23   – is not present here. From a legal perspective, the lack of a subordination agreement is a distinction

24   without a difference under these circumstances. As the court held in *Middlebrook-Anderson Co.,*

25   *supra,* at 1023, the duties owed by a lender in a situation where a formal subordination agreement

26   exists do not differ from the duties owed by a lender where a junior lienholder agrees to record after

27   such lender. *Id.* at 1029. As *Middlebrook* unequivocally stated: "Subordination is, strictly speaking,

28

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

a status, not an agreement." *Id.* Yogi agreed to record after Hankey, and so it is irrelevant that the two parties did not enter into a written subordination agreement.

      *Lennar*, read with *Middlebrook*, controls.

      Hankey refers to five cases that supposedly stand for the proposition that a senior lender holds no duty to a junior lender and is free to modify its own loan without the risk of subordination. Careful reading of such cases, as well as other cases that discuss the same principles of law, shows this is simply not correct.

      The cases cite by Hankey are distinguishable from the facts here. *Resolution Trust Corp. v. BVS Dev., Inc.*, 42 F.3d 1206, 1215 (9th Cir. 1994) involved only an extension to the term of the loan, which did not substantially impair the junior lienholder's rights or security. *De Los Angeles Gomez v. Bank of America, N.A.*, 642 F. App'x 670 (9th Cir. 2016) is a RICO case that Hankey cites only for general principles of law that are already set forth in *BVS*. And *In re Aarons*, No. 2:19-bk-18316-NB, 2022 WL 3444730 (Bankr. C.D. Cal. 2022) is a bankruptcy case with no factual similarity to the present case.

      The case on which Hankey relies most heavily is *Friery v. Sutter Buttes Sav. Bank*, 61 Cal. App. 4th 869 (1998). However, the court's language in *Friery* does not lessen the validity of the holding in *Lennar*. Indeed, the *Friery* court acknowledged that the "feasibility of a 'partial reversal' of lien priority was presented squarely" to the court in *Lennar*. *Id.* at 875. And while the *Friery* court stated that *Lennar* stands for the "proposition that the equitable relief afforded a junior lienholder most be narrowly circumscribed according to the facts of the particular case," it did so only to refute Friery's argument in favor of a broader rule which would have prevented "any senior lienholder from entering into *any* modification agreement with the borrower materially affecting the junior's security interest without the latter's consent." *Id.* (italics in original). Rather, the reason for the holding in *Friery* was that a sophisticated loan broker took a calculated investment risk and sold a property to a third party without the consent of the senior lienholder, even though a sophisticated party would have understood that such a sale would trigger the due on sale clause under the senior lien and ultimately lead to a workout and modification of the senior loan. *Id.* at 877-78. None of those facts is present here, and so *Friery* is inapposite.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

Hankey tries to cherry-pick language from *Bank of New York Mellon v. Citibank, N.A.*, 8 Cal. App. 5th 935 (2017), to support its argument, but its assertion is misplaced. Hankey argues an excerpt from the case: "Subsequent cases have made clear that a material modification of a senior lien, such as an increase in the principal or interest rate, does not result in loss of priority absent contractual subordination." *Id.* at 954. But this language is referring only to the initial (not the modified) lien, and Hankey fails to provide the immediately succeeding language from the court in *Mellon*, which clarifies its statement by citing to *Gluskin* and *Lennar*. *See id.*, stating: "Where a seller agrees to subordinate to construction loans, a material modification of those loans may result in their total loss of priority. *Gluskin*, 32 Cal. App. 3d 307, 315. However, in the case of a subordinating junior lender, only the modification of the senior lien loses priority. *Lennar*, 49 Cal. App. 4th 1576, 1586-87." The *Mellon* court goes on to say that "[t]hese cases are based on the premise that the junior lienholder has agreed to be in junior position and should be protected from modifications in the senior lien to the extent that those modifications materially increase the risk of default." *Mellon*, 8 Cal. App. 5th at 954. This conclusion is consistent with *Lennar* and *Middlebrook*, as explained above.

Another line of cases in California stands for the proposition that, like here, optional future advances on a senior loan, made after the senior lienholder has actual notice of the junior lien, are subordinate to the junior lien. *See*, *Tapia v. Demartini*, 77 Cal. 383, 386-87 (1888); *Savings & Loan Soc. v. Burnett*, 106 Cal. 514, 532–533, (1895), *Atkinson v. Foote*, 44 Cal. App. 149, 160–161, (1919). As explained by the *Atkinson* court, "In *Tapia v. Demartini*, the rule is stated as follows: The lien of the mortgage cannot be enforced as against subsequent encumbrances, of which the mortgage has actual notice, for advancements or indorsements made or given after such notice." *Atkinson, supra*, 44 Cal. App. at 159 (internal citations omitted). "In *Savings Loan Soc. v. Burnett, supra*, our supreme court expressly approves the statement of the rule as made in *Tapia v. Demartini*." *Id.* at 160 (internal citations omitted). "The rule with reference to future advances applicable to mortgages is, of course, applicable to trust deeds given entirely for the purpose of securing the payment of a debt or for the performance of any other act capable of being so secured." *Id.* at 159 (citing *Savings Loan Soc. v. Burnett*, 106 Cal. 514, 533 (1895)).

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

1    The *Atkinson* court explains the reasoning behind the California rule announced in *Tapia*,

2  which is "sustained by strong reason and eminent authority." *Id.* at 161. A senior mortgagee has

3  ample protection of its senior mortgage because if such mortgagee has actual notice of a junior lien,

4  it can simply elect not to make additional advances on its senior loan. *Id.* (stating that the mortgagee

5  would, "if a prudent business man and the property was insufficient security to indemnify both

6  mortgagees and additional advances by him, refuse to make the additional advances"). The

7  *Atkinson* court specifically addresses a situation where a borrower, in need of more money, obtains

8  a second loan, and thereafter the senior lender, with actual notice of the second lender's lien, elects

9  to make more advances on the senior loan. *Id.* In such a situation, the California rule prevents "the

10  rights of the second mortgagee [from being] wholly destroyed." *Id.* As the *Atkinson* court reiterates,

11  "the rule in this state, repeating it, is that the mortgage lien of a superior or prior mortgagee will

12  not operate to secure optional advances made under such mortgage after such mortgagee has

13  acquired actual notice of an encumbrance subsequent in point of time to his mortgage so as to defeat

14  or impair the rights of the second encumbrancer." *Id.* at 162.

15    Here, Yogi asserts that Hankey knew that Yogi was making its loan to Crestlloyd

16  (Crossclaim, ¶ 94). It was not simply by record notice that Hankey learned of Yogi's lien after the

17  recordation. Moreover, as already noted above, neither Hankey's Promissory Note, nor Hankey's

18  Construction Loan, nor Hankey's 11/6/18 Deed Of Trust contemplate an increase in the underlying

19  principal amount due Hankey. Thus, it would be consistent with *Tapia* and its progeny to hold that

20  the lien regarding the additional loan funds provided by Hankey is subordinate to Yogi's junior

21  lien. As explained in *Atkinson*, Yogi's lien is exactly the type of lien that the court sought to protect

22  from being wholly destroyed, such that Hankey's election to loan additional funds will not defeat

23  or impair the rights of Yogi.

24    Fourth, Hankey inexplicably asserts that Yogi offers no facts to explain why or how

25  Hankey's actions "materially impaired repayment." As set forth above, Hankey secretly and

26  drastically increased its loan to $91,000,000, and at the same time Hankey secretly entered into a

27  *second* Profit Participation Agreement stating that Hankey would receive an additional

28  $5,000,000+ if the Property sold for $100,000,000 or more, then with notice given only after the

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

1 transaction was completed, increased the loan to $106,000,000 recording a Modification Of Deed

2 Of Trust on the increase to $106,000,000 and recording a Memorandum Of Agreement on the

3 $5,000,000 profit participation. It is axiomatic that increasing the debt load by nearly $30,000,000,

4 (on which Hankey then sought to foreclose) materially impaired repayment to every other creditor.

5 Fifth, Hankey argues that because it placed a $5,200,000 deed of trust against the Property

6 regarding loans Crestlloyd made to Mirabella Construction, Inc., and 1369 Londonderry Estate,

7 LLC, Yogi is guilty of "unclean hands." Yogi already has addressed that contention above.

8 **B.** **The Fourth Claim for Relief Sufficiently States a Claim for Equitable Subordination**

9 Yogi seeks equitable subordination in its Fourth, Sixth, Seventh, and Eleventh Claims for

10 Relief.

11 In reviewing claims asserted against a debtor, the Bankruptcy Court has broad powers and

12 a duty to "sift the circumstances surrounding any claim to see that injustice or unfairness is not

13 done in the administration of the bankruptcy estate. *Pepper v. Litton*, 308 U.S. 295, 305 (1935).

14 Where a claimant's conduct in relation to other creditors is contrary to equitable principles, the

15 equity powers of the Bankruptcy Court (*id*. at 308) may be exercised to subordinate the claim of

16 that claimant to the claims of the others of the same class. *Prudence Realization Corp. v. Geist*,

17 316 U.S. 89, 93 (1942); *Pepper v. Litton*, *supra*, at 306; *Bostian v. Shapiro (In re Kansas City*

18 *Journal-Post Co.,* 144 F.2d 791, 800 (8th Cir. 1944). The exercise of this equitable power is

19 governed, not by the existence or nonexistence of a debt as a cognizable legal obligation, but rather

20 by rules of fair play and good conscience. *Pepper v. Litton*, *supra*, at 310. In effect, the Court

21 considers whether, notwithstanding the apparent legal validity of a particular claim, the conduct of

22 the claimant in relation to other creditors is or was such that it would be unjust or unfair to permit

23 the claimant to share *pro rata* with the other claimants of equal status. The concept of equitable

24 subordination developed without any specific statutory authority, but from the equitable

25 jurisdiction of the bankruptcy court within the context of claim review in bankruptcy proceedings

26 as an "equitable defense" to the allowance of claims (*id*. at 312).

27 The 1978 Code provided a statutory recognition to the doctrine when § 510(c) was enacted,

28 but left its delineation and development to the courts. Section 510(c) provides:

(c)    Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may –

(1)    Under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

(2)    Order that any liens securing such subordinated claim be transferred to the estate.

The equitable subordination doctrine traditionally involves a three-part test, "three conditions [which] must be satisfied before exercise of the power of equitable subordination is appropriate." *See*, *Benjamin v. Diamond (In re Mobile Steel Co.),* 563 F.2d. 692, 699 (5th Cir. 1977). According to the *Mobile Steel* test, as prerequisite to a bankruptcy court's exercise of its equitable powers, it must find:

(i)    Claimant must have engaged in some type of inequitable conduct.

(ii)    The misconduct must have resulted in an injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant.

(iii)    Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act.

*In re Mobil Steel*, *supra*, at 700 (citations omitted).

The United States Supreme Court in *U.S. v. Noland*, 517 U.S. 535, 538-39 (1996) cited with approval the standards for equitable subordination articulated by the Fifth Circuit in *Mobile Steel*. The Ninth Circuit has also referred to the *Mobil Steel* three-part test.[12]

Courts typically apply equitable subordination to insiders, such as corporate officers, directors or managers, all of whom are fiduciaries of the debtor, but as to non-insiders, courts apply an "egregious" standard – which includes overreaching – to dealings between a debtor and non-insiders to determine whether equitable subordination should be applied to the non-insiders' claims, as Hankey admits (Motion, p. 13, l. 17).

---

[12] The decision in *Mobile Steel* is cited throughout the United States, including the Ninth Circuit, as a key case, if the not the key case, on equitable subordination.

Dentons US LLP
601 South Figueroa Street, Suite 2500
Los Angeles, California 90017-5704
213 623 9300

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

This case indisputably satisfies the standard of overreaching. Here, Hankey engaged in the following conduct:

a.     Hankey's Construction Loan Agreement, the $82,500,000 Promissory Note and Hankey's 11/6/18 Deed Of Trust contain no language that the loan could be substantially increased. Nonetheless, Hankey secretly increased in 2019 its $82,500,000 loan to $91,000,000.

b.     Hankey also in 2019 secretly put in place a *second* participation agreement. In addition to Hankey already having a Profit Participation Agreement of $3,500,000 if the Property sold for $200,000,000 or more, the second Profit Participation Agreement gave Hankey an *additional* $5,000,000+ if the Property sold for more than $100,000,000.

c.     Without first seeking a subordination agreement, or even notifying second lienholder Yogi, Hankey increased its loan a second time, to $106,000,000, only then filing a Modification Of Deed Of Trust and a Memorandum Of Agreement that revealed that Hankey's loan had been increased from $82,500,000 to $106,000,000, and revealed that Hankey's profit participation had been increased from $3,500,000 to $8,500,000.[13]

Hankey argues there are no facts alleged that show that Hankey negligently supervised the construction loan disbursement process (Motion, p 13, ll. 27-28). That is incorrect. Yogi sets forth the facts in its Seventh Claim for Relief as to serious and specific questions regarding specific disbursements, in connection with the construction, all of which are identified in Exhibit KK to the Crossclaim.

Moreover, Yogi has not had the opportunity to conduct discovery, which will provide additional evidence related to Hankey's failed supervision of the construction loan and disbursements process.

Finally, Hankey again raises the fact that Yogi placed a $5,200,000 debt on the Property. Yogi already has addressed that issue above.

---

[13] If the Property sold for more than $200,000,000.

**C.**     <u>**The Fifth Claim for Declaratory Relief Sufficiently States a Claim for Subordination**</u>

As Hankey notes (Motion, p. 14, ll. 19-20), Yogi's Fifth Claim for Relief seeks to subordinate the part of Hankey's lien that relates to or accrues from – as Hankey states – "the Amended Hankey Note" and "Second Amended Hankey Note." This Claim for Relief is the alternative to Yogi's Third Claim for Relief. The Third Claim for Relief seeks to subordinate the entirety of Hankey's lien to the lien of Yogi. The Fifth Claim for Relief seeks an adjudication on the merits of whether Hankey's lien should be reduced by the amount of money calculated on the bases of the additional amounts allegedly due Hankey based on two increases to the previous principal amount of its loan. *Lennar* approves such relief. For all the reasons set forth in Yogi's defense of its Third Claim for Declaratory Relief, the Fifth Claim for Declaratory Relief should proceed.

**D.**     <u>**The Sixth Claim for Relief Sufficiently States a Claim for Equitable Subordination**</u>

The Sixth Claim for Relief seeks to equitably subordinate only that portion of the Hankey claim that relates to and accrues from Hankey increasing its $82,500,000 loan, first to $91,000,000, then to $106,000,000. For all the reasons set forth in defense of Yogi's Fourth Claim for Relief, the Sixth Claim for Relief should proceed, permitting an adjudication on the merits of whether Hankey's claim should be reduced by the amount of money calculated on the basis of additional amounts due Hankey based its two increases in its loan.

As already noted, *Lennar* approves such relief.

**E.**     <u>**The Seventh Claim for Relief for an Accounting**</u>

As set forth above, Yogi hereby withdraws, without prejudice, its Seventh Claim For Relief for an accounting as to Hankey based upon a further examination of relevant decisional authority.[14] However, Yogi's withdrawal of its Seventh Claim For Relief as to Hankey is not an admission *or* concession that Hankey should not be required to produce detailed evidence on the calculation of Hankey's $122,638,623.41 Claim No. 20-1, *or* that Yogi is not entitled to discovery on Hankey's

---

[14] The facts set forth in the Seventh Claim For Relief remain as support for Yogi's claims against Hankey where incorporated by reference.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

1  disbursements allegedly for construction of improvements to the Property, or that Yogi cannot

2  object to Hankey's Claim.

3      Moreover, Yogi's withdrawal of its Seventh Claim For Relief for an accounting against

4  Hankey is not a waiver, limitation, or withdrawal of its Seventh Claim For Relief for an accounting

5  against Crestlloyd, which relief Yogi is pursuing.

6  **F.**    **The Eighth Claim for Declaratory Relief Sufficiently States a Claim for**

7          **Subordination**

8      This Claim for Relief requests the Court to subordinate Hankey's claim to the extent

9  disbursements were not used for construction of improvements to the Property (not including the

10  $6,000,000 allocated in the Construction Loan Agreement for payment to principals of Crestlloyd).

11      As set forth in the attached Exhibit MM, Hankey's Construction Loan Agreement and

12  Exhibit D attached to the Construction Loan Agreement contain rigorous requirements regarding

13  control of disbursements to construct improvements to the Property. In addition, as set forth above,

14  Hankey engaged in complete control of disbursements.

15      Hankey is trying to use *extremely limited exculpatory language* in the Construction Loan

16  Agreement to extract itself from its obligations set forth throughout the Construction Loan

17  Agreement and Exhibit D attached to the Construction Loan Agreement (as laid out in attached

18  Exhibit MM) to monitor and control disbursements.

19      Under pertinent California case law, if exculpatory provisions are contained in a

20  construction loan agreement, depending upon the scope and breath of other provisions within the

21  agreement, such exculpatory language *can* relieve a construction lender from the obligation to

22  monitor disbursements, *unless the construction lender takes upon itself the complete control of*

23  *those disbursements. Middlebrook-Anderson Co.* and *Resolution Trust Corp., supra*, cited above at

24  page 12. That is precisely what Hankey did here.

25      Having engaged in the complete control of disbursements, Hankey cannot now try to

26  exculpate itself from the actions it took in controlling those disbursements. The claim should

27  proceed and Yogi should be entitled to conduct discovery as to Hankey's control of disbursements.

28

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

**G.     The Ninth Claim Sufficiently States a Claim for Equitable Subordination**

Hankey asserts that it did not engage in "egregious" conduct in controlling the disbursements for construction of improvements to the Property, and therefore the amounts not used for such construction should not be subordinated to Yogi's claim.

First, as already noted, egregious conduct includes "overreaching."

Hankey completely controlled disbursements to construct improvements to the Property,[15] and it would indeed be "egregious" if Hankey could exculpate itself from its own actions, after taking on the role of completely controlling the disbursements, and not be held accountable for its failure to rigorously control those disbursements.

**H.     The Tenth Claim for Relief Declaratory Relief Sufficiently States a Claim for Subordination**

Yogi's Tenth Claim for Relief seeks to subordinate Hankey's Claim No. 20-1, to the extent Hankey is seeking to *recover again payments already received, and charge interest on interest payments on those payments*. Hankey's argument that Yogi is simply complaining about Hankey charging interest on interest misses the mark.

The issue is that Hankey is trying to collect again the interest it timely received and then charge interest and default interest on that amount. *Under no circumstances should that be allowed.*

Attached as Exhibit NN is a list of the interest payments timely received by Hankey, during the administration of Hankey's loan to Crestlloyd totaling $18,280,831.87, included in Exhibit KK. Those payments were applied like clockwork.

---

[15] Notably, while the parties dispute whether Hankey exercised control over the project – when pled allegations must be taken as true, Yogi's claim must proceed, and the parties must take discovery, undergo motion practice, etc (even if *arguendo*, the contracts disclaim or do not require control). *See generally*, *Boyette v. Algonquin Gas Transmission Co.*, 952 F. Supp. 192, 197 (S.D.N.Y. 1997) (analyzing contract provisions and allegations and concluding there "remains a fact issue as to whether [a party] was so extensively involved in the project as to have the type of supervisory control to support liability"); *Wilkerson v. Mobil Oil Corp.*, 941 F. Supp. 614, 617 (E.D. Tex. 1996) ("The parties to a contract may expressly allocate the right of control between them, but such a written contractual allocation does not absolve a defendant of liability") (denying summary judgment motion because of dispute over control over construction project).

Dentons US LLP
601 South Figueroa Street, Suite 2500
Los Angeles, California 90017-5704
213 623 9300

1    In summary, the issue is *not* that Hankey could not charge interest or default interest on

2   interest payments never paid, the issue is declaring a default and seeking to recover again, payments

3   timely delivered, and seek interest on those payments.[16]

4   **I.    The Eleventh Claim for Relief Sufficiently States a Claim for Equitable**

5        **Subordination**

6        For the reasons set forth above, the Eleventh Claim for Relief should be allowed to proceed.

7   It is difficult to imagine more "egregious" conduct than a lender timely receiving interest payments,

8   then declaring a default, then including in the amounts allegedly due the amounts it already had

9   timely received, plus interest and default interest on those timely received payments.

10  **J.    The Twelfth Claim for Relief Sufficiently States a Claim for Disallowance of**

11       **Hankey's Alleged Secured Claim 18-1**

12       Hankey's recording of the Memorandum Of Agreement (Exhibit HH) could not perfect any

13  interest purportedly held by Hankey in profits from the sale of the Property. On August 31, 2020,

14  Hankey recorded the Memorandum Of Agreement (Exhibit HH) with the Los Angeles County

15  Recorder's Office (the "Recording"). The Memorandum Of Agreement contained these two

16  sentences describing the third Profit Sharing Agreement (Exhibit GG) ("PPA"):

17            In connection with a certain loan transaction between Hankey
18            Capital, LLC, a California limited liability company (the "Lender")
          and Crestlloyd, LLC, a California limited liability company (the
19            "Borrower"), the undersigned declare and acknowledge that the
          Borrower has executed a Profit Participation Agreement (the
20            "Agreement"), dated August 20, 2020, pertaining to the real property
          described in Exhibit A hereof. This instrument is a memorandum of
21            the Agreement, and the same is incorporated herein by this reference
          with the same effect and as though set forth herein in its entirety.

22  *Id.*[17] Significantly, the Recording did not attach a copy of the PPA. Attached to Proof of Claim

23  No. 18-1 is the PPA, which lets Hankey participate in the profits from the ultimate sale of the

24  Property.

---

25  [16] If, as to the Tenth and Eleventh Claims For Relief, Hankey is not including in its $122,638,623.41
26  Claim, either the amount of interest payments timely received by Hankey, or interest or default
    interest on those timely received payments, Yogi will withdraw its Tenth Claim for Relief and
27  Eleventh Claims For Relief upon verification of that fact.

28  [17] Exhibit A to the Memorandum Of Agreement contained a description of the real property
    described above. *Id.*

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

The key issue is whether the Memorandum Of Agreement, *which did not attach a copy of the PPA*, is sufficient to meet the recording and perfection requirements of California Civil Code § 2938(b) ("Section 2938(b)"). Simply put, it is not.

Section 2938(b) codifies the requirements for assignment of an interest in profits of real property in California. Under Section 2938(b), an assignment of profits must be recorded to have priority over other security interests. Sections 2938(a) and (b) firmly provide for this fundamental requirement:

> (a) A written assignment of an interest in leases, rents, issues, or profits of real property made in connection with an obligation secured by real property, irrespective of whether the assignment is denoted as absolute, absolute conditioned upon default, additional security for an obligation, or otherwise, shall, upon execution and delivery by the assignor, be effective to create a present security interest in existing and future leases, rents, issues, or profits of that real property. As used in this section, "leases, rents, issues, and profits of real property" includes the cash proceeds thereof. "Cash proceeds" means cash, checks, deposit accounts, and the like.

> (b) An assignment of an interest in leases, rents, issues, or profits of real property may be recorded in the records of the county recorder in the county in which the underlying real property is located in the same manner as any other conveyance of an interest in real property, whether the assignment is in a separate document or part of a mortgage or deed of trust, and when so duly recorded in accordance with the methods, procedures, and requirements for recordation of conveyances of other interests in real property, (1) the assignment shall be deemed to give constructive notice of the content of the assignment with the same force and effect as any other duly recorded conveyance of an interest in real property and (2) the interest granted by the assignment shall be deemed fully perfected as of the time of recordation with the same force and effect as any other duly recorded conveyance of an interest in real property, notwithstanding a provision of the assignment or a provision of law that would otherwise preclude or defer enforcement of the rights granted the assignee under the assignment until the occurrence of a subsequent event, including, but not limited to, a subsequent default of the assignor, or the assignee's obtaining possession of the real property or the appointment of a receiver.

Cal. Civ. Code § 2938(a) and (b). Here, the Memorandum Of Agreement (i) is not itself an assignment, (ii) has no language evidencing an assignment, and (iii) attaches no documentation evidencing an assignment. At bottom, the language in the Memorandum Of Agreement contains no language indicating there was an assignment of profits or any other specific transfer of rights. The Memorandum Of Agreement indicates that the PPA was "executed" and pertains to "real

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

property described in Exhibit A," but provides no specifics or contents of the PPA's terms, which is insufficient under Section 2938(b).

In addition to the plain language of the statute, case law interpreting Section 2938 further indicates that an assignment (or other document with language indicating an interest is assigned) must be recorded. *See*, *MDFC Loan Corp. v. Greenbrier Plaza Partners*, 21 Cal. App. 4th 1045, 1050 (1994), *as modified* (Feb. 2, 1994) ("Paragraph 1.18 of the trust deed states Greenbrier 'absolutely and unconditionally assigns and transfers to Beneficiary all the income, . . . of the Property, . . . and hereby gives to and confers upon Beneficiary the right, power and authority to collect such income . . .' The trust deed was recorded in July 1988 when the parties entered into the loan transaction. Consequently, plaintiff obtained a perfected interest in these funds at that time."); *In re GOCO Realty Fund I*, 151 B.R. 241, 247 (Bankr. N.D. Cal. 1993) ("The language of the written assignment controls over the parties' intent and determines the characterization of the assignment of rents."); see also *In re Millette*, 186 F.3d 638, 641-42 (5th Cir. 1999) (citing Cal. Civ. Code § 2938(a) (West 1993)) ("Under the modern approach, the recording of a mortgage document containing an assignment of rents gives the mortgagee rights superior to any subsequent third party who would seek to take a security interest in the leases and rentals pertaining thereto as a type of collateral.") (other citations and quotations omitted).

Here, the Memorandum Of Agreement is not itself an assignment and does not contain language transferring or conveying any profits, and cannot provide actual or constructive notice to third parties of any interest in profits. As such, Hankey's interest in profits from the sale of the Property was not properly recorded and is unperfected.

**K.**     **The Thirteenth Claim for Relief for Recharacterization**

As set forth above, Yogi is withdrawing its Thirteenth Claim for Relief against Hankey. However, Yogi is not waiving the opportunity to file a motion to amend its Crossclaim to reassert a claim for recharacterization if facts are discovered that support such a claim.

## V.

## CONCLUSION

For all the reasons set forth above, Yogi requests that Hankey's Motion To Dismiss be denied, except as to the Seventh and Thirteenth Claims For Relief which Yogi has now withdrawn as to Hankey, without prejudice.

In its Motion (p. 2, ll. 21-22), Hankey asserts that because Yogi filed its Amended Crossclaim after being advised by Hankey of "deficiencies," Yogi should not be permitted to file a Second Amended /Counterclaim. The Motion fails to note there was <u>no</u> detailed discussion in any way whatsoever as to <u>any</u> deficiencies, providing <u>no</u> insight as to Hankey's "thoughts" as to what was deficient, and, in fact, Hankey was conducting research to confirm how to move forward.

If the Court sustains any of Hankey's arguments on Yogi's Claims For Relief, Yogi should be permitted the opportunity to file a Second Amended Crossclaim so that it can address the Court's ruling as necessary.

Respectfully submitted,

Dated: November 30, 2022

DENTONS US LLP
ROBERT F. SCOULAR
JOHN A. MOE, II
NORMAN ASPIS

By: _____
JOHN A. MOE II

*Attorneys for Defendant, Counter/Crossclaimant
Yogi Securities Holdings, LLC*

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

# Exhibit MM

## __EXHIBIT MM__

The following provisions of the Construction Loan Agreement and Exhibit "D" to the Construction Loan Agreement demonstrate the scope and breadth of Hankey's control over the disbursement of funds intended, as outlined, to finance the improvements on the Property.

The purpose of the Construction Loan Agreement was set forth in Recitals A and B and in Section 2.1 of that Agreement:

A. Borrower owns or will own certain real property described in EXHIBIT A hereto ("Property").

B. Borrower proposes to construct new improvements or renovate existing improvements on the Property consisting of a single family residence, together with all appurtenances, fixtures, and tenant improvements now or hereafter located on the Property ("Improvements"). The Improvements shall be constructed in accordance with plans and specifications which Borrower has heretofore, or will hereafter deliver to Lender, as amended in order to comply with the terms and conditions of this Agreement ("Plans and Specifications"), Borrower has requested from Lender a loan for the purpose of such construction.

2.1. Loan. By and subject to the terms of this Agreement, Lender agrees to lend to Borrower and Borrower agrees to borrow from Lender the principal sum of EIGHTY-TWO MILLION, FIVE HUNDRED THOUSAND AND NO/100THS DOLLARS ($82,500,000.00), said sum to be evidenced by the Note of even date herewith…Amounts disbursed to or on behalf of Borrower pursuant to the Note shall be used to purchase and finance the construction of the Property and Improvements and for such other purposes and uses as may be permitted under this Agreement and the other Loan Documents.

The Construction Loan Agreement gave Hankey preapproval of design and construction budgets for the improvements, as evidenced by the approval language referenced within the following definitions within the Construction Loan Agreement:

"Deemed Approval Matter" - means any matter requiring the consent of Lender under the Loan Documents including, without limitation, the following: (1) contracts for which Lender approval is required hereunder, as contemplated in Sections 4.4 and 4.5, (2) Plans and Specifications and changes thereto for which Lender approval is required hereunder, as contemplated in Section 4.6, (3) Borrower's contracting for any materials, furnishings, equipment, fixtures or other parts or components of the Improvements in which any third party will retain any interest for which Lender approval is required hereunder, as contemplated in Section 4.8…

1

"Disbursement Budget" - means the design and construction budget for the Improvements, as approved by Lender from time to time.

"Lender Payment Turnaround Period" - means, provided that Borrower delivers the applicable application for payment to Lender under cover of a written notice stating in bold, all-capitalized letters what the outside date for such Lender Payment Turnaround Period is for that specific application for payment, ten (10) calendar days.

Hankey's controlled disbursement of loan proceeds was subject to conditions precedent set forth in Article 3 of the Construction Loan Agreement, pertinent portions of which are outlined below:

## ARTICLE 3. DISBURSEMENT

3.1. Conditions Precedent. Lender's obligation to make any disbursements or take any other action under the Loan Documents shall be subject at all times to satisfaction of each of the following conditions precedent:

\*        \*        \*

(b) Any undisbursed Loan funds together with all sums, if any, to be provided by Borrower, shall be at all times equal to or greater than the amount which Lender from time to time reasonably determines necessary to: (i) pay, through completion, all costs of renovation, development, construction, operation, marketing and sale or leasing of the Property and Improvements in accordance with the Loan Documents; (ii) pay all sums which may accrue under the Loan Documents prior to repayment of the Loan; and (iii) enable Borrower to perform and satisfy all of the covenants of Borrower contained in the Loan Documents.  If Lender reasonably determines at any time that the undisbursed Loan funds are insufficient for said purposes, Lender may deliver to Borrower written notice demanding that Borrower then deposit funds equal to such deficiency in the Borrower's Funds Account (an "Out of Balance Notice"), in which event Borrower shall deposit the amount of such deficiency in the Borrower's Funds Account within thirty (30) days after the date of delivery of the applicable Out of Balance Notice; and

(c)  Lender shall have received all Loan Documents, other documents, instruments, policies, and forms of evidence or other materials requested by Lender under the terms of this Agreement or any of the other Loan Documents, including, without limitation, such forms of estoppel certificates and subordination, non-disturbance and attornment agreements as Lender may then require from existing tenants of the Property; and

(d)  Lender acknowledges that it has received and approved in form and substance satisfactory to Lender: (i) a soils report for the Property and Improvements; (ii) an environmental questionnaire and environmental site assessment with respect to the presence, if any, of Hazardous Materials on the Property and Improvements; (iii) two set of the Plans and Specifications (or if the Plans and Specifications for the entirety of the Improvements are not then complete or some portion of the Improvements are to be constructed using a design/build process, in either such case pursuant to partial Plans and

2

Specifications approved by Lender under the provisions of Section 4.6 of this Agreement and for which a valid building permit has been issued, then such portion of the Plans and Specifications to the extent that payment for such portion of the Improvements is to be covered by a current disbursement request), together with evidence of all necessary or appropriate approvals of governmental agencies; (iv) copies of all agreements which are material to completion of the Improvements; (v) copies of all building permits and similar permits, licenses, approvals, development agreements and other authorizations of governmental agencies required in connection with the development of the Property and Improvements, or, if such approvals are to be issued on a staged basis, then for the current and all prior stages of development, provided that such staged development has been approved by Lender, as contemplated in Section 4.6; and (vi) copies of any initial study, negative declaration, mitigated negative declaration, environmental impact report, notice of determination or notice of exemption prepared, adopted, certified or filed by any governmental agency in connection with the Property; and

(e) Lender shall have received and approved the Disbursement Budget.

3.2. Account, Pledge and Assignment, and Disbursement Authorization. The proceeds of the Loan and Borrower's Funds, when qualified for disbursement, shall be deposited into an account to be designated by Borrower or otherwise disbursed to or for the benefit or account of Borrower under the terms of this Agreement. Disbursements hereunder may be made by Lender upon the written request of any person who has been authorized by Borrower to request such disbursements until such time as written notice of Borrower's revocation of such authority is received by Lender at the address shown in EXHIBIT D.

3.3. Borrower's Funds Account, Pledge and Assignment. Except as otherwise provided in this Agreement, all of the Borrower's Funds which are deposited with Lender by Borrower as shown in EXHIBIT C, or any other provision of the Loan Documents, shall be placed in the Borrower's Funds Account for disbursement under this Agreement. As additional security for Borrower's performance under the Loan Documents, Borrower hereby irrevocably pledges and assigns to Lender the Borrower's Funds Account and all monies at any time deposited in the Borrower's Funds Account.

3.4. Loan Disbursements. Subject to the conditions set forth in Section 3.1(b), the proceeds of the Loan and Borrower's Funds shall be disbursed in accordance with the terms and conditions of EXHIBIT D. Disbursements made after the deposit of Borrower's Funds shall be made first from the Borrower's Funds Account until depleted. All disbursements shall be held by Borrower in trust and applied by Borrower solely for the purposes for which the funds have been disbursed. Lender has no obligation to monitor or determine Borrower's use or application of the disbursements. Partial disbursements shall be permitted under the terms and subject to the conditions set forth in EXHIBIT D.

3.5. Working Capital. From time to time, in Borrower's Applications for Payment, Borrower may request the disbursement of proceeds of the Loan and Borrower's Funds into the Working Capital Reserve Account to maintain the balance of the Working Capital Reserve Account at the amount specified in the Disbursement Budget, provided that amounts in the Working Capital Reserve

Account may only be used to pay reasonable costs of the design or construction of the Improvements, and that Borrower shall have delivered the monthly reports with respect to the Working Capital Reserve Account that are required under the provisions of Section 10.1 of this Agreement for all prior months. As additional security for Borrower's performance under the Loan Documents, Borrower hereby irrevocably pledges and assigns to Lender the Working Capital Reserve Account and all monies at any time deposited in the Working Capital Reserve Account.

The disbursement plan, which is contained in Exhibit D attached to the Construction Loan

Agreement, states:

A. Timing Of Disbursement: Unless another provision of this Agreement specifies otherwise, on or before the fifteenth (15th) day of each month, Borrower shall submit to…with a copy to…a written itemized statement, signed by Borrower ("Application for Payment") setting forth:

1. A description of the work performed, material supplied and/or costs incurred or due for which disbursement is requested with respect to any line item ("Item") shown in the Disbursement Budget. Notwithstanding the amount of any line item shown in the Disbursement Budget, Borrower may reallocate amounts among the line items by allocating cost savings in any line item to Contingency, and amounts from the Contingency to any line item with a cost overrun; provided, however, that the aggregate amount of all disbursements under the Loan shall not exceed the Loan amount; and

2. The total amount incurred, expended and/or due for each requested Item less prior disbursements.

Each Application for Payment by Borrower shall constitute a representation and warranty by Borrower that Borrower is in compliance with all the conditions precedent to a disbursement specified in this Agreement. With respect to Borrower's remaking of the representations and warranties set forth in Article 6 of this Agreement on the date of submission of each Application for Payment, to the extent circumstances have changed for reasons beyond the reasonable control of Borrower such that Borrower must qualify such representations and warranties as of the date of delivery of any such Application for Payment, such qualification, to the extent it renders the applicable representation materially untrue or breaches the applicable warranty, shall merely be a failure of condition to Lender's obligation to disburse funds under the provisions of this EXHIBIT D, as opposed to constituting an Event of Default.

B. Lender's Right to Condition Disbursements. Lender shall have the right to condition any disbursement upon Lender's receipt in the appropriate form of the following submissions and Lender's reasonable determination that such submissions comply with the requirements set forth below:

1. The Application for Payment and an itemized requisition for payment;

2. Bills, invoices, documents of title, vouchers, statements, receipts and any other documents evidencing the total amount expended, incurred or due for any requested Items;

4

3. Evidence of Borrower's use of a lien release, joint check and voucher system acceptable to Lender for payments or disbursements to any contractor, subcontractor, materialman, supplier or lien claimant;

4. Architect's, inspector's and/or engineer's periodic certifications of the percentage and/or stage of construction that has been completed and its conformance to the Plans and Specifications and governmental requirements based upon any such architect's, inspector's and/or engineer's periodic physical inspections of the Property and Improvements;

5. Waivers and releases of any mechanics' lien, stop notice claim, equitable lien claim or other lien claim rights (conditional for costs to be paid from the current Application for Payment, and unconditional for all prior costs which have been disbursed by Lender by the twenty-fifth (25th) day of the immediately preceding month or were to have been paid from Borrower's own funds under the Disbursement Budget);

\* \* \*

10. Any other document, requirement, evidence or information that Lender may have reasonably requested under any provision of the Loan Documents at least thirty (30) days prior to the Application for Payment in question; and

11. Except with respect to items covered under #12 and #13 below, evidence that any goods, materials, supplies, fixtures or other work in process for which disbursement is requested have been incorporated into the Improvements.

12. In the event any Application for Payment includes the cost of materials stored at a location other than the Property ("Offsite Materials"), each of the following: (a) evidence that the Offsite Materials have been purchased by Borrower, have been segregated from other materials in the facility and have been appropriately marked to indicate Borrower's ownership thereof and Lender's security interest therein; and (b) evidence that the Offsite Materials are insured as required by this Agreement.

13. In the event that any Application for Payment includes the cost of materials stored on the Property ("Onsite Materials"), each of the following: (a) evidence that the Onsite Materials have been purchased for or by Borrower; (b) evidence that the Onsite Materials are insured as required hereunder; and (c) evidence that the Onsite Materials are stored in an area on the Property for which adequate security is provided against theft and vandalism.

\* \* \*

C. Periodic Disbursement of Construction Costs, Site Work Costs and Offsite Costs. As construction progresses, the amount of the retention as provided under any construction contract to which Borrower is a party (the "Retention") shall be disbursed into the Account or to or for the benefit or account of the Borrower, Property or Improvements upon Borrower's delivery to Lender of (1) the applicable lien releases specified above in Paragraph B.8 of this EXHIBIT D, (2) the applicable certificate specified above in Paragraph B.9 of this EXHIBIT D and (3) solely with respect to the Construction Contract, a duly issued temporary certificate of occupancy for the Improvements and completion of the Improvements in accordance with the Plans and Specifications.

D. Partial Disbursements. No disbursement shall be made for a particular Application for Payment unless all required supporting materials are included for Items totaling at least sixty-five percent (65%) of the total amount of funds requested thereunder.

E. Timing of Disbursements. Lender shall exercise diligent and good faith efforts to disburse funds for all approved Items in any Application for Payment within the Lender Payment Turnaround Period.

Applications for Payment required Crestlloyd's ongoing representations and warranties, as set forth in Article 6, including confirmation that $82,500,000.00 was sufficient to complete the improvements on the Property:

As a material inducement to Lender's entry into this Agreement, Borrower represents and warrants to Lender as of the Effective Date and as of the date of each Application for Payment is submitted to Lender pursuant to EXHIBIT D…that:

*    *    *

6.9. Loan Proceeds and Adequacy. The undisbursed Loan proceeds, together with Borrower's Funds and all other sums, if any, to be provided by Borrower as shown in EXHIBIT C, are sufficient to construct the Improvements in accordance with the terms and conditions of this Agreement.

6.10 Accuracy. All reports, documents, instruments, information and forms of evidence delivered to Lender concerning the Loan or security for the Loan or required by the Loan Documents are accurate, correct and sufficiently complete to give Lender true and accurate knowledge of their subject matter, and do not contain any material misrepresentation or omission

The extent of Hankey's involvement with the construction of improvements on the Property extended beyond review of payment applications for the disbursement of loan proceeds to required pre-approval of revisions to Plans and Specifications and inspection rights as set forth in the following provisions:

4.6. Plans and Specifications

(a) Changes, Lender Consent. If the Plans and Specifications contemplate staged design and construction, and if Lender has approved Plans and Specifications that contemplate that certain stages will be designed in the future, then any stages of such Plans and Specifications that have not been approved by Lender as of the date of this Agreement shall be subject to Lender's prior written approval, which consent shall not be unreasonably withheld, conditioned or delayed. Except as otherwise provided in this Agreement, Borrower shall not make any changes in the Plans and Specifications or the Improvements without Lender's prior written consent if such change, taken together with all other changes for which Lender's approval was not required

6

hereunder, could materially affect the overall quality or efficiency of the improvements or the Improvements' exterior, lobbies or building systems. Without limiting the above, Lender agrees that Borrower may make minor changes in the Plans and Specifications and Improvements without Lender's prior written consent, provided that such changes do not violate any of the conditions specified herein…Borrower shall at all times maintain, for inspection by Lender, a set of working drawings of the Improvements, which, if there is staged design that has not yet occurred, if applicable, shall at least cover the portions of the Improvements completed and under construction or fully designed at such time

(b) Changes; Submission Requirements. Borrower shall submit any proposed change in the Plans and Specifications requiring Lender's consent to Lender prior to the commencement of construction relating to such proposed change, at least ten (10) Business Days prior to the commencement of construction. Requests for any change which requires consent shall be accompanied by working drawings (or appropriate submittals) and a written description of the proposed change, submitted on a change order form acceptable to Lender, signed by Borrower and, if required by Lender, also by the Contractors. At its option, Lender may require Borrower to provide: (i) evidence satisfactory to Lender of the cost and time necessary to complete the proposed change; and (ii) a deposit in the amount of any increased costs into Borrower's Funds Account.

(c) Consent Process. Borrower acknowledges that Lender's review of any changes and required consent may result in delays in construction and hereby consents to any such delays. Nevertheless, Lender shall use commercially reasonable efforts to respond to requests for approval within the time periods provided in this Agreement…

7

# Exhibit NN

# EXHIBIT NN

| Interest Payments | |
|---|---|
| 12/1/18 | $444,329.13 |
| 1/1/19 | $576,903.41 |
| 2/1/19 | $590,753.13 |
| 3/1/19 | $555,883.87 |
| 4/1/19 | $624,088.46 |
| 5/1/19 | $632,229.27 |
| 6/1/19 | $668,982.63 |
| 7/1/19 | $654,051.72 |
| 8/1/19 | $695,044.29 |
| 9/1/19 | $703,993.75 |
| 10/1/19 | $689,623.27 |
| 11/1/19 | $736,649.19 |
| 12/1/19 | $306.91<br>$734,421.79 |
| 1/1/20 | $561,146.01 |
| 1/2/20 | $208,557.12 |
| 2/1/20 | $785,339.87 |
| 3/1/20 | $750,504.24 |
| 4/1/20 | $818,492.10 |
| 5/1/20 | $809,716.55 |
| 6/10/20 | $362,012.29 |
| 8/25/20 | $405,569.94<br>$1,210,156.30<br>$1,253,956.73<br>$1,000,000.00*<br>$873,642.46 |
| 9/1/20 | $85,000.00 |
| 10/1/20 | $899,661.63 |
| 11/1/20 | $949,015.81 |
| **TOTAL** | **$18,280,031.87** |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is Suite 2500, 601 South Figueroa Street, Los Angeles, California 90017-5704.

A true and correct copy of the foregoing document entitled (*specify*): <u>OPPOSITION OF COUNTER/CROSSCLAIMANT YOGI SECURITIES HOLDINGS, LLC TO MOTION OF CROSS-DEFENDANT HANKEY CAPITAL, LLC TO DISMISS FIRST AMENDED COUNTER CLAIM AND CROSSCLAIM OF YOGI SECURITIES HOLDINGS, LLC</u>, will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below.

**1. <u>TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)</u>:** Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) <u>November 30, 2022</u>, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Hamid R. Rafatjoo #181564
Raines Feldman, LLP
1800 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067

Counsel for 1369 Londonderry Estate LLC, Ground View LLP, Marbella Construction Inc. & Nile Niami
T: 310 440 4100 / F: 424 239 1259
E: hrafatjoo@raineslaw.com

David B. Golubchik #185520
Joseph M. Rothberg #286363
Levene Neale Bender Yoo & Golubchik LLP
2818 La Cienega Avenue
Los Angeles, CA 90034

Counsel for Crestlloyd, LLC
T: 310 229 1234 / F: 310 229 1244
E: dbg/jmr@lnbyg.com

Johnny White #269306
Wolf, Rifkin, Shapiro, Schulman & Rabkin
11400 Olympic Boulevard, 9th Floor
Los Angeles, CA 90064-1582

Counsel for Jacqueline Englanoff, Joseph Englanoff, Justine Englanoff, Nicole Englanoff & Trousdale Estate LLC
T: 310 478 4100 / F: 310 479 1422
E: jwhite@wrslawyers.com

Howard J. Steinberg #089291
Greenberg Traurig LLP
1840 Century Park East, Suite 1900
Los Angeles, CA 90067-2121

Counsel for Hankey Capital, LLC
T: 310 586 7702 / F: 310 586 0227
E: steinbergh@gtlaw.com

Ryan F. Coy #324939
BG Law LLP
21650 Oxnard Street, Suite 500
Woodland Hills, CA 91367

Counsel for Hilldun Corp.
T: 517 376 0350
E: rcoy@bg.law

Kyra E. Andrassy #207959
Smiley Wang-Ekvall, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, CA 92626

Counsel for Inferno Investment, Inc.
T: 714 445 1000 / F: 714 445 1002
E: kandrassy@swelawfirm.com

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                    1                        F 9013-3.1.PROOF.SERVICE

| | |
|---|---|
| Paul N. Sorrell #126346<br>Martin D. Singer #078166<br>Lavely & Singer PC<br>2049 Century Park East, Suite 2400<br>Los Angeles, CA 90067-2906 | Counsel for Inferno Investment, Inc.<br>T: 310 556 3501 / F: 310 556 3615<br>E: psorrell@lavelysinger.com |
| United States Trustee (LA)<br>915 Wilshire Blvd, Suite 1850<br>Los Angeles, CA 90017 | U.S. Trustee<br>T: 213 894 6811<br>E: ustpregion16.la.ecf@usdoj.gov |

**Courtesy NEFs:**

| | |
|---|---|
| Todd M. Arnold # 221868<br>Jonathan D. Gottlieb #339650<br>Levene Neale Bender Yoo & Golubchik LLP<br>2818 La Cienega Avenue<br>Los Angeles, CA 90034 | T: 310 229 1234 / F: 310 229 1244<br>E: tma/jdg@lnbyg.com |
| Max D. Fabricant #333859<br>Lavely & Singer PC.<br>2049 Century Park East, Ste. 2400<br>Los Angeles, CA 90067-3126 | T: 310 556 3501 / F: 310 556 3615<br>E: mfabricant@lavelysinger.com |
| Thomas M. Geher #130588<br>Jeffer Mangels Butler & Mitchell LLP<br>1900 Avenue of the Stars, 7th Floor<br>Los Angeles, CA 90067 | T: 310 203 8080 / F: 310 203 0567<br>E: tmg@jmbm.com |

**2.  SERVED BY UNITED STATES MAIL:** On (*date*) November 30, 2022, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) November 30, 2022, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than the next business day after the document is filed.

| | |
|---|---|
| Honorable Deborah J. Saltzman<br>U.S. Bankruptcy Court, Central District of California<br>E.R. Roybal Federal Building & U.S. Courthouse<br>255 East Temple Street, Suite 1634 / Courtroom 1639<br>Los Angeles, CA 90012 | ☒ No judge's copy of any document is required unless a copy is requested by chambers. If chambers calls to request a judge's copy, it must be provided by means such that it is received in chambers within two business days (by ☐ messenger or<br>☐ By Next Business Day [Trkg#_____]<br>☐ By Facsimile to _____<br>☐ Proposed Order via Lodged Order Upload |

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

November 30, 2022          Frederick Kalve

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                          2                              **F 9013-3.1.PROOF.SERVICE**

*Date*                    *Printed Name*                    *Signature*

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.