1  **MARTIN D. SINGER (BAR NO. 78166)**
   **PAUL N. SORRELL (BAR NO. 126346)**
2  **MAX D. FABRICANT (BAR NO. 333859)**
   **LAVELY & SINGER**
3  **PROFESSIONAL CORPORATION**
   2049 Century Park East, Suite 2400
4  Los Angeles, California 90067-2906
   Telephone: (310) 556-3501
5  Facsimile: (310) 556-3615
   Email:  mdsinger@lavelysinger.com
6           psorrell@lavelysinger.com

7
   **KYRA E. ANDRASSY (BAR NO. 207959)**
8  **SMILEY WANG-EKVALL, LLP**
   3200 Park Center Drive, Suite 250
9  Costa Mesa, CA 92626
   Telephone: (714) 445-1000
10 Email:  kandrassy@swelawfirm.com

11 Attorneys for Plaintiff INFERNO
   INVESTMENT, INC.
12

13              **UNITED STATES BANKRUPTCY COURT**

14              **CENTRAL DISTRICT OF CALIFORNIA**

15                 **LOS ANGELES DIVISION**

16 In re:                          | Case No. 2:21-bk-18205-DS

17 CRESTLLOYD, LLC,                | Chapter 11

18          Debtor.                | Adv. No. 2:22-ap-01125-DS

19

20 INFERNO INVESTMENT, INC., a     | **THIRD AMENDED COMPLAINT**
   Quebec corporation,             | **OF INFERNO INVESTMENT, INC.**
21                                 | **FOR:**
            Plaintiff,
22 v.                              | **(1) DECLARATORY RELIEF;**
                                   | **(2) FRAUDULENT**
23 CRESTLLOYD, LLC, a California   | **MISREPRESENTATION AND**
   limited liability company; HANKEY| **RESCISSION;**
24 CAPITAL, LLC, a California limited| **(3) FRAUDULENT**
   liability company; YOGI        | **CONCEALMENT; AND**
25 SECURITIES HOLDINGS, LLC, a     | **(4) INTENTIONAL INTERFERENCE**
   Nevada limited liability Company; and| **WITH CONTRACTUAL**
26 HILLDUN CORPORATION, a New      | **RELATIONS**
   York corporation,
27
            Defendants.
28
                                1
   THIRD AMENDED COMPLAINT FOR DECLARATORY RELIEF

1    Inferno Investment, Inc. ("Plaintiff" or "Inferno"), for its Third Amended

2  Complaint in this adversary proceeding pursuant to the Federal Rules of Bankruptcy

3  Procedure, alleges as follows:

4                    **<u>NATURE OF THIS PROCEEDING</u>**

5    1.    Inferno's early involvement was critical to development of "The One."

6  Its initial loans to Debtor and Defendant Crestlloyd, LLC ("Debtor" or "Crestlloyd")

7  financed the acquisition of the land located at 944 Airole Way in Bel-Air ("the

8  Property") and construction long before any other party was involved.  But for

9  Inferno, there would be no asset to liquidate.  Inferno's lien is senior to those of

10  Hankey Capital, LLC ("Hankey Capital"), Yogi Securities Holdings, LLC ("Yogi"),

11  and Hilldun Corporation ("Hilldun") (together, the "Defendant Lienholders") and all

12  amounts owed to Inferno should be paid from proceeds of the sale of the Property

13  prior to payments to any other creditor.

14    2.    Recognizing that the estate is insufficient to pay all claims, Hankey

15  Capital asserts that Inferno agreed to subordinate its claim, and Debtor joins in this

16  contention.  The assertions are unsupported and unavailing.  Because of these

17  assertions, Inferno brings this adversary proceeding for a determination of the

18  priority of its lien.  Inferno seeks a judicial determination that its "first in time" and

19  first-recorded secured debt is not subordinated to any lien of the Defendant

20  Lienholders and must be paid before the Defendant Lienholders' are paid.

21    3.    Debtor, Hankey Capital, and presumably other Defendant Lienholders

22  seek to rely on an alleged 2016 "Memorandum of Agreement" between Inferno and

23  Debtor ("the MOA") to claim that Inferno subordinated its debt to Defendant

24  Lienholders' debt, including with respect to loans made to Debtor even after the

25  MOA was signed.  Not so.  Inferno and Debtor agreed that Inferno would

26  subordinate only to future debts to which they specifically agreed to be signed in

27  writing.  It is for that reason that there were amendments to the MOA that

28  specifically referenced potential debt obligations to which Inferno might subordinate

**THIRD AMENDED COMPLAINT FOR DECLARATORY RELIEF**

– none of which involved the Defendant Lienholders.  Furthermore, the MOA is of no force or effect because Crestlloyd committed fraud and repudiated the MOA by misappropriating millions of dollars that were to be used for the Property for other properties and the personal benefit of Nile Niami and Yvonne Niami, the principals of Crestlloyd.  The MOA did not, as Defendants contend, constitute an open-ended agreement to subordinate indefinitely the Inferno debt to all future debts secured by the Property.  Inferno seeks a declaration to this effect. As a result of Crestlloyd's conduct, Inferno is also seeking to rescind the MOA.

4.      In addition, as alleged in further detail below, the signature of Inferno's principal on its alleged agreement to subordinate to the initial $82.5 million advance by Hankey Capital in October 2018 *was forged* and thus null, void and unenforceable as a matter of law.  Inferno did not agree to sign the Subordination Agreement for the Hankey Capital debt.  Email communications between the parties evidence the duplicitous nature of the alleged October 2018 Subordination Agreement on which Hankey Capital relies.  Specific requests from Hankey Capital for Inferno to subordinate its debt to Hankey Capital's advances to Debtor were refused in 2021.

5.      California law generally provides that "first in time, first in right" is the principle governing priority of secured lienholders, subject to the effect of recording statutes.  Inferno's "first in time" secured debt was recorded before Defendant Lienholders' debts and was never subordinated as Defendants allege.  Inferno has priority and its claim must be paid first, before other creditor claims.  Inferno brings this action seeking determination of its first priority.  In addition, Inferno asserts claims attributable to Hankey Capital's unfair and unscrupulous predatory business practices, including its scheme to secure payment of exorbitant default interest payments and potentially misappropriate a valuable asset while leaving other creditors "high and dry."  Had Hankey Capital acted responsibly, construction of the Property would have been completed and all creditors paid.  In reality, when Debtor

THIRD AMENDED COMPLAINT FOR DECLARATORY RELIEF

filed its bankruptcy petition, the Property was still incomplete despite the fact that it should have been finished long ago, and there is a shortfall in available assets to satisfy all claims.  Inferno alleges claims for unfair business practices against Hankey Capital and therefore seeks adjustment of its debt and its proof of claim.

## JURISDICTION AND VENUE

6.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. Section 151, 157, and 1334.  Jurisdiction to grant declaratory relief is conferred by 28 U.S.C. Section 2201 and Rule 7001 of the Federal Rules of Bankruptcy Procedure.

7.    This adversary proceeding is brought pursuant to Rule 7001 *et seq.* of the Federal Rules of Bankruptcy Procedure.

8.    Venue is proper pursuant to 28 U.S.C. Section 1409 as this adversary proceeding arises in and relates to a case under Title 11 that is now pending in this District.

9.    This adversary proceeding is a "core" proceeding as defined in subparagraphs (A), (B), (K), and (O) of 28 U.S.C. Section 157(b)(2).

## THE PARTIES

10.    Inferno is a corporation organized and existing under the laws of Quebec, Canada.  Inferno is a secured creditor of Debtor.  It filed Proof of Claim No. 11 on or about January 4, 2022.

11.    Defendant Crestlloyd is the debtor in this bankruptcy case  and its Chapter 11 case remains pending.  Inferno is informed and believes and thereon alleges that Crestlloyd is a limited liability company duly organized and existing under the laws of the State of California.

12.    Inferno is informed and believes and thereon alleges that Defendant Hankey Capital is a limited liability company duly organized and existing under the laws of the State of California.  Hankey Capital has asserted claims as an alleged secured lender pursuant to its Proofs of Claim Nos. 17, 18 and 20 filed January 14, 2022, in the amounts of $3,500,000, $5,000,000 and $122,638,623.41, respectively.

THIRD AMENDED COMPLAINT FOR DECLARATORY RELIEF

13.    Inferno is informed and believes and thereon alleges that Defendant Yogi is a limited liability company duly organized and existing under the laws of the State of California. Yogi asserted a claim as an alleged secured lender in Proof of Claim No. 15 filed January 14, 2022.

14.    Inferno is informed and believes and thereon alleges that Defendant Hilldun is a corporation duly organized and existing under the laws of the State of New York.  Hilldun asserted a claim as an alleged secured lender in Proof of Claim No. 9 filed December 23, 2021.

<u>**FACTUAL BACKGROUND OF THIS DISPUTE**</u>

<u>**Commencement of the Airole Project With Inferno Funds**</u>

15.    By late 2012 and early 2013, Nile Niami, one of Debtor's principals, was actively seeking financing to acquire real property at 944 Airole Way in Bel-Air ("the Property") and other locations to build luxury homes.  Niami used Debtor to acquire the Property, but Debtor had neither the property nor the financing to obtain the Property and complete construction.  Inferno was and is a company engaged in the business of making loans secured by real property such as the Property, and was approached by Debtor for financing.  Inferno and its assignors had provided funding to prior projects involving the principals of Debtor and determined to accept the risk of loaning funds to Debtor necessary to acquire the Property and construct a home.

16.    On March 13, 2013, Debtor entered into agreements by which it received loans from (a) Inferno in the amount of $3,925,545, (b) Inferno Realty, L.P. in the amount of $7,040,000, and (c) Maybach Holdings Corporation, Inc. in the amount of $7,000,000.  These loans were made for the purpose of acquiring the Property and constructing a luxury home that was then intended to be approximately 40,000 square feet, which was a large home but not the mammoth home that was ultimately billed as the luxurious and unique "The One."  The loans were memorialized by promissory notes secured by recorded deeds of trust on the Property.

THIRD AMENDED COMPLAINT FOR DECLARATORY RELIEF

17.     Subsequently, Inferno Realty, L.P. and Maybach Holdings Corporation, Inc. assigned their interests in the loans secured by the Property to Inferno.  As an accommodation to Debtor, and without receiving consideration, Inferno amended the secured obligation that was in the principal amount of $14,040,000, to reduce the amount owed under that secured note to $7,000,000, which was the principal balance owing on that note as of October 15, 2015.  On November 10, 2015, Debtor and Inferno recorded a Modification and Supplement to Deed of Trust in which they confirmed that the amount of secured debt owed to Inferno was $10,925,545 as of that time.  Inferno is informed and believes that Debtor's current secured debt to Inferno, as to which Inferno is entitled to priority over the claims of Defendants as alleged herein, is $22,905,813 as of November 28, 2022, including interest and legal fees, which will continue to accrue as this action proceeds.

18.     On January 1, 2016, Inferno and Debtor signed the MOA, a copy of which as amended is attached as Exhibit 1.

19.     The MOA states that proceeds from sale of the Property shall be used first to repay loans obtained from a bank or third parties, before Debtor and Inferno receive proceeds.  The context of this language was to implement the agreement, as alleged in further detail below, that Debtor and Inferno would authorize subordination to certain additional debt agreed to in writing by the Parties.  It was agreed that subordination to a particular debt would require execution of a written amendment to the MOA.  And that is how Debtor and Inferno consistently conducted business.  Debtor and Hankey Capital later sought subordination agreements from Inferno with respect to specific loans, which were not signed.

20.     Inferno is informed and believes that Defendants allege that the MOA subordinates Inferno's debt to the debts of the Defendant Lienholders.  This interpretation contravenes the agreement.  In the MOA, Inferno only agreed to subordinate to loans to which it specifically agreed.  The MOA was not an agreement, in advance, to blindly subordinate to any debt incurred by Debtor in the

6

THIRD AMENDED COMPLAINT FOR DECLARATORY RELIEF

future regardless of nature or amount.  Inferno did not agree in the MOA to subordinate to the debts of Hankey Capital, Yogi or Hilldun.  The MOA is also of no force and effect because Crestlloyd committed fraud and repudiated the MOA by misappropriating tens of millions of dollars that should have been used for the Property.

**The Original Hankey Capital Loan and**

**Alleged Subordination by Inferno**

21.    On or about October 25, 2018, Hankey Capital – which like Inferno is a private direct construction lender – entered into a written Construction Loan Agreement pursuant to which Hankey Capital agreed to loan Debtor $82.5 million ("the Hankey Initial Loan"), which states that the Hankey Initial Loan was to be secured by a first priority lien against the Property (the "Construction Loan Agreement").  A copy of the Construction Loan Agreement is attached as Exhibit 2. Debtor signed a "Promissory Note (Variable Rate)" dated October 25, 2018, a copy of which is attached as Exhibit 3 ("the First Note") , and the parties entered into and Hankey Capital recorded on or about November 6, 2018, a "Construction Deed of Trust, Security Agreement and Fixture Filing with Assignment of Rents [944 Airole Way]," a copy of which is attached as Exhibit 4 ("the Deed of Trust").  The Deed of Trust secures the $82.5 Million amount and, among other things, other sums lent to Crestlloyd "*when evidenced by a document reciting that it is so secured*."  (Emphasis added.)

22.    The Construction Loan Agreement provided that Hankey Capital was lending $82.5 million to finance the construction of the Property.  Inferno is informed and believes and thereon alleges that a large portion of the money allegedly lent (not only with respect to the Hankey Initial Loan but subsequent disbursements from Hankey Capital) was prepaid interest that Hankey Capital simply paid itself.  The amounts actually available to Debtor for use at the Property from Hankey Capital's

7

**THIRD AMENDED COMPLAINT FOR DECLARATORY RELIEF**

1     loans were significantly less than what Hankey Capital claims it lent for the benefit

2     of the Property.

3          23.     Hankey Capital assumed no obligation under the First Note,

4     Construction Loan Agreement, Deed of Trust or otherwise to lend additional funds to

5     Debtor.  To the contrary, at that time Hankey Capital and Debtor expressly agreed

6     that the monies Hankey Capital was lending would be sufficient to complete

7     construction, and implemented a procedure to ensure that result.  Paragraph 6.9 of the

8     Construction Loan Agreement states that the "undisbursed Loan proceeds, together

9     with Borrower's Funds and all other sums, if any, to be provided by Borrower as

10    shown in EXHIBIT C [which was intentionally left blank], are sufficient to construct

11    the Improvements in accordance with the terms and conditions of this Agreement."

12    The Construction Loan Agreement provides in Section 3.4 that disbursements to

13    Debtor shall be in accordance with Exhibit D thereto.  Exhibit D sets forth the

14    procedure by which Debtor shall obtain all disbursements under the Hankey Capital

15    loan.  Exhibit D requires that Debtor substantiate each request for payment for

16    materials or services and provide documentation establishing that the work being

17    funded is actually being accomplished.  There is no evidence that Hankey Capital

18    required Debtor to follow the Exhibit D procedure or that Debtor followed the

19    procedure.  Inferno is informed and believes that Debtor, with Hankey Capital's

20    active assistance and/or gross negligence or both, padded alleged invoices owed to

21    suppliers and contractors including its general contractor JR Construction in order to

22    finance construction of other projects.

23         24.     Hankey Capital alleges that a Subordination Agreement with respect to

24    Hankey Capital's loan facility of $82.5 million in October 2018 gives it priority.

25    A copy of the Subordination Agreement that Debtor requested Inferno to sign is

26    attached as Exhibit 5.  Inferno did not sign the agreement.  The Subordination

27    Agreement advanced by Hankey Capital and Debtor is an unenforceable forgery.

28

THIRD AMENDED COMPLAINT FOR DECLARATORY RELIEF

25.    The purported Subordination Agreement bears an alleged signature of Inferno's principal, Julien Remillard.  It attaches separate pages constituting alleged notary certifications from a Notary Public, Nigel Gibbs.  Inferno is informed and believes and thereon alleges that Niami frequently used Gibbs to notarize documents for Debtor and Niami's other businesses.  Gibbs falsely states in the notarizations attached to the alleged Subordination Agreement that both Nile Niami of Debtor and Remillard appeared in Los Angeles and signed the document there in his presence on October 30, 2018.  Remillard was in Montreal, Quebec, Canada, on October 30, 2018, not in Los Angeles.  In addition, an "updated" draft of the Subordination Agreement was emailed by Debtor to Inferno for its consideration on *October 31, 2018*, a day *after* Inferno had allegedly already signed before Notary Gibbs.  A copy of the email from Crestlloyd to Inferno forwarding the "updated" draft (the day after the document was allegedly signed) is attached as Exhibit 6.  Notary Gibbs also further falsely states on the notarization page that the document he is notarizing is dated October 25, 2018.  The Subordination Agreement advanced by Debtor and Hankey Capital is a forgery. It is null and void.

26.    Inferno is informed and believes and thereon alleges that the attempt to obtain a Subordination Agreement by Hankey Capital was part and parcel of an effort by Hankey Capital to insinuate itself into the project by making substantial loans, unmonitored and unchecked by Hankey Capital as alleged herein, that would be likely to generate substantial default interest opportunities as well as a potential opportunity to foreclose on a valuable asset to the prejudice of other creditors.

27.    Inferno is informed and believes and thereon alleges that on or about December 10, 2019, Hankey Capital agreed to loan additional funds to Debtor which Hankey Capital claims increased the principal balance to $91 million.  These additional funds were an optional advance to Debtor, as Hankey Capital was under no obligation, contractual or otherwise, to loan Debtor additional sums.  The additional sums were lent with knowledge of Inferno's secured interest and without

9

THIRD AMENDED COMPLAINT FOR DECLARATORY RELIEF

Inferno's consent or subordination.  Crestlloyd signed an "Amended and Restated Promissory Note (Variable Rate)" dated December 10, 2019 in the principal amount of $91 million, a copy of which is attached as Exhibit 7 ("the Second Note").  The Second Note does *not* amend the First Note.  It extinguishes and supersedes the First Note, as follows:  "This Note replaces and supersedes, in its entirety, that certain Promissory Note, executed by Borrower in favor of Lender on October 25, 2018 in the principal amount of $82,500,000."  As such, the First Note was extinguished and replaced by the Second Note.  Significantly, the Second Note does *not* recite that it is secured by the Deed of Trust.  It does not refer to the Deed of Trust at all.

28.    Inferno is informed and believes and thereon alleges that on or about August 20, 2020, Hankey Capital agreed to loan additional funds to Debtor, and that Debtor and Hankey Capital entered into amended loan documents under which Debtor agreed to pay Hankey Capital the principal amount of $106 million.  These additional funds were an additional optional advance to Debtor because, as stated, Hankey Capital was under no obligation, contractual or otherwise, to loan Debtor additional sums.  All of the additional sums were lent by Hankey Capital with full knowledge of Inferno's secured interest but without Inferno's consent.  Crestlloyd signed an "Amended and Restated Promissory Note (Variable Rate)" dated August 20, 2020 in the principal amount of $106 million, a copy of which is attached as Exhibit 8 ("the Third Note").  The Third Note does *not* amend the Second Note.  It extinguishes and supersedes the Second Note as follows:  "This Note replaces and supersedes, in its entirety, that certain Promissory Note, executed by Borrower in favor of Lender on December 10, 2019 in the principal amount of $91,000,000."  The Third Note does *not* recite that it is secured by the Deed of Trust.  It does not refer to the Deed of Trust at all.

29.    As stated, the signature of Inferno's principal was forged on the Subordination Agreement in 2018 when Inferno did not sign.  In February, 2021, Inferno was again requested by Hankey Capital to subordinate its loan to Hankey

THIRD AMENDED COMPLAINT FOR DECLARATORY RELIEF

Capital, but Inferno declined to do so, as reflected in the request from Hankey
Capital attached as Exhibit 9.  Thus, even faced with threats of foreclosure that
endangered its investment, Inferno refused to agree to subordinate to Hankey
Capital's debt.  Hankey Capital recklessly loaned additional funds to Debtor without
ensuring that Debtor complied with the loan disbursement provisions of Exhibit D to
the Construction Loan Agreement or otherwise ensuring that the loan proceeds were
used for construction and improvements at the Property.  Hankey Capital voluntarily
and without consent of other lienors including Inferno loaned Debtor at least an
additional $23.5 million, even after it provided its initial $82.5 million loan that was
supposed to complete construction and improvements at the Property.

**Loans by Yogi Securities**

30.    Beginning in 2017 (possibly earlier), Yogi made loans to Debtor and
possibly other entities associated with Nile Niami, which included loans on multiple
speculative real property developments on North Hillcrest Road, Bellagio Road,
North Carcassonne Road, Stone Ridge Lane and Londonderry Place.  On or about
October 16, 2018, Debtor signed a Secured Promissory Note agreeing to pay Yogi
the amount of $30,188,235 plus interest for loans on these projects, secured by the
Property.  Yogi filed its Proof of Claim No. 15 on January 13, 2022, asserting a
secured claim in the amount of $21,943,053.75.

31.    Inferno is informed and believes and thereon alleges that the proceeds
of loans made by Yogi were not used for the benefit of the Property and did not
contribute to any asset available to satisfy creditors.  Yogi's loan documents
submitted in support of Proof of Claim No. 15 confirm that its loans to Debtor were
*not lent with the intention, and were not used for purposes, of developing the
Property.*  The documentation instead reflects that Yogi's loans to Debtor were used
by Debtor elsewhere as it pleased, including on multiple spec developments located
on North Hillcrest, Bellagio, North Carcassonne, Stone Ridge and Londonderry.

THIRD AMENDED COMPLAINT FOR DECLARATORY RELIEF

**The Bankruptcy Filing**

32.     On October 26, 2021, Debtor filed its voluntary chapter 11 bankruptcy petition.  Claiming that it needed to pay for insurance, maintenance and improvements to the Property, and professional expenses, and that the Property was worth $325,000,000 so that the existing lienholders were adequately protected, Debtor obtained Court approval to obtain a postpetition loan of $12,000,000 from Hankey Capital that was secured by a first priority lien against the Property.  As of May 5, 2022, on information and belief, Inferno alleges that Debtor was holding approximately $3.6 million of funds attributable to the postpetition loan (the "DIP Loan Balance").  Debtor's counsel has contended that these funds are unencumbered.

**Proofs of Claim**

33.     As it pertains to the Property, Hankey Capital has filed three secured claims:  (1) Claim 17 in the amount of $3,500,000, allegedly based on a Profit Participation Agreement dated October 25, 2018, that is memorialized by a Memorandum of Agreement recorded on November 6, 2018 as Document No. 20181122919; (2) Claim 18 in the amount of $5,000,000, allegedly based on a Profit Participation Agreement dated August 20, 2020, that is memorialized by a Memorandum of Agreement recorded on August 31, 2020, as Document No. 20201030294; and (3) Claim 20, which asserts a secured claim in the amount of $122,638,623.41 based on the deed of trust recorded on November 6, 2018, as Document No. 20181122917.  On information and belief, Inferno alleges that Claim 17 and Claim 18 are not actually secured claims because neither the Memorandums of Agreement nor the underlying Profit Participation Agreements created or perfected a lien.  The instruments upon which Hankey Capital relies in support of Claim 17 and Claim 18 do not refer to any intent to create security for the referenced obligations.  They fail completely to comply with requirements for creation of a mortgage or deed of trust under California law.  Furthermore, Hankey Capital has

THIRD AMENDED COMPLAINT FOR DECLARATORY RELIEF

abandoned Claim No. 17 entirely, and declaratory relief should be rendered on that claim forthwith.

34.    Yogi filed Claim 15, asserting a secured claim in the amount of $21,943,053.75 based on its deed of trust recorded on November 7, 2018, as Document No. 20181126580, as amended.

35.    Hilldun filed Claim 9, asserting a secured claim in the amount of $5,000,000 based on its deed of trust recorded on September 4, 2020, as Document No. 20201058770.

## **The Sale of the Property**

36.    By order entered on March 28, 2022, the Court overruled objections to the sale of the Property and approved the sale of the Property for $126,000,000, plus $11,970,000 attributable to a rebate of the buyer's premium by Concierge Auctions (the "Rebate"), ordering that the net proceeds after payment of the lien attributable to the postpetition loan by Hankey Capital, the lien attributable to the receiver's certificates, brokers' commissions, property taxes, and closing costs be held pending further Court order and remain subject to all liens with the same validity, priority, and extent as they were attached to the Property.  Based on a closing statement provided by Debtor, Debtor received net proceeds of $119,943,690.74. Subsequently, the Debtor obtained authority to pay seven mechanic's lienholders in full, paying them a total of $672,876.03.

37.    By order entered on May 27, 2022, the Court authorized Debtor to pay $82,500,000 of the net proceeds to Hankey Capital "without prejudice to any and all parties' rights to assert claims and defenses as may be appropriate, including but not limited to the right to claw back any portion of the monies paid."  Inferno alleges on information and belief that this payment has been made.  Inferno and Yogi consented to the payment, subject to the reservation of rights, in order to mitigate a potential claim for interest.

THIRD AMENDED COMPLAINT FOR DECLARATORY RELIEF

# FIRST CLAIM FOR RELIEF

**(Declaratory Relief Against Hankey Capital to the Effect That It Has No Priority Due to Failure to Document and Record Its Security Interest – C.C.P. Sec. 1060, 28 U.S.C. 2201 and FRBP Rule 7001(2), (9))**

38.    Inferno repeats and realleges the allegations contained in Paragraphs 1 through 37, inclusive, and incorporates them herein by reference as if set forth in full herein.

39.    As set forth above, the Second Note to Hankey Capital superseded and replaced the First Note.  Among other things, the Second Note does not recite that it is secured by the Deed of Trust as the Deed of Trust requires.  The Second Note does not refer to the Deed of Trust at all.  Furthermore, once the First Note was extinguished by the Second Note, no security interest thereafter could exist in favor of Hankey Capital under the Deed of Trust, because the Deed of Trust was null and void as a matter of law.  The Second Note is not secured by the Deed of Trust.  Nor is there any basis for a secured claim based on the Third Note.

40.    Under California Code of Civil Procedure section 1060 *et seq.*, 28 U.S.C. 2201, Rule 7001(2) and (9) of the Federal Rules of Bankruptcy Procedure, the Court can and should determine the validity, priority and extent of the liens involved herein.  An actual controversy has arisen and now exists between Defendants and Inferno in that, among other things, Hankey Capital contends that Inferno's secured interest is subordinate to Hankey Capital's interest.  Inferno disputes these contentions and contends that its secured debt is highest priority and should be paid prior to debts of all other creditors.  Inferno contends that, based on the foregoing, Hankey Capital cannot establish any secured interest prior to Inferno's secured interest.  The Court should declare that Hankey Capital has no security interest at all, or at minimum has no security beyond the First Note.  A declaration from the Court is necessary to determine the rights and responsibilities

THIRD AMENDED COMPLAINT FOR DECLARATORY RELIEF

of the parties, and particularly the priority of liens as between Inferno and Hankey
Capital.

## SECOND CLAIM FOR RELIEF

**(Declaratory Relief Against Hankey Capital to the Effect That Inferno's
Secured Debt Is Not Subordinated to Hankey Capital's Debt Because the
Alleged Subordination Agreement Is Forged, Null and Void – C.C.P. Sec.
1060, 28 U.S.C. 2201 and FRBP Rule 7001(2), (9))**

41.    Inferno repeats and realleges the allegations contained in Paragraphs 1
through 37, inclusive, and incorporates them herein by reference as if set forth in
full herein.

42.    Inferno's debt was incurred and its liens recorded prior to the recording
of liens of the Defendant Lienholders, including Hankey Capital.  There is no basis
for subordination of Inferno's secured claim which is the subject of Proof of Claim
No. 11 to any of the alleged Hankey Capital debt based on the alleged Subordination
Agreement.  A declaration from the Court is necessary to resolve this dispute.

43.    The alleged Subordination Agreement advanced by Hankey Capital is a
forgery.  Inferno did not sign the Subordination Agreement relating to the Hankey
Capital debt.  A forged document is null and void under California law, and creates
no security interest even when recorded.  The Subordination Agreement has no legal
effect whatsoever.  Inferno is entitled to a declaration that Inferno's debt is not
subordinated to and in fact has priority over Hankey Capital's debt because Inferno
never signed an agreement to subordinate.

44.    Under California Code of Civil Procedure section 1060 *et seq.*, 28
U.S.C. 2201, Rule 7001(2) and (9) of the Federal Rules of Bankruptcy Procedure, the
Court can and should determine the validity, priority and extent of the liens involved
herein.  An actual controversy has arisen and now exists between Defendants and
Inferno in that, among other things, Hankey Capital contends that Inferno's secured
interest is subordinate to Hankey Capital's interest as a result of the signing of the

THIRD AMENDED COMPLAINT FOR DECLARATORY RELIEF

Subordination Agreement.  Inferno disputes these contentions and contends that its

secured debt is highest priority and should be paid prior to debts of all other

creditors.  A declaration from the Court is necessary to determine the rights and

responsibilities of the parties, and particularly the priority of liens as between Inferno

and Hankey Capital.

**THIRD CLAIM FOR RELIEF**

**(Declaratory Relief and Equitable Subordination Against Hankey Capital to the
Effect That Inferno's Secured Debt Is Not Subordinated Due to Substantial
Modifications to Hankey Capital's Loan That Materially Increased the Risk of
Default Without Inferno's Consent – C.C.P. Sec. 1060, 28 U.S.C. 2201 and
FRBP Rule 7001(2), (9))**

45.    Inferno repeats and realleges the allegations contained in Paragraphs 1

through 37, inclusive, and incorporates them herein by reference as if set forth in full

herein.

46.    Inferno is entitled to a declaration that its secured obligation is not

subordinated to, and has priority over, any secured claim asserted by Hankey Capital

because Hankey Capital made substantial modifications to its loan, including

optional loan advances and extensions of the deadlines for repayment by Debtor, that

materially and adversely affected Inferno's rights as a junior lienholder.  These

modifications were made unilaterally by Hankey Capital knowing of Inferno's

secured rights and without Inferno's consent.  Hankey Capital made not only the

Hankey Initial Loan, but substantial additional loan commitments referenced in

Paragraphs 27 and 28 above, lending additional millions to Debtor at exorbitant

interest rates and substantially increasing the loan balance and repayment deadlines

without the knowledge or consent of Inferno or agreement by Inferno to subordinate

to the additional loans.

47.    The modifications made without Inferno's knowledge or consent

substantially increased Debtor's principal balance to Hankey Capital and the interest

THIRD AMENDED COMPLAINT FOR DECLARATORY RELIEF

1   payable by Debtor, extended the time for repayment, and increased the risk of

2   default.  These substantial modifications were made without Inferno's knowledge or

3   consent.  They substantially impaired Inferno's security interest by significantly

4   increasing its financial risk.

5       48.    Exacerbating the danger to which Inferno and other lienholders were

6   exposed by these substantial modifications, Inferno is informed and believes that

7   Hankey Capital refused to comply with its own disbursement requirements in the

8   Construction Loan Agreement to protect the asset embodied by the Property, or

9   ensure that construction of the Property was completed with its loan proceeds as

10  agreed.  Hankey Capital failed to monitor or require compliance with the

11  Construction Loan Agreement including Exhibit D or other reasonable disbursement

12  procedures which led to dissipation of Debtor's assets and damaged all of Debtor's

13  creditors.  This conduct ultimately precipitated the filing of this bankruptcy

14  proceeding.

15      49.    It is undisputable that the Hankey Initial Loan was to be used to

16  complete construction, and Hankey Capital agreed in the Construction Loan

17  Agreement that it would be sufficient.  Had that occurred, all secured creditors of

18  Debtor would have been paid from the sale of the Property.  Instead, Hankey Capital

19  allowed Debtor to use proceeds from the Hankey Capital loan for other properties of

20  Nile Niami and Yvonne Niami and/or for their personal benefit, and lent millions

21  more.  Hankey Capital did not care if Debtor used loan funds to benefit the Property

22  because it wanted to increase Debtor's reliance on and obligations to Hankey Capital

23  and obtain significant increased default rate interest which put other creditors at risk.

24  Hankey Capital's conduct put Debtor in danger of default and ultimately resulted in

25  the filing of this bankruptcy action.  Based on Hankey Capital's conduct, the Court

26  should issue a declaration that Hankey Capital lost any priority it might otherwise

27  have over Inferno's secured debt, in its entirety.  This entire bankruptcy proceeding is

28  attributable to Hankey Capital's conduct, and the equities require that its entire

17

THIRD AMENDED COMPLAINT FOR DECLARATORY RELIEF

obligation forfeit any alleged priority.  Alternatively, the Court should order that the additional loan modifications and extensions of the loan as alleged in Paragraphs 27 and 28 (all sums over and above the Hankey Initial Loan Amount) have no priority over Inferno's secured claim based on the facts alleged above.

50.     Under California Code of Civil Procedure section 1060 *et seq.*, 28 U.S.C. 2201, Rule 7001(2) and (9) of the Federal Rules of Bankruptcy Procedure, the Court can and should determine the validity, priority and extent of the liens involved herein.  An actual controversy has arisen and now exists between Defendants and Inferno in that, among other things, Hankey Capital contends that Inferno's secured debt is subordinate to Hankey Capital's debt.  Inferno disputes these contentions and contends that its secured debt is highest priority, and that Hankey Capital's debt should equitably be subordinated based on these facts even if the claim of Hankey Capital was originally senior to Inferno's debt.  A declaration from the Court is necessary to determine the rights and responsibilities of the parties, and particularly the priority of liens as between Inferno and Hankey Capital.

## <u>FOURTH CLAIM FOR RELIEF</u>

**(Declaratory Relief Against Hankey Capital to the Effect That Inferno's Secured Debt Is Not Subordinated to Hankey Capital's Additional Optional Advances – C.C.P. Sec. 1060, 28 U.S.C. 2201 and FRBP Rule 7001(2), (9))**

51.     Inferno repeats and realleges the allegations contained in Paragraphs 1 through 37, inclusive, and incorporates them herein by reference as if set forth in full herein.

52.     Even assuming Inferno's debt could be deemed subordinate to a secured claim of Hankey Capital, such as pursuant to the Subordination Agreement, there is no basis to subordinate Inferno's secured claim to any claim premised on the additional optional advances made by Hankey Capital as referenced in Paragraphs 27 and 28 above, all of which were made with knowledge of Inferno's security interest and without Inferno's consent.  There was no obligation of Hankey Capital to make

18

1    additional advances on its loan.  Yet Hankey Capital made multiple optional

2    advances, including the advances in December 2019 and August 2020, knowing of

3    Inferno's secured interest and without Inferno's consent.  These optional advances

4    are subordinate to Inferno's lien under California law.

5              53.    The additional loan advances that were made without Inferno's

6    knowledge or consent substantially increased Debtor's principal balance to Hankey

7    Capital, significantly increased the interest rates payable by Debtor, extended the

8    term and increased the risk of default.  These substantial modifications, made without

9    Inferno's knowledge or consent, substantially impaired Inferno's security interest and

10   significantly increased its financial risk.

11             54.    Inferno is informed and believes that Hankey Capital refused to comply

12   with requirements imposed to protect the asset embodied by the Property,

13   particularly its own disbursement requirements in the Construction Loan Agreement,

14   or to ensure that construction of the Property was completed with its loan proceeds as

15   agreed.  Hankey Capital's failure to monitor and require compliance with the

16   Construction Loan Agreement including Exhibit D or other reasonable disbursement

17   procedures led to dissipation of Debtor's assets and damaged all of Debtor's

18   creditors.  Indeed, this conduct ultimately precipitated the filing of this bankruptcy

19   proceeding.

20             55.    Under California Code of Civil Procedure section 1060 *et seq.*, 28

21   U.S.C. 2201, Rule 7001(2) and (9) of the Federal Rules of Bankruptcy Procedure, the

22   Court can and should determine the validity, priority and extent of the liens involved

23   herein.  An actual controversy has arisen and now exists between Defendants and

24   Inferno in that, among other things, Hankey Capital contends that Inferno's secured

25   debt is subordinate to Hankey Capital's debt.  Inferno disputes these contentions and

26   contends that its secured debt is highest priority and should be paid prior to debts of

27   all other creditors.  A declaration from the Court is necessary to determine the rights

28

**THIRD AMENDED COMPLAINT FOR DECLARATORY RELIEF**

and responsibilities of the parties, and particularly the priority of liens as between

Inferno and Hankey Capital.

## FIFTH CLAIM FOR RELIEF

**(Declaratory Relief Against All Defendants to the Effect That Inferno**

**Did Not Subordinate Its Debt to the Defendant Lienholders' Claims**

**Pursuant to the MOA)**

56.     Inferno repeats and realleges the allegations contained in Paragraphs 1

through 37, inclusive, and incorporates them herein by reference as if set forth in full

herein.

57.     Inferno's debt was incurred, and its liens recorded prior to the liens

Defendant Lienholders seek to enforce in this bankruptcy proceeding.

58.     No factual or legal basis exists to subordinate Inferno's secured claim

referenced in Proof of Claim No. 11 to secured debts allegedly owed to Defendant

Lienholders on the basis of the MOA.  Among other things, the MOA was prepared

in the context of subordination only with respect to specific loans to which Inferno

agreed to be signed in writing to subordinate.  None of Defendant Lienholders'

alleged secured loans are in this category.  The MOA was not an advance agreement

to subordinate to all future liens secured by the Property.  Moreover, the MOA is

invalid due to Debtor's fraudulent conduct including false representations, and

repudiation through its principals' misappropriation of tens of millions of dollars that

should have been used for the Property.

59.     Under California Code of Civil Procedure section 1060 *et seq.*, 28

U.S.C. 2201 and Rule 7001(2) of the Federal Rules of Bankruptcy Procedure, the

Court can and should determine the validity, priority and extent of the liens involved

herein.  An actual controversy has arisen and now exists between Defendants and

Inferno in that, among other things, Defendants contend that Inferno's secured debt

was subordinated to Defendant Lienholders' secured debts pursuant to the terms of

the MOA.  Inferno disputes these contentions and contends that its secured debt is

THIRD AMENDED COMPLAINT FOR DECLARATORY RELIEF

highest priority and should be paid prior to debts of other creditors, particularly the

Defendant Lienholders.  A declaration from the Court is necessary to determine the

rights and responsibilities of the parties, and particularly the priority of liens as

between Inferno and Defendant Lienholders.  Inferno has first priority.

60.    Inferno seeks a declaration from the Court to the effect that the MOA is

of no effect in terms of priority of the claims of the secured parties, and that Inferno's

debt is not subordinated to the debt of Defendant Lienholders pursuant to the alleged

MOA.

### SIXTH CLAIM FOR RELIEF

**(Declaratory Relief Against All Defendants to the Effect That Inferno's**

**Claim is Senior to and Has Priority Over Debts of Other Secured**

**Creditors Including Those of Defendant Lienholders)**

61.    Inferno repeats and realleges the allegations contained in Paragraphs 1

through 37, inclusive, and incorporates them herein by reference as if set forth in full

herein.

62.    Inferno's debt was incurred, and its liens recorded prior to the liens

Defendant Lienholders seek to enforce in this bankruptcy proceeding.

63.    There is no basis for subordination of Inferno's secured claim, which is

the subject of Proof of Claim No. 11, to secured debts allegedly owed to Defendant

Lienholders.  Inferno's secured claim was prior in time and was the subject of

recorded deeds of trust prior to the inception of Defendant Lienholders' liens.  The

MOA is ineffective to subordinate Inferno's claim to Defendant Lienholders' claims

as alleged above.  The MOA cannot, and did not subordinate any subsequent debts as

to which Inferno did not agree in writing.  The MOA is otherwise null and void due

to Crestlloyd's fraud and misappropriation of funds intended for the Property.  The

purported Subordination Agreement in October 2018 was a forgery and otherwise

null and void.

64.     The recording by Hankey Capital of the two Memorandums of Agreement was insufficient to create liens against the Property.  Neither of the Profit Participation Agreements give any indication that they were intended to constitute liens against the Property, and, on information and belief, Inferno alleges that they do not, in fact, constitute valid liens against the Property.

65.     Under California Code of Civil Procedure section 1060 *et seq.*, 28 U.S.C. 2201 and Rule 7001(2) of the Federal Rules of Bankruptcy Procedure, the Court can and should determine the validity, priority and extent of the liens involved herein.  An actual controversy has arisen and now exists between Defendants and Inferno in that, among other things, Defendants contend that Inferno's secured debt was subordinated to Defendant Lienholders' secured debts pursuant to the terms of the MOA and Subordination Agreement.  Inferno disputes these contentions and contends that its secured debt is senior to other debts and should be paid prior to debts of other creditors, particularly those of Defendant Lienholders.  A declaration from the Court is necessary to determine the rights and responsibilities of the parties, and particularly the priority of liens as between Inferno and Defendant Lienholders. Inferno has first priority.

66.     Inferno seeks a declaration from the Court to the effect that its debt is first priority, is not subordinated to debt allegedly owed to Defendant Lienholders, and all amounts owed to Inferno shall be paid from proceeds of the sale of Debtor's assets prior to payments to Defendant Lienholders.  Inferno requests that the Court declare the parties' respective Property lien priorities.

THIRD AMENDED COMPLAINT FOR DECLARATORY RELIEF

## SEVENTH CLAIM FOR RELIEF

### (Declaratory Relief/Disallowance of Secured Claim Against Hankey Capital Regarding Proof of Claim No. 18 -- C.C.P. Sec. 1060, 28 U.S.C. 2001 and FRBP Rule 7001(2) and (9))

67.    Inferno repeats and realleges the allegations contained in Paragraphs 1 through 37, inclusive, and incorporates them herein by reference as if set forth in full herein.

68.    The Memorandum of Agreement recorded by Hankey Capital that allegedly supports its Proof of Claim No. 18 did not perfect any lien against the Property.  Proof of Claim No. 18 is, therefore, ineffective as a matter of law and Inferno is entitled to a declaration to this effect.  Proof of Claim No. 18 should be disallowed as a secured claim.

69.    Proof of Claim No. 18 has no effect because the deed of trust that was recorded by Hankey Capital which allegedly supports the claim does not conform with the legal formalities required for a grant of an interest in real property with respect to profit participations.  There is no mention in the profit participation agreement underlying the memorandum referenced in Proof of Claim No. 18 that the Property is to serve as security.  This is required by law to create an enforceable mortgage or deed of trust.  The documents supporting Proof of Claim No. 18 thus do not set forth specific intent to create a security interest and do not comply with requirements for creation of an interest in real property under California law.

70.    Under California Code of Civil Procedure section 1060 *et seq.*, 28 U.S.C. 2201 and Rule 7001(2) and (9) of the Federal Rules of Bankruptcy Procedure, the Court can and should determine the validity, priority and extent of the liens asserted in this case.  An actual controversy has arisen and now exists between Hankey Capital and Inferno in that, among other things, Hankey Capital contends that its Proof of Claim No. 18 is effective to establish priority of its right to a profit participation.  Inferno disputes these contentions and contends to the contrary that its

THIRD AMENDED COMPLAINT FOR DECLARATORY RELIEF

secured debt is highest priority and should be paid prior to debts of all other creditors, including Proof of Claim No. 18.  A declaration from the Court is necessary to determine the rights and responsibilities of the parties.

71.    Inferno seeks a declaration from the Court to the effect that Proof of Claim No. 18 is ineffective as a matter of law and that no security interest or priority was created as Hankey Capital contends.  Therefore, Inferno's debt is not subordinated to the debt of Hankey Capital as referenced in Proof of Claim No. 18. The Court should further determine that Proof of Claim No. 18 filed by Hankey Capital is disallowed as a secured claim for all purposes, the reasons set forth above.

## EIGHTH CLAIM FOR RELIEF

### (Declaratory Relief Regarding Whether the Rebate and the DIP Loan Proceeds Are Unencumbered)

72.    Inferno repeats and realleges the allegations contained in Paragraphs 1 through 37, inclusive, and incorporates them herein by reference as if set forth in full herein.

73.    In order to obtain the postpetition loan from Hankey Capital, Debtor represented that the Property was worth as much as $325 million so that the secured creditors were adequately protected by the equity in the Property.  Relying on Debtor's representations, the Court authorized Debtor to borrow up to $12 million secured by a first priority lien against the Property.  Upon Court approval, Debtor immediately drew down the entire $12 million loan.  Debtor did not spend the full $12 million.

74.    In connection with the sale of the Property, Debtor repaid Hankey Capital $12,084,999.98 from the proceeds from the sale of the Property instead of returning the unused DIP Loan Proceeds and paying the difference from the sale proceeds.  Inferno is informed and believes and on that basis alleges that Debtor is holding approximately $3.6 million, less professional fees recently authorized to be paid, that are attributable to the post-petition loan and Debtor contends that these DIP

THIRD AMENDED COMPLAINT FOR DECLARATORY RELIEF

Loan Proceeds are unencumbered funds.  The Court has not made a finding about whether the DIP Loan Proceeds are unencumbered or not.

75.     Further, in connection with the employment of Concierge Auctions, Debtor negotiated for Concierge to rebate to the estate 9.5% of the 12% buyer's premium to which Concierge was otherwise entitled.  Debtor and its agents have conceded on the record that buyers factor in the buyer's premium when bidding on property so that the amount of the buyer's premium has a direct negative impact on the purchase price to be paid by the bidder for the property.  The Court has not made a finding about whether the Rebate is unencumbered.  Inferno alleges that the Rebate resulted in a decreased purchase price for the Property that has directly harmed the lienholders, including Inferno.

76.     No one anticipated that the auction of the Property would have the dismal outcome that it did.  Debtor, its agents and Hankey Capital repeatedly stated and represented to the Court that the Property was worth $325 million but that even if it went for as low as $200 million, all secured creditors would be adequately protected.  If the parties were aware that the sale of the Property would result in a purchase price of only $126 million, Inferno would have objected to Debtor obtaining the post-petition loan from Hankey Capital and/or to certain of its terms on the basis that it was not in fact adequately protected.  If the parties knew that the Property would be sold for $126 million, they would have objected to Debtor's proposal for a rebate of the buyer's premium and instead insisted that Concierge just reduce its buyer's premium for this transaction so that the purchase price was not artificially depressed.  Inferno is informed and believes that the Court likely would have sustained the objections.

77.     Inferno believes that there is a dispute between the lienholders and Debtor about whether the Rebate and the DIP Loan Proceeds are available to pay the secured lienholders and seeks a declaration that the Rebate and the DIP Loan Proceeds are not unencumbered and cannot be used to pay unsecured claims unless

THIRD AMENDED COMPLAINT FOR DECLARATORY RELIEF

all parties with liens against the Property, including Inferno and Defendant Lienholders, are paid in full.

## NINTH CLAIM FOR RELIEF

### (Fraudulent Misrepresentation and Rescission of the MOA As Against Debtor)

78.    Inferno repeats and realleges the allegations contained in Paragraphs 1 through 37, inclusive, and incorporates them herein by reference as if set forth in full herein.

79.    As of November 2015, Inferno had been the primary lender on the Property for approximately 2½ years.  The parties recorded the Modification and Supplement to Deed of Trust on November 10, 2015, confirming the amount of Inferno's secured debt as $10,925,545 as of that time.  At approximately the same time, Nile Niami of Debtor approached Julien Remillard of Inferno with regard to the possibility of entering into the MOA.  In the course of these discussions, Niami made the following representations to Remillard in an attempt to induce Remillard to enter into the MOA and continue Inferno's financing and support of the Property while Niami sought additional bank lending to complete development:

a.    That in the event that Debtor obtained any loans for which subordination under the MOA was sought or needed, there would be notice to and written signed consent from Inferno; and

b.    That any additional monies obtained for the Property as contemplated by the MOA would be used solely to complete construction and improvements on the Property; no such funds would be used for Niami's other projects, or for personal uses.

80.    All of these misrepresentations were made by Niami on behalf of Debtor to Julien Remillard of Inferno over the telephone, with Niami being in Los Angeles and Remillard in Montreal, Quebec, respectively, among other places, and in oral conversations between the two in Los Angeles.

THIRD AMENDED COMPLAINT FOR DECLARATORY RELIEF

81.     Debtor's fraudulent misrepresentations were materially false and misleading because no reasonable real estate lender with priority would enter into an agreement to lend a developer money without the assurances constituted by the fraudulent misrepresentations.  It makes no sense for Inferno to enter into the MOA if Debtor planned to subordinate Inferno's loans to other loans without Inferno's consent and planned to use those additional monies for Niami's other projects or personal uses.

82.     Inferno reasonably and justifiably relied on Debtor's fraudulent misrepresentations because Inferno had no reason to doubt the truthfulness of the representations.  Inferno believed Debtor was a legitimate company that shared a common interest with it to build a professional relationship with one another and build the Property in a professional manner.

83.     In reasonable and justifiable reliance on Debtor's fraudulent misrepresentations, Inferno entered into the MOA in or around January 1, 2016. Based entirely on the representations by Niami alleged above, Julien Remillard executed the MOA in Montreal, Quebec on behalf of Inferno.

84.     The MOA was entered into by Inferno solely as a result of the material oral misrepresentations by Debtor to Inferno as alleged above.  Remillard agreed to enter into the MOA and sign the MOA on Inferno's behalf based solely on Niami's misrepresentations on behalf of Debtor that all loans for which subordination were sought would be subject to written notice to and consent of Inferno and that all loan monies would exclusively be used for the Property.

85.     In approximately July 2016, the parties to the MOA determined that a substantial loan on the Property would be made by First Credit Bank and that Inferno's claim would be subordinated to that new loan under the MOA.  Inferno and Debtor, therefore, entered into a written Amendment No. 1 to the MOA with respect to that new loan.  Subsequent amendments to the MOA were also entered into with regard to other loans to which the parties intended that their debts would be

THIRD AMENDED COMPLAINT FOR DECLARATORY RELIEF

1    subordinated.  At no time did the parties including Inferno agree to subordinate under

2    the MOA to debts of the Defendant Lienholders, including Hankey Capital.

3         86.    Debtor and Hankey Capital and others subsequently took the position

4    that Inferno's lien and claim should be subordinated under the MOA to alleged loan

5    obligations on the Property as to which Inferno did not receive notice and did not

6    consent.  Among other things, Debtor and Hankey Capital have asserted that Hankey

7    Capital's loans to Debtor exceeding $100 million should be subordinated pursuant to

8    the MOA and its amendments.  In support of this fraudulent scheme, Debtor and

9    Hankey Capital have also asserted the existence of the forged Subordination

10   Agreement.  The position that Inferno's lien should be subordinated to Hankey

11   Capital under the MOA is completely contrary to the representations made at the

12   inception of the MOA based on which Inferno agreed to enter into the MOA.

13        87.    After making the fraudulent misrepresentations to Inferno resulting in

14   the execution of the MOA, Debtor received without Inferno's knowledge and consent

15   many millions of dollars in loans to be used solely for construction and

16   improvements of the Property.  Debtor, however, misappropriated these sums for

17   other properties affiliated with Nile Niami and Yvonne Niami and other personal

18   purposes.

19        88.    Inferno is informed and believes and, on that basis, alleges that Debtor

20   knew or had reason to know that the fraudulent misrepresentations set forth in

21   Paragraph 79 were false when Debtor made them because, almost immediately after

22   entering the MOA with Inferno, Debtor subordinated Inferno's loan without its

23   written consent, and Debtor was irresponsibly and inefficiently spending him time

24   and money throughout the construction period for the Property and began improperly

25   and inefficiently disbursing loan funds that it had accepted.

26        89.    Inferno is informed and believes and, on that basis, alleges that

27   Defendant deliberately misrepresented the fraudulent representations set forth in

28   Paragraph 79 with the intent to defraud Inferno and to induce Inferno to loan Debtor

28

1    its money, enter into the MOA and its amendments, continue the pending

2    relationship and lending of funds to Debtor, and allow Debtor to accept and misuse

3    loan funds for purposes other than development of the Property.

4         90.    At the time the fraudulent misrepresentations set forth in Paragraph 79

5    were made by Nile Niami on behalf of Debtor, and at the time Inferno acted in

6    reliance on them, Inferno was ignorant of the true facts that Debtor did not plan to

7    use any of Defendant Lienholders' loans for the construction and improvement of the

8    Property and did not intend to provide notice to Inferno and receive written consent

9    from Inferno before seeking to subordinate loans made by Defendant Lienholders.

10         91.    Debtor's intentional misrepresentations, inducing Inferno's reliance

11    thereon, was the direct and proximate cause of Inferno's loss, which Inferno would

12    not have sustained but for Debtor's fraud.

13         92.    Inferno sustained significant damage.  Inferno's compensatory damages

14    are subject to proof at trial.  Inferno entered into the MOA and failed to pursue

15    repayment of millions of dollars that Debtor has now purportedly subordinated to

16    loans made by Defendant Lienholders without Inferno's written consent.  Inferno

17    would have never agreed to the terms of the MOA had it not relied on the fraudulent

18    misrepresentations alleged above.

19         93.    In addition, Debtor willfully acted with oppression, malice, and with

20    conscious disregard of the rights of Inferno by making the fraudulent

21    misrepresentations set forth in Paragraph 79 with no intent to honor them and in a

22    way that it knew would cause Inferno to rely on them to its detriment.  Pursuant to

23    Debtor's fraudulent inducement of Inferno based on the material fraudulent

24    misrepresentations alleged above, Inferno is entitled to recover punitive or exemplary

25    damages according to proof pursuant to California Civil Code Section 3294.

26         94.    Furthermore, based upon Debtor's fraudulent inducement of Inferno to

27    enter the MOA and its amendments based on the material fraudulent

28    misrepresentations alleged above, Inferno is entitled to rescission of the MOA and its

THIRD AMENDED COMPLAINT FOR DECLARATORY RELIEF

amendments, as well as a determination that the MOA is null and void.  Inferno seeks
rescission of the MOA in its entirety.  Although the MOA is only between Inferno
and Debtor and rescission is thus required only against Debtor, the rescission should
be deemed effective against the claims of all other parties, including the Defendant
Lienholders who seek to utilize the MOA's terms.

## TENTH CLAIM FOR RELIEF

### (Fraudulent Concealment of Material Facts and Rescission of the MOA As Against Debtor)

95.    Inferno repeats and realleges the allegations contained in Paragraphs 1
through 37, inclusive, and incorporates them herein by reference as if set forth in full
herein.

96.    During the course of the communications between Nile Niami of
Debtor, and Julien Remillard of Inferno, with regard to the MOA, Niami on behalf of
Debtor failed to disclose, and affirmatively concealed from Inferno, key facts relating
to the MOA and Inferno's financing of the Property.  Among other things, Niami on
behalf of Debtor concealed from Inferno the following:

a.    That Debtor intended to obtain loan funds from various lenders,
including Hankey Capital, Yogi Securities and Hilldun and use the proceeds of such
loans for Niami's and/or Yvonne Niami's other properties or for Niami's personal
purposes, notwithstanding the terms of the MOA or Debtor's obligations to Inferno;

b.    That Debtor intended to obtain loans that would be secured by
the Property and use those funds for purposes other than construction of the
Property; and

c.    That Debtor intended to obtain loans without Inferno's consent
that arguably would be subject to the terms of the MOA and as to which Debtor
would contend Inferno became subordinated under the MOA.

97.    Under the circumstances, including Inferno's substantial loans to
Debtor and the terms of the MOA, Niami had a duty on behalf of Debtor to disclose

THIRD AMENDED COMPLAINT FOR DECLARATORY RELIEF

the facts referenced above.  These facts were material, and Debtor failed to disclose them with the specific intent to mislead Inferno by causing Inferno to enter into the MOA and continue to lend to Debtor and support the Property.

98.    Inferno was unaware of the material facts that were concealed by Debtor as alleged above.  Inferno reasonably and justifiably relied on Debtor's concealments of material facts and had no reason to doubt that such facts were being concealed.  Had Inferno known of the material facts that were concealed, it never would have entered into the MOA or its amendments or loaned the funds to Debtor on the Property.

99.    Debtor acted willfully and with oppression, malice, and with conscious disregard of the rights of Inferno by concealing the facts alleged herein in a way that it knew would cause Inferno to rely to its detriment.  Pursuant to Debtor's fraudulent concealment as alleged above, Inferno is entitled to recover punitive or exemplary damages according to proof pursuant to California Civil Code Section 3294.

100.   Furthermore, based upon Debtor's fraudulent concealment of material facts that induced Inferno to enter the MOA and its amendments, Inferno is entitled to rescission of the MOA and its amendments, as well as a determination that the MOA is null and void.  Inferno seeks rescission of the MOA in its entirety.  Although the MOA is only between Inferno and Debtor and rescission is thus required only against Debtor, the rescission should be deemed effective against the claims of all other parties, including the Defendant Lienholders who seek to utilize the MOA's terms.

## **ELEVENTH CLAIM FOR RELIEF**

### **(Intentional Interference With Contract As Against Hankey Capital)**

101.   Inferno repeats and realleges the allegations contained in Paragraphs 1 through 37, inclusive, and incorporates them herein by reference as if set forth in full herein.

THIRD AMENDED COMPLAINT FOR DECLARATORY RELIEF

102.   Inferno at all relevant times had valid and existing contracts with Debtor.  Among other things, on March 13, 2013, Inferno and Debtor entered into two separate loan agreements to develop the Property.  Inferno's loans were memorialized by promissory notes secured by deeds of trust recorded on the Property with the Los Angeles County Recorder.

103.   Hankey Capital first became involved with the Property in October 2018.  At that time, Hankey Capital was fully aware that other lenders, including Inferno, had already loaned significant amounts of money to Debtor secured by the Property.  Hankey Capital was aware of Inferno's involvement and significant monies it loaned on the Property based upon documents filed with the Los Angeles County Recorder's Office, Hankey Capital's discussions with the principals involved with the Property and Debtor, and its attempts to convince Debtor and Inferno to subordinate to liens proposed by Hankey Capital.

104.   Armed with knowledge of the competing lenders, Hankey Capital made the Initial Hankey Loan of $82.5 million and represented in the Construction Loan Agreement that the proceeds of its $82.5 million loan would be fully sufficient to complete construction of the Property (Paragraph 6.9).  In addition, Hankey Capital further committed to a procedure for loan disbursement requests and expenditures to ensure that the proceeds would be used for that purpose exclusively (Paragraph 3.4 and Exhibit D) and that the Property and all lenders would be protected.

105.   Knowing the involvement and significant exposure of other lenders and particularly Inferno's lending relationship, Hankey Capital refused and failed to follow the contractual procedure under the Construction Loan Agreement because it was to Hankey Capital's financial advantage to ignore it notwithstanding the effect on other lenders.  Hankey Capital refused and failed to comply with its contractual obligations under the Construction Loan Agreement and continued cavalierly to loan additional monies to Debtor without regard to how those funds were used because it allowed Hankey Capital to pay itself large sums of interest that were allegedly

THIRD AMENDED COMPLAINT FOR DECLARATORY RELIEF

1   already past due, loan even more interest-generating funds, obtain exorbitant

2   enhanced, default-rate interest payments, increase its influence over Debtor and

3   potentially foreclose on a valuable asset of Debtor at the expense of other creditors

4   such as Inferno.

5       106.  Indeed, as alleged in Paragraphs 27 and 28 in the Complaint, Hankey

6   Capital continued to substantially increase the principal balance of its loan to Debtor,

7   combined with its concomitant refusal to monitor what was happening with the loan

8   money.  This substantially increased the risk of default and ultimately led to default

9   by Debtor and this bankruptcy proceeding.  Hankey Capital first made an additional

10  optional advance in December 2019 increasing the loan balance to $91 million, and

11  then in August 2020 made an additional optional loan increasing the balance to $106

12  million, knowing that Inferno did not consent to these substantial modifications.

13  Significantly, the additional loan monies extended by Hankey Capital went primarily

14  to merely repaying interest on Hankey Capital's prior alleged loans, pursuant to

15  Hankey Capital's scheme of loaning Debtor monies simply to pay itself interest on its

16  own loans.  Because of the substantial value of the Property, Hankey Capital at the

17  time was confident that it would be paid, and had no incentive to responsibly lend or

18  monitor loan disbursements or expenditures.  By perpetuating this intentional and

19  predatory lending scheme, Hankey Capital intentionally induced Debtor to breach or

20  disrupt its contractual relationship with Inferno.

21      107.  Hankey Capital knew at the time it engaged in this conduct that its

22  actions were substantially certain to interfere with Debtor's obligations to Inferno

23  and, in fact, were substantially certain to result in the filing of a bankruptcy by

24  Debtor that would critically damage Inferno and other lenders.  As a result of Hankey

25  Capital's intentional wrongful conduct, Debtor could not, and did not repay Inferno

26  its loan with interest as required by the promissory notes.  Inferno seeks

27  compensatory damages against Hankey Capital as a result of its intentional

28

THIRD AMENDED COMPLAINT FOR DECLARATORY RELIEF

interference with Inferno's contractual relationships with Debtor, in an amount according to proof at trial.

108.    Hankey Capital acted willfully, with oppression, malice, and conscious disregard of the rights of Inferno by acting as alleged herein, in a way that it knew would interfere with and cause a breach of Debtor's obligations to Inferno.  Based on Hankey Capital's intentional interference with Inferno's valid and existing contracts with Debtor, Inferno is entitled to recover punitive or exemplary damages according to proof pursuant to California Civil Code Section 3294.

## **PRAYER FOR RELIEF**

WHEREFORE, Inferno prays for judgment as follows:

**As to the First Claim for Relief:**

1.    For judicial determinations in the following respects:

a.    That Hankey Capital's alleged obligation is not secured and has no priority over the secured claim of Inferno as referenced in Claim No. 11;

b.    That the Court otherwise order the priority of claims of Hankey Capital and Inferno, in their entirety, and order that Inferno's claim has priority, pursuant to California Code of Civil Procedure section 1060, 28 U.S.C. 2201, and Rule 7001(2) and (9) of the Federal Rules of Bankruptcy Procedure;

**As to the Second Claim for Relief:**

2.    For judicial determinations in the following respects:

a.    That Hankey Capital's alleged obligation has no priority over the secured claim of Inferno as referenced in Claim No. 11 because, among other things, the Subordination Agreement is a forgery;

b.    That the Court otherwise order the priority of claims of Hankey Capital and Inferno, in their entirety, and order that Inferno's claim has priority pursuant to California Code of Civil Procedure section 1060, 28 U.S.C. 2201, and Rule 7001(2) and (9) of the Federal Rules of Bankruptcy Procedure;

THIRD AMENDED COMPLAINT FOR DECLARATORY RELIEF

**As to the Third Claim for Relief:**

3.      For judicial determinations in the following respects:

a.      That Hankey Capital's alleged obligation has no priority over the claim of Inferno as referenced in Claim No. 11, and that Hankey Capital's claim should be equitably subordinated to Inferno's secured claim due to material modifications Hankey Capital made unilaterally and without consent which increased Inferno's financial risk;

b.      That the Court otherwise order the priority of claims of Hankey Capital and Inferno, in their entirety, and equitably subordinate Hankey Capital's claim in whole or in part pursuant to California Code of Civil Procedure section 1060, 28 U.S.C. 2201, and Rule 7001(2) and (9) of the Federal Rules of Bankruptcy Procedure;

**As to the Fourth Claim for Relief:**

4.      For judicial determinations in the following respects:

a.      That Hankey Capital's alleged obligation has no priority over the secured claim of Inferno as referenced in Claim No. 11 because of Hankey Capital's optional advances knowing of Inferno's interest and without Inferno's consent;

b.      That the Court otherwise order and subordinate the priority of claims of Hankey Capital and Inferno, in their entirety, pursuant to California Code of Civil Procedure section 1060, 28 U.S.C. 2201, and Rule 7001(2) and (9) of the Federal Rules of Bankruptcy Procedure;

**As to the Fifth Claim for Relief:**

5.      For a judicial determination that the secured debt to Inferno in the amount determined by the Court pursuant to Proof of Claim No. 11 is not subordinate to any amounts alleged owed to Defendant Lienholders based on the MOA, and that Inferno's debt has priority and should be paid first from the proceeds of the sale of Debtor's assets prior to payments to Defendant Lienholders;

THIRD AMENDED COMPLAINT FOR DECLARATORY RELIEF

**As to the Sixth Claim for Relief:**

6. For a determination that the claim of Inferno as referenced in Proof of Claim No. 11 has never been subordinated to debts allegedly owing to Defendant Lienholders and Inferno's claim has priority over the claims of all other secured creditors of Debtor including Defendant Lienholders' claims, and all amounts owed to Inferno shall be paid from proceeds of the sale of Debtor's assets prior to payments to Defendant Lienholders;

**As to the Seventh Claim for Relief:**

7. For a judicial determination declaring that Proof of Claim No. 18 filed by Hankey Capital has no priority over Inferno's secured debt, is ineffective as a matter of law, and is disallowed as a secured claim;

**As to the Eighth Claim for Relief:**

8. For an order that the Rebate and the DIP Loan Proceeds are not unencumbered funds and may not be used to pay unsecured claims;

**As to the Ninth Claim for Relief:**

9. For compensatory damages against Debtor as a result of its fraudulent misrepresentations that induced Inferno to enter into the MOA;

10. For punitive or exemplary damages against Debtor according to proof;

11. For an order rescinding the MOA against Debtor (and all Defendants, to the extent they rely) *ab initio*;

**As to the Tenth Claim for Relief:**

12. For compensatory damages against Debtor as a result of its fraudulent concealments that induced Inferno to enter into the MOA and lend monies for the Property;

13. For punitive or exemplary damages against Debtor according to proof;

14. For an order rescinding the MOA against Debtor (and all Defendants, to the extent they rely) *ab initio;*

THIRD AMENDED COMPLAINT FOR DECLARATORY RELIEF

**As to the Eleventh Claim for Relief:**

15.    For compensatory damages against Hankey Capital as a result of its intentional interference with the contractual relations between Inferno and Debtor;

16.    For punitive or exemplary damages against Hankey Capital according to proof;

**As to All Claims for Relief:**

17.    For costs of suit incurred herein;

18.    For such other and further relief as the Court deems appropriate.

DATE:  November 27, 2024          LAVELY & SINGER
                                  PROFESSIONAL CORPORATION
                                  MARTIN D. SINGER
                                  PAUL N. SORRELL
                                  MAX D. FABRICANT


                                  By:  /s/ Paul N. Sorrell
                                       PAUL N. SORRELL
                                  Attorneys for Plaintiff INFERNO
                                  INVESTMENT, INC.

THIRD AMENDED COMPLAINT FOR DECLARATORY RELIEF

# EXHIBIT 1

## MEMORANDUM OF AGREEMENT

This Memorandum of Agreement is made and entered into this /_st_ day of
_January_ , 2016 by and between CRESTLLOYD, LLC, a California Limited Liability
Company ("Crestlloyd") and INFERNO INVESTMENTS INC. ("Inferno").

### RECITALS

The parties desire to set forth their respective rights with regard to distribution
of proceeds at such time as the residence being constructed by Crestlloyd (as successor
to the Company) at 944 Airole Way, Los Angeles, California (the "Residence") is sold.

NOW, THEREFORE, IT IS AGREED AS FOLLOWS:

1.    Incorporation of Recitals.    The above Recital is incorporated herein by this
reference as though made a part hereof.

2.    Division of Profits and Losses.    Profits and Losses shall be allocated as
follows:   Fifty percent (50%) to Crestlloyd for Developer fee and fifty percent (50%) to
Crestlloyd and Inferno in proportion to the money loaned by each to finance the
construction of the Residence.

For Example: Assume Inferno loaned $18,000,000.00 and Crestlloyd loaned
$41,000,000.00.   Inferno's share of the profits and losses is 15.25% ($18,000,000 ÷
$59,000,000 = 30.5% multiplied by 50% = 15.25%).  Crestlloyd's share of the profits and
losses is 84.75% ($41,000,000 ÷ $59,000,000 = 69.5% multiplied by 50% = 34.75%), plus
Crestlloyd's Developer fee of 50% = 84.75%.

3.    Distributions.  All proceeds received from a sale, condemnation, financing or
refinancing of the Residence shall be distributed in the following manner:

First, to repay the loan(s) obtained from a bank or third parties (excluding
Crestlloyd and Inferno) and all other unpaid costs of construction of the Residence.

Second, to Crestlloyd and Inferno, pro rata, in repayment of any loans owing
them, together with simple interest thereon at the rate of eight percent (8%) per annum.

Third, to Crestlloyd, the sum of ONE HUNDRED FORTY-FIVE THOUSAND
DOLLARS ($145,000.00) as compensation for general office overhead and services
rendered by it in connection with the construction of the Residence.

Thereafter, to Crestlloyd and Inferno in accordance with their share of the
profits and losses determined in the manner set forth in paragraph 2 above.

IN WITNESS HEREOF, the parties have executed this Memorandum of Agreement,
effective as of the date set forth above.

CRESTLLOYD, LLC, a California
Limited Liability Company

By _____
          Nile Niami, Manager

INFERNO INVESTMENTS INC.

By _____
          Julian Remillard, Director

**AMENDMENT NO. 1**

**TO MEMORANDUM OF AGREEMENT**

## AMENDMENT NO. 1

## TO AMENDMENT OF AGREEMENT

This Amendment No. 1 to Memorandum of Agreement is entered into this _____ day of July, 2016 by and between CRESTLLOYD, LLC, a California Limited Liability Company ("Crestlloyd") and INFERNO INVESTMENTS INC. ("Inferno").

## RECITALS

A.   Crestlloyd and Inferno previously entered into a Memorandum of Agreement dated January 1, 2016 with regard to division of profits and losses on the sale of the real property located at 944 Airole Way, Los Angeles, California (the "Residence").

B.   Deeds of Trust have been recorded against the Residence in favor of Inferno to secure the loans which it, and its predecessor, previously made to Crestlloyd.

C.   Crestlloyd previously obtained a loan from First Republic Bank which loan is secured by a first Deed of Trust on the Residence. Crestlloyd desires to refinance the existing loan with a new loan to be made by First Credit Bank ("New Lender"). In order to refinance the existing loan New Lender requires that Inferno subordinate the Liens of its Deeds of Trust on the Residence to the new loan to be obtained by Crestlloyd from New Lender in the amount of Forty Million Dollars ($40,000,000.00) which will be secured by a First Trust Deed on the Residence (the "New Loan").

D.   Inferno is willing to subordinate the Liens of its Deeds of Trust on the Residence to the New Loan for the consideration hereafter set forth.

NOW, THEREFORE, IT IS HEREBY AGREED AS FOLLOWS:

1.   Incorporation of Recitals. Each and all of the above Recitals are incorporated herein by this reference as though set forth in full hereat.

2.   Subordination. Inferno hereby agrees to subordinate the Liens of its Deeds of Trust on the Residence to the Lien of the First Deed of Trust securing the New Loan. In connection therewith Inferno agrees to execute any and all documents reasonably required by New Lender to evidence the subordination.

3.   Consideration. In consideration of Inferno subordinating the Liens of its Deeds of Trust to a first Deed of Trust that will secure the New Loan, Crestlloyd agrees that the percentage of profits and losses set forth in paragraph 2 of the Memorandum of Agreement shall be adjusted to provide for Inferno to be allocated an additional one and one-half percent (1.5%) of the profits and losses on the sale of the Residence (the "Additional Percentage"). The Additional Percentage to be allocated to Inferno shall be deducted from the percentage of profits and losses allocated to Crestlloyd.

For Example:  Assume that, pursuant to the formula set forth in paragraph 2 of the Memorandum of Agreement, Crestlloyd is allocated eighty-four and three-quarter percent (84.75%) of the profits and losses and Inferno is allocated  fifteen and one-quarter percent (15.25%) of the profits and losses.  The profits and losses will now be adjusted and allocated as follows:  83.25% to Crestlloyd and 16.75% to Inferno.

4.    No Other Changes.  Except as herein expressly provided, all of the terms and provisions of the Memorandum of Agreement  shall remain in full force and effect.

Dated the day and year set forth above.

CRESTLLOYD, LLC, a California          INFERNO INVESTMENTS INC.
Limited Liability Company

By_____          By_____
    Nile Niami, Manager                  Julien Remillard, Director

AMENDMENT NO 2.

TO MEMORANDUM OF AGREEMENT

This Amendment No. 2 to Memorandum of Agreement is entered into this 27th day of September , 2016 between CRESTLLOYD, LLC, a California Limited Liability Company ("Crestlloyd") and INFERNO INVESTMENT, INC. ("Inferno").

RECITALS

A.    Crestlloyd and Inferno previously entered into a Memorandum of Agreement dated January 1, 2016, which was amended July ____, 2016, with regard to division of profits and losses on the sale of the real property located at 944 Airole Way, Los Angeles, California (the "Residence").

B.    Deeds of Trust have been recorded against the Residence in favor of Inferno to secure the loans which it and its predecessor previously made to Crestlloyd.

C.    Crestlloyd previously obtained a loan with First Credit Bank which loan is secured by a first Deed of Trust on the Residence.  Crestlloyd desires to take on additional loans or refinance the existing loan with a new loan or loans to be made by First Credit Bank or another bank or a combination thereof (collectively "New Lender").  In order to accomplish same, New Lender requires that Inferno subordinate the Liens of its Deeds of Trust on the Residence to the new loan(s) to be obtained by Crestlloyd ("the New Loan") in an amount which, in the aggregate, including existing bank loans, shall not exceed fifty-two million dollars ($52 million), which shall be secured by a First Trust Deed on the Residence.

D.    Inferno is willing to subordinate the Liens of its Deeds of Trust on the Residence to the New Loan for the consideration hereafter set forth.

NOW, THEREFORE, IT IS HEREBY AGREED AS FOLLOWS:

1.    Incorporation of Recitals.  Each and all of the above Recitals are incorporated herein by this reference as though set forth in full hereat.

2.    Subordination.  Inferno hereby agrees to subordinate the Liens of its Deeds of Trust on the Residence to the Lien of the First Deed of Trust securing the New Loan.  In connection therewith Inferno agrees to execute any and all documents reasonably required by New Lender to evidence the subordination.

3.    Consideration.  In consideration of Inferno subordinating the Liens of its Deeds of Trust to a first Deed of Trust that will secure the New Loan,

Crestlloyd shall immediately pre pay two million dollars  $2,000,000.00) of loan principal ("Principal") owed to Inferno, thereby reducing the total amount of Principal to sixteen million dollars ($16,000,000.00).  Notwithstanding the foregoing, Interest due Inferno shall continue to accrue from the date hereof on the amount of eighteen million dollars ($18,000,000.00).

   4. <u>Interest Bearing Periods.</u>  The parties agree that Interest shall not be payable to either party during periods when the Property is being rented out to third parties.

   5. <u>No Other Changes</u>.  Except as herein expressly provided, all of the terms and provisions of the Memorandum of Agreement as previously amended shall remain in full force and effect.

   Dated the day and year set forth above.


CRESTLLOYD, LLC, a California   INFERNO INVESTMENT, INC.,
Limited Liability Company     a Canadian Corporation

By _____  By _____
   Nile Niami, Manager      Julien Remillard, Director

## REVISED AMENDMENT NO 2.

## TO MEMORANDUM OF AGREEMENT

This Revised Amendment No. 2 to Memorandum of Agreement is entered into this 28th day of September , 2016 between CRESTLLOYD, LLC, a California Limited Liability Company ("Crestlloyd") and INFERNO INVESTMENT, INC. ("Inferno").

## RECITALS

A.    Crestlloyd and Inferno previously entered into a Memorandum of Agreement dated January 1, 2016, which was amended July _____, 2016, with regard to division of profits and losses on the sale of the real property located at 944 Airole Way, Los Angeles, California (the "Residence").

B.    A document entitled Amendment No 2 was previously executed between the parties, however that document is deemed null and void upon execution of this Revised Amendment No. 2.

C.    Deeds of Trust have been recorded against the Residence in favor of Inferno to secure the loans which it and its predecessor previously made to Crestlloyd.

D.    Crestlloyd previously obtained a loan with First Credit Bank which loan is secured by a first Deed of Trust on the Residence.  Crestlloyd desires to take on additional loans or refinance the existing loan with a new loan or loans to be made by First Credit Bank or another bank or a combination thereof (collectively "New Lender").  In order to accomplish same, New Lender requires that Inferno subordinate the Liens of its Deeds of Trust on the Residence to the new loan(s) to be obtained by Crestlloyd ("the New Loan") in an amount which, in the aggregate, including existing bank loans, shall not exceed fifty-two million dollars ($52 million), which shall be secured by a First Trust Deed on the Residence.

E.    Inferno is willing to subordinate the Liens of its Deeds of Trust on the Residence to the New Loan for the consideration hereafter set forth.

NOW, THEREFORE, IT IS HEREBY AGREED AS FOLLOWS:

1.    Incorporation of Recitals. Each and all of the above Recitals are incorporated herein by this reference as though set forth in full hereat.

2.    Subordination. Inferno hereby agrees to subordinate the Liens of its Deeds of Trust on the Residence to the Lien of the First Deed of Trust securing the New Loan.  In connection therewith Inferno agrees to execute any

and all documents reasonably required by New Lender to evidence the subordination.

     3.    <u>Incentive.</u>  As an incentive for Inferno to subordinate the Liens of its Deeds of Trust to a first Deed of Trust that will secure the New Loan, Crestlloyd shall immediately pre pay to Inferno two million dollars  $2,000,000.00.  It is agreed that this payment shall be made in reduction of the outstanding indebtedness owing to Inferno and not as consideration or Interest.

     4.    <u>Interest and Interest Bearing Periods.</u>  The parties agree that Interest shall not be payable to either party during periods when the Property is being rented out to third parties.

     5.    <u>No Other Changes</u>.  Except as herein expressly provided, all of the terms and provisions of the Memorandum of Agreement as previously amended shall remain in full force and effect.

     Dated the day and year set forth above.


CRESTLLOYD, LLC, a California
Limited Liability Company

By _____
    Nile Niami, Manager


INFERNO INVESTMENT, INC.,
a Canadian Corporation

By _____
    Julien Remillard,  Director

AMENDMENT NO 3

TO MEMORANDUM OF AGREEMENT


This Amendment No. 3 to Memorandum of Agreement is entered into this 29th day of Mar , 2018 between CRESTLLOYD, LLC, a California Limited Liability Company ("Crestlloyd") and INFERNO INVESTMENT INC. ("Inferno").

## RECITALS

     A.    Crestlloyd and Inferno previously entered into a Memorandum of Agreement dated January 1, 2016, which was amended July ____, 2016, and Feb ___, 2017 with regard to division of profits and losses on the sale of the real property located at 944 Airole Way, Los Angeles, California (the "Residence"). Except as modified by this Amendment No. 3, all previous items agreed to by the parties shall be incorporated herein.

     B.    Deeds of Trust have been recorded against the Residence in favor of Inferno or its associates to secure the loans which it and its predecessor previously made to Crestlloyd. (the "Inferno DOTs")

     C.    Deeds of Trust shall be recorded against the Residence in favor of Crestlloyd, its successor, designee or assigns, to secure the loans which it or its affiliated entities have made and may continue to make in order to complete construction and pay carrying costs associated with the Residence.  (the "Crestlloyd DOTs").

     D.    Crestlloyd previously obtained loans with First Credit Bank which are secured by Deeds of Trust on the Residence. (the "FCB DOTs"). Crestlloyd desires to refinance these existing bank loans with a new loan to be made by ABP Capital, LLC or its affiliate, C3 Capital, LLC (hereafter "New Lender").  In order to accomplish same, New Lender requires that Inferno subordinate the Liens of the Inferno DOTs to the new loan(s) to be obtained by Crestlloyd ("the New Loan") in an amount which, in the aggregate, (including existing First Credit Bank loans), shall not exceed eighty-five million dollars ($85 million), and which shall be secured by a new First Trust Deed on the Residence. (the "ABP DOT").

     E.    New Lender also requires that Crestlloyd subordinate the Liens of the Crestllloyd DOTs to the New Loan.

     F.    Crestlloyd and Inferno are willing to subordinate the Liens of their respective Deeds of Trust on the Residence to the New Loan for the consideration hereafter set forth.

     NOW, THEREFORE, IT IS HEREBY AGREED AS FOLLOWS:

1.    Incorporation of Recitals.  Each and all of the above Recitals are incorporated herein by this reference as though set forth in full hereat.

2.    Subordination.  Inferno hereby agrees (on a pari-passu basis with Crestlloyd) to subordinate the Liens of the Inferno DOTs to the ABP DOT.  In connection therewith, Inferno agrees to execute any and all documents reasonably required by New Lender to evidence the subordination.  Crestlloyd hereby agrees to subordinate the Liens of the Crestlloyd DOTs to the ABP DOT. In connection therewith Crestlloyd agrees to execute any and all documents reasonably required by New Lender to evidence the subordination.

3.    Consideration due Inferno.  In consideration of Inferno subordinating the Liens of the Inferno DOTs to the ABP DOT, Inferno shall receive from the first draw proceeds of the New Loan the sum of Five Million Four Hundred Fifty-Two Thousand One Hundred And Seventy-Four Dollars $5,452,174.00 ("Consideration").  This Consideration shall pay down $5,452,174.00 of loan principal owed to Inferno ("Inferno Principal").  Because an additional Two Million Dollars ($2,000,000.00) of Inferno Principal was previously paid down on October 3, 2016, the revised amount of Inferno Principal owing once this Consideration has been paid shall be Six Million Five Hundred Eighty-Seven Thousand Eight Hundred Twenty-Six Dollars ($6,587,826), (hereafter "Revised Inferno Principal").  Notwithstanding the foregoing, the Revised Inferno Principal amount is for Inferno internal accounting purposes only; Interest due Inferno shall continue to accrue from the date hereof on the full amount of Eighteen Million Dollars ($18,000,000.00).  The amount of Seven Million Four Hundred Fifty-Two Thousand One Hundred and Seventy-Four Dollars ($7,452,174.00) shall be deducted from Inferno's Share of Net Profits as defined in Section 5 below.

4.    Consideration due Crestlloyd.  In consideration of Crestlloyd subordinating the Liens of the Crestlloyd DOTs to the ABP DOT, and only in the event the New Loan has not been otherwise paid in full by the maturity date thereof, Inferno shall use its best efforts to loan or cause to be loaned to Crestlloyd, its designee, successor or assigns, the sum of at least Eighty-Five Million Dollars ($85,000,000.00) (the "Future Inferno-Arranged Loan") with terms mutually agreed to between the parties.:  The maturity date of the Future Inferno Loan shall be the date escrow closes upon the sale of the Residence ("Maturity Date").  The Future Inferno-Arranged Loan shall be secured by the lien of a new First Trust Deed to which the Inferno DOTs and Crestlloyd DOTs shall subordinate.  It is understood and agreed between the parties that the budget reflecting the Residence's construction and carrying costs shall be raised as necessary to accommodate the interest, points and/or fees required by the Future Inferno-Arranged Loan.

5.    Distribution of Net Profits.  All consideration paid to purchase the Residence shall be paid into escrow by the buyer.  "Gross Receipts" shall be defined as all monies so received by escrow.  "Net Receipts" shall be defined as that amount remaining after the deduction from Gross Receipts of the following:

2

a) all closing costs including but not limited to taxes, commissions, escrow fees, title fees, legal costs and fees, accounting fees, etc., b) that amount required to reconvey any First Trust Deeds from third-party lenders, it being agreed that the Inferno DOTs and the Crestlloyd DOTs shall NOT be considered as being from third-party lenders, however the Future Inferno-Arranged Loan SHALL be considered a third-party lender; and c) the sum of One Hundred And Forty Five Thousand Dollars $145,000, which shall be paid to Skyline Development or its designee as reimbursement for overhead expenses.  Net Receipts shall be disbursed in the following order: on a pro-rata, pari passu basis, to Inferno and Crestlloyd or their designees, successors or assigns, the amounts required to reconvey fully their respective DOTs.  The amount remaining, if any, shall be defined as "Net Profits".  Net Profits shall be disbursed as follows: Twenty-Four Per Cent (24%) to Inferno ("Inferno Share of Net Profits") and Seventy-Six Per Cent (76%) to Crestlloyd ("Crestlloyd Share of Net Profits").  Notwithstanding the aforesaid, the Inferno Share of Net Profits shall be decreased by the amount of $7,452,174.00, and this amount shall be paid instead to Crestlloyd.

5.      No Other Changes.  Except as herein expressly provided, all of the terms and provisions of the Memorandum of Agreement as previously amended shall remain in full force and effect.

Dated the day and year set forth above.


CRESTLLOYD, LLC, a California
Limited Liability Company

By _____
        Nile Niami, Manager


INFERNO INVESTMENT INC.,
a Canadian Corporation

By _____
        Julien Remillard, Director

REVISED AMENDMENT NO 3

TO MEMORANDUM OF AGREEMENT

This Amendment No. 3 to Memorandum of Agreement is entered into this 16th day of May, 2018 between CRESTLLOYD, LLC, a California Limited Liability Company ("Crestlloyd") and INFERNO INVESTMENT INC. ("Inferno").

## RECITALS

A.     Crestlloyd and Inferno previously entered into a Memorandum of Agreement dated January 1, 2016, which was amended July _____, 2016, and September 28, 2016 with regard to division of profits and losses on the sale of the real property located at 944 Airole Way, Los Angeles, California (the "Residence"). Except as modified by this Revised Amendment No. 3, all previous items agreed by the parties shall be incorporated herein.

B.     A previous document entitled AMENDMENT NO 3 TO MEMORANDUM OF AGREEMENT was executed by the parties on the 29th of March 2018

NOW, THEREFORE, IT IS HEREBY AGREED AS FOLLOWS:

1.     <u>Incorporation of Recitals</u>.  Each and all of the above Recitals are incorporated herein by this reference as though set forth in full hereat.

2.     The aforementioned AMENDMENT NO 3 TO MEMORANDUM OF AGREEMENT shall be deemed null and void as if it never existed.

5.     <u>No Other Changes</u>.  Except as herein expressly provided, all of the terms and provisions of the Memorandum of Agreement as previously amended shall remain in full force and effect.

Dated the day and year set forth above.

CRESTLLOYD, LLC, a California
Limited Liability Company

By _____
    Nile Niami, Manager

INFERNO INVESTMENT INC.,
a Canadian Corporation

By _____
    Julien Remillard, Director

# EXHIBIT 2

CONSTRUCTION LOAN AGREEMENT

BETWEEN

CRESTLLOYD, LLC,
A CALIFORNIA LIMITED LIABILITY COMPANY,
AS BORROWER

AND

HANKEY CAPITAL, LLC,
A CALIFORNIA LIMITED LIABILITY COMPANY,
AS LENDER

EXECUTED AS OF OCTOBER 25, 2018

CONSTRUCTION LOAN AGREEMENT

THIS CONSTRUCTION LOAN AGREEMENT ("Agreement") is executed as of October 25, 2018 by and between CRESTLLOYD, LLC, a California limited liability company (the "Borrower"), and HANKEY CAPITAL, LLC, a California limited liability company ("Lender").

RECITALS

A. Borrower owns or will own certain real property described in EXHIBIT A hereto ("Property").

B. Borrower proposes to construct new improvements or renovate existing improvements on the Property consisting of: a single family residence, together with all appurtenances, fixtures, and tenant improvements now or hereafter located on the Property ("Improvements"). The Improvements shall be constructed in accordance with plans and specifications which Borrower has heretofore, or will hereafter deliver to Lender, as amended in order to comply with the terms and conditions of this Agreement ("Plans and Specifications"). Borrower has requested from Lender a loan for the purpose of such construction.

NOW, THEREFORE, Borrower and Lender agree as follows:

ARTICLE 1. DEFINITIONS

1.1. Defined Terms. The following capitalized terms generally used in this Agreement shall have the meanings defined or referenced below. Certain other capitalized terms used only in specific sections of this Agreement are defined in such sections.

1

"Account" - means an account with Bank, account number _____, in the name of Borrower or Borrower's designee into which Loan proceeds will be deposited.

"ADA" - means the Americans with Disabilities Act, 42 U.S.C. Section 12101, et seq. as now or hereafter amended or modified.

"Affiliate" - means, as to any person or entity, any person or entity which, directly or indirectly, controls, is controlled by or is under common control with, or which has the power to control the management or operations of, such person or entity.

"Bank" - means _____.

"Bankruptcy Code" - means the Bankruptcy Reform Act of 1978 (11 U.S.C. Section 101-1330) as now or hereafter amended or recodified.

"Bonded Work" - shall have the meaning ascribed to such term in Section 8.1.

"Border Zone Property" - means any property designated as "border zone property" under the provisions of California Health and Safety Code, Sections 25220 et seq., or any regulation adopted in accordance therewith.

"Borrower" - means CRESTLLOYD, LLC, a California limited liability company.

"Borrower's Funds" - means all funds of Borrower deposited with Lender into the Borrower's Funds Account maintained with Bank pursuant to the terms and conditions of this Agreement.

"Borrower's Funds Account" - means the account with Bank into which all funds deposited with Lender pursuant to this Agreement shall be placed.

"Business Day" - means a day of the week (but not a Saturday, Sunday or holiday) on which the offices of Bank are open to the public for carrying on substantially all of Bank's business functions. Unless specifically referenced in this Agreement as a Business Day, all references to "days" shall be to calendar days.

"Certificate of Approval" - means a certificate in the form of EXHIBIT F.

"Completion Date" - means the date upon which Borrower satisfies the last of the conditions for the release of the Retention, as provided in Paragraph C of EXHIBIT D, currently estimated to be _____, the date by which construction of the Improvements must be complete, subject to extension pursuant to change orders approved by Lender as provided herein or pursuant to the provisions of Section 4.3.

"Construction Agreements" - means those certain agreements to construct the Improvements by and between Borrower (in its capacity as the builder) and various contractors.

2

"Contractors" - means various contractors which have executed Construction Agreements for construction of the Improvements.

"Deed of Trust" - means that certain Deed of Trust and Fixture Filing with Assignment of Leases and Rents, of even date herewith executed by Borrower, as Trustor, to Chicago Title Company, as Trustee, for the benefit of Lender, as Beneficiary, as hereafter amended, supplemented, replaced or modified.

"Deemed Approval Matter" - means any matter requiring the consent of Lender under the Loan Documents including, without limitation, the following: (1) contracts for which Lender approval is required hereunder, as contemplated in Sections 4.4 and 4.5, (2) Plans and Specifications and changes thereto for which Lender approval is required hereunder, as contemplated in Section 4.6, (3) Borrower's contracting for any materials, furnishings, equipment, fixtures or other parts or components of the Improvements in which any third party will retain any interest for which Lender approval is required hereunder, as contemplated in Section 4.8, (4) the inclusion of the Property in any assessment district or community facilities district for which Lender approval is required hereunder, as contemplated in Section 4.11, (5) formation and authorization documents of Borrower, and modifications thereto, for which Lender approval is required hereunder, as contemplated in Sections 6.3 and 9.10, (6) the issuance of any Set Aside Letter for which Lender approval is required hereunder, as contemplated in Section 8.1; (7) leases and leasing parameters for which Lender approval is required hereunder, as contemplated in Section 9.4, (8) any Subdivision Map for which Lender approval is required hereunder, as contemplated in Section 9.6, (9) assignment of all or any portion of Borrower's interest under the Loan documents or any moneys due or to become due thereunder for which Lender approval is required hereunder, as contemplated in Section 9.8, and (10) agreements providing for the management, leasing or operation of the Property or Improvements for which Lender approval is required hereunder, as contemplated in Section 9.9.

"Default" - shall have the meaning ascribed to such term in Section 11.1.

"Disbursement Budget" - means the design and construction budget for the Improvements, as approved by Lender from time to time.

"Distribution" - means any transfer of cash or other property from Borrower to any constituent member or statutory manager thereof, whether characterized as a distribution, dividend, redemption, fee, repayment of a loan or otherwise, but excluding the payment of any fees, commissions or expenses pursuant to the Development and Management Agreements prior to the date that Lender requires Borrower to terminate the Development and Management Agreements under the provisions of Section 11.6 and following the date of any reinstatement of any terminated Development and Management Agreements under the provisions of Section 11.6.

3

"Effective Date" - means the date the Deed of Trust is recorded in the Office of the County Recorder of the county where the Property is located.

"Environmental Report" - means the reports actually received by Lender as contemplated in Section 3.1(d) of this Agreement.

"Hazardous Materials" - shall have the meaning ascribed to such term in Section 7.1(a).

"Hazardous Materials Claims" - shall have the meaning ascribed to such term in Section 7.1(c).

"Hazardous Materials Laws" - shall have the meaning ascribed to such term in Section 7.1(b).

"Improvements" - shall have the meaning ascribed to such term in Recital B.

"Lender" - means Hankey Capital, LLC, a California limited liability company.

"Lender Payment Turnaround Period" - means, provided that Borrower delivers the applicable application for payment to Lender under cover of a written notice stating in bold, all-capitalized letters what the outside date for such Lender Payment Turnaround Period is for that specific application for payment, ten (10) calendar days.

"Loan" - means the principal sum that Lender agrees to lend and Borrower agrees to borrow pursuant to the terms and conditions of this Agreement: EIGHTY TWO MILLION, FIVE HUNDRED THOUSAND AND NO/100THS DOLLARS ($82,500,000.00).

"Loan Documents" - means those documents, as hereafter amended, supplemented, replaced or modified, properly executed and in recordable form, if necessary, listed in EXHIBIT B as Loan Documents.

"Maturity Date" – October 31, 2020.

"Note" - means that certain Promissory Note of even date herewith, in the original principal amount of the Loan, executed by Borrower and payable to the order of Lender, as hereafter amended, supplemented, replaced or modified.

"Obligee" - shall have the meaning ascribed to such term in Section 8.1.

"Other Borrower Loan Documents" - means those documents, as hereafter amended, supplemented, replaced or modified from time to time, properly executed and in recordable form, if necessary, listed in EXHIBIT B as "Other Borrower Loan Documents."

4

"Other Related Documents" - means those documents, as hereafter amended, supplemented, replaced or modified from time to time, properly executed and in recordable form, if necessary, listed in EXHIBIT B as Other Related Documents.

"Out of Balance Notice" - shall have the meaning ascribed to such term in Section 3.1(b).

"Plans and Specifications" - shall have the meaning ascribed to such term in Recital B.

"Principal Subs" - shall have the meaning ascribed to such term in Section 4.7.

"Project Entitlements" - means the Los Angeles Department of Building and Safety Permit Nos. _____.

"Property" - shall have the meaning ascribed to such term in Recital A.

"Secured Obligations" - shall have the meaning ascribed to such term in the Deed of Trust.

"Set Aside Letter" - shall have the meaning ascribed to such term in Section 8.1.

"Subdivision Map" - shall have the meaning ascribed to such term in Section 9.6.

"Surety" - shall have the meaning ascribed to such term in Section 8.1.

"Title Policy" - means the ALTA Lender's Policy of Title Insurance as issued by First American Title Company, together with such special endorsements as Lender may require thereto, including, without limitation, forms CLTA 100 (making particular reference to any easement or encroachment listed in the Title Policy), 116, 116.1 (survey), 102.7 (foundation), 103.7 (modified to insure access to a physically open public street sufficient to provide vehicular and pedestrian ingress and egress), 111.5 (variable interest rate), 129-06 (separate tax parcel), 122.4 (advances), 137.1-06, and such other special endorsements as Lender may require.

"Working Capital" - means all proceeds of the Loan disbursed by Lender into the Working Capital Reserve Account maintained with Bank pursuant to the terms and conditions of this Agreement.

"Working Capital Reserve Account" - means the account with Bank into which all funds disbursed as Working Capital by Lender pursuant to this Agreement shall be placed.

1.2. Exhibits Incorporated. EXHIBITS A, B, C, D, E, F and G, all attached hereto, are hereby incorporated into this Agreement.

ARTICLE 2. LOAN

2.1. Loan. By and subject to the terms of this Agreement, Lender agrees to lend to Borrower and Borrower agrees to borrow from Lender the principal sum of EIGHTY-TWO MILLION, FIVE HUNDRED THOUSAND AND NO/100THS DOLLARS ($82,500,000.00), said sum to be evidenced by the Note of even date herewith. The Note shall be secured, in part, by the Deed of Trust, of even date herewith, encumbering certain real property and improvements as legally defined therein. Amounts disbursed to or on behalf of Borrower pursuant to the Note shall be used to purchase and finance the construction of the Property and Improvements and for such other purposes and uses as may be permitted under this Agreement and the other Loan Documents.

2.2. Loan Documents. Borrower shall deliver to Lender concurrently with this Agreement each of the documents, properly executed and in recordable form, as applicable, described in EXHIBIT B as Loan Documents, together with those documents described in EXHIBIT B as Other Related Documents. Notwithstanding anything to the contrary contained elsewhere within this Agreement, the lien of the Deed of Trust shall not secure any obligation under any of the Loan Documents that are designated on EXHIBIT B as not being secured by liens upon real property.

2.3. Effective Date. The date of the Loan Documents is for reference purposes only. The Effective Date of delivery and transfer to Lender of the security under the Loan Documents and of Borrower's and Lender's obligations under the Loan Documents shall be the date the Deed of Trust is recorded in the Office of the County Recorder of the county where the Property is located.

2.4. Maturity Date; Prepayment. Upon the Maturity Date, all sums due and owing under this Agreement and the other Loan Documents shall be repaid in full. All payments due to Lender under this Agreement, whether at the Maturity Date or otherwise, shall be paid in immediately available funds. Amounts owing under the Note may be prepaid by Borrower, in whole or in part, at any time, without premium or penalty.

2.5. Credit for Principal Payments. Any payment made upon the outstanding principal balance of the Loan shall be credited as of the Business Day received, provided such payment is received by Lender no later than 11:00 a.m. Pacific Time) and constitutes immediately available funds. Any principal payment received after said time or which does not constitute immediately available funds shall be credited upon such funds having become unconditionally and immediately available to Lender.

2.6. Full Repayment and Reconveyance. Upon receipt of all sums owing and outstanding under the Loan Documents, Lender shall issue a full reconveyance of the Property and Improvements from the lien of the Deed of Trust and otherwise release Lender's security interest in all other personal property collateral that secure the Loan; provided, however, that all of the following conditions shall be satisfied at the time of,

6

and with respect to, such reconveyance: (a) Lender shall have received all escrow, closing and recording costs, the costs of preparing and delivering such reconveyance and any sums then due and payable under the Loan Documents, and (b) Lender shall have received a written release satisfactory to Lender of any set aside letter, letter of credit or other form of undertaking which Lender has issued to any surety, governmental agency or any other party in connection with the Loan and/or the Property and Improvements. Lender's obligation to make further disbursements under the Loan shall terminate as to any portion of the Loan undisbursed as of the date of issuance of such full release or reconveyance, and any commitment of Lender to lend any undisbursed portion of the Loan shall be canceled.

2.7. Lender Profit Participation.  If, at any time, during the term of the Loan or following repayment of the Loan, the Property is sold for a purchase price in excess of $200,000,000, Lender shall be entitled to a Lender Profit Participation Payment in the amount of $3,500,000. The Lender Profit Participation Payment shall be collected at the close of the sale of the Property. Contemporaneous with this Agreement, Borrower and Lender shall enter into a Profit Participation Agreement memorializing the parties' agreement with respect to the Lender Profit Participation Payment, and upon the closing of the Loan, Lender shall record a Memorandum of Agreement in the Official Records of the County Recorder of Los Angeles County, California, evidencing the existence of the Profit Participation Agreement.

## ARTICLE 3. DISBURSEMENT

3.1. Conditions Precedent. Lender's obligation to make any disbursements or take any other action under the Loan Documents shall be subject at all times to satisfaction of each of the following conditions precedent:

(a) There shall exist no Default, as defined in this Agreement, Default as defined in any of the other Loan Documents, event, omission or failure of condition which would constitute a Default after notice or lapse of time, or both, or default by Borrower (following any applicable notice and cure period) under any of the Other Related Documents, except to the extent that such event, omission or failure (i) is of a nature that it could ripen into a monetary Default, and that event, omission or failure will be cured by the requested disbursement or with funds that Borrower is then attempting to raise during the 60-day cure period set forth in the provisions of the final paragraph of Section 11.1, or (ii) is of a nature that it could ripen into a non-monetary Default, such event, omission or failure is curable, and Borrower is then diligently prosecuting such cure to completion within the applicable cure period; and

(b) Any undisbursed Loan funds together with all sums, if any, to be provided by Borrower, shall be at all times equal to or greater than the amount which Lender from time to time reasonably determines necessary to: (i) pay, through completion, all costs of renovation, development, construction, operation, marketing and sale or leasing of the Property and Improvements in accordance with the Loan Documents; (ii) pay all sums which may accrue under the Loan Documents prior to repayment of the Loan; and (iii)

7

enable Borrower to perform and satisfy all of the covenants of Borrower contained in the Loan Documents. If Lender reasonably determines at any time that the undisbursed Loan funds are insufficient for said purposes, Lender may deliver to Borrower written notice demanding that Borrower then deposit funds equal to such deficiency in the Borrower's Funds Account (an "Out of Balance Notice"), in which event Borrower shall deposit the amount of such deficiency in the Borrower's Funds Account within thirty (30) days after the date of delivery of the applicable Out of Balance Notice; and

(c) Lender shall have received all Loan Documents, other documents, instruments, policies, and forms of evidence or other materials requested by Lender under the terms of this Agreement or any of the other Loan Documents, including, without limitation, such forms of estoppel certificates and subordination, non-disturbance and attornment agreements as Lender may then require from existing tenants of the Property; and

(d) Lender acknowledges that it has received and approved in form and substance satisfactory to Lender: (i) a soils report for the Property and Improvements; (ii) an environmental questionnaire and environmental site assessment with respect to the presence, if any, of Hazardous Materials on the Property and Improvements; (iii) two sets of the Plans and Specifications (or if the Plans and Specifications for the entirety of the Improvements are not then complete or some portion of the Improvements are to be constructed using a design/build process, in either such case pursuant to partial Plans and Specifications approved by Lender under the provisions of Section 4.6 of this Agreement and for which a valid building permit has been issued, then such portion of the Plans and Specifications to the extent that payment for such portion of the Improvements is to be covered by a current disbursement request), together with evidence of all necessary or appropriate approvals of governmental agencies; (iv) copies of all agreements which are material to completion of the Improvements; (v) copies of all building permits and similar permits, licenses, approvals, development agreements and other authorizations of governmental agencies required in connection with the development of the Property and Improvements, or, if such approvals are to be issued on a staged basis, then for the current and all prior stages of development, provided that such staged development has been approved by Lender, as contemplated in Section 4.6; and (vi) copies of any initial study, negative declaration, mitigated negative declaration, environmental impact report, notice of determination or notice of exemption prepared, adopted, certified or filed by any governmental agency in connection with the Property; and

(e) Lender shall have received and approved the Disbursement Budget.

3.2. Account, Pledge and Assignment, and Disbursement Authorization. The proceeds of the Loan and Borrower's Funds, when qualified for disbursement, shall be deposited into an account to be designated by Borrower or otherwise disbursed to or for the benefit or account of Borrower under the terms of this Agreement. Disbursements hereunder may be made by Lender upon the written request of any person who has been authorized by

Borrower to request such disbursements until such time as written notice of Borrower's revocation of such authority is received by Lender at the address shown in EXHIBIT D.

3.3. Borrower's Funds Account, Pledge and Assignment. Except as otherwise provided in this Agreement, all of the Borrower's Funds which are deposited with Lender by Borrower as shown in EXHIBIT C, or any other provision of the Loan Documents, shall be placed in the Borrower's Funds Account for disbursement under this Agreement. As additional security for Borrower's performance under the Loan Documents, Borrower hereby irrevocably pledges and assigns to Lender the Borrower's Funds Account and all monies at any time deposited in the Borrower's Funds Account.

3.4. Loan Disbursements. Subject to the conditions set forth in Section 3.1(b), the proceeds of the Loan and Borrower's Funds shall be disbursed in accordance with the terms and conditions of EXHIBIT D. Disbursements made after the deposit of Borrower's Funds shall be made first from the Borrower's Funds Account until depleted. All disbursements shall be held by Borrower in trust and applied by Borrower solely for the purposes for which the funds have been disbursed. Lender has no obligation to monitor or determine Borrower's use or application of the disbursements. Partial disbursements shall be permitted under the terms and subject to the conditions set forth in EXHIBIT D.

3.5. Working Capital. From time to time, in Borrower's Applications for Payment, Borrower may request the disbursement of proceeds of the Loan and Borrower's Funds into the Working Capital Reserve Account to maintain the balance of the Working Capital Reserve Account at the amount specified in the Disbursement Budget, provided that amounts in the Working Capital Reserve Account may only be used to pay reasonable costs of the design or construction of the Improvements, and that Borrower shall have delivered the monthly reports with respect to the Working Capital Reserve Account that are required under the provisions of Section 10.1 of this Agreement for all prior months. As additional security for Borrower's performance under the Loan Documents, Borrower hereby irrevocably pledges and assigns to Lender the Working Capital Reserve Account and all monies at any time deposited in the Working Capital Reserve Account.

3.6. Interest Reserve.  Interest charged on the Loan shall be applied monthly from an interest reserve account to be maintained by the Lender, in accordance with the budget approved by the Lender. Borrower shall make timely payments of monthly interest upon depletion of the interest reserve maintained by the Lender.

ARTICLE 4. CONSTRUCTION

4.1. Commencement and Completion. Borrower shall commence construction of the Improvements without delay after recordation of the Deed of Trust and shall complete construction of the Improvements on or before the Completion Date.

4.2. Commencement and Completion of Offsite Improvements. Borrower shall commence construction of any offsite improvements required by any governmental

9

authority to be performed by Borrower under any Project Entitlements in connection with the construction of the Improvements without delay after recordation of the Deed of Trust and shall complete construction of any such offsite improvements on or before the date required under the applicable Project Entitlements.

4.3. Force Majeure. The time within which construction of the Improvements must be completed shall be extended for a period of time equal to the period of any delay directly affecting construction which is caused by fire, earthquake or other acts of God, unexpected inclement weather, utility shortages or interruptions, strike, lockout, acts of public enemy, riot, insurrection, or governmental regulation of the sale or transportation of materials, supplies or labor, the failure of any governmental authority to issue any Project Entitlement for reasons beyond Borrower's reasonable control, the failure of any condition of approval on any Project Entitlement for any reason beyond Borrower's reasonable control, or any moratorium enacted by any governmental authority over Borrower's good faith opposition that prohibits, impairs, delays or restricts development of the Improvements; provided, however, that Borrower shall furnish Lender with written notice satisfactory to Lender evidencing any such delay within ten (10) days after the occurrence of any such delay. In no event shall the time the anticipated date for completion of the Improvements be extended beyond the Maturity Date or more than one hundred twenty (120) days beyond the Completion Date as scheduled prior to such delay.

4.4. Construction Agreements. Borrower and Contractors have entered into various Construction Agreements pursuant to the terms and conditions of which Contractors are to construct the Improvements. Borrower shall require each Contractor to perform in accordance with the terms of the Construction Agreements and shall not amend, modify or alter the Construction Agreements without Lender's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed. Borrower shall execute, upon Lender's request, an assignment of Borrower's rights under the Construction Agreements to Lender as security for Borrower's obligations under this Agreement and the other Loan Documents and shall cause the Contractors to consent to any such assignment.

4.5. [Deleted].

4.6. Plans and Specifications.

(a) Changes; Lender Consent. If the Plans and Specifications contemplate staged design and construction, and if Lender has approved Plans and Specifications that contemplate that certain stages will be designed in the future, then any stages of such Plans and Specifications that have not been approved by Lender as of the date of this Agreement shall be subject to Lender's prior written approval, which consent shall not be unreasonably withheld, conditioned or delayed. Except as otherwise provided in this Agreement, Borrower shall not make any changes in the Plans and Specifications or the Improvements without Lender's prior written consent if such change, taken together with all other changes for which Lender's approval was not required hereunder, could materially affect the overall quality or efficiency of the Improvements or the

10

Improvements' exterior, lobbies or building systems. Without limiting the above, Lender agrees that Borrower may make minor changes in the Plans and Specifications and Improvements without Lender's prior written consent, provided that such changes do not violate any of the conditions specified herein. Notwithstanding the foregoing, Lender shall not have any approval rights respecting any change in the Plans and Specifications or the Improvements if such change follows inevitably from previously approved Plans and Specifications or changes thereto. Borrower shall at all times maintain, for inspection by Lender, a set of working drawings of the Improvements, which, if there is staged design that has not yet occurred, if applicable, shall at least cover the portions of the Improvements completed and under construction or fully designed at such time.

(b) Changes; Submission Requirements. Borrower shall submit any proposed change in the Plans and Specifications requiring Lender's consent to Lender prior to the commencement of construction relating to such proposed change, at least ten (10) Business Days prior to the commencement of construction. Requests for any change which requires consent shall be accompanied by working drawings (or appropriate submittals) and a written description of the proposed change, submitted on a change order form acceptable to Lender, signed by Borrower and, if required by Lender, also by the Contractors. At its option, Lender may require Borrower to provide: (i) evidence satisfactory to Lender of the cost and time necessary to complete the proposed change; and (ii) a deposit in the amount of any increased costs into Borrower's Funds Account.

(c) Consent Process. Borrower acknowledges that Lender's review of any changes and required consent may result in delays in construction and hereby consents to any such delays. Nevertheless, Lender shall use commercially reasonable efforts to respond to requests for approval within the time periods provided in this Agreement. Lender shall not declare a Default under the terms of the Loan in the event the Default has been caused by a delay in Lender's approval.

(d) Final Plans and Specifications. Upon completion of the Improvements, Borrower shall deliver to Lender within sixty (60) days a set of final, as-built Plans and Specifications.

4.7. Contractor/Construction Information. Borrower shall deliver to Lender in a form acceptable to Lender: (a) a list detailing the name, address and phone number of each contractor, subcontractor and material supplier to be employed or used for construction of the Improvements who is under contract or otherwise has been selected to supply goods or services or perform work for the Project costing in excess of $5,000 in the aggregate and any other person or entity who delivers a Preliminary Notice to Owner or Lender under Civil Code Sections 3097 or 3098 (collectively, "Principal Subs") together with the dollar amount, including changes, if any, reflected in each contract and subcontract for the Principal Subs, and the portion thereof, if any, paid through the date of such list of Principle Subs; (b) copies of each contract and subcontract identified in such list of Principal Subs, including any changes thereto; (c) a cost breakdown of the projected total cost of constructing the Improvements, and that portion, if any, of each cost item which has been incurred; and (d) a construction progress schedule detailing the progress of

11

construction and the projected sequencing and completion time for uncompleted work, all
as of the date of such schedule.

Borrower agrees that Lender's approval of any contractor, subcontractor or material
supplier if and to the extent permitted under the terms of this Agreement shall not
constitute a warranty or representation of qualification by Lender. Lender may contact
any contractor, subcontractor or material supplier to discuss the course of construction.

4.8. Prohibited Contracts. Without Lender's prior written consent, Borrower shall not
contract for any materials, furnishings, equipment, fixtures or other parts or components
of the Improvements, if any third party shall retain any ownership interest (other than lien
rights created by operation of law) in such items after their delivery to the Property and
Improvements. Borrower shall have twenty (20) days to effect the removal of any such
retained interest not otherwise permitted above, or, provided that such interest or the
holder's realization thereon will not jeopardize Borrower's title to or use of the Property,
if such retained interest cannot be reasonably removed in such period, Borrower shall
have commenced such removal within such time and shall diligently pursue its removal
until completed.

4.9. Liens and Stop Notices. If a claim of lien is recorded which affects the Property
or Improvements or a bonded stop notice is served upon Lender, within twenty (20)
calendar days after such recording or service or within five (5) Business Days after
Lender's demand, whichever occurs first, Borrower, at Borrower's election, shall do one
of the following: (a) pay and discharge the claim of lien or bonded stop notice; (b) effect
the release thereof by recording or delivering to Lender a surety bond in sufficient form
and amount; or (c) provide Lender with other assurances which Lender deems, in its sole
discretion, to be satisfactory for the payment of such claim of lien or bonded stop notice
and for the full and continuous protection of Lender from the effect of such lien or
bonded stop notice.

4.10. Construction Responsibilities. Borrower shall construct the Improvements in a
workmanlike manner substantially in accordance with the Plans and Specifications and
the recommendations of any soils or engineering report approved by Lender pursuant to
Section 3.1(d) above. Borrower shall substantially comply with all applicable laws,
ordinances, rules, regulations, building restrictions, recorded covenants and restrictions,
and requirements of all regulatory authorities having jurisdiction over the Property or
Improvements. Borrower shall be solely responsible for all aspects of Borrower's
business and conduct in connection with the Property and Improvements, including,
without limitation, for the quality and suitability of the Plans and Specifications and their
compliance with all governmental requirements, the supervision of the work of
construction, the qualifications, financial condition and performance of all architects,
engineers, contractors, material suppliers, consultants and property managers, and the
accuracy of all applications for payment and the proper application of all disbursements.
Lender is not obligated to supervise, inspect or inform Borrower or any third party of any
aspect of the construction of the Improvements or any other matter referred to above.

4.11. Assessments and Community Facilities Districts. Without Lender's prior written consent, Borrower shall not cause or suffer to become effective or otherwise consent to the formation of any assessment district or community facilities district which includes all or any part of the Property and Improvements pursuant to: (a) the Mello-Roos Community Facilities Act of 1982; (b) the Municipal Improvement Act of 1913; or (c) any other comparable or similar statute or regulation. Nor shall Borrower cause or otherwise consent to the levying of special taxes or assessments against the Property and Improvements by any such assessment district or community facilities district.

4.12. Delay. Borrower shall promptly notify Lender in writing of any event causing delay or interruption of construction, or the timely completion of construction. The notice shall specify the particular work delayed, and the cause and period of each delay.

4.13. Inspections. Lender shall have the right to enter upon the Property at all reasonable times to inspect the Improvements and the construction work to verify information disclosed or required pursuant to this Agreement. Any inspection or review of the Improvements by Lender is solely to determine whether Borrower is properly discharging its obligations to Lender and may not be relied upon by Borrower or by any third party as a representation or warranty of compliance with this Agreement or any other agreement. Lender owes no duty of care to Borrower or any third party to protect against, or to inform Borrower or any third party of, any negligent, faulty, inadequate or defective design or construction of the Improvements as determined by Lender.

4.14. Surveys. Upon Lender's written request, Borrower shall promptly deliver to Lender: (a) a current survey of the Property showing the location of the Improvements on the Property (as constructed as of the date of such survey), all easements, encroachments and applicable governmental set backs; and (b) upon completion of the Improvements, an as-built survey acceptable to a title insurer for purposes of issuing an ALTA policy of title insurance. All such surveys shall be performed and certified by a licensed engineer or surveyor acceptable to the title insurer.

ARTICLE 5. INSURANCE

Borrower shall, while any obligation of Borrower under any Loan Document remains outstanding, maintain at Borrower's sole expense, with licensed insurers approved by Lender, the following policies of insurance in form and substance satisfactory to Lender:

5.1. Title Insurance. A Title Policy insuring Lender, in the principal amount of the Loan, of the validity and the priority of the lien of the Deed of Trust upon the Property and Improvements, subject only to matters approved by Lender in writing. During the term of the Loan, Borrower shall deliver to Lender, within five (5) Business Days after Lender's written request, such other endorsements to the Title Policy as Lender may reasonably require.

5.2. Property Insurance. A Builders Risk Completed Value Hazard Insurance policy, including, without limitation, such endorsements as Lender may require, insuring Lender

13

against damage to the Property and Improvements in an amount acceptable to Lender. Lender shall be named on the policy under a Lender's Loss Payable Endorsement (form #438BFU or equivalent).

5.3. Flood Hazard Insurance. A policy of flood insurance, as required by applicable governmental regulations, or as deemed necessary by Lender.

5.4. Liability Insurance. A policy of commercial general liability insurance with limits as required by Lender, insuring against liability for injury and/or death to any person and/or damage to any property occurring on the Property and/or in the Improvements from any cause whatsoever.

5.5. General. Borrower shall provide to Lender the originals of all required insurance policies, or other evidence of insurance acceptable to Lender. All insurance policies shall provide that the insurance shall not be cancelable or materially changed without ten (10) days prior written notice to Lender. Lender shall be named under a Lender's Loss Payable Endorsement (form #438BFU or equivalent) on all insurance policies which Borrower actually maintains with respect to the Property and Improvements. Borrower shall provide to Lender evidence of any other hazard insurance Lender may deem necessary at any time during the Loan.

## ARTICLE 6. REPRESENTATIONS AND WARRANTIES

As a material inducement to Lender's entry into this Agreement, Borrower represents and warrants to Lender as of the Effective Date and as of the date each Application for Payment is submitted to Lender pursuant to EXHIBIT D (provided, however, that to the extent circumstances have changed for reasons beyond the reasonable control of Borrower such that Borrower must qualify such representations and warranties as of the date of delivery of any such Application for Payment, such qualification, to the extent it renders the applicable representation materially untrue or breaches the applicable warranty, shall merely be a failure of condition to Lender's obligation to disburse funds under the provisions of EXHIBIT D, as opposed to constituting an Event of Default) that:

6.1. Authority/Enforceability. Borrower is in substantial compliance with all laws and regulations applicable to its organization, existence and transaction of business and has all necessary rights and powers to own, develop and operate the Property and Improvements as contemplated by the Loan Documents.

6.2. Binding Obligations. Borrower is authorized to execute, deliver and perform its obligations under the Loan Documents and such obligations are and shall continue to be valid and binding obligations of Borrower.

6.3. Intentionally Omitted.

6.4. No Violation. Borrower's execution, delivery, and performance under the Loan Documents do not: (a) require any consent or approval not heretofore obtained under any

14

partnership agreement, operating agreement, limited liability company agreement, articles of incorporation, bylaws or other document; (b) materially violate any governmental requirement applicable to the Property and Improvements or any other statute, law, regulation or ordinance or any order or ruling of any court or governmental entity; (c) materially conflict with, or constitute a material breach or default or permit the acceleration of obligations under any agreement, contract, lease, or other document by which the Borrower is or the Property and Improvements are bound or regulated; or (d) materially violate any statute, law, regulation or ordinance, or any order of any court or governmental entity.

6.5. Compliance with Laws. Borrower has, and at all applicable times shall have obtained, all permits, licenses, exemptions, and approvals necessary to construct, occupy, operate and market the Property and Improvements for the applicable stage of development and operation, and shall maintain substantial compliance with all governmental requirements applicable to the Property and Improvements and all other applicable statutes, laws, regulations and ordinances necessary for the transaction of its business.

6.6. Litigation. Except as disclosed to Lender in writing, there are no claims, actions, suits, or proceedings pending, or to Borrower's knowledge threatened, against Borrower or affecting the Property or Improvements that are of a material nature and that, if successfully prosecuted against Borrower would create a material adverse change in the financial condition of Borrower.

6.7. Financial Condition. All financial statements and information relating to the financial condition of Borrower, the Property, and the Improvements, which have been heretofore and hereafter are delivered to Lender by Borrower, fairly and accurately represent as of the date of such delivery the financial condition of the subject thereof and have been prepared (except as noted therein) in accordance with generally accepted accounting principles consistently applied. Borrower acknowledges and agrees that Lender may request and obtain additional information from third parties regarding any of the above, including, without limitation, credit reports.

6.8. [Deleted]

6.9. Loan Proceeds and Adequacy. The undisbursed Loan proceeds, together with Borrower's Funds and all other sums, if any, to be provided by Borrower as shown in EXHIBIT C, are sufficient to construct the Improvements in accordance with the terms and conditions of this Agreement.

6.10. Accuracy. All reports, documents, instruments, information and forms of evidence delivered to Lender concerning the Loan or security for the Loan or required by the Loan Documents are accurate, correct and sufficiently complete to give Lender true and accurate knowledge of their subject matter, and do not contain any material misrepresentation or omission.

15

6.11. Tax Liability. Borrower has filed all required federal, state, county and municipal tax returns and has paid all taxes and assessments owed and payable by Borrower or with respect to the Property, and Borrower has no knowledge of any basis for any additional payment with respect to any such taxes and assessments.

6.12. Utilities. Subject to the provisions of Section 4.3 of this Agreement, all utility services, including, without limitation, gas, water, sewage, electrical and telephone, necessary for the development and occupancy of the Property and Improvements are available at or within the boundaries of the Property, or Borrower has taken all steps reasonably necessary to date to assure that all such services will be available upon completion of the Improvements.

6.13. Compliance. Borrower is familiar with and in substantial compliance with all governmental requirements for the development of the Property and construction of the Improvements and, subject to the provisions of Section 4.3 of this Agreement, will substantially conform to and comply with all governmental requirements and the Plans and Specifications.

6.14. [Deleted].

6.15. Business Loan. The Loan is a business loan transaction in the stated amount solely for the purpose of carrying on the business of Borrower and none of the proceeds of the Loan will be used for the personal, family or agricultural purposes of the Borrower. Lender acknowledges that a portion of the Loan, up to Six Million and No/100 Dollars ($6,000,000.00), may be used by Borrower for distributions to members and other affiliates of the Borrower.

## ARTICLE 7. HAZARDOUS MATERIALS

7.1. Special Representations and Warranties. Without in any way limiting the other representations and warranties set forth in this Agreement, and after reasonable investigation and inquiry, and except as disclosed in the Environmental Report or otherwise disclosed in writing to Lender prior to the date of this Agreement, Borrower hereby specially represents and warrants to the best of Borrower's knowledge as of the date of this Agreement as follows:

(a) Hazardous Materials. The Property and Improvements are not and have not been a site for the use, generation, manufacture, storage, treatment, release, threatened release, discharge, disposal, transportation or presence of any oil, flammable explosives, asbestos, urea formaldehyde insulation, radioactive materials, hazardous wastes, toxic or contaminated substances or similar materials, including, without limitation, any substances which are "hazardous substances," "hazardous wastes," "hazardous materials," "toxic substances," "wastes," "regulated substances," "industrial solid wastes," or "pollutants" under the Hazardous Materials Laws, as described below, and/or other applicable environmental laws, ordinances or regulations (collectively, the "Hazardous Materials"). "Hazardous Materials" shall not include commercially reasonable amounts of

16

such materials used in the ordinary course of preparation of the Property for construction, construction of the Improvements and operation of the Property which are used and stored in accordance with all applicable environmental laws, ordinances and regulations.

(b) Hazardous Materials Laws. The Property and Improvements are in substantial compliance with all laws, ordinances and regulations relating to Hazardous Materials ("Hazardous Materials Laws"), including, without limitation: the Clean Air Act, as amended, 42 U.S.C. Section 7401 et seq.; the Federal Water Pollution Control Act, as amended, 33 U.S.C. Section 1251 et seq.; the Resource Conservation and Recovery Act of 1976, as amended, 42 U.S.C. Section 6901 et seq.; the Comprehensive Environment Response, Compensation and Liability Act of 1980, as amended (including the Superfund Amendments and Reauthorization Act of 1986, "CERCLA"), 42 U.S.C. Section 9601 et seq.; the Toxic Substances Control Act, as amended, 15 U.S.C. Section 2601 et seq.; the Occupational Safety and Health Act, as amended, 29 U.S.C. Section 651, the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. Section 11001 et seq.; the Mine Safety and Health Act of 1977, as amended, 30 U.S.C. Section 801 et seq.; the Safe Drinking Water Act, as amended, 42 U.S.C. Section 300f et seq.; and all comparable state and local laws, laws of other applicable jurisdictions or orders and regulations.

(c) Hazardous Materials Claims. To the actual knowledge of the Borrower, there are no claims or actions ("Hazardous Materials Claims") pending or threatened against Borrower, the Property or Improvements by any governmental entity or agency or by any other person or entity relating to Hazardous Materials or pursuant to the Hazardous Materials Laws.

(d) Border Zone Property. To the actual knowledge of the Borrower, the Property has not been designated as Border Zone Property under the provisions of California Health and Safety Code, Sections 25220 et seq. and there has been no occurrence or condition on any real property adjoining or in the vicinity of the Property that could cause the Property or any part thereof to be designated as Border Zone Property.

7.2. Hazardous Materials Covenants. Borrower agrees as follows:

(a) No Hazardous Activities. Except for the implementation of remediation programs or plans required under agreements, orders or consent decrees referenced in the Environmental Report, Borrower shall not cause or permit the Property or Improvements to be used as a site for the use, generation, manufacture, storage, treatment, release, discharge, disposal, transportation or presence of any Hazardous Materials.

(b) Compliance. Except to the extent such compliance is to be the result of the implementation of remediation programs or plans required under agreements, orders or consent decrees referenced in the Environmental Report, Borrower shall comply and cause the Property and Improvements to comply with all Hazardous Materials Laws.

(c) Notices. Except for those matters set forth in the Environmental Report or otherwise disclosed in writing to Lender prior to the date of this Agreement, Borrower

17

shall immediately notify Lender in writing of: (i) the discovery of any Hazardous Materials on, under or about the Property and Improvements; (ii) any knowledge by Borrower that the Property and Improvements are not in material compliance with any Hazardous Materials Laws; (iii) any Hazardous Materials Claims; and (iv) the discovery of any occurrence or condition on any real property adjoining or in the vicinity of the Property that could cause the Property or any part thereof to be designated as Border Zone Property.

(d) Remedial Action. Except with respect to any Hazardous Materials, violations of Hazardous Materials Laws and Hazardous Materials Claims that are to be remedied by the implementation of remediation programs or plans required under agreements, orders or consent decrees referenced in the Environmental Report, in response to the presence of any Hazardous Materials on, under or about the Property or Improvements, Borrower shall immediately take, at Borrower's sole expense, all remedial action required by any Hazardous Materials Laws or any judgment, consent decree, settlement or compromise in respect to any Hazardous Materials Claims.

(e) Inspection By Lender. Upon reasonable prior notice to Borrower, Lender, its employees and agents, may from time to time (whether before or after the commencement of a nonjudicial or judicial foreclosure proceeding) enter and inspect the Property and Improvements for the purpose of determining the existence, location, nature and magnitude of any past or present release or threatened release of any Hazardous Materials into, onto, beneath or from the Property and Improvements.

(f) Hazardous Materials Indemnity. BORROWER HEREBY AGREES TO DEFEND, INDEMNIFY AND HOLD HARMLESS LENDER, ITS DIRECTORS, OFFICERS, MEMBERS, MANAGERS, EMPLOYEES, AGENTS, SUCCESSORS AND ASSIGNS FROM AND AGAINST ANY AND ALL LOSSES, DAMAGES, LIABILITIES, CLAIMS, ACTIONS, JUDGMENTS, COURT COSTS AND LEGAL OR OTHER EXPENSES (INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES AND EXPENSES) WHICH LENDER MAY INCUR AS A DIRECT OR INDIRECT CONSEQUENCE OF THE USE, GENERATION, MANUFACTURE, STORAGE, DISPOSAL, THREATENED DISPOSAL, TRANSPORTATION OR PRESENCE OF HAZARDOUS MATERIALS IN, ON, UNDER OR ABOUT THE PROPERTY OR IMPROVEMENTS. BORROWER SHALL IMMEDIATELY PAY TO LENDER UPON DEMAND ANY AMOUNTS OWING UNDER THIS INDEMNITY, TOGETHER WITH INTEREST FROM THE DATE THE INDEBTEDNESS ARISES UNTIL PAID AT THE RATE OF INTEREST APPLICABLE TO THE PRINCIPAL BALANCE OF THE NOTE. BORROWER'S DUTY AND OBLIGATIONS TO DEFEND, INDEMNIFY AND HOLD HARMLESS LENDER SHALL SURVIVE THE CANCELLATION OF THE NOTE AND THE RELEASE, RECONVEYANCE OR PARTIAL RECONVEYANCE OF THE DEED OF TRUST.

(g) Legal Effect of Section. Borrower and Lender agree that: (a) this Article VII is intended as Lender's written request for information (and Borrower's response) concerning the environmental condition of the real property security as required by

18

California Code of Civil Procedure Section 726.5; and (b) each provision in this Article (together with any indemnity applicable to a breach of any such provision) with respect to the environmental condition of the real property security is intended by Lender and Borrower to be an "environmental provision" for purposes of California Code of Civil Procedure Section 736, and as such it is expressly understood that Borrower's duty to indemnify Lender hereunder shall survive: (i) any judicial or non-judicial foreclosure under the Deed of Trust, or transfer of the Property in lieu thereof; (ii) the release and reconveyance or cancellation of the Deed of Trust; and (iii) the satisfaction of all of Borrower's obligations under the Loan Documents.

## ARTICLE 8. SET ASIDE LETTERS

8.1. Set Aside Letters. If, at Borrower's request, Lender issues any letter or letters ("Set Aside Letter") to any governmental agency ("Obligee") or bonding company ("Surety") whereby Lender agrees to allocate Loan proceeds for the construction of off-site, common area, or other improvements required by any governmental agency or for which bonds may be required ("Bonded Work") in connection with the development of the Property, Borrower represents, warrants, covenants and agrees as follows:

(a) The sum which Borrower requests Lender to allocate for the Bonded Work shall be sufficient to pay for the construction and completion cost of the Bonded Work in accordance with any agreement between Borrower and Obligee or as may be required under the Project Entitlements, and a copy of such agreement shall be furnished to Lender by Borrower prior to and as a condition precedent to the issuance by Lender of any Set Aside Letter;

(b) Lender is irrevocably and unconditionally authorized to disburse to the Obligee or Surety all or any portion of said allocated Loan proceeds upon a demand of such Surety or Obligee made in accordance with the terms and conditions of the Set Aside Letter;

(c) Any disbursements or payments which Lender makes or may be obligated to make under any Set Aside Letter, whether made directly to the Surety, Obligee, or to others for completion of all or part of the Bonded Work, shall be deemed a disbursement under this Agreement to or for the benefit or account of Borrower;

(d) BORROWER SHALL DEFEND, INDEMNIFY AND HOLD HARMLESS LENDER FROM ANY CLAIM, DEMAND, CAUSE OF ACTION, DAMAGE, LOSS OR LIABILITY, INCLUDING, WITHOUT LIMITATION, ANY COURT COSTS AND ATTORNEYS' FEES AND EXPENSES, WHICH LENDER MAY SUFFER OR INCUR AS A DIRECT OR INDIRECT CONSEQUENCE OF ITS ISSUANCE OF OR COMPLIANCE WITH ANY REQUESTED SET ASIDE LETTER. BORROWER SHALL PAY ANY INDEBTEDNESS ARISING UNDER THIS INDEMNITY TO LENDER IMMEDIATELY UPON DEMAND OF LENDER. BORROWER'S DUTY TO DEFEND, INDEMNIFY AND HOLD HARMLESS LENDER HEREUNDER SHALL SURVIVE THE RELEASE AND CANCELLATION OF THE NOTE AND

19

THE FULL OR PARTIAL RELEASE OR RECONVEYANCE OF THE DEED OF
TRUST OR OTHER LOAN DOCUMENTS;

(e) Lender shall have no obligation to release any collateral or security under the
Loan Documents unless and until Lender has received a full and final written release of
its obligations under each Set Aside Letter; and

(f) Lender is not obligated to issue any Set Aside Letter and may refuse to do so
in Lender's sole and absolute discretion, excepting only the following Set Aside Letters:
None.

## ARTICLE 9. COVENANTS OF BORROWER

9.1. Expenses. Borrower shall immediately pay Lender upon demand all Lender's
reasonable out-of-pocket costs and expenses actually incurred by Lender in connection
with: (a) the preparation of this Agreement, all other Loan Documents and Other Related
Documents contemplated hereby; (b) the administration of this Agreement, the other
Loan Documents and Other Related Documents for the term of the Loan; and (c) the
enforcement or satisfaction by Lender of any of Borrower's obligations under this
Agreement, the other Loan Documents or the Other Related Documents. For all purposes
of this Agreement, Lender's costs and expenses shall include, without limitation, all
appraisal fees, cost engineering and inspection fees, legal fees and expenses, accounting
fees, environmental consultant fees, auditor fees, and the cost to Lender of any title
insurance premiums, title surveys, reconveyance and notary fees. Borrower recognizes
and agrees that Lender may, at its option, require inspection of the Property and
Improvements by an independent supervising architect and/or cost engineering specialist:
(i) prior to each advance; (ii) at least once each month during the course of construction
even though no disbursement is to be made for that month; (iii) upon completion of the
Improvements; and (iv) at least semi-annually thereafter during the term of the Loan. To
the extent that any of the foregoing are performed or incurred by employees of Lender or
any Affiliate of Lender, no such costs, or any associated travel, lodging, subsistence or
other expenses for such goods and services shall be owed by Borrower.

9.2. ERISA Compliance. Borrower shall at all times comply with the provisions of
ERISA with respect to any retirement or other employee benefit plan to which it is a
party as employer, and as soon as possible after Borrower knows, or has reason to know,
that any Reportable Event (as defined in ERISA) with respect to any such plan of
Borrower has occurred, it shall furnish to Lender a written statement setting forth details
as to such Reportable Event and the action, if any, which Borrower proposes to take with
respect thereto, together with a copy of the notice of such Reportable Event furnished to
the Pension Benefit Guaranty Corporation.

9.3. [Deleted]

9.4. [Deleted]

20

9.5. Revenue to be Applied to Debt Service. Following the occurrence and during the continuation of any Default, no Distributions shall be made or distributed to any partner, venturer, member or equity investor of Borrower.

9.6. Subdivision Maps. Prior to recording any final map, plat, parcel map, lot line adjustment or other subdivision map of any kind covering any portion of the Property (collectively, "Subdivision Map"), Borrower shall submit such Subdivision Map to Lender for Lender's review and approval, which approval shall not be unreasonably withheld. Within ten (10) Business Days after Lender's receipt of such Subdivision Map, Lender shall provide Borrower written notice if Lender disapproves of said Subdivision Map. Lender shall be deemed to have approved the Subdivision Map if such notice is not so provided to Borrower. Within five (5) Business Days after Lender's request, Borrower shall execute, acknowledge and deliver to Lender such amendments to the Loan Documents as Lender may reasonably require to reflect the change in the legal description of the Property resulting from the recordation of any Subdivision Map. In connection with and promptly after the recordation of any amendment or other modification to the Deed of Trust recorded in connection with such amendments, Borrower shall deliver to Lender, at Borrower's sole expense, a title endorsement to the Title Policy in form and substance satisfactory to Lender insuring the continued first priority lien of the Deed of Trust. Subject to the execution and delivery by Borrower of any documents required under this Section, Lender shall, if required by applicable law, sign any Subdivision Map approved, or deemed to be approved, by Lender pursuant to this Section.

9.7. Further Assurances. Upon Lender's request and at Borrower's sole cost and expense, Borrower shall execute, acknowledge and deliver any other instruments and perform any other acts necessary, desirable or proper, as determined by Lender, to carry out the purposes of this Agreement and the other Loan Documents or to perfect and preserve any liens created by the Loan Documents.

9.8. Assignment. Without the prior written consent of Lender, Borrower shall not assign Borrower's interest under any of the Loan Documents, or in any monies due or to become due thereunder, and any assignment without such consent shall be void. In this regard, Borrower acknowledges that Lender would not make this Loan except in reliance on Borrower's expertise, reputation, prior experience in developing and constructing commercial real property, Lender's knowledge of Borrower, and Lender's understanding that this Agreement is more in the nature of an agreement involving personal services than a standard loan where Lender would rely on security which already exists.

9.9. [Deleted]

9.10. Governing Documents. Without the prior written consent of Lender, Borrower shall not modify or permit to be modified the formation or organizational documents of the Borrower, or any partners, joint venturers or members thereof.

9.11. [Deleted]

21

## ARTICLE 10. REPORTING COVENANTS

10.1. Financial Information. Borrower hereby consents to Lender's obtaining from other parties copies of any and all reports that Borrower delivers to any party. In addition, on or before the tenth (10th) day of each month, Borrower shall deliver to Lender a reconciliation showing the balance of the Working Capital Reserve Account as of the beginning of the first day of the preceding calendar month, the balance of the Working Capital Reserve as of the end of the last day of the preceding calendar month, and a line item listing of all expenditures, together with supporting documentation, of amounts expended from the Working Capital Reserve Account during such period.

To the extent not otherwise obtained as provided above, within thirty (30) days after Lender's request, Borrower shall also deliver to Lender such quarterly and other financial information regarding the Property or Borrower. If audited financial information is prepared, Borrower shall deliver to Lender copies of that information within fifteen (15) days after its final preparation. Except as otherwise agreed to by Lender, all such financial information shall be prepared in accordance with generally accepted accounting principles consistently applied. Upon written request of Lender, Borrower use good faith efforts to obtain and deliver to Lender any specific financial reports and information pertaining to the members, managers, partners and shareholders of Borrower.

10.2. Books and Records. Borrower shall maintain complete books of account and other records for the Property and Improvements and for disbursement and use of the proceeds of the Loan and Borrower's Funds, and the same shall be available for inspection and copying by Lender upon reasonable prior notice.

## ARTICLE 11. DEFAULTS AND REMEDIES

11.1. Default. The occurrence of any one or more of the following shall constitute an event of default (hereinafter, "Default") under this Agreement and the other Loan Documents:

(a) Monetary. Borrower's failure to pay within ten (10) Business Days following the date of delivery of written notice from Lender to Borrower that such amount was not received when due, any sums payable under the Note or any of the other Loan Documents or Borrower's failure to deposit any Borrower's Funds as and when required under this Agreement; provided, however, that if such written notice from Lender is an Out of Balance Notice, then, in lieu of such 10-Business Day period, Borrower shall have a thirty (30) day period following the date of delivery of such Out of Balance Notice before a Default shall occur in which to deposit funds equal to the amount of the applicable deficiency into the Borrower's Funds Account, as contemplated by the provisions of Section 3.1(b); further, provided, however, that no such notice or cure period shall apply at maturity or upon acceleration; or

22

(b) Performance of Obligations. Borrower's failure to perform any obligation in addition to those in Section 11.1(a) above under any of the Loan Documents within thirty (30) days following the date of delivery of written notice from Lender; provided, however, that if a longer or shorter cure period is expressly provided for the remedy of any such failure, Borrower's failure to perform will not constitute a Default until such longer or shorter date as the specified cure period expires; but provided further, however, if such Default is curable, but the nature of such failure is such that it cannot reasonably be cured within said thirty (30) days (or longer or shorter specified cure period), then if Borrower fails to commence a cure thereof within said time and thereafter fails to diligently pursue a cure thereof and fails to complete same within ninety (90) days after Lender's written demand; or a default by Borrower (following any applicable notice and cure period) under any of the Other Related Documents; or

(c) Construction; Use. (i) There is any material deviation in the work of construction from the Plans and Specifications or governmental requirements from that required under this Agreement or the appearance or use of defective workmanship or materials in constructing the Improvements, and Borrower fails to remedy the same to Lender's satisfaction within ten (10) Business Days after Lender's written demand to do so, or if the nature of such deviation or defect is curable but such that it cannot reasonably be cured within said ten (10) Business Days, then if Borrower fails to commence a cure thereof within said ten (10) Business Days and thereafter fails to diligently pursue a cure thereof and complete same within ninety (90) days after Lender's written demand; or (ii) subject to the provisions of Section 4.3, there is a cessation of construction of the Improvements prior to completion for a continuous period of more than fifteen (15) days; or (iii) the construction, renovation, sale or leasing of any of the Improvements in accordance with the Loan Documents is prohibited, enjoined or delayed for a continuous period of more than forty-five (45) days; or (iv) subject to the provisions of Section 4.3, utilities or other public services necessary for the full occupancy and utilization of the Property and Improvements are curtailed for a continuous period of more than thirty (30) days; or

(d) Liens, Attachment; Condemnation. (i) The recording of any claim of lien against the Property or Improvements or the service on Lender of any bonded stop notice relating to the Loan and the continuance of such claim of lien or bonded stop notice for twenty (20) days without discharge, satisfaction or provision for payment being made by Borrower in a manner satisfactory to Lender, subject to the provisions of Section 4.9 hereof and Section 5.5 of the Deed of Trust; or (ii) the condemnation, seizure or appropriation of, or occurrence of an uninsured casualty with respect to any material portion of the Property or Improvements that is not otherwise offset by Borrower's deposit of sufficient restoration funds (including any applicable deductible amount under any applicable policy of casualty insurance) into the Borrower's Funds Account within forty-five (45) days after the occurrence of such event; or (iii) the sequestration or attachment of, or any levy or execution upon any of the Property or Improvements, any other collateral provided by Borrower under any of the Loan Documents, any monies in the Account or in the Borrower's Funds Account, or any substantial portion of the other assets of Borrower, which sequestration, attachment, levy or execution is not released,

23

expunged or dismissed prior to the earlier of forty-five (45) days or the sale of the assets affected thereby; or

(e) Representations and Warranties. (i) The material failure of any representation or warranty of Borrower in any of the Loan Documents to be true, correct and complete as of the date made, and the continuation of such failure for more than ten (10) Business Days after written notice to Borrower from Lender requesting that Borrower cure such failure; or

(f) Voluntary Bankruptcy; Insolvency; Dissolution. (i) The filing of a petition by Borrower for relief under the Bankruptcy Code, or under any other present or future state or federal law regarding bankruptcy, reorganization or other debtor relief law; (ii) a general assignment by Borrower for the benefit of creditors; or (iii) Borrower applying for, or the appointment of, a receiver, trustee, custodian or liquidator of Borrower or any of its property; or

(g) Involuntary Bankruptcy. (i) The filing of any pleading or an answer by Borrower in any involuntary proceeding under the Bankruptcy Code or other debtor relief law which admits the jurisdiction of the court or the petition's material allegations regarding Borrower's insolvency; or (ii) the failure of Borrower to effect a full dismissal of any involuntary petition under the Bankruptcy Code or under any other debtor relief law that is filed against Borrower or in any way restrains or limits Borrower or Lender regarding the Loan, the Property or the Improvements, prior to the earlier of the entry of any court order granting relief sought in such involuntary petition, or forty-five (45) days after the date of filing of such involuntary petition; or

(h) [Deleted]; or

(i) Change In Management or Control. The occurrence of any material management or organizational change in Borrower or in the partners, venturers or members of Borrower, including, without limitation, any dispute among the constituent members or partners of Borrower, and which Lender determines, in its sole and absolute discretion, shall have a material adverse effect on the Loan, on the Property and Improvements, or on the ability of Borrower or its partners, venturers or members to perform their obligations under the Loan Documents; or

(j) Loss of Priority. The failure at any time of the Deed of Trust to be a valid first lien upon the Property and Improvements or any portion thereof, other than as a result of any release or reconveyance of the Deed of Trust with respect to all or any portion of the Property and Improvements pursuant to the terms and conditions of this Agreement; or

(k) Hazardous Materials. The discovery of any significant Hazardous Materials in, on or about the Property or Improvements subsequent to the Effective Date (to the extent not disclosed in the Environmental Report or otherwise disclosed in writing to Lender prior to the date of this Agreement); provided, however, if such Default is curable, but the nature of such failure is such that it cannot reasonably be cured within thirty (30) days,

24

then if Borrower fails to commence a cure thereof within said time and thereafter fails to diligently pursue a cure thereof and fails to complete same within ninety (90) days after Lender's written demand. Any such Hazardous Materials shall be "significant" for this purpose if said Hazardous Materials, in Lender's sole discretion, have a materially adverse impact on the value of the Property and Improvements.

Notwithstanding any of the foregoing or anything to the contrary in this Agreement, to the extent that any Default can be cured by the payment of money directly to Lender, to Borrower's Funds Account or to any third party to reimburse same for materials or services already delivered or performed or for the purpose of delivering materials or performing services which if so done would cure said Default, the applicable cure period specified in this Agreement shall be extended by an additional sixty (60) days to allow Borrower to undertake any necessary capital calls or to seek or arrange the necessary partnership loans.

11.2. Acceleration Upon Default; Remedies. Upon the occurrence of any Default specified in this Article XI, Lender may, at its sole option, declare all sums owing to Lender under the Note, this Agreement and the other Loan Documents immediately due and payable. Upon such acceleration, Lender may, in addition to all other remedies permitted under this Agreement and the other Loan Documents and at law or equity, apply any sums in the Account and Borrower's Funds Account to the sums owing under the Loan Documents and any and all obligations of Lender to fund further disbursements under the Loan shall terminate.

11.3. Disbursements to Third Parties. Upon the occurrence of a Default occasioned by Borrower's failure to pay money to a third party as required by this Agreement, Lender may but shall not be obligated to make such payment from the Loan proceeds, Borrower's Funds, or other funds of Lender. If such payment is made from proceeds of the Loan or from Borrower's Funds, Borrower shall immediately deposit with Lender, upon written demand, an amount equal to such payment. If such payment is made from funds of Lender, Borrower shall immediately repay such funds upon written demand of Lender. In either case, the Default with respect to which any such payment has been made by Lender shall not be deemed cured until such deposit or repayment (as the case may be) has been made by Borrower to Lender.

11.4. Lender's Completion of Construction. Upon the occurrence of a Default, Lender may, upon five (5) Business Days prior written notice to Borrower, and with or without legal process, take possession of the Property and Improvements, remove Borrower and all agents, employees and contractors of Borrower from the Property and Improvements, complete the work of construction and market for lease and lease space within the Property and/or Improvements. For this purpose, Borrower irrevocably appoints Lender as its attorney-in-fact, which agency is coupled with an interest. As attorney-in-fact, Lender may, in Borrower's name, take or omit to take any action Lender may deem appropriate with respect to third parties, including, without limitation, exercising

Borrower's rights under all contracts concerning the Property and/or Improvements, but excluding the Loan Documents.

11.5. Lender's Cessation of Construction. If Lender determines at any time that the Improvements are not being constructed substantially in accordance with the requirements under this Agreement, then upon the occurrence of a Default therefor, Lender may, upon five (5) Business Days prior written notice to Borrower, immediately cause all construction to cease on any of the Improvements affected by the condition of nonconformance. Borrower shall thereafter not allow any construction work, other than corrective work, to be performed on any of the Improvements affected by the condition of nonconformance until such time as Lender notifies Borrower in writing that the nonconforming condition has been corrected.

11.6. Termination or Continuation of Development and Management Agreements. Upon the occurrence of a Default wherein Lender elects to accelerate the Loan and records a notice of default to foreclose the lien of the Deed of Trust, Lender may elect to require Borrower to terminate the Development and Management Agreements (and Borrower shall immediately do so), without any termination fee or penalty, provided that all fees and expenses previously accrued thereunder up to the effective date of such termination are paid in full; provided however, so long as the Development and Management Agreements are not terminated, the respective party or parties performing services thereunder shall be entitled to continue to receive all fees and expenses owed such party or parties under the applicable Development and Management Agreements. In the event that Borrower reinstates the Loan under California law prior to the foreclosure of the lien of the Deed of Trust, such Development and Management Agreements shall be deemed to have been reinstated as of the date of such reinstatement of the Loan.

11.7. Repayment of Funds Advanced. Any funds expended by Lender in the exercise of its rights or remedies under this Agreement and the other Loan Documents shall be payable to Lender upon demand, together with interest at the rate applicable to the principal balance of the Note from the date the funds were expended.

11.8. Rights Cumulative, No Waiver. All Lender's rights and remedies provided in this Agreement and the other Loan Documents, together with those granted by law or at equity, are cumulative and may be exercised by Lender at any time. Lender's exercise of any right or remedy shall not constitute a cure of any Default unless all sums then due and payable to Lender under the Loan Documents are repaid and Borrower has cured all other Defaults. No waiver shall be implied from any failure of Lender to take, or any delay by Lender in taking, action concerning any Default or failure of condition under the Loan Documents, or from any previous waiver of any similar or unrelated Default or failure of condition. Any waiver or approval under any of the Loan Documents must be in writing and shall be limited to its specific terms.

ARTICLE 12. MISCELLANEOUS PROVISIONS

26

12.1. Indemnity. BORROWER HEREBY AGREES TO DEFEND, INDEMNIFY AND HOLD HARMLESS LENDER, ITS DIRECTORS, OFFICERS, MEMBERS, MANAGERS, EMPLOYEES, AGENTS, SUCCESSORS AND ASSIGNS FROM AND AGAINST ANY AND ALL LOSSES, DAMAGES, LIABILITIES, CLAIMS, ACTIONS, JUDGMENTS, COURT COSTS AND LEGAL OR OTHER EXPENSES (INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEYS' FEES AND EXPENSES) WHICH LENDER MAY INCUR AS A DIRECT OR INDIRECT CONSEQUENCE OF: (A) THE PURPOSE TO WHICH BORROWER APPLIES THE LOAN PROCEEDS; (B) THE FAILURE OF BORROWER TO PERFORM ANY OBLIGATIONS AS AND WHEN REQUIRED BY THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS; (C) ANY FAILURE AT ANY TIME OF ANY OF BORROWER'S REPRESENTATIONS OR WARRANTIES TO BE TRUE AND CORRECT; OR (D) ANY ACT OR OMISSION BY BORROWER, ANY CONSTITUENT PARTNER OR MEMBER OF BORROWER, ANY CONTRACTOR, SUBCONTRACTOR OR MATERIAL SUPPLIER, ENGINEER, ARCHITECT OR OTHER PERSON OR ENTITY WITH RESPECT TO ANY OF THE PROPERTY OR IMPROVEMENTS, EXCEPT TO THE EXTENT CAUSED OR CONTRIBUTED TO BY THE BAD FAITH, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF LENDER. BORROWER SHALL IMMEDIATELY PAY TO LENDER UPON DEMAND ANY AMOUNTS OWING UNDER THIS INDEMNITY, TOGETHER WITH INTEREST FROM THE DATE THE INDEBTEDNESS ARISES UNTIL PAID AT THE RATE OF INTEREST APPLICABLE TO THE PRINCIPAL BALANCE OF THE NOTE. BORROWER'S DUTY AND OBLIGATIONS TO DEFEND, INDEMNIFY AND HOLD HARMLESS LENDER SHALL SURVIVE CANCELLATION OF THE NOTE AND THE RELEASE, RECONVEYANCE OR PARTIAL RECONVEYANCE OF THE DEED OF TRUST.

12.2. Form of Documents. The form and substance of all documents, instruments, and forms of evidence to be delivered to Lender under the terms of this Agreement and any of the other Loan Documents shall be subject to Lender's approval and shall not be modified, superseded or terminated in any respect without Lender's prior written approval, except to the extent otherwise provided in this Agreement.

12.3. No Third Parties Benefited. No person other than Lender and Borrower and their permitted successors and assigns shall have any right of action under any of the Loan Documents.

12.4. Notices. All notices, demands, or other communications under this Agreement and the other Loan Documents shall be in writing and shall be delivered to the appropriate party at the address set forth on the signature page of this Agreement and as specified in EXHIBIT D (subject to change from time to time by written notice to all other parties to this Agreement). All communications shall be deemed served upon delivery of, or if mailed, upon receipt or rejection after the deposit in the United States Postal Service mail, certified postage prepaid-return receipt requested and addressed to the address of Borrower or Lender at the address specified; provided, however, that non-receipt of any communication as the result of any change of address of which the sending

27

party was not notified or as the result of a refusal to accept delivery shall be deemed receipt of such communication.

12.5. Attorney-in-Fact. Borrower hereby irrevocably appoints and authorizes Lender, as Borrower's attorney-in-fact, which agency is coupled with an interest, to execute and/or record in Lender's or Borrower's name any notices, instruments or documents that Lender deems appropriate to protect Lender's interest under any of the Loan Documents.

12.6. Actions. Borrower agrees that Lender, in exercising the rights, duties or liabilities of Lender or Borrower under the Loan Documents, may commence, appear in or defend any action or proceeding purporting to affect the Property, the Improvements, or the Loan Documents and Borrower shall immediately reimburse Lender upon demand for all such expenses so incurred or paid by Lender, including, without limitation, attorneys' fees and expenses and court costs.

12.7. Right of Contest. Borrower may contest in good faith any claim, demand, levy or assessment (other than liens and stop notices, subject to the provisions of Section 4.9 of this Agreement) by any person other than Lender which would constitute a Default if: (a) Borrower pursues the contest diligently, in a manner which Lender determines is not prejudicial to Lender, and does not impair the rights of Lender under any of the Loan Documents; and (b) Borrower deposits with Lender any funds or other forms of assurance which Lender in good faith determines from time to time appropriate to protect Lender from the consequences of the contest being unsuccessful. Borrower's compliance with this Section shall operate to prevent such claim, demand, levy or assessment from becoming a Default.

12.8. Relationship of Parties. The relationship of Borrower and Lender under the Loan Documents is, and shall at all times remain, solely that of borrower and lender, and Lender neither undertakes nor assumes any responsibility or duty to Borrower or to any third party with respect to the Property or Improvements, except as expressly provided in this Agreement and the other Loan Documents.

12.9. Delay Outside Lender's Control. Lender shall not be liable in any way to Borrower or any third party for Lender's failure to perform or delay in performing under the Loan Documents if such failure to perform or delay in performing results directly or indirectly from, or is based upon, the action, inaction, or purported action, of any governmental or local authority, or because of war, rebellion, insurrection, strike, lock-out, boycott or blockade (whether presently in effect, announced or in the sole judgment of Lender deemed probable), or from any Act of God or other cause or event beyond Lender's control.

12.10. Attorneys' Fees and Expenses; Enforcement. If any attorney is engaged by Lender to enforce or defend any provision of this Agreement, any of the other Loan Documents or Other Related Documents, or as a consequence of any Default under the Loan Documents, with or without the filing of any legal action or proceeding, and including, without limitation, any fees and expenses incurred in any bankruptcy

28

proceeding of the Borrower, then Borrower shall immediately pay to Lender, upon demand, the amount of all reasonable attorneys' fees and expenses and all costs incurred by Lender in connection therewith, together with interest thereon from the date of such demand until paid at the rate of interest applicable to the principal balance of the Note as specified therein.

12.11. Immediately Available Funds. Unless otherwise expressly provided for in this Agreement, all amounts payable by Borrower to Lender shall be payable only in United States currency, immediately available funds.

12.12. Lender's Consent. Wherever in this Agreement there is a requirement for Lender's consent and/or a document to be provided or an action taken "to the satisfaction of Lender", it is understood by such phrase that Lender shall exercise its consent, right or judgment in a reasonable manner given the specific facts and circumstance applicable at the time.

12.13. Signs. Lender may place on the Property reasonable signs standard to construction loan transactions stating that construction financing is being provided by Lender and any other lenders or participants in the Loan, subject to the requirements of the Project Entitlements and applicable law.

12.14. Lender's Agents. Lender may designate an agent or independent contractor to exercise any of Lender's rights under this Agreement and any of the other Loan Documents. Any reference to Lender in any of the Loan Documents shall include Lender's agents, employees or independent contractors. Borrower shall pay the costs of such agent or independent contractor either directly to such person or to Lender in reimbursement of such costs, as applicable.

12.15. Tax Service. Lender is authorized to secure, at Borrower's expense, a tax service contract with a third party vendor which shall provide tax information on the Property and Improvements satisfactory to Lender.

12.16. WAIVER OF RIGHT TO TRIAL BY JURY. EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (a) ARISING UNDER THE LOAN DOCUMENTS, INCLUDING, WITHOUT LIMITATION, ANY PRESENT OR FUTURE MODIFICATION THEREOF OR (b) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THE LOAN DOCUMENTS (AS NOW OR HEREAFTER MODIFIED) OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION IS NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM,

29

DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF ANY RIGHT THEY MIGHT OTHERWISE HAVE TO TRIAL BY JURY.

12.17. Severability. If any provision or obligation under this Agreement and the other Loan Documents shall be determined by a court of competent jurisdiction to be invalid, illegal or unenforceable, that provision shall be deemed severed from the Loan Documents and the validity, legality and enforceability of the remaining provisions or obligations shall remain in full force as though the invalid, illegal, or unenforceable provision had never been a part of the Loan Documents, provided, however, that if the rate of interest or any other amount payable under the Note or this Agreement or any other Loan Document, or the right of collectability therefor, are declared to be or become invalid, illegal or unenforceable, Lender's obligations to make advances under the Loan Documents shall not be enforceable by Borrower.

12.18. Heirs, Successors and Assigns. Except as otherwise expressly provided under the terms and conditions of this Agreement, the terms of the Loan Documents shall bind and inure to the benefit of the heirs, successors and assigns of the parties.

12.19. Time. Time is of the essence of each and every term of this Agreement.

12.20. Headings. All article, section or other headings appearing in this Agreement and any of the other Loan Documents are for convenience of reference only and shall be disregarded in construing this Agreement and any of the other Loan Documents.

12.21. Governing Law. This Agreement shall be governed by, and construed and enforced in accordance with the laws of the State of California, except to the extent preempted by federal laws. Borrower and all persons and entities in any manner obligated to Lender under the Loan Documents consent to the jurisdiction of any federal or state court within the State of California having proper venue and also consent to service of process by any means authorized by California or federal law.

12.22. Integration; Interpretation. The Loan Documents contain or expressly incorporate by reference the entire agreement of the parties with respect to the matters contemplated therein and supersede all prior negotiations or agreements, written or oral. The Loan Documents shall not be modified except by written instrument executed by all parties. Any reference in any of the Loan Documents to the Property or Improvements shall include all or any part of the Property or Improvements. Any reference to the Loan Documents includes any amendments, renewals or extensions now or hereafter approved by Lender in writing.

30

12.23. Joint and Several Liability. The liability of all persons and entities obligated in any manner under this Agreement and any of the Loan Documents shall be joint and several.

12.24. Counterparts. This Agreement, any of the other Loan Documents (except for the Note), any Other Related Documents and any subsequent modifications, amendments, waivers, consents or supplements thereof, if any, may be executed in any number of counterparts, each of which when executed and delivered shall be deemed to be an original and all such counterparts together, shall constitute one and the same instrument.

IN WITNESS WHEREOF, Borrower and Lender have executed this Agreement as of the date appearing on the first page of this Agreement.

[SIGNATURE PAGES TO FOLLOW]

31

"Lender"

Hankey Capital, LLC,
a California limited liability company

By: _____
    W. Scott Dobbins, President

Lender's Address:

4751 Wilshire Blvd., Suite 110
Los Angeles, CA 90010

32

BORROWER:

CRESTLLOYD, LLC,
a California limited liability company

By:_____
    Nile Niami, Manager

Borrower's Address:

c/o Skyline Development
8981 W. Sunset Blvd., Suite 303
West Hollywood, CA 90069

33

**CALIFORNIA ACKNOWLEDGMENT**                                   CIVIL CODE § 1189

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of _LOS ANGELES_ }

On _OCTOBER 30, 2018_ before me, _Nigel Gibbs Notary Public_
    *Date*           *Here insert Name and Title of the Officer*

personally appeared _Nile Niami_
           *Name(s) of Signer(s)*

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

NIGEL GIBBS
Notary Public - California
Los Angeles County
Commission # 2164239
My Comm. Expires Oct 4, 2020

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____
           *Signature of Notary Public*

*Place Notary Seal and/or Stamp Above*

──────────────── OPTIONAL ────────────────

*Completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document _CONSTRUCTION LOAN Agreement_

Document Date: _10/25/18_                   Number of Pages: _43_

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

| | |
|---|---|
| Signer's Name: _____ | Signer's Name: _____ |
| ☐ Corporate Officer – Title(s): _____ | ☐ Corporate Officer – Title(s): _____ |
| ☐ Partner – ☐ Limited ☐ General | ☐ Partner – ☐ Limited ☐ General |
| ☐ Individual     ☐ Attorney in Fact | ☐ Individual     ☐ Attorney in Fact |
| ☐ Trustee     ☐ Guardian or Conservator | ☐ Trustee     ☐ Guardian or Conservator |
| ☐ Other: _____ | ☐ Other: _____ |
| Signer is Representing: _____ | Signer is Representing: _____ |

©2018 National Notary Association

EXHIBIT A

DESCRIPTION OF PROPERTY

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF LOS
ANGELES, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND
IS DESCRIBED AS FOLLOWS:

PARCEL 1:

LOTS 1 AND 2 OF TRACT NO. 22727, IN THE CITY OF LOS ANGELES, COUNTY
OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK
623 PAGE(S) 81 TO 83 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY
RECORDER OF SAID COUNTY.

EXCEPTING THEREFROM THAT PORTION OF SAID LOTS LYING WESTERLY
OF THE FOLLOWING DESCRIBED LINE:

BEGINNING AT A POINT IN THE NORTHWESTERLY TERMINUS OF AIROLE
WAY, 30 FEET WIDE, AS SHOWN ON SAID MAP, DISTANT THEREON SOUTH
76° 06' 07" WEST 2.86 FEET FROM THE MOST NORTHERLY CORNER
THEREOF; THENCE LEAVING SAID TERMINUS ALONG A CURVE CONCAVE
WESTERLY, HAVING A RADIUS OF 361.97 FEET AND CONCENTRIC WITH
THAT CERTAIN CURVE IN THE WESTERLY LINE OF SAID LOT 1 HAVING A
RADIUS OF 349.83 FEET; THENCE NORTHERLY 22.69 FEET ALONG SAID
CURVE THROUGH A CENTRAL ANGLE OF 03° 35' 48" TO THE BEGINNING OF
A COMPOUND CURVE, CONCAVE SOUTHWESTERLY AND HAVING A
RADIUS OF 175.66 FEET; THENCE NORTHWESTERLY 119.88 FEET ALONG
SAID CURVE THROUGH A CENTRAL ANGLE OF 39° 06' 53"; THENCE NORTH
56° 36' 22" WEST 7.97 FEET TO THE BEGINNING OF A CURVE CONCAVE
NORTHEASTERLY AND HAVING A RADIUS OF 90.80 FEET; THENCE
NORTHWESTERLY 71.18 FEET ALONG SAID CURVE THROUGH A CENTRAL
ANGLE OF 44° 55' 04"; THENCE NORTH 11° 41' 18" WEST 208.55 FEET TO THE
BEGINNING OF A CURVE CONCAVE EASTERLY AND HAVING A RADIUS OF
35.90 FEET; THENCE NORTHERLY 34.44 FEET ALONG SAID CURVE THROUGH
A CENTRAL ANGLE OF 56° 32' 34"; THENCE NORTH 44° 51' 16" EAST 42.37
FEET TO THE CURVED SOUTHEASTERLY LINE OF STRADELLA ROAD, 40
FEET WIDE, AS SHOWN ON SAID MAP.

PARCEL 2:

THAT PORTION OF LOT 3 IN BLOCK 3 OF TRACT NO. 9745, IN THE CITY OF
LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER
MAP RECORDED IN BOOK 141 PAGES 93 TO 96 INCLUSIVE OF MAPS, IN THE

34

OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, LYING NORTHERLY
OF THE FOLLOWING DESCRIBED LINE:

BEGINNING AT A POINT IN THE EASTERLY LINE OF SAID LOT, DISTANCE
THEREON SOUTH 13° 13' 20" EAST 34.33 FEET FROM THE NORTHERLY
TERMINUS OF THAT CERTAIN COURSE IN SAID EASTERLY LINE SHOWN ON
SAID MAP AS HAVING A BEARING AND LENGTH OF NORTH 13° 13' 20" WEST
106.35 FEET; THENCE NORTH 89° 27' 20" WEST 214.07 FEET, MORE OR LESS,
TO A POINT IN THE WESTERLY LINE OF SAID LOT, DISTANT SOUTHERLY
THEREON 54.93 FEET FROM THE NORTHERLY TERMINUS OF THAT CERTAIN
CURVE IN SAID WESTERLY LINE HAVING A LENGTH OF 115.83 FEET.

APN: **4369-026-021**

## EXHIBIT B

### DOCUMENTS

A. Loan Documents. The documents listed below, numbered 1 through 7, inclusive, and amendments, modifications and supplements thereto which have received the prior written consent of Lender, together with any documents executed in the future that are approved by Lender and that recite that they are "Loan Documents" for purposes of this Agreement are collectively referred to herein as the Loan Documents.

1. This Agreement;

2. Promissory Note of even date herewith in the original principal amount of the Loan made by Borrower payable to the order of Lender;

3. Deed of Trust, Security Agreement and Fixture Filing With Assignment of Rents of even date herewith executed by Borrower, as Trustor, to Chicago Title Company, as Trustee, for the benefit of Lender, as Beneficiary;

4. Hazardous Materials Indemnification Agreement of even date herewith executed by Borrower.

5. Assignment of Contracts

B. Other Related Documents (Which Are Not Loan Documents):

1. Manager's Consent;

2. Certificate Regarding Loan Purpose;

3. Truth-In-Lending Affidavit;

4. Summary of Loan Terms and Good Faith Estimate

5. Profit Participation Agreement

EXHIBIT C

FINANCIAL REQUIREMENT ANALYSIS

THIS SPACE INTENTIONALLY LEFT BLANK

EXHIBIT D

DISBURSEMENT PLAN

A. Timing of Disbursement. Unless another provision of this Agreement specifies otherwise, on or before the fifteenth (15th) day of each month, Borrower shall submit to:

Hankey Capital, LLC
c/o Scott Dobbins
4751 Wilshire Blvd., Suite 110
Los Angeles, California 90010
Phone :  (323) 692-4022
Facsimile:  (323) 692-4122

with a copy to:

[none]

a written itemized statement, signed by Borrower ("Application for Payment") setting forth:

1. A description of the work performed, material supplied and/or costs incurred or due for which disbursement is requested with respect to any line item ("Item") shown in the Disbursement Budget. Notwithstanding the amount of any line item shown in the Disbursement Budget, Borrower may reallocate amounts among the line items by allocating cost savings in any line item to Contingency, and amounts from the Contingency to any line item with a cost overrun; provided, however, that the aggregate amount of all disbursements under the Loan shall not exceed the Loan amount; and

2. The total amount incurred, expended and/or due for each requested Item less prior disbursements.

Each Application for Payment by Borrower shall constitute a representation and warranty by Borrower that Borrower is in compliance with all the conditions precedent to a disbursement specified in this Agreement. With respect to Borrower's remaking of the representations and warranties set forth in Article 6 of this Agreement on the date of submission of each Application for Payment, to the extent circumstances have changed for reasons beyond the reasonable control of Borrower such that Borrower must qualify such representations and warranties as of the date of delivery of any such Application for Payment, such qualification, to the extent it renders the applicable representation materially untrue or breaches the applicable warranty, shall merely be a failure of condition to Lender's obligation to disburse funds under the provisions of this EXHIBIT D, as opposed to constituting an Event of Default.

B. Lender's Right to Condition Disbursements. Lender shall have the right to condition any disbursement upon Lender's receipt in the appropriate form of the

38

following submissions and Lender's reasonable determination that such submissions ·
comply with the requirements set forth below:

1. The Application for Payment and an itemized requisition for payment;

2. Bills, invoices, documents of title, vouchers, statements, receipts and any other
documents evidencing the total amount expended, incurred or due for any requested
Items;

3. Evidence of Borrower's use of a lien release, joint check and voucher system
acceptable to Lender for payments or disbursements to any contractor, subcontractor,
materialman, supplier or lien claimant;

4. Architect's, inspector's and/or engineer's periodic certifications of the percentage
and/or stage of construction that has been completed and its conformance to the Plans and
Specifications and governmental requirements based upon any such architect's,
inspector's and/or engineer's periodic physical inspections of the Property and
Improvements;

5. Waivers and releases of any mechanics' lien, stop notice claim, equitable lien claim
or other lien claim rights (conditional for costs to be paid from the current Application for
Payment, and unconditional for all prior costs which have been disbursed by Lender by
the twenty-fifth (25th) day of the immediately preceding month or were to have been paid
from Borrower's own funds under the Disbursement Budget);

6. Reasonable evidence of Borrower's compliance with the provisions of the Sections
of this Agreement entitled CONSTRUCTION and AUTHORITY/ENFORCEABILITY.
Where this Agreement calls for the delivery of a certificate as evidence of any action,
such certificate, if factually accurate, shall constitute such reasonable evidence;

7. A written release executed by any surety to whom Lender has issued or will issue a
set-aside letter and/or any public entity or agency which is a beneficiary under any
instrument of credit, set-aside letter or standby letter of credit which Lender has issued or
will issue with respect to the Loan;

8. For final payment only with respect all or any separate, independent portion of the
Improvements, valid, recorded Notice(s) of Completion for the Improvements or any
portions of the Improvements for which Notice(s) of Completion may be recorded under
applicable law, and final payment lien release waivers (conditional with respect to costs
to be paid from such final payment, and unconditional for all other costs);

9. Certificate of Substantial Completion from the Architect and Engineer, if any, prior
to the final retention disbursement;

39

10. Any other document, requirement, evidence or information that Lender may have reasonably requested under any provision of the Loan Documents at least thirty (30) days prior to the Application for Payment in question; and

11. Except with respect to items covered under #12 and #13 below, evidence that any goods, materials, supplies, fixtures or other work in process for which disbursement is requested have been incorporated into the Improvements.

12. In the event any Application for Payment includes the cost of materials stored at a location other than the Property ("Offsite Materials"), each of the following: (a) evidence that the Offsite Materials have been purchased by Borrower, have been segregated from other materials in the facility and have been appropriately marked to indicate Borrower's ownership thereof and Lender's security interest therein; and (b) evidence that the Offsite Materials are insured as required by this Agreement.

13. In the event that any Application for Payment includes the cost of materials stored on the Property ("Onsite Materials"), each of the following: (a) evidence that the Onsite Materials have been purchased for or by Borrower; (b) evidence that the Onsite Materials are insured as required hereunder; and (c) evidence that the Onsite Materials are stored in an area on the Property for which adequate security is provided against theft and vandalism.

Borrower acknowledges that this approval process may result in disbursement delays and Borrower hereby consents to all such delays; provided, however, that Lender shall use commercially reasonable efforts to respond to all requests for approval within the time periods designated in this Agreement.

C. Periodic Disbursement of Construction Costs, Site Work Costs and Offsite Costs. As construction progresses, the amount of the retention as provided under any construction contract to which Borrower is a party (the "Retention") shall be disbursed into the Account or to or for the benefit or account of the Borrower, Property or Improvements upon Borrower's delivery to Lender of (1) the applicable lien releases specified above in Paragraph B.8 of this EXHIBIT D, (2) the applicable certificate specified above in Paragraph B.9 of this EXHIBIT D and (3) solely with respect to the Construction Contract, a duly issued temporary certificate of occupancy for the Improvements and completion of the Improvements in accordance with the Plans and Specifications.

D. Partial Disbursements. No disbursement shall be made for a particular Application for Payment unless all required supporting materials are included for Items totaling at least sixty-five percent (65%) of the total amount of funds requested thereunder. Subject to the foregoing, to the extent that an unconditional lien release and waiver for an Item that was included in a prior disbursement is not delivered to Lender prior to the date that Lender approves the subsequent disbursement, Lender may withhold from the then current approved disbursement an amount equal to one hundred fifty percent (150%) of the amount for the Item(s) which had been previously funded. Thereafter, such withheld

amount shall be disbursed as part of the next ensuing disbursement upon Lender's receipt of the missing unconditional lien release and waiver.

E. Timing of Disbursements. Lender shall exercise diligent and good faith efforts to disburse funds for all approved Items in any Application for Payment within the applicable Lender Payment Turnaround Period.

41

EXHIBIT E

LEASING PARAMETERS

THIS SPACE INTENTIONALLY LEFT BLANK

EXHIBIT F

CERTIFICATE OF APPROVAL

THIS SPACE INTENTIONALLY LEFT BLANK

# EXHIBIT G

## SCHEDULE OF PRE-CLOSING DISBURSEMENTS

THIS SPACE INTENTIONALLY LEFT BLANK

# EXHIBIT 3



**Hankey Capital**
*a California Finance Lender*
*Department of Business Oversight License No. 6038812*

### PROMISSORY NOTE
### (VARIABLE RATE)

| BORROWER'S NAME | MATURITY DATE |
|---|---|
| CRESTLLOYD, LLC, a California limited liability company (the "Borrower") | October 31, 2020 |

$82,500,000.00          Los Angeles, California          October 25, 2018

On or prior to October 31, 2020 (the "Maturity Date"), for value received, Borrower promises to pay to the order of HANKEY CAPITAL, LLC, a California limited liability company ("Lender"), at its office at 4751 Wilshire Blvd., Suite 110, Los Angeles, California 90010, or at such other place as the holder of this Note may from time to time designate in writing, the principal sum of Eighty-Two Million Five Hundred Thousand and No/100 Dollars ($82,500,000.00), together with interest from the date hereof computed on the principal balance hereof from time to time outstanding, at the rate of four and three-quarters percent (4.75%) per annum above the Prime Rate.

Prime Rate: The rate of interest published from time to time by *The Wall Street Journal* as the "prime rate." **In no event shall the interest rate hereunder be less than 11.0%.**

The interest rate on this Note is subject to change from time to time based on changes in the Prime Rate (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. If the Index becomes unavailable during the term of this loan, Lender may designate a substitute Index after notice to Borrower. Lender will disclose to Borrower the current Index rate upon Borrower's request. Borrower acknowledges that Lender may make loans based on other rates as well. The Index currently is 5.25% per annum. Borrower hereby waives the right to receive notice of any future change(s) in the interest rate. Whenever increases occur in the interest rate, Lender, at its option, may do one or more of the following: (a) Increase Borrower's payments to ensure that the Loan will pay off by its original final maturity date, (b) Increase Borrower's payments to cover accruing interest, (c) Increase the number of payments, and (d) continue the payments and increase Borrower's final payment.

Commencing on the first full calendar month following the date of the initial disbursement, and continuing on the first day of each subsequent calendar month until the Maturity Date, Borrower shall make monthly payments of interest-only in arrears on the disbursed and

1

unpaid principal balance of this Note.  Interest shall be computed daily based upon a three hundred sixty (360) day year for the actual number of days elapsed.  Should interest not be paid when due, it shall become part of the principal and thereafter bear interest as herein provided.

Should default be made in the payment of principal or interest when due or in the performance or observance when due of any term, covenant or condition of any deed of trust, security agreement or other agreement (including amendments and extensions thereof) securing or pertaining to this Note, then, upon Lender's written notice to Borrower of such default (sent via certified mail), and upon Borrower's failure to cure such default within thirty (30) days from the date of receipt of said notice, at the option of the holder hereof, the entire balance of principal and accrued interest then remaining unpaid shall become immediately due and payable and thereafter bear interest, until paid in full, at the increased rate of five percent (5%) per annum over and above the interest rate contracted for herein as it may vary from time to time.  Borrower acknowledges and agrees that during the time that any payment of principal, interest or other amounts due under this Note is delinquent, the holder will incur additional costs and expenses attributable to its loss of use of the money due and to the adverse impact on the holder's ability to avail itself of other opportunities.  Borrower acknowledges and agrees that it is extremely difficult and impractical to ascertain the extent of such costs and expenses and that proof of actual damages would be costly or inconvenient.  Borrower therefore agrees that interest at the increased rate of five percent (5%) per annum over and above the interest rate contracted for in this Note represents a reasonable sum considering all the circumstances existing on the date of this Note and represents a fair and reasonable estimate of such costs and expenses.  No delay or omission on the part of the holder hereof in exercising any right hereunder, or under any such deed of trust, security agreement or other agreement shall operate as a waiver of such right or of any other right under this Note or under any such deed of trust, security agreement or other agreement.

Except with respect to the final monthly payment hereunder and following the Maturity Date, if any payment of principal or interest under this Note shall not be made within five (5) calendar days of the date due, a late charge of five percent (5%) of the overdue amount may be charged by the holder for the purpose of defraying the expenses incident to handling such delinquent payments.  Borrower acknowledges and agrees that it is extremely difficult and impractical to ascertain the extent of such expenses and that proof of actual damages would be costly or inconvenient.  Borrower therefore agrees that such late charge represents a reasonable sum considering all of the circumstances existing on the date of this Note and represents a fair and reasonable estimate of the costs that will be sustained by the holder due to the failure of Borrower to make timely payments.  Such late charge shall be paid without prejudice to the right of the holder to collect any other amounts provided to be paid or to declare a default under this Note or under the Deed of Trust referred to in this Note or from exercising any of the other rights and remedies of the holder, including, without limitation, the right to declare the entire balance of the principal and accrued interest then remaining unpaid immediately due and payable.

In no event shall interest accrue or be payable hereon or under any such deed of trust, security agreement or other agreement in excess of the maximum amount of interest permitted on the date hereof by the laws of the State of California.

2

If this Note is not paid when due, whether at its specified or accelerated maturity date, Borrower promises to pay all costs of collection and enforcement of this Note, including, but not limited to, reasonable attorneys' fees and costs, incurred by the holder hereof on account of such collection or enforcement, whether or not suit is filed hereon.

Principal and interest shall be payable in lawful money of the United States without setoff, demand or counterclaim. Borrower waives the defense of the statute of limitations in any action on this Note. Presentment, notice of dishonor, and protest are waived by all makers, sureties, guarantors and endorsers of this Note. Such parties expressly consent to any extension of the time of payment hereof or any installment hereof, to any renewal, and to the release of any or all of the security given for the payment of this Note or the release of any party liable for this obligation.

This Note shall be governed and construed in accordance with the laws of the State of California.

Borrower may prepay this Note in whole or in part, at any time. In the event this Note is paid in its entirety on or prior to April 30, 2020, a prepayment penalty equal to one percent (1.0%) of the then-outstanding principal balance shall be payable hereunder. No partial prepayment shall affect the obligation of Borrower to pay the next subsequent regular installment payable hereunder until the entire balance of principal and interest shall have been paid in full.

IN WITNESS WHEREOF, the undersigned has executed this Note as of the date first written above.

BORROWER:

CRESTLLOYD, LLC,
a California limited liability company

By: _____
      Nile Niami, Manager

3

This loan is made pursuant to California Finance Lender's Law,
Division 9 (commencing with Section 22000) of the Financial Code.
For information contact the Department of Business Oversight, State of California.

**EXHIBIT 4**



This page is part of your document - DO NOT DISCARD

## 20181122917





Pages:
0020

Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California

**11/06/18 AT 08:00AM**

| | |
|---|---|
| FEES: | 121.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| SB2: | 225.00 |
| PAID: | 346.00 |



**LEADSHEET**



201811060250001

00015919183

009447827

**SEQ:**
**17**

DAR - Title Company (Hard Copy)



**THIS FORM IS NOT TO BE DUPLICATED**

T72

2



11/06/2018

*20181122917*

**RECORDING REQUESTED BY**

**AND WHEN RECORDED MAIL TO:**

HANKEY CAPITAL, LLC
4751 Wilshire Blvd., Suite 110
Los Angeles, CA 90010
Attention: Eugene Leydiker

**CONSTRUCTION DEED OF TRUST, SECURITY AGREEMENT AND FIXTURE
FILING WITH ASSIGNMENT OF RENTS**
[944 Airole Way]

This CONSTRUCTION DEED OF TRUST, SECURITY AGREEMENT AND FIXTURE
FILING WITH ASSIGNMENT OF RENTS (hereinafter the "Deed of Trust") made this 25th day
of October, 2018, by CRESTLLOYD, LLC, a California limited liability company (hereinafter
referred to as "Trustor"), whose address is c/o Skyline Development, 8981 W. Sunset Blvd.,
Suite 303, West Hollywood, California 90069 to CHICAGO TITLE COMPANY, hereinafter
called "Trustee", for the benefit of HANKEY CAPITAL, LLC, a California limited liability
company, hereinafter called "Beneficiary", whose address is 4751 Wilshire Blvd., Suite 110, Los
Angeles, California 90010.

This Deed of Trust is given for purpose of securing the following:

(1)    Performance of all obligations of Trustor under any agreements of Trustor
incorporated by reference or contained herein.

(2)    Payment of indebtedness in the total principal amount of Eighty-Two Million, Five
Hundred Thousand and No/100 Dollars ($82,500,000.00), together with interest thereon, as
provided in and evidenced by that certain Promissory Note of even date herewith executed by
Trustor in favor of Beneficiary (the "Note"), and any and all modifications, extensions and
renewals thereof.

(3)    Performance of such other obligations or payment of such other indebtedness now
or hereafter owing to Beneficiary from Trustor, when evidenced by a document reciting that it is
so secured.

1

94109

3

    (4)    Payment of all sums advanced or paid out by the Beneficiary under any provision of this Deed of Trust or to protect the security of this Deed of Trust.

    This Deed of Trust, and any other instruments given to evidence or further secure the payment and performance of any obligation secured hereby may hereinafter be referred to as the "Trust Documents". The payment obligations of Trustor described in Paragraphs 2, 3, and 4 above are hereinafter referred to as the "Indebtedness".

    Trustor, in consideration of the premises and the aforesaid Indebtedness, and in order to secure its obligations under the Note, according to their terms, has granted, bargained, sold, conveyed, confirmed, transferred and assigned and by these presents does grant, bargain, sell, convey, confirm, transfer and assign unto Trustee, his successors and assigns, with power of sale and right of entry and possession, Trustor's interest in and to that certain property described as follows:

    (A)    The land described in Exhibit A attached hereto, made a part hereof.

    (B)    All buildings and improvements now or hereafter located on said land.

    (C)    All easements, tenements, hereditaments and appurtenances thereunto belonging or in anywise appertaining, and the reversion and reversions, remainder and remainders, rents, issues and profits of the aforesaid property and all the estate, title and interest, homestead or other claim or demand, as well in law as in equity, which Trustor now has or hereafter may acquire, of, in or to said property, or any part thereof, with the appurtenances thereto.

    (D)    All of Trustor's right, title and interest in, to or under the property described in Exhibit B attached hereto, made a part hereof and comprising one page.

    Trustor's interest in and to the land, buildings, improvements and the rights and property described in paragraphs (A) through (D) above are hereinafter referred to collectively as the "Property".

    TO HAVE AND TO HOLD the same unto Trustee, Trustee's successors and assigns, Trustor hereby covenants and agrees as follows:

## ARTICLE I
## COVENANTS AND AGREEMENTS OF TRUSTOR

Trustor hereby covenants and agrees:

1.00    <u>Payment of Indebtedness.</u>  Trustor will pay the Indebtedness hereby secured promptly when and as said Indebtedness becomes due and payable.

1.01    <u>Liens.</u>  Trustor, absent the written consent of Beneficiary, will not suffer any lien to

2

be created hereafter upon the Property, or any part thereof, prior to the lien of this Deed of Trust, and will not do or suffer any act or omission whereby the value of the Property, or lien hereof or of any estate or title covered hereby, may be diminished or impaired in any way.

1.02   Maintenance, Repair and Alterations.   Trustor will keep any buildings and improvements constructed on the Property in good condition and repair, will not remove or demolish any buildings or improvements thereon, and commit or permit no waste thereon. Should said building or buildings, or any part thereof, require inspection, repair or protection other than that given it by Trustor, then, and in that event, Beneficiary may enter or cause entry to be made upon the Property and into said building or buildings for inspection, repair or protection thereof and such repair may be made by Beneficiary and be made or done in such manner as fully to protect the interest of Beneficiary, and any and all sums expended by Beneficiary in doing or causing to be done any of the things above authorized are secured by this Deed of Trust and shall be paid by Trustor on demand.  Trustor shall comply with all laws, ordinances, governmental regulations, covenants, conditions and restrictions affecting the Property or requiring any alteration or improvement thereof, and permit no violation, as to the Property, of any such law, ordinance, governmental regulation, covenant, condition or restriction affecting the Property.

1.03   Title to Property.   Trustor covenants that Trustor is lawfully seized of each and every part and parcel of the Property as described in the granting clauses hereof and has good and indefeasible title to the same; that there are no liens or encumbrances on said property except for such liens and encumbrances that are approved by Beneficiary; and Trustor forever will warrant and defend the title in the same to the Trustee against the claims and demands of all persons. If during the existence of this Deed of Trust there be commenced or pending any suit or action affecting said property, or any part thereof, or the title thereto, or if any adverse claim for or against said property, or any part thereof, be made or asserted, Trustee or Beneficiary may appear in said suit or action and retain counsel therein and defend the same or otherwise take such action therein as Trustee or Beneficiary may deem advisable, and may settle or compromise the same or the said adverse claim, and in that behalf and for any of the said purposes, may pay and expend such sums of money as Trustee or Beneficiary may deem to be necessary.

1.04   Taxes and Assessments.   Trustor shall pay, satisfy and discharge at maturity all taxes and assessments and all other charges and encumbrances which now are or hereafter shall be or appear to be a lien upon the Property, or any part thereof, or upon the debt secured hereby; and in default thereof, Beneficiary, without demand or notice, may pay, satisfy or discharge said taxes, assessments, charges or encumbrances, and pay and expend such sums of money as Beneficiary may deem to be necessary therefor, and shall be the sole judge of the legality or the validity of such taxes, assessments, charges or encumbrances, and the amount necessary to be paid in the satisfaction or discharge thereof.

1.05   Evidence of Payment of Taxes and Assessments.   Trustor further agrees to deposit with Beneficiary within thirty (30) days of Beneficiary's request, all receipts or other satisfactory evidence of the payment of taxes, assessments, charges, claims and liens of every nature (hereinafter collectively referred to as "taxes" or "tax") affecting or which may affect the Property or any part thereof.  Upon the request of Beneficiary, following Trustor's failure to

3

5

provide such evidence of payment, Trustor thereafter shall deposit with and pay to Beneficiary, on the first day of each calendar month, a sum equivalent to one-twelfth (1/12) of the estimated annual taxes assessed or levied against the Property and all annual premiums for insurance required by this Deed of Trust to be furnished by Trustor, and upon the date when any such tax or insurance premiums shall become due shall pay to Beneficiary an amount which, taken together with tax and insurance deposits theretofore made and not expended for taxes and insurance, shall be sufficient to pay and discharge such tax and insurance premiums. Beneficiary shall not be liable for interest on any such tax and insurance deposits and may mingle the same with its general funds, and such deposits shall create a debtor-creditor relationship and not that of a trust. Trustor shall procure and deliver to Beneficiary, in advance, statements for such charges. Payments from said account for such purposes may be made by Beneficiary at Beneficiary's discretion, even though subsequent owners of the property described herein may benefit thereby. In the event of any default under the terms of this Deed of Trust, any part or all of the balance of said account may be applied to any part of the indebtedness hereby secured, and, in refunding any part of said account, Beneficiary may deal with whomever is represented to be the owner of said property at that time. The enforceability of the covenants relating to taxes and insurance premiums provided for herein shall not be affected, except to the extent that said obligations have been actually met by compliance with this paragraph.

1.06   Insurance.   Trustor at all times shall keep the buildings and improvements which are now or hereafter erected upon said property insured against loss or damage by vandalism, malicious mischief and fire with extended coverage (and by other hazards as reasonably may be required by Beneficiary) and shall procure and maintain in force such other insurance as may be required by Beneficiary, all in amounts approved by Beneficiary and by an insurance company or companies or governmental agency or instrumentality approved by Beneficiary, and the policies for such insurance shall be made payable, in case of loss, to Beneficiary pursuant to standard mortgagee's loss payable endorsement, and shall be delivered to and held by Beneficiary as further security for payment under the Note and other moneys herein mentioned, said policies shall provide for fifteen days' notice to Beneficiary prior to cancellation or nonrenewal for any reason, including nonpayment of premium; and in default thereof, Beneficiary may procure such insurance to be effected upon Beneficiary's interest as Beneficiary or upon the interest of Trustee or upon the interest of the owners of the Property and in their names; loss, if any, being made payable to Beneficiary, and Beneficiary may pay and expend for premiums for such insurance such moneys as Beneficiary may deem to be necessary. The form of said policies shall be approved by Beneficiary. If Trustor is a co-insurer under any policies of fire and extended coverage insurance, then Trustor covenants and agrees that, upon request of Beneficiary at any time, it will furnish the Beneficiary satisfactory evidence of insurable value of the improvements situated on said Property. In addition, Trustor shall procure and maintain liability insurance insuring Trustor and, if requested, Beneficiary against liability because of personal injury or property damage in amounts and by companies approved by Beneficiary.

1.07   Insurance and Condemnation Proceeds.   Should a loss occur under any policy of insurance required by Paragraph 1.06 hereof, or should all or any portion of the Property be taken or damaged by reason of any public improvement or condemnation proceeding, Beneficiary shall be entitled to all insurance proceeds, compensation, awards, and other payments or relief therefor (all hereinafter referred to as "proceeds"), and, whether or not the

4

security for the Note secured by this Deed of Trust has been impaired, Beneficiary shall be entitled to apply the proceeds collected, after first deducting therefrom all its expenses, including attorneys' fees, in collecting said proceeds, to any and all indebtedness secured hereby and thereafter shall pay the balance remaining, if any, to Trustor. At its option, in its own name, Beneficiary shall be entitled to commence, appear in and prosecute any action or proceedings or to make any compromise or settlement, in connection with such loss, taking or damage. All such proceeds and rights of action hereby are assigned to Beneficiary. Notwithstanding the foregoing, absent an "Event of Default" as set for in Paragraph 4.00 below, in the event of such insurance loss or that only a portion of the Property is taken or damaged by reason of any public improvement or condemnation proceeding, and restoration is necessary, Beneficiary, after deducting from said proceeds received all its expenses, including attorneys' fees, may release to Trustor as restoration progresses, so much of said amount as equals the costs of restoration effected by Trustor, subject to reasonable conditions, including the right of Beneficiary to withhold up to ten percent (10%) of said amount until completion and the expiration of the period within which mechanics' or materialmen's liens may be filed and until receipt of satisfactory evidence that no liens exist. Any amount required to complete such restoration in excess of such proceeds shall be paid to Trustor before such proceeds are used. Trustor agrees to execute such further assignments of any such proceeds and rights of action as Beneficiary or Trustee may require.

1.08    Performance of Other Obligations. Trustor promises and agrees to perform all of the obligations in and under the Note, and any other documents given now or hereafter as security for the Indebtedness secured by this Deed of Trust.

1.09    Restrictions on Transfer or Further Encumbrance. Absent the prior written consent of Beneficiary, Trustor shall not (a) execute or deliver any pledge, security agreement, mortgage, deed of trust or other instrument of hypothecation, covering all or any portion of the Property or any interest therein; (b) sell, convey, alienate, transfer or otherwise dispose of all or any portion of the Property or any interest therein, whether voluntarily or involuntarily, by operation of law or otherwise; (c) in the event Trustor is a corporation or trust or similar entity, sell, convey, transfer or encumber, whether voluntarily, involuntarily or otherwise, more than ten percent (10%) of the issued and outstanding capital stock of Trustor or of the beneficial interest of such trust or similar entity; or (d) in the event Trustor is a limited or general partnership, or a joint venture, change any constituent general partner or any joint venturer whether voluntarily, involuntarily or otherwise, or sell, convey, transfer, change or encumber any such general partner or joint venturer interests.

1.10    Environmental Compliance. Trustor shall keep and maintain the Property in compliance with, and shall not cause or permit the Property to be in violation of any federal, state or local laws, ordinances or regulations relating to industrial hygiene or to the environmental conditions on, under or about the Property including, but not limited to, soil and ground water conditions. Trustor shall not use, generate, manufacture, store or dispose of on, under or about the Property or transport to or from the Property any flammable explosives, radioactive materials, hazardous wastes, toxic substances or related materials, including, without limitation, any substances defined as or included in the definition of "hazardous substances", "hazardous wastes", "hazardous materials" or "toxic substances" under any applicable federal or

5

*1*

state laws or regulations (collectively referred to hereinafter as "Hazardous Materials"), except only those materials and substances which are usually and customarily used in the operation of a residential construction project so long as the amount of such materials and substances which are used or stored upon the Property shall not exceed the amount reasonably required for the operation of such business in its normal and ordinary course.

Trustor shall immediately advise Beneficiary in writing of (i) any and all enforcement, cleanup, removal or other governmental or regulatory actions instituted, completed or threatened pursuant to any applicable federal, state or local laws, ordinances, or regulations relating to any Hazardous Materials affecting the Property ("Hazardous Materials Laws"); (ii) all claims made or threatened by any third party against Trustor or the Property relating to damage, contribution, cost recovery compensation, loss or injury resulting from any Hazardous Materials (the matters set forth in clauses (i) and (ii) above are hereinafter referred to as "Hazardous Materials Claims"); and (iii) Trustor's discovery of any occurrence or condition on any real property adjoining or in the vicinity of the Property that could cause the Property or any part thereof to be classified as "border-zone property" under the provisions of California Health and Safety Code, Sections 25220 et. seq. or any regulation adopted in accordance therewith, or to be otherwise subject to any restrictions on the ownership, occupancy, transferability or use of the Property under any Hazardous Materials Laws.

Beneficiary shall have the right to join and participate in, as a party, if it so elects, any legal proceedings or actions initiated in connection with any Hazardous Materials Claims and to have its reasonable attorneys' fees in connection therewith paid by Trustor. Trustor shall be solely responsible for, and shall indemnify and hold harmless Beneficiary, its directors, officers, employees, agents, successors and assigns from and against any loss, damage, cost, expense or liability directly or indirectly arising out of or attributable to the use, generation, storage, release, threatened release, discharge, disposal, or presence of Hazardous Materials on, under or about the Property, including, without limitation: (a) all foreseeable consequential damages; (b) the costs of any required or necessary repair, cleanup or detoxification of the Property, and the preparation and implementation of any closure, remedial or other required plans; and (c) all reasonable costs and expenses incurred by Beneficiary in connection with clauses (a) and (b) including, but not limited to, reasonable attorneys' fees.

Without Beneficiary's prior written consent, which shall not be unreasonably withheld, Trustor shall not take any remedial action in response to the presence of any Hazardous Materials on, under, or about the Property, nor enter into any settlement agreement, consent decree, or other compromise in respect to any Hazardous Material Claims, which remedial action, settlement, consent or compromise might, in Beneficiary's reasonable judgment, impair the value of the Beneficiary's security hereunder; provided, however, that Beneficiary's prior consent shall not be necessary in the event that the presence of Hazardous Materials on, under, or about the Property either poses an immediate threat to the health, safety or welfare of any individual or is of such a nature that an immediate remedial response is necessary and it is not possible to obtain Beneficiary's consent before taking such action, provided that in such event Trustor shall notify Beneficiary as soon as practicable of any action so taken. Beneficiary agrees not to withhold its consent, where such consent is required hereunder, if either (i) a particular remedial action is ordered by a court of competent jurisdiction, or (ii) Trustor establishes to the

6

reasonable satisfaction of Beneficiary that there is no reasonable alternative to such remedial action which would result in less impairment of Beneficiary's security hereunder.

1.11    Indemnification.    Trustor hereby agrees to indemnify Beneficiary and hold Beneficiary harmless from and against any and all claims, losses, damages, liabilities, fines, penalties, charges, administrative and judicial proceedings and orders, judgments, remedial action requirements, enforcement actions of any kind, and all costs and expenses incurred in connection therewith (including, but not limited to, reasonable attorneys' fees and expenses) arising directly or indirectly, in whole or in part, out of (i) the presence on or under the Property of any Hazardous Materials (as defined in Paragraph 1.10), or any releases or discharges of any Hazardous Materials on, under or from the Property, or (ii) any activity carried on or undertaken on or off the Property, whether prior to or during the period during which any indebtedness under the Note is outstanding and whether by Trustor or any predecessor in title or any employees, agents, contractors or subcontractors of Trustor or any predecessor in title, or any third persons at any time occupying or present on the Property, in connection with the handling, treatment, removal, storage, decontamination, clean-up, transport or disposal of any Hazardous Materials (as defined in Paragraph 1.10) at any time located or present on or under the Property. The foregoing indemnity shall further apply to any residual contamination on or under the Property, or affecting any natural resources, and to any contamination of any property or natural resources arising in connection with the generation, use, handling, storage, transport or disposal of any such Hazardous Materials, and irrespective of whether any of such activities were or will be undertaken in accordance with applicable laws, regulations, codes and ordinances.

1.12    Environmental Provisions.    Trustor hereby acknowledges and agrees that the provisions of Paragraphs 1.10 and 1.11 hereof are intended to be "environmental provisions" (as defined in Section 736 of the California Code of Civil Procedure), and that Beneficiary is intended to have all of the rights of a secured lender under Section 736 of the California Code of Civil Procedure in respect of such "environmental provisions." Trustor further acknowledges and agrees that the rights afforded to Beneficiary under Section 736 of the California Code of Civil Procedure are in addition to all rights, powers and remedies otherwise available to Beneficiary under any of the Trust Documents or at law or in equity.

1.13    Financial Statements.    Trustor shall deliver to Beneficiary a copy of Trustor's federal and state tax returns, prepared by a certified public accountant, concurrently with Trustor's filing of said returns.

1.14    Covenant to Assign Future Leases.    Until all of the Indebtedness secured by the Deed of Trust shall have been paid in full, Trustor covenants and agrees that it will immediately transfer and assign to Beneficiary any and all other and future leases on all or any portion of the Property. Assignor further covenants and agrees to make, execute and deliver to Assignee on demand, and at any time or times, any and all written assignments and other instruments sufficient for this purpose or that Beneficiary may deem advisable for carrying out the true intent of this covenant.

**ARTICLE II**
**ASSIGNMENT OF RENTS, ISSUES AND PROFITS**

7

*q*

    2.00   <u>Assignments of Rents.</u>   Trustor hereby assigns to Beneficiary the rents, issues, profits, royalties, and payment payable under any lease of the Property, or portion thereof including any oil, gas or mineral lease, or any installments of money payable pursuant to any agreement or any sale of said property or any part thereof, reserving unto Trustor the rights prior to default by Trustor in payment of the Indebtedness secured hereby or in the performance of any agreement hereunder, to collect and retain such rents, issues, profits, royalties, payments and installments of money as they may become due and payable. Upon any such default, Beneficiary, without regard to the adequacy of any security for the Indebtedness hereby secured, shall be entitled to (1) collect such rents, issues, profits, royalties, payments and installments of money and apply the same as more particularly set forth in this Paragraph, all without taking possession of the Property, or (2) enter and take possession of the Property or any part thereof, in person, by agent, or by a receiver to be appointed by the court and to sue for or otherwise collect such rents, issues, profits, royalties, payments and installments of money. Beneficiary may apply any such rents, issues, profits, royalties, payments and installments of money so collected, less costs and expenses of operation and collection, including reasonable attorneys' fees, upon any indebtedness secured hereby, in such order as Beneficiary may determine, and, if such costs and expenses and attorneys' fees shall exceed the amount collected, the excess shall be immediately due and payable. The collection of such rents, issues, profits, royalties, payments and installments of money and the application thereof as aforesaid shall not cure or waive any default or notice of default hereunder or invalidate any  act done pursuant to such notice, except to the extent any such default fully is cured. Failure or discontinuance of Beneficiary at any time, or from time to time, to collect any such moneys shall not impair in any manner the subsequent enforcement by Beneficiary of the right, power and authority herein conferred on Beneficiary. Nothing contained herein, including the exercise of any right, power or authority herein granted to Beneficiary, shall be, or be construed to be, an affirmation by Beneficiary of any tenancy, lease or option, or an assumption of liability under, or the subordination of the lien or charge of this Deed of Trust to any such tenancy, lease or option. Trustor hereby agrees that, in the event Beneficiary exercises its rights as in this Paragraph provided, Trustor waives any right to compensation for the use of Trustor's furniture, furnishings or equipment in the Property for the period such assignment of rents or receivership is in effect, it being understood that the rents, issues, profits, royalties, payments and installments of money derived from the use of any such items shall be applied to Trustor's obligation hereunder as above provided. In the event that Trustor concurrently herewith or hereafter executes any separate assignment of rents or of leases to Beneficiary, then to the extent of any inconsistency between the provisions hereof and any such assignment, the provisions of such assignment shall control.

    2.01   <u>Performance of Leases.</u>   Trustor promises and agrees to keep, perform and observe all of the lessor's covenants, agreements and obligations, under the terms of all leases now or hereafter executed relating to all or any portion of the Property, to require that lessees under said leases keep, perform, and observe all of the covenants, agreements and obligations thereunder on their part to be kept, performed and observed; not to alter, amend or modify such leases or any of them without the prior written consent of Beneficiary.

**ARTICLE III**
**SECURITY AGREEMENT AND FIXTURE FILING**

8

*10*

3.00    Creation of Security Interest. This Deed of Trust is deemed a Security Agreement as defined in the California Commercial Code, the Trustor being the Debtor and the Beneficiary being the Secured Party, and the remedies for any violation of the covenants, terms and conditions of the agreements herein contained shall be as prescribed (i) herein, or (ii) by general law, or (iii) as to such part of the security which is also reflected in the financing statement which will be filed to perfect the security interest created herein, by the specific statutory consequences now, or hereafter enacted and specified in the California Commercial Code, all at Beneficiary's sole election. Trustor and Beneficiary agree that the filing of a financing statement in the records normally having to do with personal property shall never be construed as in anywise derogating from or impairing this declaration and the hereby-stated intention of the parties hereto that everything used in connection with the operation or occupancy of the Property is and, at all times and for all purposes and in all proceedings, both legal and equitable, shall be regarded as real property, irrespective of whether (1) any such item is physically attached to the buildings and improvements, (2) serial numbers are used for the better identification of certain equipment items capable of being filed by the Beneficiary, or (3) any such item is referred to or reflected in any such financing statement so filed at any time. Such mention in the financing statement is declared to be for the protection of the Beneficiary in the event any court or judge shall at any time hold that notice of Beneficiary's priority of interest must be filed in the California Commercial Code records to be effective against a particular class of persons, including, but not limited to, the federal government and any subdivision or entity of the federal government. Trustor covenants and agrees to reimburse Beneficiary for any costs incurred in filing such financing statement and any continuation statements.

3.01    Fixture Filing. Portions of the Property are goods which are or are to become fixtures relating to the land, buildings and improvements, and Trustor covenants and agrees that the recording of this Deed of Trust in the real estate records of the County where the land is located shall also operate from the time of recording as a Fixture Filing in accordance with Section 9313 of the California Uniform Commercial Code.

## ARTICLE IV
## DEFAULTS AND REMEDIES

4.00    Events of Default. Any of the following events shall be deemed an Event of Default hereunder, upon the expiration of any applicable grace period:

(a)    Default shall be made in the payment of any installment of principal or interest or any other sum secured hereby when due, whether at maturity or by acceleration or as part of any prepayment or otherwise; or

(b)    If the Trustor shall become insolvent or admit in writing its inability to pay its debts as they mature; or make any assignment for the benefit of creditors; or apply for or consent to the appointment of a receiver or trustee for it or for a substantial part of its property or business; or

(c)    If any order, judgment or decree shall be entered against Trustor decreeing its dissolution or diversion; or

9

(d)    If bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings for relief under any bankruptcy law or any law for the relief of debtors shall be instituted against Trustor; or

(e)    A writ of execution or attachment or any similar process shall be issued or levied against all or any part of or interest in the Property, or any judgment involving monetary damages shall be entered against Trustor which shall become a lien on the Property or any portion thereof or interest therein; or

(f)    There has occurred a breach of or default under any term, covenant, agreement, condition, provision, representation or warranty contained in the Note or the Note, or any loan application or other agreement related thereto or any other now or hereafter existing agreement between Trustor or any affiliate of Trustor and Beneficiary.

4.01    Acceleration upon Default, Additional Remedies.  In the event of any such Event of Default, Beneficiary may declare, by notice given to Trustor, all Indebtedness secured hereby to be due and payable without any further presentment, demand, protest or notice of any kind. Thereafter Beneficiary may:

(a)    Either in person or by agent, with or without bringing any action or proceeding, or by a receiver appointed by a court and without regard to the adequacy of any security for the Indebtedness and obligations hereby secured, enter upon and take possession of the Property hereby granted, or any part thereof, in its own name or in the name of the Trustee, and do any acts which it deems necessary or desirable to preserve the rentability or increase the income of such property or protect the security hereof and with or without taking possession of the Property sue for or otherwise collect the rents, issues and profits thereof, including those past due and unpaid, and apply the rents, issues and profits collected, less costs and expenses of operation and collection including reasonable attorneys' fees and accountants' fees, upon any indebtedness secured hereby, all in such order as Beneficiary may determine. The entering upon and taking possession of said property, the collection of such rents, issues and profits, or the application thereof as aforesaid shall not cure or waive any default or notice of default hereunder or invalidate any act done pursuant to such notice; and notwithstanding Beneficiary's or Trustee's continuance in possession of the Property or the collection, receipt and application of rents, issues or profits, Trustee or Beneficiary shall be entitled to exercise every right provided for in this instrument or by law upon the occurrence of any default including the right to exercise the power of sale;

(b)    Commence an action to foreclose this Deed of Trust as a mortgage, appoint a receiver, or specifically enforce any of the covenants hereof;

(c)    Deliver to Trustee a written declaration of default and demand for sale, and a written notice of default and election to cause Trustor's interest in the Property to be sold, which notice Trustee or Beneficiary shall cause to be duly filed for record in the Official Records of the County in which the Property is located.

10

12

4.02    Foreclosure by Power of Sale. Should Beneficiary elect to foreclose by exercise of the power of sale herein contained, Beneficiary shall notify Trustee and shall deposit with Trustee this Deed of Trust and the Note, the Note and such receipts with evidence of expenditures made and secured hereby as Trustee may require. Trustee shall then have the following duties and powers:

(a)    Upon receipt of such notice from Beneficiary, Trustee shall cause to be recorded, published and delivered to Trustor such Notice of Default and Election to Sell as then required by law and by this Deed of Trust and after lapse of such time as may then be required by law and after recordation of such notice of default, Trustee, without demand on Trustor, shall, after notice of sale having been given as required by law, sell the Property at the time and place of sale fixed by it in said notice of sale, either as a whole or in separate parcels or items and in such order as Trustee may determine, at public auction to the highest bidder for cash in lawful money of the United States payable at the time of sale. Trustee shall deliver to such purchaser its deed conveying the Property so sold, but without any covenant or warranty, express or implied. The recitals in such deed of any matters or facts shall be conclusive proof of the truthfulness thereof. Any person, including, without limitation, Trustor, Trustee or Beneficiary, may purchase at such sale.

(b)    After deducting all costs, fees and expenses of Trustee and of this trust, including costs of evidence of title in connection with sale, Trustee shall apply the proceeds of sale to payment of all sums due under the Note, all other sums then secured hereby, and the remainder, if any, to the person or persons legally entitled thereto.

(c)    Trustee may postpone the sale of all or any portion of the Property by public announcement at the time and place first fixed for sale, and from time to time thereafter may postpone such sale by public announcement at the time and place fixed by the preceding postponement, and without further notice make such sale at the time fixed by the last postponement, or may, in its discretion, give new notice of sale.

4.03    Appointment of Receiver. If any Event of Default described in Paragraph 4.00 of this Deed of Trust shall have occurred and be continuing, Beneficiary, as a matter of right but with notice as provided herein to Trustor, but without notice to anyone claiming under Trustor and without regard to the then value of the Property or the interest of Trustor therein, shall have the right to apply to any court having jurisdiction to appoint a receiver or receivers of the Property. Any such receiver or receivers shall have all the usual powers and duties of Beneficiary in case of entry as provided in Paragraph 4.01(a) and shall continue as such and exercise such powers until the date of confirmation of sale of the Property unless such receivership is sooner terminated.

4.04    Remedies Not Exclusive. No remedy herein conferred upon or reserved to Trustee or Beneficiary is intended to be exclusive of any other remedy herein, in the Trust Documents, or by law provided or permitted, but each shall be distinct and cumulative and shall be in addition to every other remedy given hereunder, under the Trust Documents, or now or hereafter existing at law or in equity or by statute. Every power or remedy given by this Deed of Trust or by the Trust Documents to Trustee or Beneficiary or to which either of them may be otherwise entitled,

11

*15*

may be exercised, concurrently or independently, from time to time and as often as may be deemed expedient by Trustee or Beneficiary and either of them may pursue inconsistent remedies.

4.05    Partial or Late Payment.    The acceptance by Beneficiary of any sum after the same is due shall not constitute a waiver of the right either to require prompt payment, when due, of all other sums secured hereby or to declare a default as herein provided and in either event to assess a late charge or penalty. The acceptance by Beneficiary of any sum in an amount less than the sum then due shall be deemed an acceptance on account only and upon the condition that it shall not constitute a waiver of the obligation of Trustor to pay the entire sum then due, and Trustor's failure to pay said entire sum then due shall be and continue to be a default notwithstanding such acceptance of such amount on account as aforesaid, and Beneficiary or Trustee shall be at all times thereafter and until the entire sum then due shall have been paid, and notwithstanding the acceptance by Beneficiary thereafter of further sums on account, or otherwise, entitled to exercise all rights in this Deed of Trust or the other Trust Documents confirmed upon them or either of them upon the occurrence of a default.

4.06    Failure or Indulgence Not Waiver.    No failure or delay on the part of Beneficiary in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other power, right or privilege.

**ARTICLE V**
**MISCELLANEOUS**

5.00    Governing Law.    This Deed of Trust shall be governed by the laws of the State of California. In the event that any provision or clause of this Deed of Trust conflicts with applicable laws, such conflicts shall not affect other provisions of this Deed of Trust which can be given effect without the conflicting provision, and to this end the provisions of this Deed of Trust are declared to be severable. This instrument cannot be waived, changed, discharged or terminated orally, but only by an instrument in writing by the party against whom enforcement of any waiver, change, discharge or termination is sought.

5.01    Statements by Trustor.    Trustor, upon fifteen (15) days' written request shall furnish a duly acknowledged written statement setting forth the amount of the debt secured by this Deed of Trust and stating either that there are no known offsets or defenses existing against the debt, or if such known offsets or defenses are alleged to exist, the nature thereof.

5.02    Repayment.    In the event that Trustor fully satisfies its obligations under the Note, in lawful money of the United States of America, and pays all moneys herein agreed to be paid by Trustor, and the interest thereon, and also the reasonable expenses of this trust, as herein specified, then Trustee at the request and expense of Trustor, shall reconvey to Trustor, Trustor's successors or assigns, all the estate in the Property granted to Trustee by this instrument.

5.03    Change in Taxation Method.    In the event of the passage after the date of this Deed of Trust of any law of the State of California, deducting from the value of land, for the purpose

12

14

of taxation, any lien thereon, or changing in any way the laws now in force for the taxation of deeds of trust or debts secured by deeds of trust for state or local purposes or the manner of the collection of such taxes so as to cause the assessment of a tax on Beneficiary or a lien or charge on this Deed of Trust, the entire amount due under said Note, at the option of said Beneficiary, without demand or notice, forthwith shall become due and payable; provided, however, that such option shall be ineffective if Trustor is permitted by law to pay the whole of such tax, in addition to all other payments required hereunder and, if prior to such specified date, Trustor does pay such tax and agrees to pay any such tax when hereafter levied or assessed against the Property, and such agreement shall constitute a modification of this Deed of Trust.

5.04   Substitution of Trustee.   Beneficiary, from time to time, may substitute another Trustee in place of the Trustee named herein, to execute the trusts hereby created; and upon such appointment, and without conveyance to the successor trustee, the successor trustee shall be vested with all the title, interest, powers, duties and trusts in the Property hereby vested in or conferred upon Trustee herein named. Each appointment and substitution shall be made by written instrument executed by the Beneficiary containing reference to this Deed of Trust sufficient to identify it, which, when recorded in the office of the County Recorder of the county or counties in which the Property is situated, shall be conclusive proof of proper appointment of the successor trustee. The recital or statements in any instrument executed by Trustee, in pursuance of any of said trusts of the due authorization of any agent of the Trustee executing the same, shall for all purposes be conclusive proof of such authorization.

5.05   Legal Proceedings by Trustee.   Trustee at any time, at Trustee's option, may commence and maintain suit in any court of competent jurisdiction and obtain the aid and direction of said court in the execution by it of the trusts or any of them, herein expressed or contained, and, in such suit, may obtain the orders or decrees, interlocutory or final of said court directing the execution of said trusts, and confirming and approving Trustee's acts, or any of them, or any sales or conveyance made by Trustee, and adjudging the validity thereof, and directing that the purchasers of the Property sold and conveyed be let into immediate possession thereof, and providing for orders of court or other process requiring the Sheriffs of the counties in which the Property is situated to place and maintain said purchasers in quiet and peaceable possession of the Property so purchased by them, and the whole thereof.

5.06   Reconveyance by Trustee.   Trustee, at any time, upon request of Beneficiary, may reconvey to Trustor or Trustor's successors or assigns, any portion of the Property without affecting the personal liability of any person for the payment of any of the Indebtedness, or the lien of this Deed of Trust upon the remainder of the Property not reconveyed.

5.07   No Estoppel.   Any failure of Trustee or Beneficiary to exercise any right or option by this Deed of Trust given or preserved to Trustee or Beneficiary shall not stop Trustee or Beneficiary from exercising any such right or option upon any subsequent default of Trustor.

5.08   Further Assurances.   Trustor, forthwith upon request, at any and all times hereafter, at the expense of Trustor, will cause to be made, executed, acknowledged and delivered to Trustee, any and every deed or assurance in law which Trustee or counsel of Trustee shall advise

13

15

or require for the more sure, effectual and satisfactory granting and confirming of the Property unto Trustee.

5.9      Non-Liability of Trustee.  Trustee shall not be liable or responsible with respect to its acts or omissions hereunder, except for Trustee's own gross negligence or willful default, or be liable or responsible for any acts or omissions of any agent, attorneys or employee by it employed hereunder, if selected with reasonable care.

5.10      Release and Exchange of Security.  In the event that any change or changes occur in the title to all or any part of the Property, Beneficiary, from time to time, without notice to or consent of Trustor and without prejudice to any rights which Beneficiary may have against Trustor, may (a) take, exchange, or release any security for any of the obligations now or hereafter secured hereby; or (b) extend the time for payment of the said obligations.

5.11      Successors and Assigns.   This Deed of Trust applies to, inures to the benefit of, and binds all parties hereto, their successors and assigns.

5.12      Construction.  This Deed of Trust shall be construed so that, wherever applicable and with reference to any of the parties hereto, the use of the singular number shall include the plural number, the use of the plural number shall include the singular number, the use of one gender shall include the neuter, masculine and feminine gender.

5.13      Notices.  Trustor requests that a copy of any notice of default and of any notice of sale hereunder shall be mailed to Trustor at the address set forth above which is Trustor's address.

14

16

IN WITNESS WHEREOF, Trustor has executed this instrument the day and year first above written.

CRESTLLOYD, LLC
a California limited liability company

By:_____
    Nile Niami, Manager

15

17

| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |
| --- |

State of California

County of _LOS ANGELES_

On _October 30, 2018_ before me, _Nigel Gibbs_ a Notary Public, personally appeared _Nile Niami_, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

**I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.**

WITNESS my hand and official seal.

Signature _____ (Seal)

NIGEL GIBBS
Notary Public - California
Los Angeles County
Commission # 2164239
My Comm. Expires Oct 4, 2020

16

18

## EXHIBIT A

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF LOS
ANGELES, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS
DESCRIBED AS FOLLOWS:

PARCEL 1:

LOTS 1 AND 2 OF TRACT NO. 22727, IN THE CITY OF LOS ANGELES, COUNTY OF
LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 623
PAGE(S) 81 TO 83 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY
RECORDER OF SAID COUNTY.

EXCEPTING THEREFROM THAT PORTION OF SAID LOTS LYING WESTERLY OF THE
FOLLOWING DESCRIBED LINE:

BEGINNING AT A POINT IN THE NORTHWESTERLY TERMINUS OF AIROLE WAY, 30
FEET WIDE, AS SHOWN ON SAID MAP, DISTANT THEREON SOUTH 76° 06' 07" 'WEST
2.86 FEET FROM THE MOST NORTHERLY CORNER THEREOF; THENCE LEAVING
SAID TERMINUS ALONG A CURVE CONCAVE WESTERLY, HAVING A RADIUS OF
361.97 FEET AND CONCENTRIC WITH THAT CERTAIN CURVE IN THE WESTERLY
LINE OF SAID LOT 1 HAVING A RADIUS OF 349.83 FEET; THENCE NORTHERLY 22.69
FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 03° 35' 48" TO THE
BEGINNING OF A COMPOUND CURVE, CONCAVE SOUTHWESTERLY AND HAVING
A RADIUS OF 175.66 FEET; THENCE NORTHWESTERLY 119.88 FEET ALONG SAID
CURVE THROUGH A CENTRAL ANGLE OF 39° 06' 53"; THENCE NORTH 56° 36' 22"
WEST 7.97 FEET TO THE BEGINNING OF A CURVE CONCAVE NORTHEASTERLY
AND HAVING A RADIUS OF 90.80 FEET; THENCE NORTHWESTERLY 71.18 FEET
ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 44° 55' 04"; THENCE NORTH
11° 41' 18" WEST 208.55 FEET TO THE BEGINNING OF A CURVE CONCAVE
EASTERLY AND HAVING A RADIUS OF 35.90 FEET; THENCE NORTHERLY 34.44
FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 56° 32' 34"; THENCE
NORTH 44° 51' 16" EAST 42.37 FEET TO THE CURVED SOUTHEASTERLY LINE OF
STRADELLA ROAD, 40 FEET WIDE, AS SHOWN ON SAID MAP.

PARCEL 2:

THAT PORTION OF LOT 3 IN BLOCK 3 OF TRACT NO. 9745, IN THE CITY OF LOS
ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP
RECORDED IN BOOK 141 PAGES 93 TO 96 INCLUSIVE OF MAPS, IN THE OFFICE OF
THE COUNTY RECORDER OF SAID COUNTY, LYING NORTHERLY OF THE
FOLLOWING DESCRIBED LINE:

17

BEGINNING AT A POINT IN THE EASTERLY LINE OF SAID LOT, DISTANCE
THEREON SOUTH 13° 13' 20" EAST 34.33 FEET FROM THE NORTHERLY TERMINUS
OF THAT CERTAIN COURSE IN SAID EASTERLY LINE SHOWN ON SAID MAP AS
HAVING A BEARING AND LENGTH OF NORTH 13° 13' 20" WEST 106.35 FEET;
THENCE NORTH 89° 27' 20" WEST 214.07 FEET, MORE OR LESS, TO A POINT IN THE
WESTERLY LINE OF SAID LOT, DISTANT SOUTHERLY THEREON 54.93 FEET FROM
THE NORTHERLY TERMINUS OF THAT CERTAIN CURVE IN SAID WESTERLY LINE
HAVING A LENGTH OF 115.83 FEET.

APN: **4369-026-021**

Initials

18

# EXHIBIT B

(1)    All machinery, equipment, materials (including building materials), appliances, and fixtures now or hereafter installed or placed on or in said land or buildings and improvements for the generation and distribution of air, water, heat, electricity, light, fuel or refrigeration or for ventilating or air conditioning purposes or for sanitary or drainage purposes or for the exclusion of vermin or insects or the removal of dust, refuse or garbage, and all elevators, awnings, window shades, drapery rods and brackets, screens, floor coverings, incinerators, carpeting and all furniture, fixtures, and other property used in the operation or occupancy of said land or buildings and improvements, together with all additions to, substitutions for, changes in or replacements of the whole or any part of any or all of said articles of property, and together with all property of the same character that Trustor may hereafter acquire at any time until the termination of this Deed of Trust and all proceeds received upon the sale, exchange, collection or other disposition of the foregoing.

(2)    All intangible property and rights relating to that land or the operation thereof, or used in connection therewith, including but not limited to all governmental permits relating to construction on said land.

(3)    All reserves, deferred payments, deposits, refunds, cost savings and payments of any kind relating to the construction of any improvements on said land.

(4)    All water stock relating to said property.

(5)    All causes of action, claims, compensation and recoveries for any damage, condemnation or taking of said property, or for any conveyance in lieu thereof, whether direct or consequential, or for any damage or injury to said property, or for any loss or diminution in value of said property.

(6)    All plans and specifications prepared for construction of buildings and improvements on said land and all studies, data and drawings related thereto; and also all contracts and agreements of the Trustor relating to the aforesaid plans and specifications or to the aforesaid studies, data and drawings or to the construction of buildings and improvements on said land.

(7)    All monies on deposit for the payment of real estate taxes or special assessments against said property or for the payment of premiums on policies of fire and other hazard insurance covering the property described herein or said land.

Initials

# EXHIBIT 5

**This page is part of your document - DO NOT DISCARD**



# 20181122920



**Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California**

**11/06/18 AT 08:00AM**

**Pages:
0012**

| | |
|---|---|
| FEES: | 50.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| PAID: | 50.00 |



**L E A D S H E E T**



201811060250001

**00015919186**

009447827

**SEQ:
20**

DAR - Title Company (Hard Copy)



**THIS FORM IS NOT TO BE DUPLICATED**

E.TRS156

T72




2

RECORDING REQUESTED BY
CHICAGO
**WHEN RECORDED, RETURN TO:**

Hankey Capital, LLC
4751 Wilshire Blvd., Ste 110
Los Angeles, CA 90010
Attn: Eugene M. Leydiker

APN No. 4369-026-021



11/06/2018

*20181122920*

€

## SUBORDINATION
## AGREEMENT

### (Deed of Trust to Deed of Trust)

**NOTICE: THIS SUBORDINATION AGREEMENT RESULTS IN YOUR SECURITY
INTEREST IN THE PROPERTY BECOMING SUBJECT TO AND OF LOWER PRIORITY
THAN THE LIEN OF SOME OTHER OR LATER SECURITY INSTRUMENT.**

THIS SUBORDINATION AGREEMENT ("Agreement") is entered into as of October 30, 2018,
by and between CRESTLLOYD, LLC, a California limited liability company ("Owner"); and
INFERNO INVESTMENT INC. ("Subordinate Lender"); and Hankey Capital, LLC ("Lender").

### RECITALS

**A.**    Subject to the terms and provisions of that certain Deed of Trust With Assignment of
Rents dated March 13, 2013, executed by Owner, as Trustor, in favor of INFERNO REALTY, L.P.
and MAYBACH CORPORATION HOLDINGS, INC., Subordinate Lender's predecessors-in-
interest, recorded on March 13, 2013, as Document Number 20130384037 in the official records of
the County of Los Angeles, State of California ("Official Records") ("Subordinate Lender's Deed
of Trust"), Owner granted to Subordinate Lender's predecessors-in-interest a security interest in and to
the property described in Exhibit "A" attached hereto and incorporated herein located at 944 Airole Way,
Los Angeles, California (which property, together with all improvements now or hereafter located on
the property, is hereinafter collectively referred to as the "Property") to secure Owner's obligations
to Subordinate Lender's predecessors-in-interest (the "Subordinated Debt").

**B.**    MAYBACH CORPORATION HOLDINGS, INC. assigned the entirety of its interest in
the Subordinate Lender's Deed of Trust to INFERNO REALTY, L.P. by means of that certain
Assignment of Note and Deed of Trust/Mortgage, dated June 2, 2014 and recorded on November 10,
2015 in the Official Records as Document Number 20151375606.

**C.**    INFERNO REALTY, L.P. assigned the entirety of its interest in the Subordinate
Lender's Deed of Trust to Subordinate Lender by means of that certain Assignment of Note and Deed of
Trust/Mortgage, dated October 21, 2015 and recorded on November 10, 2015 in the Official Records as
Document Number 20151375607.

**D.**    Owner has executed or will execute a Deed of Trust, Security Agreement and
Fixture Filing With Assignment of Rents ("Lender's Deed of Trust") securing, among other things,
Owner's obligations to Lender as set forth in that certain Promissory Note dated October 25,
2018, in favor of Lender, in the principal amount of Eighty Two Million Five Hundred Thousand and
No/100 Dollars ($82,500,000.00) (the "Note"). Lender's Deed of Trust is being recorded in the Official

1

94109

Exempt from fee per GC 27388.1 (a) (1);
fee cap of $225 reached

20E

Records concurrently herewith. The Note and the Lender's Deed of Trust are collectively referred to herein as the "Loan Agreement".

    **E.**    As a condition to Lender making a Loan (the "Loan"), to be secured by, among other things, the Lender's Deed of Trust (the "Senior Debt"), Lender requires that Lender's Deed of Trust be unconditionally and at all times remain a lien or charge upon the Property, prior and superior to all the rights of Subordinate Lender under its deed of trust and that Subordinate Lender specifically and unconditionally subordinates its deed of trust to the lien or charge of Lender's Deed of Trust.

    **F.**    Subordinate Lender and Owner agree to the subordination in favor of Lender.

    **NOW THEREFORE,** for good and valuable consideration and the receipt and adequacy of which is hereby acknowledged, and to induce Lender to make the Loan, Owner and Subordinate Lender hereby agree for the benefit of Lender as follows:

    **Section 1.**    **Subordination.** Lender's Deed of Trust securing the Note in favor of Lender, shall unconditionally be and at all times remain a lien or charge on the Property prior and superior to Subordinate Lender's Deed of Trust.

    **Section 2.**    **Entire Agreement.** This Agreement shall be the whole agreement with regard to the subordination of Subordinate Lender's Deed of Trust to the lien or charge of Lender's Deed of Trust, and shall supersede and cancel, but only insofar as would affect the priority of Lender's Deed of Trust, any prior agreements as to such subordination, including, without limitation, those provisions, if any, contained in Subordinate Lender's deed of trust which provide for the subordination of the deed of trust to a deed or deeds of trust or to a mortgage or mortgages.

    **Section 3.** **Lien Subordination.** Subordinate Lender intentionally and unconditionally waives, relinquishes and subordinates all of Subordinate Lender's right, title and interest in and to the Property to the lien or charge of Lender's Deed of Trust, upon the Property and understands that in reliance upon, and in consideration of, this waiver, relinquishment and subordination, specific loans and advances are being and will be made by Lender and, as part and parcel thereof, specific monetary and other obligations are being and will be entered into which would not be made or entered into but for said reliance upon this waiver, relinquishment and subordination.

    **Section 4.** **Rights Upon Insolvency.** In the event of (1) any insolvency, bankruptcy, receivership, liquidation, reorganization, arrangement, assignment for the benefit of creditors, or other similar proceeding relative to the Owner or its property (as defined in the Loan Agreement), or (2) any proceeding for the voluntary or involuntary liquidation, dissolution or other winding up of the Owner whether or not involving insolvency or bankruptcy proceedings, then and in any such event:

        (a) the principal amount of, and all interest on, and all other amounts in respect of, the Senior Debt (including interest thereon accruing after the commencement of any such proceeding, whether or not such interest shall be allowed in such proceeding) shall be paid in full before any payment or distribution of any character, whether in cash, securities or other property, shall be made in respect of the Subordinated Debt; and

        (b) any payment or distribution of any character, whether in cash, securities or other property, which would otherwise (but for the terms hereof) be payable or deliverable in respect of Subordinated Debt (including any payment or distribution in respect of the Subordinated Debt by reason of any other indebtedness of the Owner being subordinated to the Subordinated Debt), shall be paid or delivered directly to the Lender, or its representatives, until the principal amount of, and all interest and premium on, and all other amounts in respect of, the Senior Debt shall have been paid in full and the Subordinate Lender or any other holder of the Subordinated Debt

irrevocably authorizes, empowers and directs all receivers, trustees, liquidators, conservators and others having authority in the premises to effect all such payments and deliveries.

**Section 5. Owner Obligations.** Owner agrees that, in the event that any note or other obligation of the Owner not evidencing Senior Debt, or any portion thereof, shall become due and payable before its expressed maturity for any reason, Owner will give prompt notice, in writing, of such occurrence to the Lender.

**Section 6.    Rights of Lender.**

(a)    Subordinate Lender further declares, agrees and acknowledges for the benefit of the Lender, that Lender, in making disbursement pursuant to the Loan Agreement (whether obligatory or optional), is under no obligation or duty to, nor has Lender represented that it will, see to the application of such proceeds by the person or persons to whom Lender disburses such proceeds, an any application or use of such proceeds for purposes other than those provided for in such agreement or agreements shall not defeat the subordination herein made in whole or in part.

(b)    Except as otherwise provided herein, so long as any of the Senior Debt shall remain unpaid, Lender may at all times exercise any and all powers and rights which it now has or may hereafter acquire with respect to the Loan Agreement, any other security instrument, including, but not limited to deed of trust or mortgage, Collateral Security Agreement, or Membership Interest Pledge Agreement (collectively, "Security Document"), or any of the collateral subject to the Loan Agreement or any other Security Document without having to obtain any consent or approval of the Subordinate Lender and without any accountability to the Subordinate Lender, nor shall it have any liability to the Subordinate Lender for any action taken or failure to act with respect to this Agreement, the Loan Agreement, any other Security Document or the aforesaid collateral.

**Section 7. Constructive Trust.** If, notwithstanding the provisions of this Agreement, any payment or distribution of any character (whether in cash, securities or other property) shall be received by the Subordinate Lender in contravention of the terms of this Agreement, such payment or distribution shall not be commingled with any asset of the Subordinate Lender, but shall be held in trust for the benefit of, and shall be paid over or delivered and transferred to, the Lender, or its representatives or agents, for application to the payment of all Senior Debt remaining unpaid, until the principal amount of, and all interest and premium (including interest thereon accruing after the commencement of any proceedings described herein) on, and all other amounts in respect of, the Senior Debt shall have been paid in full.

**Section 8.    Successors and Assigns.** This Agreement, without further reference, shall pass to and may be relied on and enforced by any transferee or subsequent holder of the Senior Debt and the Subordinated Debt.

**Section 9. Modification.** The terms of this Agreement, the subordination effectuated hereby, and the rights of the Lender and the obligations of the Subordinate Lender arising hereunder, shall  not be affected, modified or impaired in any manner or to any extent by: (i) any amendment or modification of or supplement to the Loan Agreement, any other Security Document or any other instrument or document executed or delivered pursuant thereto.

**Section 10. Notices.** All notice, consents, approvals, requests, demands, instruments or other communications to be made, given or furnished pursuant to, under or by virtue of their Agreement (each, a "Notice") shall be in writing and shall be deemed given or furnished if addressed to the party intended to receive the same at the address or such party as set forth below (i) upon receipt when personally delivered at such address, or (ii) one (1) business day after the date of delivery of such notice to a nationwide, reputable commercial courier service:

3

5

| Lender: | HANKEY CAPITAL, LLC |
|  | 4751 Wilshire Blvd., Suite 110 |
|  | Los Angeles, CA 90010 |
|  | Attention: Eugene M. Leydiker |

| Subordinate Lender: | INFERNO INVESTMENT INC. |
|  | 95-4 Chemin de Kandahar |
|  | Mont-Tremblant, Quebec J8E 1E2 |

| Owner: | CRESTLLOYD, LLC |
|  | c/o Skyline Development |
|  | 8981 W. Sunset Blvd., Suite 303 |
|  | West Hollywood, CA 90069 |
|  | Attn: Nile Niami |

Any party may change the address to which any notice is to be delivered to any other address within the United States of America by furnishing written notice of such change at least fifteen (15) days prior to the effective date of such change to the other parties in the manner set forth above, but no notice of change shall be effective unless and until received by such other parties. Notices may be given on behalf of any party by its attorneys.

**Section 11.    Miscellaneous.** This Agreement may not be amended or modified orally but may be amended or modified only in writing, signed by all parties hereto. No waiver of any term or provision of this Agreement shall be effective unless it is in writing, making specific reference to this Agreement and signed by the party against whom such waiver is sought to be enforced. This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof. This Agreement shall be binding upon the parties hereto and their respective heirs, legal representatives, successors and assigns. This Agreement shall be governed by and construed in accordance with the laws of the State of California.

**Section 12.    Definitions.**    Terms used in this Agreement and not defined herein shall have the respective meanings ascribed to them in the Loan Agreement. The recitals hereto shall be a part of this Agreement.

**Section 13. Termination.** This Agreement shall terminate upon the final and indefeasible payment in full of the principal amount of, and all interest and premium on, and all other amounts in respect of, the Senior Debt.

**Section 14. Counterparts.** This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original and all of which together shall constitute and be construed as one and the same instrument.

NOTICE: THIS SUBORDINATION AGREEMENT CONTAINS A PROVISION WHICH ALLOWS THE PERSON OBLIGATED ON YOUR REAL PROPERTY SECURITY TO OBTAIN A LOAN A PORTION OF WHICH MAY BE EXPENDED FOR OTHER PURPOSES THAN IMPROVEMENT OF THE LAND.

IT IS RECOMMENDED THAT, PRIOR TO THE EXECUTION OF THIS AGREEMENT, THE PARTIES CONSULT WITH THEIR ATTORNEYS WITH RESPECT HERETO.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date hereof.

4

**NOTE: THIS AGREEMENT MAY BE EXECUTED IN COUNTERPARTS.**

**[SIGNATURES COMMENCE ON THE FOLLOWING PAGE.]**

**OWNER:**

CRESTLLOYD, LLC,
a California limited liability company

By: _____
    Nile Niami, Manager

---

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

---

State of California    )

County of LOS ANGELES )

On OCTOBER 30, 2018 before me, Nigel Gibbs, Notary Public
    Date                    Here Insert Name and Title of the Officer
Personally Appeared Nile Niami
                      Name(s) of Signer(s)

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

NIGEL GIBBS
Notary Public - California
Los Angeles County
Commission # 2164239
My Comm. Expires Oct 4, 2020

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____
              Signature of Notary Public

6

**SUBORDINATE LENDER:**

**INFERNO INVESTMENT INC.**

By: _____

Name:   Julien Remillard

Title:   Director

---

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

---

State of California                              )

County of_____)

On_____before me, _____

　　　　　*Date*　　　　　　　　　　　*Here Insert Name and Title of the Officer*

Personally Appeared _____

　　　　　　　　　　　　　　　*Name(s) of Signer(s)*

_____,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.
WITNESS my hand and official seal.

Signature _____

　　　　　　　*Signature of Notary Public*

7

**CALIFORNIA ACKNOWLEDGMENT**                                     CIVIL CODE § 1189

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of *LOS ANGELES* }

On *October 30 2018* before me, *Nigel Gibbs Notary Public*,
      *Date*                          *Here Insert Name and Title of the Officer*

personally appeared _*Julien Remillard*_
                                        *Name(s) of Signer(s)*

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

NIGEL GIBBS
Notary Public - California
Los Angeles County
Commission # 2164239
My Comm. Expires Oct 4, 2020

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____
*Place Notary Seal and/or Stamp Above*             *Signature of Notary Public*

---

**OPTIONAL**

*Completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**
Title or Type of Document: *Subordination Agreement*
Document Date: *10/25/18* _____ Number of Pages: *10*
Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

| Signer's Name: _____ | Signer's Name: _____ |
|---|---|
| ☐ Corporate Officer – Title(s): _____ | ☐ Corporate Officer – Title(s): _____ |
| ☐ Partner – ☐ Limited ☐ General | ☐ Partner – ☐ Limited ☐ General |
| ☐ Individual    ☐ Attorney in Fact | ☐ Individual    ☐ Attorney in Fact |
| ☐ Trustee    ☐ Guardian or Conservator | ☐ Trustee    ☐ Guardian or Conservator |
| ☐ Other: _____ | ☐ Other: _____ |
| Signer is Representing: _____ | Signer is Representing: _____ |

©2018 National Notary Association

LENDER:

**HANKEY CAPITAL, LLC**

By: _____

W. Scott Dobbins, President

---

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

---

State of California                              )

County of Los Angeles                         )

On November 1, 2018 before me, T. Douglas, notary Public
Date                                                    Here Insert Name and Title of the Officer

Personally Appeared W. Scott Dobbins
                                          Name(s) of Signer(s)

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.



T. DOUGLAS
Notary Public – California
Los Angeles County
Commission # 2184270
My Comm. Expires Mar 22, 2021

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.
WITNESS my hand and official seal.

Signature _____
                              Signature of Notary Public

8

EXHIBIT "A"

PROPERTY DESCRIPTION

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF LOS ANGELES, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

PARCEL 1:

LOTS 1 AND 2 OF TRACT NO. 22727, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 623 PAGE(S) 81 TO 83 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPTING THEREFROM THAT PORTION OF SAID LOTS LYING WESTERLY OF THE FOLLOWING DESCRIBED LINE:

BEGINNING AT A POINT IN THE NORTHWESTERLY TERMINUS OF AIROLE WAY, 30 FEET WIDE, AS SHOWN ON SAID MAP, DISTANT THEREON SOUTH 76° 06' 07" 'WEST 2.86 FEET FROM THE MOST NORTHERLY CORNER THEREOF; THENCE LEAVING SAID TERMINUS ALONG A CURVE CONCAVE WESTERLY, HAVING A RADIUS OF 361.97 FEET AND CONCENTRIC WITH THAT CERTAIN CURVE IN THE WESTERLY LINE OF SAID LOT 1 HAVING A RADIUS OF 349.83 FEET; THENCE NORTHERLY 22.69 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 03° 35' 48" TO THE BEGINNING OF A COMPOUND CURVE, CONCAVE SOUTHWESTERLY AND HAVING A RADIUS OF 175.66 FEET; THENCE NORTHWESTERLY 119.88 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 39° 06' 53"; THENCE NORTH 56° 36' 22" WEST 7.97 FEET TO THE BEGINNING OF A CURVE CONCAVE NORTHEASTERLY AND HAVING A RADIUS OF 90.80 FEET; THENCE NORTHWESTERLY 71.18 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 44° 55' 04"; THENCE NORTH 11° 41' 18" WEST 208.55 FEET TO THE BEGINNING OF A CURVE CONCAVE EASTERLY AND HAVING A RADIUS OF 35.90 FEET; THENCE NORTHERLY 34.44 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 56° 32' 34"; THENCE NORTH 44° 51' 16" EAST 42.37 FEET TO THE CURVED SOUTHEASTERLY LINE OF STRADELLA ROAD, 40 FEET WIDE, AS SHOWN ON SAID MAP.

PARCEL 2:

THAT PORTION OF LOT 3 IN BLOCK 3 OF TRACT NO. 9745, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 141 PAGES 93 TO 96 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, LYING NORTHERLY OF THE FOLLOWING DESCRIBED LINE:

9



BEGINNING AT A POINT IN THE EASTERLY LINE OF SAID LOT, DISTANCE
THEREON SOUTH 13° 13' 20" EAST 34.33 FEET FROM THE NORTHERLY TERMINUS
OF THAT CERTAIN COURSE IN SAID EASTERLY LINE SHOWN ON SAID MAP AS
HAVING A BEARING AND LENGTH OF NORTH 13° 13' 20" WEST 106.35 FEET;
THENCE NORTH 89° 27' 20" WEST 214.07 FEET, MORE OR LESS, TO A POINT IN THE
WESTERLY LINE OF SAID LOT, DISTANT SOUTHERLY THEREON 54.93 FEET
FROM THE NORTHERLY TERMINUS OF THAT CERTAIN CURVE IN SAID
WESTERLY LINE HAVING A LENGTH OF 115.83 FEET.

APN: **4369-026-021**

10

**EXHIBIT 6**

**From:** Julien Rémillard - II <jremillard@investissementinferno.com>
**Sent:** Sunday, October 31, 2021 7:27:32 PM
**To:** Anthony Aquino <aaquino@investissementinferno.com>
**Subject:** Fwd: 944 Airole Way -- Draft Loan Docs


Envoyé de mon iPad

Début du message transféré :

1

**De:** Doug Witkins <doug@skylinedevelopment.net>
**Date:** 31 octobre 2018 à 12:39:45 HAE
**À:** Linda Riberdy - II <lriberdy@investissementinferno.com>, Julien
Rémillard - II <jremillard@investissementinferno.com>
**Objet: Rép : 944 Airole Way -- Draft Loan Docs**


Attached please find updated version that includes

1. Inferno address
2. Proper name of Inferno on the signature sign (Inc. not LLC)
3. Julien's title.

**From:** Linda Riberdy - II <lriberdy@investissementinferno.com>
**Date:** Wednesday, October 31, 2018 at 4:12 AM
**To:** Doug Witkins <doug@skylinedevelopment.net>, Julien
Rémillard - II <jremillard@investissementinferno.com>
**Subject:** RE: 944 Airole Way -- Draft Loan Docs

Thank you



**LINDA RIBERDY | DIRECTRICE GÉNÉRALE**
C.P. 218, Succursale Place-d'Armes, Montréal, Québec H2Y 3G7
**T** 514.307.0821 / 222 | **C** 438.871.1340
| lriberdy@investissementinferno.com

**De :** Doug Witkins <doug@skylinedevelopment.net>
**Envoyé :** Tuesday, October 30, 2018 2:59 PM
**À :** Julien Rémillard - II <jremillard@investissementinferno.com>; Linda
Riberdy - II <lriberdy@investissementinferno.com>
**Objet :** FW: 944 Airole Way -- Draft Loan Docs

Julien,

Attached please find the subordination agreement the new lender
needs signed by Inferno.

Best
Doug

**WHEN RECORDED, RETURN TO:**

Hankey Capital, LLC
4751 Wilshire Blvd., Ste 110
Los Angeles, CA 90010
Attn: Eugene M. Leydiker

APN No. 4369-026-021

---

# SUBORDINATION
# AGREEMENT

### (Deed of Trust to Deed of Trust)

**NOTICE: THIS SUBORDINATION AGREEMENT RESULTS IN YOUR SECURITY INTEREST IN THE PROPERTY BECOMING SUBJECT TO AND OF LOWER PRIORITY THAN THE LIEN OF SOME OTHER OR LATER SECURITY INSTRUMENT.**

THIS SUBORDINATION AGREEMENT ("Agreement") is entered into as of October 30, 2018, by and between CRESTLLOYD, LLC, a California limited liability company ("Owner"); and INFERNO INVESTMENT INC. ("Subordinate Lender"); and Hankey Capital, LLC ("Lender").

## RECITALS

**A.** Subject to the terms and provisions of that certain Deed of Trust With Assignment of Rents dated March 13, 2013, executed by Owner, as Trustor, in favor of INFERNO REALTY, L.P. and MAYBACH CORPORATION HOLDINGS, INC., Subordinate Lender's predecessors-in-interest, recorded on March 13, 2013, as Document Number 20130384037 in the official records of the County of Los Angeles, State of California ("Official Records") ("Subordinate Lender's Deed of Trust"), Owner granted to Subordinate Lender's predecessors-in-interest a security interest in and to the property described in Exhibit "A" attached hereto and incorporated herein located at 944 Airole Way, Los Angeles, California (which property, together with all improvements now or hereafter located on the property, is hereinafter collectively referred to as the "Property") to secure Owner's obligations to Subordinate Lender's predecessors-in-interest (the "Subordinated Debt").

**B.** MAYBACH CORPORATION HOLDINGS, INC. assigned the entirety of its interest in the Subordinate Lender's Deed of Trust to INFERNO REALTY, L.P. by means of that certain Assignment of Note and Deed of Trust/Mortgage, dated June 2, 2014 and recorded on November 10, 2015 in the Official Records as Document Number 20151375606.

**C.** INFERNO REALTY, L.P. assigned the entirety of its interest in the Subordinate Lender's Deed of Trust to Subordinate Lender by means of that certain Assignment of Note and Deed of Trust/Mortgage, dated October 21, 2015 and recorded on November 10, 2015 in the Official Records as Document Number 20151375607.

**D.** Owner has executed or will execute a Deed of Trust, Security Agreement and Fixture Filing With Assignment of Rents ("Lender's Deed of Trust") securing, among other things, Owner's obligations to Lender as set forth in that certain Promissory Note dated October 25, 2018, in favor of Lender, in the principal amount of Eighty Two Million Five Hundred Thousand and No/100 Dollars ($82,500,000.00) (the "Note"). Lender's Deed of Trust is being recorded in the Official

1

Records concurrently herewith. The Note and the Lender's Deed of Trust are collectively referred to herein as the "Loan Agreement".

      **E.**     As a condition to Lender making a Loan (the "Loan"), to be secured by, among other things, the Lender's Deed of Trust (the "Senior Debt"), Lender requires that Lender's Deed of Trust be unconditionally and at all times remain a lien or charge upon the Property, prior and superior to all the rights of Subordinate Lender under its deed of trust and that Subordinate Lender specifically and unconditionally subordinates its deed of trust to the lien or charge of Lender's Deed of Trust.

      **F.**     Subordinate Lender and Owner agree to the subordination in favor of Lender.

      **NOW THEREFORE**, for good and valuable consideration and the receipt and adequacy of which is hereby acknowledged, and to induce Lender to make the Loan, Owner and Subordinate Lender hereby agree for the benefit of Lender as follows:

      **Section 1.**   **Subordination.**  Lender's Deed of Trust securing the Note in favor of Lender, shall unconditionally be and at all times remain a lien or charge on the Property prior and superior to Subordinate Lender's Deed of Trust.

      **Section 2.**   **Entire Agreement.**  This Agreement shall be the whole agreement with regard to the subordination of Subordinate Lender's deed of trust to the lien or charge of Lender's Deed of Trust, and shall supersede and cancel, but only insofar as would affect the priority of Lender's Deed of Trust, any prior agreements as to such subordination, including, without limitation, those provisions, if any, contained in Subordinate Lender's deed of trust which provide for the subordination of the deed of trust to a deed or deeds of trust or to a mortgage or mortgages.

      **Section 3.** **Lien Subordination.**  Subordinate Lender intentionally and unconditionally waives, relinquishes and subordinates all of Subordinate Lender's right, title and interest in and to the Property to the lien or charge of Lender's Deed of Trust, upon the Property and understands that in reliance upon, and in consideration of, this waiver, relinquishment and subordination, specific loans and advances are being and will be made by Lender and, as part and parcel thereof, specific monetary and other obligations are being and will be entered into which would not be made or entered into but for said reliance upon this waiver, relinquishment and subordination.

      **Section 4.** **Rights Upon Insolvency.**  In the event of (1) any insolvency, bankruptcy, receivership, liquidation, reorganization, arrangement, assignment for the benefit of creditors, or other similar proceeding relative to the Owner or its property (as defined in the Loan Agreement), or (2) any proceeding for the voluntary or involuntary liquidation, dissolution or other winding up of the Owner whether or not involving insolvency or bankruptcy proceedings, then and in any such event:

      (a) the principal amount of, and all interest on, and all other amounts in respect of, the Senior Debt (including interest thereon accruing after the commencement of any such proceeding, whether or not such interest shall be allowed in such proceeding) shall be paid in full before any payment or distribution of any character, whether in cash, securities or other property, shall be made in respect of the Subordinated Debt; and

      (b) any payment or distribution of any character, whether in cash, securities or other property, which would otherwise (but for the terms hereof) be payable or deliverable in respect of Subordinated Debt (including any payment or distribution in respect of the Subordinated Debt by reason of any other indebtedness of the Owner being subordinated to the Subordinated Debt), shall be paid or delivered directly to the Lender, or its representatives, until the principal amount of, and all interest and premium on, and all other amounts in respect of, the Senior Debt shall have been paid in full and the Subordinate Lender or any other holder of the Subordinated Debt

2

irrevocably authorizes, empowers and directs all receivers, trustees, liquidators, conservators and others having authority in the premises to effect all such payments and deliveries.

**Section 5. <u>Owner Obligations</u>.** Owner agrees that, in the event that any note or other obligation of the Owner not evidencing Senior Debt, or any portion thereof, shall become due and payable before its expressed maturity for any reason, Owner will give prompt notice, in writing, of such occurrence to the Lender.

**Section 6.      <u>Rights of Lender</u>.**

(a)      Subordinate Lender further declares, agrees and acknowledges for the benefit of the Lender, that Lender, in making disbursement pursuant to the Loan Agreement (whether obligatory or optional), is under no obligation or duty to, nor has Lender represented that it will, see to the application of such proceeds by the person or persons to whom Lender disburses such proceeds, an any application or use of such proceeds for purposes other than those provided for in such agreement or agreements shall not defeat the subordination herein made in whole or in part.

(b)      Except as otherwise provided herein, so long as any of the Senior Debt shall remain unpaid, Lender may at all times exercise any and all powers and rights which it now has or may hereafter acquire with respect to the Loan Agreement, any other security instrument, including, but not limited to deed of trust or mortgage, Collateral Security Agreement, or Membership Interest Pledge Agreement (collectively, "Security Document"), or any of the collateral subject to the Loan Agreement or any other Security Document without having to obtain any consent or approval of the Subordinate Lender and without any accountability to the Subordinate Lender, nor shall it have any liability to the Subordinate Lender for any action taken or failure to act with respect to this Agreement, the Loan Agreement, any other Security Document or the aforesaid collateral.

**Section 7. <u>Constructive Trust</u>.** If, notwithstanding the provisions of this Agreement, any payment or distribution of any character (whether in cash, securities or other property) shall be received by the Subordinate Lender in contravention of the terms of this Agreement, such payment or distribution shall not be commingled with any asset of the Subordinate Lender, but shall be held in trust for the benefit of, and shall be paid over or delivered and transferred to, the Lender, or its representatives or agents, for application to the payment of all Senior Debt remaining unpaid, until the principal amount of, and all interest and premium (including interest thereon accruing after the commencement of any proceedings described herein) on, and all other amounts in respect of, the Senior Debt shall have been paid in full.

**Section 8.      <u>Successors and Assigns</u>.**  This Agreement, without further reference, shall pass to and may be relied on and enforced by any transferee or subsequent holder of the Senior Debt and the Subordinated Debt.

**Section 9. <u>Modification</u>.** The terms of this Agreement, the subordination effectuated hereby, and the rights of the Lender and the obligations of the Subordinate Lender arising hereunder, shall  not be affected, modified or impaired in any manner or to any extent by: (i) any amendment or modification of or supplement to the Loan Agreement, any other Security Document or any other instrument or document executed or delivered pursuant thereto.

**Section 10. <u>Notices</u>.** All notice, consents, approvals, requests, demands, instruments or other communications to be made, given or furnished pursuant to, under or by virtue of their Agreement (each, a "Notice") shall be in writing and shall be deemed given or furnished if addressed to the party intended to receive the same at the address or such party as set forth below (i) upon receipt when personally delivered at such address, or (ii) one (1) business day after the date of delivery of such notice to a nationwide, reputable commercial courier service:

Lender:                    HANKEY CAPITAL, LLC
                           4751 Wilshire Blvd., Suite 110
                           Los Angeles, CA 90010
                           Attention: Eugene M. Leydiker

Subordinate Lender:        INFERNO INVESTMENT INC.
                           95-4 Chemin de Kandahar
                           Mont-Tremblant, Quebec J8E 1E2

Owner:                     CRESTLLOYD, LLC
                           c/o Skyline Development
                           8981 W. Sunset Blvd., Suite 303
                           West Hollywood, CA 90069
                           Attn: Nile Niami

Any party may change the address to which any notice is to be delivered to any other address within the United States of America by furnishing written notice of such change at least fifteen (15) days prior to the effective date of such change to the other parties in the manner set forth above, but no such notice of change shall be effective unless and until received by such other parties. Notices may be given on behalf of any party by its attorneys.

**Section 11.    Miscellaneous.** This Agreement may not be amended or modified orally but may be amended or modified only in writing, signed by all parties hereto. No waiver of any term or provision of this Agreement shall be effective unless it is in writing, making specific reference to this Agreement and signed by the party against whom such waiver is sought to be enforced. This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof. This Agreement shall be binding upon the parties hereto and their respective heirs, legal representatives, successors and assigns. This Agreement shall be governed by and construed in accordance with the laws of the State of California.

**Section 12.    Definitions.**    Terms used in this Agreement and not defined herein shall have the respective meanings ascribed to them in the Loan Agreement. The recitals hereto shall be a part of this Agreement.

**Section 13.  Termination.** This Agreement shall terminate upon the final and indefeasible payment in full of the principal amount of, and all interest and premium on, and all other amounts in respect of, the Senior Debt.

**Section 14.  Counterparts.** This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original and all of which together shall constitute and be construed as one and the same instrument.

NOTICE: THIS SUBORDINATION AGREEMENT CONTAINS A PROVISION WHICH ALLOWS THE PERSON OBLIGATED ON YOUR REAL PROPERTY SECURITY TO OBTAIN A LOAN A PORTION OF WHICH MAY BE EXPENDED FOR OTHER PURPOSES THAN IMPROVEMENT OF THE LAND.

IT IS RECOMMENDED THAT, PRIOR TO THE EXECUTION OF THIS AGREEMENT, THE PARTIES CONSULT WITH THEIR ATTORNEYS WITH RESPECT HERETO.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date hereof.

4

**NOTE: THIS AGREEMENT MAY BE EXECUTED IN COUNTERPARTS.**

**[SIGNATURES COMMENCE ON THE FOLLOWING PAGE.]**

**OWNER**:

CRESTLLOYD, LLC,
a California limited liability company

By: _____
     Nile Niami, Manager

---

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

---

State of California          )

County of_____)

On_____before me, _____
       *Date*                   *Here Insert Name and Title of the Officer*
Personally Appeared _____
                        *Name(s) of Signer(s)*
_____,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

                        I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.
                        WITNESS my hand and official seal.

                        Signature _____
                              *Signature of Notary Public*

6

**SUBORDINATE LENDER:**

**INFERNO INVESTMENT INC.**

By: _____

Name:   Julien Rémillard

Title:    Director

---

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

---

State of California                                      )

County of_____)

On_____before me, _____
         *Date*                                                    *Here Insert Name and Title of the Officer*
Personally Appeared _____
                                              *Name(s) of Signer(s)*
_____,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.
WITNESS my hand and official seal.

Signature _____
                              *Signature of Notary Public*

7

**LENDER:**

**HANKEY CAPITAL, LLC**

By: _____
       W. Scott Dobbins, President

| |
|---|
| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |

State of California              )

County of_____)

On_____before me, _____
          *Date*                           *Here Insert Name and Title of the Officer*
Personally Appeared _____
                                 *Name(s) of Signer(s)*

_____,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

                                       I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.
                                       WITNESS my hand and official seal.

                                       Signature _____
                                             *Signature of Notary Public*

## Exhibit "A"

## Property Description

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF LOS
ANGELES, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS
DESCRIBED AS FOLLOWS:

PARCEL 1:

LOTS 1 AND 2 OF TRACT NO. 22727, IN THE CITY OF LOS ANGELES, COUNTY OF
LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 623
PAGE(S) 81 TO 83 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY
RECORDER OF SAID COUNTY.

EXCEPTING THEREFROM THAT PORTION OF SAID LOTS LYING WESTERLY OF
THE FOLLOWING DESCRIBED LINE:

BEGINNING AT A POINT IN THE NORTHWESTERLY TERMINUS OF AIROLE WAY,
30 FEET WIDE, AS SHOWN ON SAID MAP, DISTANT THEREON SOUTH 76° 06' 07"
'WEST 2.86 FEET FROM THE MOST NORTHERLY CORNER THEREOF; THENCE
LEAVING SAID TERMINUS ALONG A CURVE CONCAVE WESTERLY, HAVING A
RADIUS OF 361.97 FEET AND CONCENTRIC WITH THAT CERTAIN CURVE IN THE
WESTERLY LINE OF SAID LOT 1 HAVING A RADIUS OF 349.83 FEET; THENCE
NORTHERLY 22.69 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF
03° 35' 48" TO THE BEGINNING OF A COMPOUND CURVE, CONCAVE
SOUTHWESTERLY AND HAVING A RADIUS OF 175.66 FEET; THENCE
NORTHWESTERLY 119.88 FEET ALONG SAID CURVE THROUGH A CENTRAL
ANGLE OF 39° 06' 53"; THENCE NORTH 56° 36' 22" WEST 7.97 FEET TO THE
BEGINNING OF A CURVE CONCAVE NORTHEASTERLY AND HAVING A RADIUS
OF 90.80 FEET; THENCE NORTHWESTERLY 71.18 FEET ALONG SAID CURVE
THROUGH A CENTRAL ANGLE OF 44° 55' 04"; THENCE NORTH 11° 41' 18" WEST
208.55 FEET TO THE BEGINNING OF A CURVE CONCAVE EASTERLY AND HAVING
A RADIUS OF 35.90 FEET; THENCE NORTHERLY 34.44 FEET ALONG SAID CURVE
THROUGH A CENTRAL ANGLE OF 56° 32' 34"; THENCE NORTH 44° 51' 16" EAST
42.37 FEET TO THE CURVED SOUTHEASTERLY LINE OF STRADELLA ROAD, 40
FEET WIDE, AS SHOWN ON SAID MAP.

PARCEL 2:

THAT PORTION OF LOT 3 IN BLOCK 3 OF TRACT NO. 9745, IN THE CITY OF LOS
ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP
RECORDED IN BOOK 141 PAGES 93 TO 96 INCLUSIVE OF MAPS, IN THE OFFICE OF
THE COUNTY RECORDER OF SAID COUNTY, LYING NORTHERLY OF THE
FOLLOWING DESCRIBED LINE:

BEGINNING AT A POINT IN THE EASTERLY LINE OF SAID LOT, DISTANCE
THEREON SOUTH 13° 13' 20" EAST 34.33 FEET FROM THE NORTHERLY TERMINUS
OF THAT CERTAIN COURSE IN SAID EASTERLY LINE SHOWN ON SAID MAP AS
HAVING A BEARING AND LENGTH OF NORTH 13° 13' 20" WEST 106.35 FEET;
THENCE NORTH 89° 27' 20" WEST 214.07 FEET, MORE OR LESS, TO A POINT IN THE
WESTERLY LINE OF SAID LOT, DISTANT SOUTHERLY THEREON 54.93 FEET
FROM THE NORTHERLY TERMINUS OF THAT CERTAIN CURVE IN SAID
WESTERLY LINE HAVING A LENGTH OF 115.83 FEET.

APN: **4369-026-021**

# EXHIBIT 7



## Hankey Capital
*a California Finance Lender*
*Department of Business Oversight License No. 6038812*

### AMENDED AND RESTATED
### PROMISSORY NOTE
### (VARIABLE RATE)

| BORROWER'S NAME | MATURITY DATE |
|---|---|
| CRESTLLOYD, LLC, a California limited liability company (the "Borrower") | October 31, 2020 |

$91,000,000.00          Los Angeles, California      December 10, 2019

On or prior to October 31, 2020 (the "Maturity Date"), for value received, Borrower promises to pay to the order of HANKEY CAPITAL, LLC, a California limited liability company ("Lender"), at its office at 4751 Wilshire Blvd., Suite 110, Los Angeles, California 90010, or at such other place as the holder of this Note may from time to time designate in writing, the principal sum of Ninety-One Million and No/100 Dollars ($91,000,000.00), together with interest from the date hereof computed on the principal balance hereof from time to time outstanding, at the rate of four and three-quarters percent (4.75%) per annum above the Prime Rate.

Prime Rate: The rate of interest published from time to time by *The Wall Street Journal* as the "prime rate." **In no event shall the interest rate hereunder be less than 11.0%.**

The interest rate on this Note is subject to change from time to time based on changes in the Prime Rate (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. If the Index becomes unavailable during the term of this loan, Lender may designate a substitute Index after notice to Borrower. Lender will disclose to Borrower the current Index rate upon Borrower's request. Borrower acknowledges that Lender may make loans based on other rates as well. The Index currently is 4.75% per annum. Borrower hereby waives the right to receive notice of any future change(s) in the Index rate. Whenever increases occur in the interest rate, Lender, at its option, may do one or more of the following: (a) Increase Borrower's payments to ensure that the Loan will pay off by its original final maturity date, (b) Increase Borrower's payments to cover accruing interest, (c) Increase the number of payments, and (d) continue the payments and increase Borrower's final payment.

Commencing on the first full calendar month following the date of the initial disbursement, and continuing on the first day of each subsequent calendar month until the Maturity Date,

1

Borrower shall make monthly payments of interest-only in arrears on the disbursed and unpaid principal balance of this Note. Interest payment shall be initially paid from a reserve account, maintained by the Lender, in the amount of $4,500,000.00 (the "Reserve"). Borrower shall make timely payments of interest upon depletion of the Reserve. Interest shall be computed daily based upon a three hundred sixty (360) day year for the actual number of days elapsed. Should interest not be paid when due, it shall become part of the principal and thereafter bear interest as herein provided.

On or prior to the Maturity Date, should default be made in the payment of principal or interest when due or in the performance or observance when due of any term, covenant or condition of any deed of trust, security agreement or other agreement (including amendments and extensions thereof) securing or pertaining to this Note, then, at the option of the holder hereof and without notice or demand, the entire balance of principal and accrued interest then remaining unpaid shall become immediately due and payable and thereafter bear interest, until paid in full, at the increased rate of five percent (5%) per annum over and above the interest rate contracted for herein. Should Borrower fail to pay all outstanding principal and accrued interest on or prior to the Maturity Date, then, without notice or demand, the entire balance of principal and accrued interest then remaining unpaid shall thereafter bear interest, until paid in full, at the increased rate of five percent (5%) per annum over and above the interest rate contracted for herein. Borrower acknowledges and agrees that during the time that any payment of principal, interest or other amounts due under this Note is delinquent, whether before or after the Maturity Date, the holder will incur additional costs and expenses attributable to its loss of use of the money due and to the adverse impact on the holder's ability to avail itself of other opportunities. Borrower acknowledges and agrees that it is extremely difficult and impractical to ascertain the extent of such costs and expenses and that proof of actual damages would be costly or inconvenient. Borrower therefore agrees that interest at the increased rate of five percent (5%) per annum over and above the interest rate contracted for in this Note represents a reasonable sum considering all the circumstances existing on the date of this Note and represents a fair and reasonable estimate of such costs and expenses. No delay or omission on the part of the holder hereof in exercising any right hereunder, or under any deed of trust, security agreement or other agreement shall operate as a waiver of such right or of any other right under this Note or under any such deed of trust, security agreement or other agreement.

Except with respect to the final monthly payment hereunder and following the Maturity Date, if any payment of principal or interest under this Note shall not be made within five (5) calendar days of the date due, a late charge of five percent (5%) of the overdue amount may be charged by the holder for the purpose of defraying the expenses incident to handling such delinquent payments. Borrower acknowledges and agrees that it is extremely difficult and impractical to ascertain the extent of such expenses and that proof of actual damages would be costly or inconvenient. Borrower therefore agrees that such late charge represents a reasonable sum considering all of the circumstances existing on the date of this Note and represents a fair and reasonable estimate of the costs that will be sustained by the holder due to the failure of Borrower to make timely payments. Such late charge shall be paid without prejudice to the right of the holder to collect any other amounts provided to be paid or to declare a default under this Note or under the Deed of Trust referred to in this Note or from exercising any of the other rights and remedies of the holder, including, without limitation,

2

the right to declare the entire balance of the principal and accrued interest then remaining unpaid immediately due and payable.

In no event shall interest accrue or be payable hereon or under any such deed of trust, security agreement or other agreement in excess of the maximum amount of interest permitted on the date hereof by the laws of the State of California. If this Note is not paid when due, whether at its specified or accelerated maturity date, Borrower promises to pay all costs of collection and enforcement of this Note, including, but not limited to, reasonable attorneys' fees and costs, incurred by the holder hereof on account of such collection or enforcement, whether or not suit is filed hereon.

Principal and interest shall be payable in lawful money of the United States without setoff, demand or counterclaim. Borrower waives the defense of the statute of limitations in any action on this Note. Presentment, notice of dishonor, and protest are waived by all makers, sureties, guarantors and endorsers of this Note. Such parties expressly consent to any extension of the time of payment hereof or any installment hereof, to any renewal, and to the release of any or all of the security given for the payment of this Note or the release of any party liable for this obligation. This Note shall be governed and construed in accordance with the laws of the State of California.

Borrower may prepay this Note in whole or in part, at any time. In the event this Note is paid in its entirety on or prior to April 30, 2020, a prepayment penalty equal to one percent (1.0%) of the then-outstanding principal balance shall be payable hereunder. No partial prepayment shall affect the obligation of Borrower to pay the next subsequent regular installment payable hereunder until the entire balance of principal and interest shall have been paid in full. This Note replaces and supersedes, in its entirety, that certain Promissory Note, executed by Borrower in favor of Lender on October 25, 2018, in the principal amount of $82,500,000.00. A loan fee in the amount of Eighty-Five Thousand and No/100 Dollars ($85,000.00) shall be payable to Lender in connection with this Note.

IN WITNESS WHEREOF, the undersigned has executed this Note as of the date first written above.

BORROWER:

CRESTLLOYD, LLC,
a California limited liability company

By: _____
    Nile Niami, Manager

3

This loan is made pursuant to California Finance Lender's Law,
Division 9 (commencing with Section 22000) of the Financial Code.
For information contact the Department of Business Oversight, State of California.

**EXHIBIT 8**



# Hankey Capital

*a California Finance Lender*
*Department of Business Oversight License No. 6038812*

### AMENDED AND RESTATED
### PROMISSORY NOTE
### (VARIABLE RATE)

| BORROWER'S NAME | MATURITY DATE |
|---|---|
| CRESTLLOYD, LLC, a California limited liability company (the "Borrower") | October 31, 2020 |

$106,000,000.00          Los Angeles, California          August 20, 2020

On or prior to October 31, 2020 (the "Maturity Date"), for value received, Borrower promises to pay to the order of HANKEY CAPITAL, LLC, a California limited liability company ("Lender"), at its office at 4751 Wilshire Blvd., Suite 110, Los Angeles, California 90010, or at such other place as the holder of this Note may from time to time designate in writing, the principal sum of One Hundred Six Million and No/100 Dollars ($106,000,000.00), together with interest from the date hereof computed on the principal balance hereof from time to time outstanding, at the rate of four and three-quarters percent (4.75%) per annum above the Prime Rate.

Prime Rate: The rate of interest published from time to time by *The Wall Street Journal* as the "prime rate." **In no event shall the interest rate hereunder be less than 11.0%.**

The interest rate on this Note is subject to change from time to time based on changes in the Prime Rate (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. If the Index becomes unavailable during the term of this loan, Lender may designate a substitute Index after notice to Borrower. Lender will disclose to Borrower the current Index rate upon Borrower's request. Borrower acknowledges that Lender may make loans based on other rates as well. The Index currently is 3.25% per annum. Borrower hereby waives the right to receive notice of any future change(s) in the Index rate. Whenever increases occur in the interest rate, Lender, at its option, may do one or more of the following: (a) Increase Borrower's payments to ensure that the Loan will pay off by its original final maturity date, (b) Increase Borrower's payments to cover accruing interest, (c) Increase the number of payments, and (d) continue the payments and increase Borrower's final payment.

Commencing on the first full calendar month following the date of the initial disbursement, and continuing on the first day of each subsequent calendar month until the Maturity Date, Borrower shall make monthly payments of interest-only in arrears on the disbursed and unpaid principal balance of this Note. Interest payment shall be initially paid from a reserve

1

account, maintained by the Lender, in the amount of $5,700,000.00 (the "Reserve"). Borrower shall make timely payments of interest upon depletion of the Reserve. Interest shall be computed daily based upon a three hundred sixty (360) day year for the actual number of days elapsed. Should interest not be paid when due, it shall become part of the principal and thereafter bear interest as herein provided.

On or prior to the Maturity Date, should default be made in the payment of principal or interest when due or in the performance or observance when due of any term, covenant or condition of any deed of trust, security agreement or other agreement (including amendments and extensions thereof) securing or pertaining to this Note, then, at the option of the holder hereof and without notice or demand, the entire balance of principal and accrued interest then remaining unpaid shall become immediately due and payable and thereafter bear interest, until paid in full, at the increased rate of five percent (5%) per annum over and above the interest rate contracted for herein. Should Borrower fail to pay all outstanding principal and accrued interest on or prior to the Maturity Date, then, without notice or demand, the entire balance of principal and accrued interest then remaining unpaid shall thereafter bear interest, until paid in full, at the increased rate of five percent (5%) per annum over and above the interest rate contracted for herein. Borrower acknowledges and agrees that during the time that any payment of principal, interest or other amounts due under this Note is delinquent, whether before or after the Maturity Date, the holder will incur additional costs and expenses attributable to its loss of use of the money due and to the adverse impact on the holder's ability to avail itself of other opportunities. Borrower acknowledges and agrees that it is extremely difficult and impractical to ascertain the extent of such costs and expenses and that proof of actual damages would be costly or inconvenient. Borrower therefore agrees that interest at the increased rate of five percent (5%) per annum over and above the interest rate contracted for in this Note represents a reasonable sum considering all the circumstances existing on the date of this Note and represents a fair and reasonable estimate of such costs and expenses. No delay or omission on the part of the holder hereof in exercising any right hereunder, or under any deed of trust, security agreement or other agreement shall operate as a waiver of such right or of any other right under this Note or under any such deed of trust, security agreement or other agreement.

Except with respect to the final monthly payment hereunder and following the Maturity Date, if any payment of principal or interest under this Note shall not be made within five (5) calendar days of the date due, a late charge of five percent (5%) of the overdue amount may be charged by the holder for the purpose of defraying the expenses incident to handling such delinquent payments. Borrower acknowledges and agrees that it is extremely difficult and impractical to ascertain the extent of such expenses and that proof of actual damages would be costly or inconvenient. Borrower therefore agrees that such late charge represents a reasonable sum considering all of the circumstances existing on the date of this Note and represents a fair and reasonable estimate of the costs that will be sustained by the holder due to the failure of Borrower to make timely payments. Such late charge shall be paid without prejudice to the right of the holder to collect any other amounts provided to be paid or to declare a default under this Note or under the Deed of Trust referred to in this Note or from exercising any of the other rights and remedies of the holder, including, without limitation, the right to declare the entire balance of the principal and accrued interest then remaining unpaid immediately due and payable.

2

In no event shall interest accrue or be payable hereon or under any such deed of trust, security agreement or other agreement in excess of the maximum amount of interest permitted on the date hereof by the laws of the State of California. If this Note is not paid when due, whether at its specified or accelerated maturity date, Borrower promises to pay all costs of collection and enforcement of this Note, including, but not limited to, reasonable attorneys' fees and costs, incurred by the holder hereof on account of such collection or enforcement, whether or not suit is filed hereon.

Principal and interest shall be payable in lawful money of the United States without setoff, demand or counterclaim. Borrower waives the defense of the statute of limitations in any action on this Note. Presentment, notice of dishonor, and protest are waived by all makers, sureties, guarantors and endorsers of this Note. Such parties expressly consent to any extension of the time of payment hereof or any installment hereof, to any renewal, and to the release of any or all of the security given for the payment of this Note or the release of any party liable for this obligation. This Note shall be governed and construed in accordance with the laws of the State of California.

Borrower may prepay this Note in whole or in part, at any time, without penalty. No partial prepayment shall affect the obligation of Borrower to pay the next subsequent regular installment payable hereunder until the entire balance of principal and interest shall have been paid in full. This Note replaces and supersedes, in its entirety, that certain Amended and Restated Promissory Note, executed by Borrower in favor of Lender on December 10, 2019, in the principal amount of $91,000,000.00.

A loan fee in the amount of One Million and No/100 Dollars ($1,000,000.00) shall be payable to Lender in connection with this Note. Said fee shall be paid from proceeds of the Loan upon execution hereof.

IN WITNESS WHEREOF, the undersigned has executed this Note as of the date first written above.

BORROWER:

CRESTLLOYD, LLC,
a California limited liability company

By: _____
    Nile Niami, Manager

3

This loan is made pursuant to California Finance Lender's Law,
Division 9 (commencing with Section 22000) of the Financial Code.
For information contact the Department of Business Oversight, State of California.

# EXHIBIT 9

**De :** Douglas Witkins
**Envoyé le :** 24 février 2021 13:47
**À :** Me Mathieu Robillard
**Objet :** Hankey Loan, The One

Hello, Mathieu,

Hankey Capital has informed Crestlloyd that they will file a file Notice of Default tomorrow unless Crestlloyd and the secured parties agree for them to extend the maturity date on their loan to May 31, 2021 and also raise their loan to $115M to cover interest payments through that time and additional loan fee and continued draws required to get the final permits, etc.

They are requiring the junior lienholders to sign Subordination Agreements.  I am attaching the one pertaining to Julien's interest.  Please read it over and let me know if you are on board.  If you have questions, I will try to get answers for you.

Thank you

Doug

WHEN RECORDED, RETURN TO:

Hankey Capital, LLC
4751 Wilshire Blvd., Ste 110
Los Angeles, CA 90010
Attn: Eugene M. Leydiker

APN No. 4369-026-021

---

# SUBORDINATION
# AGREEMENT

## (Deed of Trust to Deed of Trust)

**NOTICE: THIS SUBORDINATION AGREEMENT RESULTS IN YOUR SECURITY INTEREST IN THE PROPERTY BECOMING SUBJECT TO AND OF LOWER PRIORITY THAN THE LIEN OF SOME OTHER OR LATER SECURITY INSTRUMENT.**

THIS SUBORDINATION AGREEMENT ("Agreement") is entered into as of February 23, 2021, by and between CRESTLLOYD, LLC, a California limited liability company ("Owner"); and INFERNO INVESTMENT INC. ("Subordinate Lender"); and Hankey Capital, LLC ("Lender").

## RECITALS

**A.**      Subject to the terms and provisions of that certain Deed of Trust With Assignment of Rents dated March 13, 2013, executed by Owner, as Trustor, in favor of INFERNO REALTY, L.P. and MAYBACH CORPORATION HOLDINGS, INC., Subordinate Lender's predecessors-in-interest, recorded on March 13, 2013, as Document Number 20130384037 in the official records of the County of Los Angeles, State of California ("Official Records") ("Subordinate Lender's Deed of Trust"), Owner granted to Subordinate Lender's predecessors-in-interest a security interest in and to the property described in Exhibit "A" attached hereto and incorporated herein located at 944 Airole Way, Los Angeles, California (which property, together with all improvements now or hereafter located on the property, is hereinafter collectively referred to as the "Property") to secure Owner's obligations to Subordinate Lender's predecessors-in-interest (the "Subordinated Debt").

**B.**      MAYBACH CORPORATION HOLDINGS, INC. assigned the entirety of its interest in the Subordinate Lender's Deed of Trust to INFERNO REALTY, L.P. by means of that certain Assignment of Note and Deed of Trust/Mortgage, dated June 2, 2014 and recorded on November 10, 2015 in the Official Records as Document Number 20151375606.

**C.**      INFERNO REALTY, L.P. assigned the entirety of its interest in the Subordinate Lender's Deed of Trust to Subordinate Lender by means of that certain Assignment of Note and Deed of Trust/Mortgage, dated October 21, 2015 and recorded on November 10, 2015 in the Official Records as Document Number 20151375607.

**D.**      Owner has executed a Deed of Trust, Security Agreement and Fixture Filing With Assignment of Rents ("Lender's Deed of Trust") securing, among other things, Owner's obligations to Lender as set forth in that certain Promissory Note dated October 25, 2018, in favor of Lender, in the principal amount of Eighty Two Million Five Hundred Thousand and No/100 Dollars ($82,500,000.00) (the "Note"). Lender's Deed of Trust was recorded in the Official Records on

1

November 6, 2018 as Document No. 20181122917. The Note and the Lender's Deed of Trust are collectively referred to herein as the "Loan Agreement".

**E.**    Subordinate Lender executed a Subordination Agreement on October 31, 2018, subordinating the Subordinated Debt to Lender's Deed of Trust, which Subordination Agreement was recorded on November 6, 2018 as Document No. 20181122920.

**F.**    Separate from the Lender's Deed of Trust, Owner and Lender have entered into two (2) separate agreements, a memorandum of each of which has been recorded in the Official Records on November 6, 2018 as Document No. 20181122919 (the "First Memorandum of Agreement") and on August 31, 2020 as Document No. 20201030294 (the "Second Memorandum of Agreement").

**G.**    Owner has requested that Lender increase the amount of the Note to One Hundred Fifteen Million and No/100 Dollars ($115,000,000.00) (the "Loan Increase").

**H.**    As a condition to Lender making the Loan Increase, to be secured by, among other things, the Lender's Deed of Trust, to be modified by that certain Modification of Deed of Trust of even date herewith, Lender requires that Lender's Deed of Trust, as modified, the First Memorandum of Agreement and the Second Memorandum of Agreement be unconditionally and at all times remain a lien or charge upon the Property, prior and superior to all the rights of Subordinate Lender under its deed of trust and that Subordinate Lender specifically and unconditionally subordinates its deed of trust to the lien or charge of (i) Lender's Deed of Trust, as modified by that certain Modification of Deed of Trust of even date herewith, (ii) the First Memorandum of Agreement, and (iii) the Second Memorandum of Agreement (collectively, the "Senior Debt").

**I.**    Subordinate Lender and Owner agree to the subordination in favor of Lender.

**NOW THEREFORE**, for good and valuable consideration and the receipt and adequacy of which is hereby acknowledged, and to induce Lender to make the Loan, Owner and Subordinate Lender hereby agree for the benefit of Lender as follows:

**Section 1.**    **Subordination.**  Lender's Deed of Trust, as modified by that certain Modification of Deed of Trust of even date herewith, securing the Note (evidencing the Loan Increase) in favor of Lender, the First Memorandum of Agreement and the Second Memorandum of Agreement, shall unconditionally be and at all times remain a lien or charge on the Property prior and superior to Subordinate Lender's Deed of Trust.

**Section 2.**    **Entire Agreement**.  This Agreement shall be the whole agreement with regard to the subordination of Subordinate Lender's Deed of Trust to the lien or charge of Lender's Deed of Trust, as modified by that certain Modification of Deed of Trust of even date herewith, the First Memorandum of Agreement and the Second Memorandum of Agreement, and shall supersede and cancel, but only insofar as would affect the priority of Lender's Deed of Trust, as modified by that certain Modification of Deed of Trust of even date herewith, of the First Memorandum of Agreement, of the Second Memorandum of Agreement, any prior agreements as to such subordination, including, without limitation, those provisions, if any, contained in Subordinate Lender's deed of trust which provide for the subordination of the deed of trust to a deed or deeds of trust or to a mortgage or mortgages.

**Section 3. Lien Subordination.**  Subordinate Lender intentionally and unconditionally waives, relinquishes and subordinates all of Subordinate Lender's right, title and interest in and to the Property to the lien or charge of Lender's Deed of Trust, as modified by that certain Modification of Deed of Trust of even date herewith, the First Memorandum of Agreement and the Second Memorandum of Agreement, upon the Property and understands that in reliance upon, and in consideration of, this waiver, relinquishment and subordination, specific loans and advances are being and will be made by

2

Lender and, as part and parcel thereof, specific monetary and other obligations are being and will be entered into which would not be made or entered into but for said reliance upon this waiver, relinquishment and subordination.

Section 4. **Rights Upon Insolvency.** In the event of (1) any insolvency, bankruptcy, receivership, liquidation, reorganization, arrangement, assignment for the benefit of creditors, or other similar proceeding relative to the Owner or its property (as defined in the Loan Agreement), or (2) any proceeding for the voluntary or involuntary liquidation, dissolution or other winding up of the Owner whether or not involving insolvency or bankruptcy proceedings, then and in any such event:

(a) the principal amount of, and all interest on, and all other amounts in respect of, the Senior Debt (including interest thereon accruing after the commencement of any such proceeding, whether or not such interest shall be allowed in such proceeding) shall be paid in full before any payment or distribution of any character, whether in cash, securities or other property, shall be made in respect of the Subordinated Debt; and

(b) any payment or distribution of any character, whether in cash, securities or other property, which would otherwise (but for the terms hereof) be payable or deliverable in respect of Subordinated Debt (including any payment or distribution in respect of the Subordinated Debt by reason of any other indebtedness of the Owner being subordinated to the Subordinated Debt), shall be paid or delivered directly to the Lender, or its representatives, until the principal amount of, and all interest and premium on, and all other amounts in respect of, the Senior Debt shall have been paid in full and the Subordinate Lender or any other holder of the Subordinated Debt irrevocably authorizes, empowers and directs all receivers, trustees, liquidators, conservators and others having authority in the premises to effect all such payments and deliveries.

Section 5. **Owner Obligations.** Owner agrees that, in the event that any note or other obligation of the Owner not evidencing Senior Debt, or any portion thereof, shall become due and payable before its expressed maturity for any reason, Owner will give prompt notice, in writing, of such occurrence to the Lender.

Section 6.    **Rights of Lender.**

(a)    Subordinate Lender further declares, agrees and acknowledges for the benefit of the Lender, that Lender, in making disbursement pursuant to the Loan Agreement (whether obligatory or optional), is under no obligation or duty to, nor has Lender represented that it will, see to the application of such proceeds by the person or persons to whom Lender disburses such proceeds, an any application or use of such proceeds for purposes other than those provided for in such agreement or agreements shall not defeat the subordination herein made in whole or in part.

(b)    Except as otherwise provided herein, so long as any of the Senior Debt shall remain unpaid, Lender may at all times exercise any and all powers and rights which it now has or may hereafter acquire with respect to the Loan Agreement, any other security instrument, including, but not limited to deed of trust or mortgage, Collateral Security Agreement, or Membership Interest Pledge Agreement (collectively, "Security Document"), or any of the collateral subject to the Loan Agreement or any other Security Document without having to obtain any consent or approval of the Subordinate Lender and without any accountability to the Subordinate Lender, nor shall it have any liability to the Subordinate Lender for any action taken or failure to act with respect to this Agreement, the Loan Agreement, any other Security Document or the aforesaid collateral.

Section 7. **Constructive Trust.** If, notwithstanding the provisions of this Agreement, any payment or distribution of any character (whether in cash, securities or other property) shall be received by the Subordinate Lender in contravention of the terms of this Agreement, such payment or distribution shall not be commingled with any asset of the Subordinate Lender, but shall be held in trust for the benefit

3

of, and shall be paid over or delivered and transferred to, the Lender, or its representatives or agents, for application to the payment of all Senior Debt remaining unpaid, until the principal amount of, and all interest and premium (including interest thereon accruing after the commencement of any proceedings described herein) on, and all other amounts in respect of, the Senior Debt shall have been paid in full.

**Section 8.      Successors and Assigns.** This Agreement, without further reference, shall pass to and may be relied on and enforced by any transferee or subsequent holder of the Senior Debt and the Subordinated Debt.

**Section 9. Modification.** The terms of this Agreement, the subordination effectuated hereby, and the rights of the Lender and the obligations of the Subordinate Lender arising hereunder, shall  not be affected, modified or impaired in any manner or to any extent by: (i) any amendment or modification of or supplement to the Loan  Agreement, any  other Security  Document or any  other instrument or document executed or delivered pursuant thereto.

**Section 10.  Notices.** All notice, consents, approvals, requests, demands, instruments or other communications to be made, given or furnished pursuant to, under or by virtue of their Agreement (each, a "Notice") shall be in writing and shall be deemed given or furnished if addressed to the party intended to receive the same at the address or such party as set forth below (i) upon receipt when personally delivered at such address, or (ii) one (1) business day after the date of delivery of such notice to a nationwide, reputable commercial courier service:

|                     |                                       |
|---------------------|---------------------------------------|
| Lender:             | HANKEY CAPITAL, LLC                   |
|                     | 4751 Wilshire Blvd., Suite 110        |
|                     | Los Angeles, CA 90010                 |
|                     | Attention: Eugene M. Leydiker         |
|                     |                                       |
| Subordinate Lender: | INFERNO INVESTMENT INC.               |
|                     | 95-4 Chemin de Kandahar               |
|                     | Mont-Tremblant, Quebec J8E 1E2        |
|                     |                                       |
| Owner:              | CRESTLLOYD, LLC                       |
|                     | c/o Skyline Development               |
|                     | 8981 W. Sunset Blvd., Suite 303       |
|                     | West Hollywood, CA 90069              |
|                     | Attn: Nile Niami                      |

Any party may change the address to which any notice is to be delivered to any other address within the United States of America by furnishing written notice of such change at least fifteen (15) days prior to the effective date of such change to the other parties in the manner set forth above, but no such notice of change shall be effective unless and until received by such other parties. Notices may be given on behalf of any party by its attorneys.

**Section 11.      Miscellaneous.** This Agreement may not be amended or modified orally but may be amended or modified only in writing, signed by all parties hereto. No waiver of any term or provision of this Agreement shall be effective unless it is in writing, making specific reference to this Agreement and signed by the party against whom such waiver is sought to be enforced. This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof. This Agreement shall be binding upon the parties hereto and their respective heirs, legal representatives, successors and assigns. This Agreement shall be governed by and construed in accordance with the laws of the State of California.

**Section 12.    Definitions.**    Terms used in this Agreement and not defined herein shall have the

4

respective meanings ascribed to them in the Loan Agreement. The recitals hereto shall be a part of this Agreement.

**Section 13. <u>Termination</u>.** This Agreement shall terminate upon the final and indefeasible payment in full of the principal amount of, and all interest and premium on, and all other amounts in respect of, the Senior Debt.

**Section 14. <u>Counterparts</u>.** This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original and all of which together shall constitute and be construed as one and the same instrument.

NOTICE: THIS SUBORDINATION AGREEMENT CONTAINS A PROVISION WHICH ALLOWS THE PERSON OBLIGATED ON YOUR REAL PROPERTY SECURITY TO OBTAIN A LOAN A PORTION OF WHICH MAY BE EXPENDED FOR OTHER PURPOSES THAN IMPROVEMENT OF THE LAND.

IT IS RECOMMENDED THAT, PRIOR TO THE EXECUTION OF THIS AGREEMENT, THE PARTIES CONSULT WITH THEIR ATTORNEYS WITH RESPECT HERETO.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date hereof.

**NOTE: THIS AGREEMENT MAY BE EXECUTED IN COUNTERPARTS.**

**[SIGNATURES COMMENCE ON THE FOLLOWING PAGE.]**

**OWNER:**

CRESTLLOYD, LLC,
a California limited liability company


By: _____
     Nile Niami, Manager


---

| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |
| --- |

State of California                )

County of_____)

On_____before me, _____
        *Date*                       *Here Insert Name and Title of the Officer*
Personally Appeared _____
                        *Name(s) of Signer(s)*
_____,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

                        I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.
                        WITNESS my hand and official seal.

                        Signature _____
                             *Signature of Notary Public*

6

**SUBORDINATE LENDER:**

**INFERNO INVESTMENT INC.**

By: _____

Name:   Julien Rémillard

Title:    Director

---

| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |
| --- |

State of California                                    )

County of_____)

On_____before me, _____
　　　　　　*Date*　　　　　　　　　　　　　　　*Here Insert Name and Title of the Officer*
Personally Appeared _____
　　　　　　　　　　　　　　　*Name(s) of Signer(s)*
_____,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.
WITNESS my hand and official seal.

Signature _____
　　　　　　　　*Signature of Notary Public*

7

**LENDER:**

**HANKEY CAPITAL, LLC**

By: _____
     W. Scott Dobbins, President

---

| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |
| --- |

State of California                 )

County of_____)

On_____before me, _____
         *Date*                           *Here Insert Name and Title of the Officer*
Personally Appeared _____
                                   *Name(s) of Signer(s)*
_____,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

                                       I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.
                                       WITNESS my hand and official seal.

                                       Signature _____
                                            *Signature of Notary Public*

8

### Exhibit "A"

### Property Description

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF LOS ANGELES, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

PARCEL 1:

LOTS 1 AND 2 OF TRACT NO. 22727, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 623 PAGE(S) 81 TO 83 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPTING THEREFROM THAT PORTION OF SAID LOTS LYING WESTERLY OF THE FOLLOWING DESCRIBED LINE:

BEGINNING AT A POINT IN THE NORTHWESTERLY TERMINUS OF AIROLE WAY, 30 FEET WIDE, AS SHOWN ON SAID MAP, DISTANT THEREON SOUTH 76° 06' 07" 'WEST 2.86 FEET FROM THE MOST NORTHERLY CORNER THEREOF; THENCE LEAVING SAID TERMINUS ALONG A CURVE CONCAVE WESTERLY, HAVING A RADIUS OF 361.97 FEET AND CONCENTRIC WITH THAT CERTAIN CURVE IN THE WESTERLY LINE OF SAID LOT 1 HAVING A RADIUS OF 349.83 FEET; THENCE NORTHERLY 22.69 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 03° 35' 48" TO THE BEGINNING OF A COMPOUND CURVE, CONCAVE SOUTHWESTERLY AND HAVING A RADIUS OF 175.66 FEET; THENCE NORTHWESTERLY 119.88 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 39° 06' 53"; THENCE NORTH 56° 36' 22" WEST 7.97 FEET TO THE BEGINNING OF A CURVE CONCAVE NORTHEASTERLY AND HAVING A RADIUS OF 90.80 FEET; THENCE NORTHWESTERLY 71.18 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 44° 55' 04"; THENCE NORTH 11° 41' 18" WEST 208.55 FEET TO THE BEGINNING OF A CURVE CONCAVE EASTERLY AND HAVING A RADIUS OF 35.90 FEET; THENCE NORTHERLY 34.44 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 56° 32' 34"; THENCE NORTH 44° 51' 16" EAST 42.37 FEET TO THE CURVED SOUTHEASTERLY LINE OF STRADELLA ROAD, 40 FEET WIDE, AS SHOWN ON SAID MAP.

PARCEL 2:

THAT PORTION OF LOT 3 IN BLOCK 3 OF TRACT NO. 9745, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 141 PAGES 93 TO 96 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, LYING NORTHERLY OF THE FOLLOWING DESCRIBED LINE:

BEGINNING AT A POINT IN THE EASTERLY LINE OF SAID LOT, DISTANCE THEREON SOUTH 13° 13' 20" EAST 34.33 FEET FROM THE NORTHERLY TERMINUS OF THAT CERTAIN COURSE IN SAID EASTERLY LINE SHOWN ON SAID MAP AS HAVING A BEARING AND LENGTH OF NORTH 13° 13' 20" WEST 106.35 FEET; THENCE NORTH 89° 27' 20" WEST 214.07 FEET, MORE OR LESS, TO A POINT IN THE WESTERLY LINE OF SAID LOT, DISTANT SOUTHERLY THEREON 54.93 FEET FROM THE NORTHERLY TERMINUS OF THAT CERTAIN CURVE IN SAID WESTERLY LINE HAVING A LENGTH OF 115.83 FEET.

APN: **4369-026-021**