Howard J. Steinberg (SBN CA 89291)
Eric V. Rowen (SBN CA 106234)
Matthew R. Gershman (SBN CA 253031)
GREENBERG TRAURIG, LLP
1840 Century Park East, Suite 1900
Los Angeles, California 90067-2121
Telephone: 310-586-7700/Facsimile: 310-586-7800

Thomas M. Geher (SBN CA 130588)
JEFFER MANGELS & MITCHELL LLP
1900 Avenue of the Stars, 7th Floor
Los Angeles, California 90067
Telephone: 310-203-8080/Facsimile: 310-203-0567


Attorneys for Hankey Capital, LLC

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA – LOS ANGELES DIVISION**

| | |
|---|---|
| In re:<br><br>CRESTLLOYD, LLC,<br><br>      Debtor. | Bk No. 2:21-bk-18205-DS<br><br>Chapter 11 |
| INFERNO INVESTMENT, INC., a Quebec corporation,<br><br>      Plaintiff,<br><br>v.<br><br>CRESTLLOYD, LLC, a California limited liability company; HANKEY CAPITAL, LLC, a California limited liability company; YOGI SECURITIES HOLDINGS, LLC, a Nevada limited liability company; and HILLDUN CORPORATION, a New York corporation,<br><br>      Defendant(s).<br><br>AND RELATED CROSS-ACTIONS | Adv. No. 2:22-ap-01125-DS<br><br>**HANKEY CAPITAL, LLC's OPPOSITION TO YOGI SECURITIES HOLDINGS, LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON NINTH CLAIM FOR RELIEF AND TENTH CLAIM FOR RELIEF**<br>[*Filed concurrently with Declarations of Howard Steinberg, Patricia Hankey, and Priyesh Bhakta, Statement of Genuine Issues*]<br><br>Date: March 24, 2026<br>Time: 1:00 p.m.<br>Courtroom: 1639<br>Judge:     Hon. Deborah J. Saltzman<br><br>Action Filed: June 9, 2022 |

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................................ 6

II.    FACTS ............................................................................................................... 8

    A.    Debtor and Related Entities ................................................................... 8
    B.    Yogi's Multiple Cross-Collateralized Loans to Debtor ......................... 8

        (1)    The Yogi $1.8M Note and Collateral ....................................... 9
        (2)    The Yogi $17M Note and Collateral ........................................ 9
        (3)    The Yogi $5M Note and Collateral .......................................... 9
        (4)    The Yogi $30M Note and Collateral ...................................... 10

    C.    The Sale of Non-Debtor Properties ...................................................... 12
    D.    The Sale of Debtor's Hillcrest Property ............................................... 12
    E.    The Initial Hankey Loan ...................................................................... 14
    F.    The First Modification to the Hankey Loan ......................................... 15
    G.    The Second Modification to the Hankey Loan ..................................... 15
    H.    The Application of the Subsequent Advances ...................................... 15
    I.    Adversary Proceeding Claims Asserted Against Yogi .......................... 16

III.    STANDARD ON SUMMARY JUDGMENT .................................................. 17

IV.    ARGUMENT ................................................................................................... 18

    A.    Hankey's Entire $106 Million Loan Is Senior to Any Yogi Lien Because Yogi
        Consented to Senior Indebtedness Up to $115 Million and Hankey's Original
        Deed of Trust Secures Its Entire Loan. ................................................ 18
    B.    Because Yogi Never Contractually Subordinated to Hankey's Security Interest,
        Any Loan Modifications After Actual Notice of Yogi's Intervening Security
        Interest Do Not Affect Priority. ........................................................... 20

        (1)    Subsequent Advances Do Not Require the Consent of Junior Lienholders. ........ 20
        (2)    Yogi's Citation to Law Governing Mechanic's Lienholder Is Not
            Applicable. .................................................................... 21

    C.    Yogi Does Not Establish that the Subsequent Advances Were Not Obligatory or
        that They Materially Impaired Yogi's Lien. .......................................... 23
    D.    There Are Material Disputes Over the Validity and Priority of Any Lien by Yogi. ........ 25
    E.    Hankey Is Awaiting Additional Discovery Material to Determine the Validity or
        Priority of Yogi's Lien on the Property ................................................ 30

        (1)    Documentary Evidence .......................................................... 30
        (2)    Expert Forensic Accounting ................................................... 33
        (3)    Depositions ............................................................................ 34

V.    CONCLUSION ................................................................................................ 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re AIG Fin. Prods. Corp.*,
  660 B.R. 603 (Bankr. D. Del. 2024) .................................................................. 29

*Alliance Mortgage Co. v. Rothwell*,
  10 Cal. 4th 1226 (1995) ................................................................................... 29

*Althouse v. Provident Mut. Building-Loan Ass'n*,
  59 Cal. App. 31 (1922) ..................................................................................... 22

*In re America West Airlines, Inc.*,
  217 F.3d 1161 (9th Cir. 2000) .......................................................................... 29

*In re American Sports Innovations (ASI)*,
  105 B.R. 614 (W.D. Wash. 1989) ..................................................................... 25

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) .......................................................................................... 17

*Bank of N.Y. Mellon v. Citibank, N.A.*,
  8 Cal. App. 5th 935 (2017) .......................................................................... 20, 29

*Baron Servs., Inc. v. Media Weather Innovations LLC*,
  717 F.3d 907 (Fed. Cir. 2013) .......................................................................... 30

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) .......................................................................................... 17

*Coast Cen. Credit Union v. Superior Court*,
  209 Cal. App. 3d 703 (1999) ........................................................................ 21, 22

*Committee of Unsecured Creditors v. Commodity Credit Corp. (In re KF Diaries, Inc.)*,
  143 B.R. 734 (9th Cir. BAP 1992) ..................................................................... 29

*In re The Vill. at Lakeridge, LLC*,
  814 F.3d 993 (9th Cir. 2016) ............................................................................. 28

*In re Eckert*,
  388 B.R. 813 (Bankr. N.D. Ill. 2008) ................................................................. 28

*Enlow v. Salem-Keizer Yellow Cab Co., Inc.*,
  389 F.3d 802 (9th Cir. 2004) ............................................................................. 19

*Five Point Capital v. Generators Hawaii Corp.*,
  No. CV1308653MWFSSX, 2014 WL 12461047 (C.D. Cal., Nov. 26, 2014) .................................. 19

*Fraser v. Goodale*,
  342 F.3d 1032 (9th Cir. 2003) ........................................................................... 17

*Friery v. Sutter Buttes Sav. Bank*,
  61 Cal. App. 4th 869 (1998) ........................................................................ 20, 25

*Garcia v. Atmajian*,
   113 Cal. App. 3d 516 (1980) ................................................................................... 22

*Gluskin v. Atl. Sav. & Loan Assn.*,
   32 Cal. App 3d 307 (1973) ............................................................................... 23, 25

*Henry v. Gill Indus., Inc.*,
   983 F.2d 943 (9th Cir. 1993) ................................................................................. 23

*Imhoff v. Title Ins. & Trust Co.*,
   113 Cal. App. 2d 139 (1952) ................................................................................. 22

*In re Japanese Elec. Prods. Antitrust Litigation*,
   723 F.2d 238 (3d Cir. 1983) .................................................................................. 17

*Kendall-Jackson Winery, Ltd. v. Superior Court*,
   76 Cal. App. 4th 970 (1999) .................................................................................. 26

*Lawrence v. Oakes*,
   117 Cal. App. 32 (1931) ........................................................................................ 19

*Los Angeles News Service v. Tullo*,
   973 F.2d 791 (9th Cir. 1992) ................................................................................. 26

*Machado v. Bank of Italy*,
   67 Cal. App. 769 (1924) ........................................................................................ 19

*Manning v. Queen*,
   263 Cal. App. 2d 672 (1968) ................................................................................. 24

*Mortg. Guar. Co. v. Hammond Lumber Co.*,
   13 Cal. App. 2d 538 (1936) ................................................................................... 24

*In re Nat'l Reality Invs. Advisors, LLC*,
   672 B.R. 651 (D.N.J. 2025) ................................................................................... 28

*Oaks v. Weingartner*,
   105 Cal. App. 2d 598 (1951) ................................................................................. 22

*Official Mech. Lienholder Comm. v. Point Ctr. Fin., Inc. (In re Mi Arbolito, LLC)*,
   2010 Bankr. LEXIS 3382 (Bankr. S.D. Cal. Sept. 23, 2010) ............................... 21

*In re Pajaro Dunes Rental Agency, Inc.*,
   174 B.R. 557 (N.D. Cal. Bankr. 1994) ................................................................. 28

*In re Rossi*,
   86 B.R. 220 (B.A.P. 9th Cir. 1988) ................................................................. 23, 25

*Sav. & Loan Soc. v. Burnett*,
   106 Cal. 514 (1895) ............................................................................................... 23

*Spacek v. Thomen (In re Universal Farming Indus.)*,
   873 F.2d 1334 (9th Cir. 1989) ............................................................................... 28

*Stoumbos v. Kilimnik*,
   988 F.2d 949 (9th Cir. 1993) ................................................................................. 28

*Villarimo v. Aloha Island Air, Inc.*,
   281 F.3d 1054 (9th Cir. 2002) ............................................................................... 17

HANKEY CAPITAL, LLC'S OPPOSITION TO YOGI SECURITIES HOLDINGS, LLC'S MOTION FOR PARTIAL
SUMMARY JUDGMENT ON NINTH CLAIM FOR RELIEF AND TENTH CLAIM FOR RELIEF

*W. P. Fuller & Co. v. McClure*,
   48 Cal. App. 185 (1920) ................................................................................................................ 22

**Statutes**

11 U.S.C. § 502 .............................................................................................................. 7, 26, 28, 29

11 U.S.C. § 506 ............................................................................................................................... 29

11 U.S.C. § 548 ................................................................................................................. 27, 28, 29

Cal. Civ. Code § 3136 ............................................................................................................... 21, 22

Cal. Civ. Code § 8456 ............................................................................................................... 21, 22

**Other Authorities**

Fed. R. Bankr. P. 7056 ............................................................................................................... 8, 17

Fed. R. Civ. P. 56 ................................................................................................................. 8, 17, 30

Fed. R. Evid. 706 ............................................................................................................................ 33

Restatement (Third) of Property (Mortgages) § 7.3 (1997) ........................................................... 20

*Transaction, Black's Law Dictionary* (10th ed. 2014) .................................................................. 28

I.    **INTRODUCTION**

Yogi Securities Holdings, LLC's ("Yogi") Motion for Partial Summary Judgment on its Ninth Claim for Relief and Tenth Claim for Relief ("Motion") (Doc. No. 372) is a waste of time and resources for the Court and parties as there are numerous disputed issues of material fact that are not even mentioned, let alone addressed, in the Motion. Hankey Capital, LLC ("Hankey") made an initial loan of $82.5 million (the "Initial Loan") to Crestlloyd, LLC ("Crestlloyd" or "Debtor") at a time when Debtor's real estate project at 944 Airole Way (the "Property") was partially constructed. Debtor represented, in writing, that the Initial Loan would be sufficient to complete construction. Debtor's representation was incorrect, and Hankey made two other advances to Debtor to complete construction, one for $8.5 million and a second advance of $15 million, both of which were documented with amended promissory notes, construction loan agreements, and deeds of trust. Thus, a total of $23.5 million (the "Subsequent Advances") was made after the Initial Loan such that the total of monies loaned by Hankey was $106 million.

Yogi concedes that Hankey's lien was recorded prior to the time that Yogi recorded its lien on the Property. Nonetheless, the Motion seeks a determination that the Subsequent Advances by Hankey are junior in priority to a lien that secures an alleged $30,188,235 loan (the "Yogi Loan") Yogi made to Debtor, the proceeds of which were, per the explicit terms of the promissory note, to be used for the development of the Property and four other non-Debtor properties owned by non-Debtor entities controlled by Debtor's principal, Nile Niami ("Niami")—properties in which Yogi also held interests. Yogi contends that it did not consent to the Subsequent Advances and that, absent such consent, these advances are junior in priority to its alleged lien. There are a myriad of reasons why the Motion must be denied, each of which are sufficient on their own, including but not limited to the following:

1.  Hankey's loan documents expressly provide for amendments to its loan, and Yogi's loan documents with Debtor expressly provide that senior construction financing of up to $115 million can be placed on the Property. Thus, the Subsequent Advances were authorized and consented to by Yogi. Yogi now ignores and seeks to disavow its own agreement. If Yogi's authorization in the loan documents is not dispositive, at minimum, whether Yogi agreed to be subordinate to $115 million of senior financing is a disputed material fact that requires the denial of the Motion.

2. Even if Yogi did not approve the Subsequent Advances, consent from Yogi was not required in order for these Subsequent Advances to be senior in priority.

3. Even if Yogi's agreement to be subordinate to $115 million of senior financing did not approve the Subsequent Advances, no consent is required for any subsequent advances that can be characterized as protective advances, which are advances used to protect the security of the Initial Loan. Yogi requests that all Subsequent Advances be recognized as optional advances yet provides no evidence to demonstrate that this is appropriate. The factual disputes concerning whether the Subsequent Advances are protective advances require denial of the Motion.

4. No evidence is proffered to demonstrate the amount of the Yogi Loan, which is of particular import because Yogi's loan proceeds were, pursuant to the explicit terms of Yogi's promissory note, distributed to and for the benefit of both Debtor and numerous non-Debtor entities. Absent evidence of which entity received Yogi's loan proceeds (which Yogi has failed to disclose), there is no basis for the Court to conclude that Yogi even holds a valid claim against Debtor, let alone one that is senior in priority to the Subsequent Advances.

5. Yogi admits that, in concert with Debtor, over $6 million in sales proceeds from a sale of a property owned by Debtor were applied *to obligations owed to Yogi by non-debtor entities in which Niami had an interest rather than to the Yogi Loan, even though that property was not pledged as security for those non-Debtor obligations*. Debtor has asserted a fraudulent transfer claim against Yogi as a result of this transaction. Bankruptcy Code section 502(d) precludes Yogi from having any claim until such time as the fraudulent transfer is repaid.

6. Yogi, through a related entity, also engaged in a flip of Debtor's property in Beverly Hills where it purchased and then, shortly thereafter, resold the property at a substantial profit.  This transaction is likewise the subject of a fraudulent transfer claim asserted by Debtor.

7. Both Debtor and Hankey have asserted claims against Yogi for, among other things, equitable subordination and recharacterization of its alleged claim based upon its untoward conduct, none of which is addressed in the Motion. Yogi had extensive dealings with Niami prior to the Yogi Loan which call into question the true relationship between these parties.

HANKEY CAPITAL, LLC'S OPPOSITION TO YOGI SECURITIES HOLDINGS, LLC'S MOTION FOR PARTIAL
SUMMARY JUDGMENT ON NINTH CLAIM FOR RELIEF AND TENTH CLAIM FOR RELIEF

8.  Issues pertaining to both the Yogi Loan and Yogi's illicit dealings with Niami, including the fraudulent transfers referenced above, are the subject of outstanding discovery, as well as additional discovery that needs to be conducted. Pursuant to Rule 56(d) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7056, if there is any doubt about whether this Motion should be denied, additional time is needed to complete this discovery, and the Motion should not be considered now.

In sum, the Motion is unwarranted and premature. It should be denied.

## II.    FACTS

### A.  Debtor and Related Entities

This dispute concerns the priorities of the creditors who assert liens secured by the Property.  The Property was one of several single-family speculative luxury housing projects undertaken by Niami through different special purpose entities. The Property was owned by Debtor, and Niami served as its managing member. Debtor also developed, owned, and sold to a Yogi-related entity a property located at 1175 N. Hillcrest Road in Beverly Hills, CA 90210 ("Hillcrest Property"). (Declaration of Howard Steinberg ("Steinberg Decl.") Exs. 5, 15.) Other Niami entities include 10701 Bellagio Road, LLC ("Bellagio"), Carcassonne Fine Homes ("Carcassonne"), Marbella Construction, Inc ("Marbella"), 1369 Londonderry Estate, LLC ("Londonderry"), and Contemporary Vista, LLC.[1] (*Id.* Exs. 30–34, 36.) The project at the Property was not completed, and Debtor filed a chapter 11 petition on October 26, 2021.

### B.  Yogi's Multiple Cross-Collateralized Loans to Debtor

Niami and Yogi's principal, Joseph Englanoff ("Englanoff"), have a long history of working together, including often as business partners. (Declaration of Priyesh Bhakta ("Bhakta Decl."), Ex. 3.) As relevant here, Yogi and Niami entered into a series of promissory notes and security interests that Hankey (and Debtor) is still untangling, making priority decisions premature. Yet, the facts known to date call into question whether Yogi has a valid secured claim against the Property at all and, if it does, whether that claim can be senior to any other indebtedness on the Property:

---

[1] These non-Crestlloyd, Nile-affiliated entities are referred to as "non-Debtor entities."

HANKEY CAPITAL, LLC'S OPPOSITION TO YOGI SECURITIES HOLDINGS, LLC'S MOTION FOR PARTIAL
SUMMARY JUDGMENT ON NINTH CLAIM FOR RELIEF AND TENTH CLAIM FOR RELIEF

*(1) The Yogi $1.8M Note and Collateral*

On August 9, 2017, Debtor executed a promissory note in favor of Yogi in the principal amount of $1,800,000 (the "Yogi $1.8M Note"). (Englanoff Declaration filed in support of the Motion (Dkt. 374) ("Englanoff Decl."), Ex. O.) The Yogi $1.8M Note was not secured by the Property but was secured by the Hillcrest Property through a deed of trust. (Englanoff Decl., Ex. P.) The borrower statement itemizing the disbursements of Debtor's loan proceeds under the Yogi $1.8M Note reflects three disbursements of $21,000 to each of Justine Englanoff, Nicole Englanoff, and Jacqueline Englanoff, the children of Yogi's principal, Joseph Englanoff.[2] (Steinberg Decl., Ex. 15.)

On April 13, 2018, Debtor executed an amendment to the $1.8M Yogi Note, which increased the principal amount to $2,044,125 and extended the note's maturity date (the "Amended Yogi $1.8M Note"). (Englanoff Decl., Ex. Q.) No additional security interest was given in connection with the Amended Yogi $1.8M Note. (*Id.*)

*(2)* <u>The Yogi $17M Note and Collateral</u>

On May 22, 2018, Debtor executed a promissory note in favor of Yogi in the principal amount of $17,499,900 (the "Yogi $17M Note"). (Englanoff Decl., Ex. R.) The Yogi $17M Note was secured by: (1) the Property; (2) the Hillcrest Property; and (3) a non-Debtor property located at 301 Copa de Oro Road, Los Angeles, CA 90077 (the "Copa Property").[3] (Englanoff Decl., Ex. S; Yogi's Third Amended Counterclaim and Cross-claim (Dkt. 288) ("Yogi TAC"), ¶ 23, Ex. M.)

*(3)* <u>The Yogi $5M Note and Collateral</u>

On April 20, 2018, non-Debtor entities Marbella and Londonderry executed a promissory note in favor of Yogi in the principal amount of $5,200,000 (the "Yogi $5M Note"). (Steinberg Decl., Ex. 7.) The

---

[2] Hankey sought documents about Englanoff and his children in relation to these disbursements from Niami, Yvonne Niami ("Yvonne"; Nile's ex-wife, who was intimately involved with Debtor and Niami's other projects), Douglas Witkins ("Witkins"; an agent of Niami at all relevant times), Tony Camarena ("Camarena"; Yvonne's brother, and an agent of the Niamis at all relevant times), and Dunfanaghy Bay Ventures, LLC d/b/a Skyline Development, Inc. ("Skyline"; the entity under which Niami, Yvonne, Witkins, and Camarena performed operations). No documents have been produced in response to these requests, and neither Englanoff nor his children have yet been deposed. (Steinberg Decl., ¶¶ 32–37, 42.)

[3] The Copa Property was owned by an entity named Holding Company of Beverly Hills, which was owned by Niami's wife, Yvonne. (Yogi TAC, ¶ 30, Ex. M; Steinberg Decl., Ex. 37.)

Yogi $5M Note was secured by deeds of trust recorded against two non-Debtor properties, the Londonderry Property and the Stone Ridge Property.[4] The Yogi $5M Note and its deeds of trust were amended five times. (*Id.*, Exs. 7–12.) The fifth and final amendment of the deeds of trust securing the Yogi $5M Note was recorded on October 28, 2019 (the "Fifth Amended Yogi $5M Note"). (*Id.*, Ex. 12.) The Fifth Amended Yogi $5M Note recited a principal balance of $6,196,810.64, was executed by and between Yogi and Debtor, as well as four non-Debtor entities owned by Niami: (1) Marbella; (2) Londonderry; (3) Bellagio; and (4) Carcassonne. (*Id.*) It recited that the note was secured by (as defined below): (1) the Londonderry Property; (2) the Stone Ridge Property; (3) the Bellagio Property; (4) the Carcassonne Property; and (5) the Property. (*Id.*) The Property was added as security for the Yogi $5M Note without notice to Hankey, even though Hankey had already recorded its initial loan to Debtor, and despite the fact that Debtor never received any of these loan proceeds. (Yogi's Answer to Hankey's Crossclaim (Dkt. 311) ("Yogi Answer"), ¶ 17.)

Yogi admits the Hillcrest Property (owned by Debtor) was never pledged as security for the Yogi $5M Note. (*Id.* ¶ 18.)

### (4)    *The Yogi $30M Note and Collateral*

On October 16, 2018, Debtor executed a promissory note in favor of Yogi in the principal amount of $30,188,235 (the "Yogi $30M Note"). (Englanoff Decl., Ex. V.) The Yogi $30M Note was secured by deeds of trust recorded against:

(1) The Property, recorded on November 7, 2018 (the "Yogi Deed of Trust"). (Englanoff Decl., Ex. W; Yogi TAC, ¶ 25, Ex. O.)

(2) The Hillcrest Property, recorded on October 19, 2018. (Yogi TAC ¶ 26, Ex. P.)

(3) A non-Debtor property owned by Bellagio located at 10701 Bellagio Road, Los Angeles, CA (the "Bellagio Property"), recorded on October 19, 2018. (*Id.*)

(4) A non-Debtor property owned by Carcassonne located at 627 North Carcassonne Road, Los Angeles, CA (the "Carcassonne Property"), recorded on October 19, 2018. (*Id.*)

---

[4] Londonderry executed a deed of trust dated April 1, 2018, that secured the obligations under the Yogi $5M Note with the Londonderry Property, which was recorded on April 23, 2018. (Yogi TAC, ¶ 30, Ex. U.) Marbella executed a deed of trust dated April 1, 2018, that secured the obligations under the Yogi $5M Note with the Stone Ridge Property, which was recorded on April 23, 2018. (*Id.*)

(5) A non-Debtor property owned by Marbella located at 3381 Stone Ridge Lane, Los Angeles, CA (the "Stone Ridge Property"), recorded on October 19, 2018. (*Id.*)

(6) A non-Debtor property owned by Londonderry located at 1369 Londonderry Place, Los Angeles, CA (the "Londonderry Property"), recorded on October 19, 2018. (*Id.*)

(Englanoff Decl., Ex. V, ¶ 3.)

The Yogi $30M Note states that "all funds advanced hereunder shall be used solely for business, commercial, investment or other similar purposes, particularly for development of" all six of the above properties, including four non-Debtor properties. (Englanoff Decl., Ex. V, ¶ 14.) The Motion provides no information on how these monies were distributed and used as between these properties and, to date, Englanoff and Yogi have failed to provide such information. *See generally* Motion and Supporting Documents.

The Yogi $30M Note provides that a sale or encumbrance of any of the six properties by Debtor and any of the four non-Debtor entities without Yogi's consent triggers acceleration. (*Id*. ¶ 8) It also includes mandatory payments that are "due and payable" upon the sale of the non-Debtor properties as follows:

(1) $10 million upon the sale of the Londonderry Property. (*Id*.)

(2) $10 million upon the sale of the Bellagio Property. (*Id.*)

(3) $15 million upon the sale of the Carcassonne Property. (*Id.*)

(4) $5 million upon the sale of the Stone Ridge Property. (*Id.*)

(*Id.* ¶ 1(b).).

The Yogi $30M Note is a "roll up" of all the sums "already advanced" under the Yogi $1.8M Note, Amended Yogi $1.8M Note, and Yogi $17M Note plus accrued interest. (Englanoff Decl., Ex. V, ¶ 2.1(b).). Yogi executed reconveyances of all four deeds of trust related to each of these earlier notes.[5] (*Id.*, Exs. T, U; Yogi TAC, ¶ 27, Ex. Q.) The Yogi $30M Note includes express terms regarding senior indebtedness for the six properties, which provides that the Property could be encumbered by senior encumbrances up to $115,000,000. (Englanoff Decl., Ex. V, ¶ 16; *see also* Steinberg Decl., Ex. 18

---

[5] The Motion states, "Debtor borrowed approximately $10,000,000.00 in addition to the prior borrowings made under the [Prior Yogi Notes]," but no evidence is provided in support of this proposition. (Motion at p. 3.)

[Englanoff: "Nile and I have agreed to terms for a new note" and reciting terms as "Full Note amount (30+ million) behind no more than 115 million."].)

The Yogi $5M Note, *supra* Section II.A.3, remained independent and outstanding.

## C.  The Sale of Non-Debtor Properties

Stone Ridge Property. Upon the sale of the Stone Ridge Property, despite being entitled to $5,000,000, no payment was made to Yogi on account of the Yogi $30M Note. (Steinberg Decl., Ex. 28 [Yogi/Crestlloyd Interrogatory ["ROG"] No. 5 Resp.].) The seller's closing statement contemporaneous with the sale reflects no mechanic's liens were perfected on the Stone Ridge Property at the time of sale. (*Id.*, Ex. 22 [Stone Ridge Closing Statement].)

Bellagio Property. Upon the sale of the Bellagio Property, despite being entitled to $10,000,000, only approximately $2,500,000 was paid to Yogi on account of the Yogi $30M Note. (Steinberg Decl., Ex. 28 [Yogi/Crestlloyd ROG No. 5 Resp.].) The seller's closing statement contemporaneous with the sale reflects no mechanic's liens were perfected on the Bellagio Property at the time of sale. (*Id.*, Ex. 19 [Bellagio Closing Statement].)

Carcassonne Property. Upon the sale of the Carcassonne Property, despite being entitled to $15,000,000, only approximately $2,810,057 was paid to Yogi on account of the Yogi $30M Note. (Steinberg Decl., Ex. 28 [Yogi/Crestlloyd ROG No. 5 Resp.].) The seller's closing statement contemporaneous with the sale reflects one mechanic's lien in the amount of $19,942.42 was perfected on the Carcassonne Property at the time of sale. (*Id.*, Ex. 20 [Carcassonne Closing Statement].)

Londonderry Property. Upon the sale of the Londonderry Property, despite being entitled to $10,000,000, only approximately $6,013,000 was paid to Yogi on account of the Yogi $30M Note. (Steinberg Decl., Ex. 28 [Yogi/Crestlloyd ROG No. 5 Resp.].) The seller's closing statement contemporaneous with the sale reflects no mechanic's liens were perfected on the Londonderry Property at the time of sale. (*Id.*, Ex. 21 [Londonderry Closing Statement].)

## D.  The Sale of Debtor's Hillcrest Property

On January 14, 2020, Yogi's principal, Englanoff, began arrangements to purchase the Hillcrest Property from Debtor through another one of his entities, Trousdale Estate, LLC ("Trousdale"). (Steinberg Decl., Ex. 5 ["I'm working with Nile and Yvonne to purchase (thru my entity) 1175 N. Hillcrest rd.

12

HANKEY CAPITAL, LLC'S OPPOSITION TO YOGI SECURITIES HOLDINGS, LLC'S MOTION FOR PARTIAL
SUMMARY JUDGMENT ON NINTH CLAIM FOR RELIEF AND TENTH CLAIM FOR RELIEF

90210."]; Dkt. 311, (Yogi's Answer to Hankey Crossclaim) ¶ 18.) When the sale of the Hillcrest Property to Trousdale was consummated, the Hillcrest Property was "not [] transferred in 'as is' condition but rather as brand new construction, with all applicable warranties, indemnities, assurances, standards and legal obligations." (Steinberg Decl., Ex. 5.) Also included in the sale was all personal property at the Hillcrest Property, which was said to include "furniture, furnishings, finishings, decor, staging, art, decorations, serving-ware, supplies, inventory, and the like." (*Id.*; Exs. 27, 34 [Excerpted Escrow Instructions stating same].) The value of these items is currently unknown to Hankey and is the subject of pending discovery requests. (Steinberg Decl., ¶ 25.)

Debtor's sale of the Hillcrest Property to Trousdale closed on February 7, 2020, for a purchase price of $38,325,000. (Steinberg Decl., Ex. 15 [Closing Statement].) The escrow instructions for the sale required Debtor to deposit $9,500,000, less certain enumerated shortfalls, which "shall be paid" to Yogi to pay down the principal balance of the Yogi $30M Note. (Steinberg Decl., Exs. 27, 34 [Excerpted Escrow Instructions].) That did not occur. Instead, at closing, Yogi was credited $9,352,824.23, and on February 8, 2020, one day after closing, Englanoff sent a letter to Niami (addressed to Londonderry and Marbella) to "confirm our conversation where we agreed how to apply the payment to [Yogi] of the $9,352,824.23." (Steinberg Decl., Ex. 16 [Letter to Niami].) The letter states Englanoff and Niami agreed to apply the proceeds to pay off the *non-Debtor* Yogi $5M Note first, in the amount of $6,435,535.37— even though the Hillcrest Property was never pledged as security for that note and Debtor (owner of the Hillcrest Property) was not the borrower on that note. (*Id.*; Yogi Answer, ¶ 18.) Together, Nile and Englanoff agreed that only the proceeds remaining *after* paying off the Yogi $5M Note would be used to pay down the Yogi $30M Note, in the amount of $2,917,288.86—even though the Hillcrest Property *was* pledged as security on the $30M Note and Debtor *was* the borrower on that note. (Steinberg Decl., Ex. 16 [Letter to Niami].)

On May 11, 2020, about three months after purchasing the Hillcrest Property for $38,325,000, Englanoff listed the Hillcrest Property for sale at the asking price of $59,950,000. (Steinberg Decl., ¶ 22, Ex. 25–26 [Zillow and Redfin].) Englanoff ultimately sold the Hillcrest Property on November 24, 2020,

less than ten months after its purchase, for at least $47,000,000. (*Id.*; Steinberg Decl., Ex. 17. [Trousdale Seller Closing Statement]; Yogi Answer, ¶ 19.)[6]

### E.  The Initial Hankey Loan

In 2018, Debtor sought from Hankey substantial funding to complete the construction and improvements at the Property. (*See* Yogi TAC, ¶ 34.) Hankey made a loan of $82,500,000 to Debtor on October 25, 2018, which is evidenced by a construction loan agreement (the "Construction Loan Agreement"), promissory note (the "Hankey Note"), and secured by a deed of trust (the "Hankey Deed of Trust"). (Declaration of John Lucas filed in support of Motion, Dkt. 375, ["Lucas Decl."], Exs. Z, AA, BB.) The Construction Loan Agreement contains a representation and warranty from *Debtor* that the loan proceeds will be sufficient to complete construction. (*Id.*, Ex. BB, ¶ 6.9.) There is no such representation or warranty by Hankey to that effect. (*Id.*) The Construction Loan Agreement provides that loan proceeds will be used to "finance the construction of the Property and Improvements and for such other purposes and uses as may be permitted under this Agreement and the other Loan Documents. (*Id.*, Ex. BB ¶ 2.1.)

The Hankey Deed of Trust was recorded on November 6, 2018, before the Yogi Deed of Trust, and stated that it secured:

(1)  Performance of all obligations of Trustor [Debtor] under any agreements of Trustor incorporated by reference or contained herein.

(2)  Payment of indebtedness in the total principal amount of Eighty-Two Million, Five Hundred Thousand and No/100 Dollars ($82,500,000.00), together with interest thereon, as provided in and evidenced by that certain Promissory Note of even date herewith executed by Trustor in favor of Beneficiary (the "Note"), and any and all modifications, extensions, and renewals thereof.

(3)  Performance of such other obligations or payment of such other indebtedness now or hereafter owing to Beneficiary from Trustor, when evidenced by a document reciting that it is so secured.

(4)  Payment of all sums advanced or paid out by the Beneficiary under any provision of this Deed of Trust or to protect the security of this Deed of Trust.

(Lucas Decl., Ex. AA.)

/ / /

---

[6] Yogi recently produced this document, but it redacts the amount and source of an additional credit to Trousdale, suggesting the proceeds to Trousdale may have been greater than $47,000,000. (*Id.*)

### F.  The First Modification to the Hankey Loan

On December 10, 2019, Debtor executed: (i) an amended and restated promissory note (the "Amended Hankey Note") which reflected an increase of $8,500,000 in the amount it borrowed from Hankey, from $82,500,000 to $91,000,000; (ii) a first modification of construction loan agreement ("Modified Construction Loan Agreement"), which among other things, reflected the increase in the loan amount; and (iii) a modification of deed of trust. (Lucas Decl., Exs. DD, EE; Yogi TAC, Ex. JJ.) The Modified Construction Loan Agreement did not change the Construction Loan Agreement's purpose, which remained providing loan proceeds to "finance the construction of the Property and Improvements and for such other purposes and uses as may be permitted under this Agreement and the other Loan Documents." (Lucas Decl., Exs. EE at p. 3, BB ¶ 2.1.)

### G.  The Second Modification to the Hankey Loan

On August 20, 2020, Debtor executed: (i) an amended and restated promissory note (the "Second Amended Hankey Note") which reflected an increase of $15,000,000 in the amount it borrowed from Hankey, from $91,000,000 to $106,000,000; (ii) a second modification of construction loan agreement ("Second Modified Construction Loan Agreement"), which among other things, reflected the increase in the loan amount; and (iii) a modification of deed of trust, which was recorded on August 31, 2020. (Lucas Decl., Exs. FF, GG, HH.). The Second Modified Construction Loan Agreement also did not alter the Construction Loan Agreement's purpose. (Lucas Decl., Ex. HH at p. 3, BB ¶ 2.1.)

### H.  The Application of the Subsequent Advances

As set forth in the Declaration of Patricia Hankey ("Hankey Decl.") filed concurrently herewith, Hankey maintained records as to how the Subsequent Advances were applied. The following is a summary of those uses:

| Use | Amount of Payment |
| --- | --- |
| Improvements | $9,225,461.67 |
| Insurance | $837,461.34 |
| Interest | $10,412,315.04 |
| Labor | $1,134,793.86 |
| Legal | $9,729.40 |
| Loan fees | $85,000.00 |
| Plus Development (loan monitoring) | $151,500 |
| Property Taxes | $545,759.14 |
| Operational Expenses | $500,000 |
| **Total:** | $22,902,020.45 |

(Hankey Decl., ¶ 3.)

## I.    Adversary Proceeding Claims Asserted Against Yogi

Omitted from Yogi's Motion is any mention of the claims asserted against it by Debtor and Hankey. Yet, Debtor's Cross-Complaint asserts multiple claims against Yogi for:

(1) Recharacterization of Yogi's debt as equity (Debtor's Cross-Complaint (Dkt. 27), Claim 11, ¶¶ 174–179);

(2) Equitable subordination of Yogi's debt (*Id.*, Claim 12, ¶¶ 180–183);

(3) Avoidance of actual and constructive fraudulent transfers to Yogi, Englanoff, and Trousdale (*Id.*, Claims 13–16, ¶¶ 184–206);

(4) Disallowance of Yogi's claim against Debtor (*Id.*, Claim 21, ¶¶ 234–240); and

(5) Recovery of avoided transfers, including more than $11 million from Yogi, Englanoff, and Trousdale (*Id.*., Claim 25, ¶¶ 268–270).

Debtor's claims are based on the concern, shared by Hankey, that "in fact and in truth, Joseph Englanoff and Nile Niami were in a partnership or joint-venture with one another to develop several different high-end residential real estate properties, and it therefore did not matter to Joseph Englanoff which properties were being secured to various loans between him and Nile Niami, as long as Joseph Englanoff felt that he was being provide adequate security." (*Id.* ¶ 175.) Moreover, Debtor alleges that "[t]he sale of the Hillcrest Property occurred in rapid fashion" and was "undervalued relative to market," that there were other

16

HANKEY CAPITAL, LLC'S OPPOSITION TO YOGI SECURITIES HOLDINGS, LLC'S MOTION FOR PARTIAL
SUMMARY JUDGMENT ON NINTH CLAIM FOR RELIEF AND TENTH CLAIM FOR RELIEF

1  "diversions of funds," including that funds that "should have rightfully gone to Crestlloyd, [] instead went"

2  to Englanoff or his children, among others. (*Id.* ¶ 178.) Crestlloyd also agrees with Hankey that "Yogi,

3  Trousdale, and Joseph Englanoff diverted $6,435,535.37 from Crestlloyd when it credited" those amounts

4  to the Yogi $5M Note "rather than crediting Crestlloyd's outstanding loan to Yogi" on the Yogi $30M

5  Note, and alleges that further funds were diverted by way of the Hillcrest Property's sale. (*Id.* ¶ 185.)

6  Based on substantially similar allegations, Hankey has also asserted claims against Yogi for equitable

7  subordination of the entirety of Yogi's lien.

8  ## III.    <u>STANDARD ON SUMMARY JUDGMENT</u>

9  Federal Rule of Bankruptcy Procedure ("FRBP") 7056 incorporates Federal Rule of Civil

10  Procedure ("FRCP") 56. Under this rule, the party moving for summary judgment bears the burden of

11  showing the absence of a genuine dispute. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

12  Summary judgment is appropriate only when the court finds that there is "no genuine issue as to any

13  material fact and the movant is entitled to judgment as a matter of law." FRCP 56(c). A factual dispute is

14  genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

15  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

16  The movant has the "initial responsibility of informing the district court of the basis for its motion

17  and identifying [evidence] which it believes demonstrate[s] the absence of a genuine issue of material

18  fact." *Celotex Corp*, 477 U.S. at 323 (internal citations omitted). In determining whether to grant a motion

19  for summary judgment, the Court "must draw all reasonable inferences supported by the evidence in favor

20  of the non-moving party." *Villarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002).

21  Simply, if there "is any evidence in the record from any source from which a reasonable inference in the

22  [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment."

23  *Celotex Corp.*, 477 U.S. at 330 n.2 (Brennan, J., dissenting) (quoting *In re Japanese Elec. Prods. Antitrust*

24  *Litigation*, 723 F.2d 238, 258 (3d Cir. 1983)). At the summary judgment phase, evidence need not be

25  presented in admissible form; it must be capable of being presented in an admissible form at trial. *See*

26  *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) ("At the summary judgment stage, we do not

27  focus on the admissibility of the evidence's form. We instead focus on the admissibility of its contents.");

28  Fed. R. Civ. P. 56(c).

## IV.    ARGUMENT

For purposes of this motion, Yogi does not dispute that Hankey's $82.5M Note is senior to any lien Yogi has on the Property. Instead, Yogi seeks a declaration that its $30M Note is senior to the $23.5 million increase in principal of Hankey's loan via the Subsequent Advances. Application of the correct law to the dispute and consideration of all material facts demonstrates that such a declaration would be improper.

### A.    Hankey's Entire $106 Million Loan Is Senior to Any Yogi Lien Because Yogi Consented to Senior Indebtedness Up to $115 Million and Hankey's Original Deed of Trust Secures Its Entire Loan.

The plain language of the very $30M Note on which Yogi seeks recovery precludes a finding, as a matter of law, that Yogi's lien is senior to any portion of Hankey's. (Englanoff Decl., Ex. V, ¶ 16.) Although Yogi's Motion declines to mention it, the $30M Note makes clear that Yogi explicitly consented to senior secured lending on the Property up to $115 million. *Id.* ("Borrower agree[s] that at no time while any portion of the Note remains unpaid shall senior indebtedness … encumbering the Airole Property exceed $115,000,000.00…."). Nothing in the Yogi $30M Note requires Yogi to provide additional consent before any such expressly allowed senior indebtedness up to $115 million is advanced. In its Motion, Yogi concedes that the total principal of Hankey's loans to Debtor (the only purported senior debt on the Property) was $106 million—well short of Yogi's pre-authorized $115 million threshold for senior debt. (Motion, Dkt. 372, p. 8; *see also* Lucas Decl., Ex. FF (last Hankey note).)

Further, the Hankey Note and Hankey Deed of Trust provide for, authorize, and secure additional advances by Hankey. The Hankey Deed of Trust, which was recorded before Yogi's Deed of Trust and provided notice to the world regarding the scope of its agreement with Debtor, states that it is securing not only the initial principal of $82.5 million, but also (1) "any and all modifications" of the note; (2) "payment of such other indebtedness now or hereafter owing" to Hankey; and (3) "all sums advanced … to protect the security of this Deed of Trust."(Lucas Decl., Ex. AA / RJN Ex. L.) On its face, such language permits the loan to be "modif[ied]" to include additional sums that may be "hereafter" owed, including, but not limited to, those necessary to "protect the security," *i.e.*, the Property, and establishes Hankey's right to increase the principal amount of its loan and have it secured by the original

Hankey Deed of Trust. *See Lawrence v. Oakes*, 117 Cal. App. 32, 34–35 (1931) (mortgage given "to secure all other indebtedness and obligations that may now or hereafter be due, owing or existing from said mortgagors" covered subsequent advances); *Machado v. Bank of Italy*, 67 Cal. App. 769, 773–74 (1924) (deed of trust securing future advances, generally, gave subsequent advances priority over junior deed of trust where junior lienholder consented to priority of first deed of trust). The fact that the Hankey Deed of Trust does not specify any precise sum of subsequent advances is of no consequence. *Machado*, 67 Cal. App. at 774–75 ("[T]he future advances provided for tact and the deed gives a valid lien for all advances made thereunder although made after notice of the subsequent incumbrance. Nor does the mere fact that the amount of such advances was left open [by the deed of trust] alter the situation or indicate that none was intended.").

It does not matter whether Hankey knew of Yogi's junior lien at the time of the Subsequent Advances, as Yogi suggests. (Motion at pp. 14–15.) Given the terms of the Hankey Deed of Trust, Yogi's consent was not required to secure subsequent advances—and particularly not *additional* consent beyond what Yogi had already authorized under the $30M Note. *See Machado*, 67 Cal. App. at 774 (junior lienholder's consent to priority of senior deed of trust was "decisive" in priority dispute "irrespective of whether or not the [senior lienholder] had knowledge of the existence or terms of the [junior lien]" when making subsequent advances).

Yogi's Motion does not dispute or even address the plain language of its note or Hankey's Deed of Trust, nor does it seek to explain how Yogi could claim priority over any senior indebtedness below $115 million in the face of such unambiguous agreements. At minimum, these documents create a genuine dispute of fact regarding whether Yogi consented to Hankey's senior indebtedness up to $115 million, which prevents a declaration that Yogi's lien is senior to the Subsequent Advances. *See Enlow v. Salem-Keizer Yellow Cab Co., Inc.*, 389 F.3d 802, 815 (9th Cir. 2004) (denial of summary judgment was proper when there were genuine issues of material fact regarding non-movant's affirmative defenses); *see also Five Point Capital v. Generators Hawaii Corp.*, No. CV1308653MWFSSX, 2014 WL 12461047, at *11 (C.D. Cal., Nov. 26, 2014) ("[G]enuine issues of material fact related to [non-movant's] defense and counterclaims … preclude summary judgment on all of [movant's] claims…."). To the extent Yogi intends to respond that the language of the Yogi $30M Note or the Hankey Deed of Trust are ambiguous

1  or somehow do not establish Yogi's consent to the exact conduct about which it complains (or that

2  extrinsic evidence should be considered to interpret the documents), then a triable material disputed fact

3  exists and Hankey must be permitted discovery, including a deposition of Yogi regarding that position,

4  before summary judgment accepting Yogi's position as a matter of law can possibly be entertained.

### B. Because Yogi Never Contractually Subordinated to Hankey's Security Interest, Any Loan Modifications After Actual Notice of Yogi's Intervening Security Interest Do Not Affect Priority.

8  Even if Yogi had not consented to Hankey's Subsequent Advances, such consent was not needed

9  for Hankey's lien to retain its priority. Yogi cites a string of cases purportedly suggesting that any and all

10  non-obligatory advances made by Hankey after it knew of Yogi's $30M Note are junior to that note as a

11  matter of law. (Motion at pp. 12–14.) Yogi cites the wrong law.

### *(1) Subsequent Advances Do Not Require the Consent of Junior Lienholders.*

13  When it comes to sophisticated lenders like Hankey and Yogi, a senior lender is free to modify the

14  terms of its loan, including by increasing the principal, without risking subordination, unless there is a

15  special relationship, such as a subordination agreement, between them: "[A] material modification of a

16  senior lien, such as an increase in the principal or interest rate, does not result in loss of priority absent

17  contractual subordination." *Bank of N.Y. Mellon v. Citibank, N.A.*, 8 Cal. App. 5th 935, 954 (2017) (citing

18  *Friery v. Sutter Buttes Sav. Bank*, 61 Cal. App. 4th 869, 871, 87779 (1998)) (holding senior lienholder

19  had no duty to refrain from modifying the terms of its senior note without junior– lienholder's consent

20  even if the modification would "substantially impair their security"). Rather, where a senior lender

21  "undert[akes] no express or implied contractual duties" toward a junior lienholder, the "relationship …

22  [is] nothing more than that of [] competing lienholder[s] on the same property," and the senior lender is

23  free to modify its loan without the junior lienholder's consent without risk of subordination. *Friery*, 61

24  Cal. App. 4th at 877–78 ("It would defy logic to conclude that … renegotiating the loan to protect [the

25  senior lienholder's] lien may subject the senior to the loss of priority unless the junior 'consents' to it.

26  Absent facts giving rise to a special relationship between the senior and the junior, such a rule would

27  amount to the 'tail wagging the dog.'"); *see* Restatement (Third) of Property (Mortgages) § 7.3(c) (1997)

28  ("If the mortgagor and mortgagee reserve the right in a mortgage to modify the mortgage or the obligation

1    it secures, the mortgage as modified retains priority even if the modification is materially prejudicial to

2    the holders of junior interests in the real estate….”). Yogi does not assert in its Motion that there was a

3    subordination agreement between Hankey and Yogi, or any other special relationship, that warrants

4    altering Hankey's ordinary rights. Further, Hankey has provided evidence that such is not the case.

5    (Bhakta Decl., ¶ 3.) Yogi has failed to establish the absence of all material facts necessary to establish that

6    any portion of Hankey's loan has lost priority over Yogi's loan.

7    *(2) Yogi's Citation to Law Governing Mechanic's Lienholder Is Not Applicable.*

8    In an effort to confuse things, Yogi cites inapt case law that applies exclusively to govern priority

9    disputes among parties not involved here—holders of mechanic's liens. Yogi neglects to mention that its

10    own cited case law establishes that mechanic's liens are uniquely governed by statutes that do not apply

11    to other liens. *See Coast Cen. Credit Union v. Superior Court*, 209 Cal. App. 3d 703, 708 (1999) (cited in

12    Motion at p. 12) ("The mechanics' lien is the only creditors' remedy stemming from constitutional

13    command and our courts have uniformly classified the mechanics' lien laws as remedial legislation, to be

14    liberally construed for the protection of laborers and materialmen.") (citations and quotations omitted).

15    For example, Yogi relies heavily on *Official Mech. Lienholder Comm. v. Point Ctr. Fin., Inc. (In*

16    *re Mi Arbolito, LLC)*, 2010 Bankr. LEXIS 3382 (Bankr. S.D. Cal. Sept. 23, 2010). There, the Court held

17    that advances that post-dated a mechanic's lien were not "subject to priority pursuant to California Civil

18    Code section 3136," governing mechanic's liens. *Id.* at *3, 49–56. The court noted that, "here the priority

19    battle involves mechanics' liens. And as a result, the Subsequent Loans have priority over mechanics'

20    liens only if they are obligatory advances within the meaning of Section 3136." *Id.* at *52. Because the

21    claimant was an agent tasked with finding lenders—and not even a lender itself—and claimant "admitted

22    that as of the closing neither [it] nor the [lenders] had any obligation to loan additional dollars," the

23    advances at issue were optional within the meaning of the statute and thus junior to the mechanic's lien.

24    *Id.* *54–56.

25    However, that rule has no application here. While California Civil Code section 8456(b)—

26    formerly Civil Code section 3136—declares that "[a]n optional advance of funds by the construction

27    lender that is used for construction costs has the same priority as a mandatory advance of funds by the

28    construction lender, provided that the total of all advances does not exceed the amount of the original

1  construction loan," the rule on its face only applies to mechanic's liens.[7] *See id.* § 8456(a) (stating that the

2  rule "applies to a construction loan secured by a mortgage or deed of trust that has priority over a lien

3  *under this chapter* [Chapter 4 Mechanics Lien]") (emphasis added). If this were the rule in all

4  circumstances, there would be no need for a statute declaring it so for the heavily-protected, statutorily-

5  governed mechanic's liens.[8] *W. P. Fuller & Co. v. McClure*, 48 Cal. App. 185 (1920) (cited in Motion at

6  p. 12) proves the point. There, the Court resolved a priority dispute between the holder of a mortgage, the

7  beneficiary under a deed of trust, and mechanics' lien claimants. The mortgage was recorded first,

8  securing a promissory note for $6,500, but the mortgagor only initially advanced $1,600 under the note,

9  agreeing the rest was optional. *Id.* at 188. The next day, the trust deed was recorded and expressly

10  acknowledged its junior position to the $6,500 mortgage. *Id.* The Court ultimately determined that, as

11  between the mortgagor and the mechanics' lien claimants, the optional advances issued after the

12  mechanics' liens arose were subordinate pursuant to the statutory principles governing priority disputes

13  involving mechanics' liens claimants. *See id.* at 192–93. However, as between the mortgagor and the

14  holder of the deed of trust, the optional advances retained their priority under the earlier recorded

15  mortgage. *Id.* at 195–96.

16  / / /

17  / / /

18  _____

19

20  [7] *See* Motion at pp. 12–13 (collecting cases); *Coast Cen. Credit Union v. Superior Court*, 209 Cal. App.
3d 703, 711–712 (1989) (analyzing "the priorities between mechanics' lien and a deed of trust securing a

21  construction loan") (citing Civ. Code § 3136 [the predecessor to Civ. Code § 8456]); *Imhoff v. Title Ins.
& Trust Co.*, 113 Cal. App. 2d 139, 142 (1952) (analyzing whether appellant's "mechanic's lien is prior

22  to respondents' [] alleged lien for future advances"); *Oaks v. Weingartner*, 105 Cal. App. 2d 598, 600
(1951) (analyzing whether "the deed of trust was security prior to the lien of the materialman for materials

23  furnished after the advances had been made").

24  [8] Yogi's citation to the law governing the liens of buyer and sellers of real property fares no better. *Garcia
v. Atmajian*, 113 Cal. App. 3d 516, 520 (1980) stands only for the unremarkable proposition that a buyer

25  "who pays to the owner any part of the price of real property, under an agreement for the sale thereof, has
a special lien upon the property, independent of possession, for such part of the amount paid as he may be

26  entitled to recover back, in case of a failure of consideration." (citations omitted). That special lien takes
priority over additional advances made by lenders after the purchase contract. *Althouse v. Provident Mut.

27  Building-Loan Ass'n*, 59 Cal. App. 31, 34 (1922) is also inapt as it deals with the priorities among
lienholders with *concurrently filed deeds of trust*. Where the plaintiffs expressly agreed to be subordinate

28  to $3,000 senior indebtedness by defendant, optional advances beyond $3,000 were subordinate. *Id.* at 38.

### C.  Yogi Does Not Establish that the Subsequent Advances Were Not Obligatory or that They Materially Impaired Yogi's Lien.

Even if Yogi were correct that Hankey did not have the absolute right to modify the Initial Loan and maintain the priority of the Hankey Deed of Trust, to grant Yogi's Motion, this Court would have to conclude that the Subsequent Advances were not obligatory and that they substantially impaired Yogi's lien on the Property. Yogi's Motion fails to address either issue, and thus Yogi has not carried its burden to demonstrate an absence of material fact warranting summary judgment. *See In re Rossi*, 86 B.R. 220, 222 (B.A.P. 9th Cir. 1988) ("Whether a lienholder's security is impaired and by how much are questions of fact."); *Gluskin v. Atl. Sav. & Loan Assn.*, 32 Cal. App 3d 307, 315 (1973) ("[I]t is of course a question of fact whether [a] modification materially affected the rights of the subordinated seller."); *see also Henry v. Gill Indus., Inc.*, 983 F.2d 943, 950 (9th Cir. 1993) ("Summary judgment may be resisted and must be denied on no other grounds than that the movant has failed to meet its burden of demonstrating the absence of triable issues.")

Moreover, there are numerous material disputes of fact that prevent this Court from deciding either issue in Yogi's favor.

First, Yogi's entire priority argument depends on the notion that the full amount of the Subsequent Advances was not obligatory, and all non-obligatory advances are junior to Yogi's $30M Note as a matter of law. (Motion pp. 11–16.) Yet the only "fact" Yogi claims supports its categorization of the Subsequent Advances as not obligatory is that Hankey's $82.5M Note does not expressly say Hankey has to give Debtor any more than that sum. (*Id.* at p. 6.) Yogi's analysis is far too reductive.

In fact, Yogi's own cited case law confirms that advances made under a senior deed of trust, including for taxes, assessments, insurance, improvements, or that are otherwise for the benefit of the property *are*, by definition, obligatory and thus fall outside the rule Yogi seeks to impose. *See Sav. & Loan Soc. v. Burnett*, 106 Cal. 514, 523, 525-26 (1895) (cited in Motion at p. 13). As the Supreme Court of California explained in *Burnett*, payments by a lender are "not optional advances," when they are "made to be used, and which [are] used, to pay street assessments and taxes, and to improve the property." *Id.* at 536. Instead, where the payments are, "for the preservation and benefit, not only of [the lender's] security, but equally of the [junior lienholders'] interest in the land," they retain their senior priority. *Id.* (advances

made after knowledge of junior lien related back to the senior deed of trust's recording date); *see Mortg. Guar. Co. v. Hammond Lumber Co.*, 13 Cal. App. 2d 538, 541, 544–45 (1936) (sums for "interest, title fees, and other legal purposes" are "obligatory advancements"). Indeed, Yogi fails to mention that California courts have consistently recognized that lender advances for taxes, insurance, and other payments necessary to protect a lender's security interest should retain priority when advanced under a deed of trust with provisions akin to the Hankey Deed of Trust language securing "all sums advanced… to protect the security of this Deed of Trust." (Lucas Decl., Ex. AA / RJN Ex. L); *see, e.g.*, *Manning v. Queen*, 263 Cal. App. 2d 672, 673 (1968) (deed of trust extending security for "items necessary to protect the property" is sufficient to render first lien lender's advances for taxes, insurance, loan advancement fees, and other costs necessary to preserve the security interest in the property senior to second lien deed of trust). The Hankey Decl. establishes that the Subsequent Advances were applied to obligations that courts have concluded are protective advances. (Hankey Decl., ¶ 3.) As such, the Motion must be denied.

The Motion does not address the purposes for which the Subsequent Advances were intended or put, let alone present any evidence on this issue. Further, it cites no cases which demonstrate that the Subsequent Advances were not obligatory as a matter of law. At worst, the facts show that there are material disputes about whether some or all of the Subsequent Advances were in fact obligatory. Separate and apart from the Hankey Decl., the Construction Loan Agreement between Debtor and Hankey states on its face that this was the main purpose of the loan, including the Subsequent Advances. (*See* Lucas Decl., Ex. BB, p. 1 ("Borrower proposes to construct new improvements or renovate existing improvements on the Property…. Borrower has requested from Lender a loan for the purpose of such construction."); *see also* Lucas Decl., Exs. EE at p. 3, HH at p. 3.) Yogi's failure to establish that the whole of the Subsequent Advances were non-obligatory precludes its request for a declaration that the entirety of those advances is subordinate to Yogi's lien. [9]

---

[9] Yogi claims Hankey's proof of claim "admits" that the amended and restated notes for the Subsequent Advances "were each subject to new agreements, which shows that each of the advances were optional and not mandatory …." Motion at p. 9, n. 49. It says no such thing; it merely says that "[t]o memorialize [the] loan increases, Amended and Restated Promissory Notes, along with a modification of the construction loan agreement, were executed." Lucas Decl., Ex. II. In any event, this fact is not included

24

HANKEY CAPITAL, LLC'S OPPOSITION TO YOGI SECURITIES HOLDINGS, LLC'S MOTION FOR PARTIAL
SUMMARY JUDGMENT ON NINTH CLAIM FOR RELIEF AND TENTH CLAIM FOR RELIEF

Second, even when the law imposes a duty on a senior lienholder, the duty is to avoid making material modifications that substantially impair the junior lienholder's security—not to refrain from making any and all modifications. *See Friery*, 61 Cal. App. 4th at 871, 880 (acknowledging limited circumstances in which there may be a duty "not to substantially impair  [a junior lienholder's] security without [its] consent"; noting the court did not need to consider the "alternate ground for granting the summary judgment [] that the modification was not 'material'" because it found no duty on the part of the senior lienholder to refrain from any loan modifications). Here, Yogi has not even attempted to offer facts to demonstrate the Subsequent Advances substantially impaired Yogi's security in the Property. Nor could it. Hankey loaned Subsequent Advances because Debtor needed additional funds in its efforts to complete the project. (*See* Hankey Decl., Ex. 1 [HANKEY0019122] ("I just need a few minutes to discuss our immediate funding issue and a potential long term resolutuon (sic) plan[.]") The Subsequent Advances were intended to sustain the completion of construction, which would enhance the value of the Property (and thus Hankey and Yogi's security) so that the Property would bring in top dollar when it sold. Yogi cannot legitimately dispute that the Property is and would be unable to garner a sales price necessary to cover all of the liens on the Property if construction is not complete. Thus, there remain genuine factual disputes regarding "[w]hether … and by how much" Yogi's security interest was impaired, if at all. *In re Rossi*, 86 B.R. at 222; *see Gluskin*, 32 Cal. App. 3d at 315.

### D.  There Are Material Disputes Over the Validity and Priority of Any Lien by Yogi.

The Motion makes no effort to establish the validity of Yogi's lien or underlying claim nor to address the many arguments pending against it by Hankey and Debtor that Yogi's conduct prevents it from seeking priority. A prerequisite to any declaration that Yogi's lien takes priority over Hankey's is a valid lien by Yogi against the Property. Put another way, any "determination of priority is contingent upon a finding that [Yogi] has a valid security interest in" the Property in the first instance. *In re American Sports Innovations (ASI)*, 105 B.R. 614, 618 (W.D. Wash. 1989) (denying summary judgment because material issues of fact as to validity of security interest precluded declaration). Yogi has not met its burden

in Yogi's statement of facts in support of its Motion and thus need not be considered in evaluating the Motion. *Compare id. with* Dkt. 373.

HANKEY CAPITAL, LLC'S OPPOSITION TO YOGI SECURITIES HOLDINGS, LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON NINTH CLAIM FOR RELIEF AND TENTH CLAIM FOR RELIEF

to demonstrate an absence of material fact as to the validity or priority of its lien. To the contrary, numerous material disputes raise serious doubts about both.

First, Yogi does not provide a scintilla of evidence that loans were made to Debtor under the Yogi $30M Note. The only statement in the Motion that comes close to addressing the issue refers to Englanoff's declaration for the notion that, under that note, "the Debtor borrowed approximately $10[million] in addition to the prior borrowings made under the Yogi $1.8M Note, the Amended Yogi $1.8M Note, and the Yogi $17M Note." (Motion at p. 3) The Englanoff declaration says no such thing. The Englanoff declaration merely references the execution of a series of notes, culminating in the $30M Note. (Englanoff Decl., Ex. V.) There is no evidence that a single dollar changed hands (or, if it did, that it went to the benefit of Crestlloyd, as opposed to the benefit of one of the other numerous non-Debtor properties referred to in the Yogi $30M Note or elsewhere).

Second, there are numerous material disputes about whether Yogi's inequitable conduct precludes it from having a valid or senior claim. *See Los Angeles News Service v. Tullo*, 973 F.2d 791, 799 (9th Cir. 1992) ("The application of the unclean hands doctrine raises primarily a question of fact"); *Kendall-Jackson Winery, Ltd. v. Superior Court*, 76 Cal. App. 4th 970, 978 (1999) ("[Claimant] must come into court with clean hands, and keep them clean, or he will be denied relief, regardless of the merits of his claim."). The Motion's recitation of facts omits the details of Yogi's web of entanglements with Debtor's principal, Niami, and numerous non-Debtor entities under Niami's control. Yogi was heavily invested in multiple non-Debtor entities, cross-collateralized multiple loans, and then, in violation of its agreements with Debtor, applied funds indiscriminately for its own benefit and to Hankey's detriment. *E.g.*, *supra* II.C. As a result, Debtor has asserted a claim for recharacterization of Yogi's loan as equity, (Dkt. 27 [Crestlloyd's Cross-Complaint]), Eleventh Claim for Relief: Recharacterization as to Yogi [11 U.S.C. § 502]), and Hankey asserts, *inter alia*, a claim for equitable subordination and numerous affirmative defenses premised on Yogi's inequitable conduct (Dkt. 296 [Hankey's Answer to Yogi's Third Amended Counterclaim and Cross Claim].) Some of the facts that must be considered before making any determination regarding the validity and seniority of Yogi's lien include:

Yogi admits that, after Hankey recorded its $82.5M Note, Yogi amended the Yogi $5M Note on which two non-Debtor entities were borrowers to pledge the Property as security without notice to

Hankey. (Dkt. 311 [Yogi's Answer to Hankey's Crossclaim], ¶ 17.) Far worse, Yogi admits that, after the sale of the Hillcrest Property, $6,435,535.37 was credited toward the Yogi $5M Note, even though the Hillcrest Property *"was not pledged as security* for that Note and *Crestlloyd was not the Borrower on that Note.*" (*Id*. ¶ 28 (emphasis added).) This was a fraudulent transfer. *See* 11 U.S.C § 548(a)(1)(A) and (B).

The sale of the Hillcrest Property (collateral for the Yogi $30M Note) itself is also suspected to be a fraudulent transfer. The Hillcrest Property was sold in February 2020 to Trousdale—which Yogi admits is owned by its principal, Englanoff—for $38.3 million. (Steinberg Decl., Ex. 15; Yogi's Answer, ¶ 18.) Trousdale turned around and sold the Hillcrest Property for $47 million in November 2020—earning a 23% return on investment in less than a year. (Steinberg Decl., Exs. 5, 15, 17; Yogi's Answer, ¶ 19 ("Yogi admits that 'on or about November 24, 2020, fewer than ten months after purchasing the Hillcrest Property, Trousdale sold [it] to a third party for the sum of $47,000,000'".) If that were not enough, Trousdale's $38.3 million purchase price included not only the Hillcrest Property, but also personal property of likely significant value, including "furniture, furnishings, finishings, decor, staging, art, decorations, serving-ware, supplies, inventory, and the like." (Steinberg Decl., Exs. 5, 27, 34.)

Hankey has discovery outstanding to Trousdale, which asks it to explain whether any of the personal property Trousdale purchased was included in Trousdale's re-sale of the Hillcrest Property later that year; and, for anything that was not, Hankey has asked for Trousdale to identify such personal property. (Steinberg Decl., ¶ 25.) If Trousdale retained valuable personal property from its purchase, its true profit margin on re-sale of the Hillcrest Property was even *more* than 23%. While Hankey does not know what personal property was included along with the Hillcrest Property, the potential value is immense. Niami decorated his investment properties extravagantly; as just one example, during a tour of his Londonderry property, Niami flaunted expensive artwork on the walls, declaring its value to be five, six, or maybe even seven figures. (Steinberg Decl., Ex. 24 [video transcription].)

Irrespective of any personal property that Trousdale received as part of its purchase of the Hillcrest Property, such a rapid and exorbitant profit necessarily raises the question of whether Trousdale's purchase from Debtor was an arm's-length transaction, made in good faith, and in exchange for reasonably equivalent value—or whether it was a sweetheart deal for Yogi to recoup millions without crediting those funds to the $30M Note that the Hillcrest Property secured (beyond those it diverted to pay down the Yogi

1   $5M Note for which Hillcrest was not security). *See Transaction, Black's Law Dictionary* (10th ed. 2014)

2   (defining an arm's-length transaction as "[a] transaction between two unrelated and unaffiliated parties"

3   or "[a] transaction between two parties, however closely related they may be, conducted as if the parties

4   were strangers, so that no conflict of interest arises."); *see also In re The Vill. at Lakeridge, LLC*, 814 F.3d

5   993, 1001 (9th Cir. 2016), *aff'd sub nom. U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Mgmt. LLC v.*

6   *Vill. at Lakeridge, LLC*, 583 U.S. 387 (2018) ("A court must conduct a fact-intensive analysis to determine

7   if a creditor and debtor shared a close relationship and negotiated at less than arm's length."). There is

8   thus a material dispute as to whether this, too, was a fraudulent transfer. *See* 11 U.S.C. § 548(a)(1)(A);

9   *id.*§ 548(a)(1)(B) (transfer made where debtor "received less than a reasonably equivalent value" is a

10  potential fraudulent transfer); *see, e.g.*, *In re Eckert*, 388 B.R. 813, 836 (Bankr. N.D. Ill. 2008), *aff'd sub*

11  *nom. Grochocinski v. Schlossberg*, 402 B.R. 825 (N.D. Ill. 2009) (transferee's profitable resale of real

12  property less than a year after purchase from debtor supported conclusion that sale was for less than

13  reasonably equivalent value and constituted constructive fraudulent transfer).

14          These facts alone support Hankey's pending claim against Yogi for equitable subordination, which

15  requires proof of (1) inequitable conduct that (2) resulted in injury to creditors or conferred an unfair

16  advantage on the claimant, as long as equitable subordination is not inconsistent with bankruptcy law. *See*

17  *Stoumbos v. Kilimnik*, 988 F.2d 949, 958 (9th Cir. 1993) (quoting *Spacek v. Thomen (In re Universal*

18  *Farming Indus.)*, 873 F.2d 1334, 1337 (9th Cir. 1989)). Yogi's receipt of fraudulent transfers—by

19  improperly paying down the Yogi $5.2M Note with proceeds from a property that did not secure it, rather

20  than the Yogi $30M Note it did secure, or obtaining the Hillcrest Property and an unknown magnitude of

21  valuable personal property at a substantial discount—fits the bill perfectly. *See In re Nat'l Reality Invs.*

22  *Advisors, LLC*, 672 B.R. 651, 659 (D.N.J. 2025) ("equitable subordination can be used in conjunction

23  with recovery in a fraudulent transfer action to provide a 'complete remedy'" to a creditor); *see also In re*

24  *Pajaro Dunes Rental Agency, Inc.*, 174 B.R. 557, 597 (N.D. Cal. Bankr. 1994) (claims asserted by the

25  recipient of a fraudulent transfer may be equitably subordinated, even if the recipient "committed no

26  intentionally bad acts").

27          Further, while Yogi remains in receipt of a fraudulent transfer, it has *no allowable claim* at all. *See*

28  11 U.S.C. § 502(d) ("[T]he court *shall disallow* any claim of any entity … that is a transferee of a transfer

---

28

avoidable under section … 548 [fraudulent transfers and obligations]….") (emphasis added); *In re America West Airlines, Inc.*, 217 F.3d 1161, 1167 (9th Cir. 2000) (affirming disallowance of claim in its entirety and noting rule that section 502(d) "operates to disallow claims of transferees who do not surrender their avoidable transfer," regardless of whether any affirmative claim for avoidance would be timely) (quoting *Committee of Unsecured Creditors v. Commodity Credit Corp. (In re KF Diaries, Inc.)*, 143 B.R. 734, 737 (9th Cir. BAP 1992)). Because security interests are derivative of, and cannot exist without, the underlying obligations they secure, when an underlying claim is disallowed under Section 502(d), Section 506(d) of the Bankruptcy Code generally voids any lien securing that disallowed claim. 11 U.S.C. § 506(d) ("To the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void …."); *Bank of N.Y. Mellon*, 8 Cal. App 5th at 945 ("A security interest cannot exist without an underlying obligation….") (quoting *Alliance Mortgage Co. v. Rothwell*, 10 Cal. 4th 1226, 1235 (1995). Thus, if Yogi's claim is not allowable, it has no security interest in the Property at all—an insurmountable roadblock to any declaration that such non-existent security interest is senior to Hankey's.

Yogi has also been sued by Debtor for recharacterization, based in part on the web of ties between Niami and Niami-affiliated entities, including Crestlloyd and Marbella, on the one hand, and Englanoff and Englanoff-affiliated entities, including Yogi and Trousdale, on the other. (Dkt. 27 [Crestlloyd's Cross-Complaint], Claim 11, ¶¶ 174–79.) If Yogi's $30M Note is recharacterized as equity, it is necessarily junior to all secured and unsecured creditors on the Property—including, of course, Hankey's Subsequent Advances. Granting Yogi's Motion, which necessarily bakes in a finding of a valid lien on the Property, would amount to granting summary judgment *against* Debtor's recharacterization claim without ever hearing from Debtor. *See In re AIG Fin. Prods. Corp.*, 660 B.R. 603, 614, 632 (Bankr. D. Del. 2024) (denying motion for judgment on the pleadings because a determination of priority must await final resolution of the adversary proceeding if there are plausible claims for recharacterization and/or equitable subordination, and noting that "the true character of [a] claim must first be determined before considering what its priority is").

/ / /

/ / /

**E.  Hankey Is Awaiting Additional Discovery Material to Determine the Validity or Priority of Yogi's Lien on the Property**

Hankey has diligently pursued discovery and continues to investigate facts relevant to the claims and defenses in this action. Yogi's Motion purports to distill the relevant issues to a handful of documents signed and/or recorded—an oversimplification which disregards Hankey's (and Debtor's) claims and defenses that undermine the declarations Yogi seeks. The issues here arose over the course of several years from a convoluted and evolving web of entities and individuals, many of whom are now defunct, non-responsive, or evasive. If the Court is not inclined to deny the Motion on its merits, Hankey respectfully requests that the Court deny the Motion on the grounds that more discovery is necessary and justified to allow Hankey to present its defenses. "[I]f a nonmovant shows by affidavit or declarations that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any appropriate order." FRCP 56(d); *see, e.g. Baron Servs., Inc. v. Media Weather Innovations LLC*, 717 F.3d 907, 912 (Fed. Cir. 2013) (reversing grant of summary judgment because district court erred in granting motion over Rule 56(d) opposition where opposing party identified additional discovery it desired and "explained how that additional discovery was relevant and essential for its opposition"). Here, should the Court have any hesitation regarding whether denial of Yogi's Motion is required, ruling on the Motion should be deferred until Hankey can complete additional discovery.

*(1) Documentary Evidence*

Hankey's ability to obtain key documents has been stifled by the evasiveness of key players involved in Debtor and non-Debtor affairs material to this dispute. On January 29, 2025, Hankey served Requests for Production of Documents ("RFP") on Nile Niami, the principal of Debtor and non-Debtor entities, and the central figure in this dispute. (Steinberg Decl., ¶ 32.) As Niami failed to respond to the RFP, Hankey sought and obtained an order from this Court compelling Niami to comply with his discovery obligations on August 27, 2025. (Dkt. 352.) Yet Hankey is informed and believes that Niami fled the country and cannot be located with reasonable diligence. (*Id.*, Ex. 35.)

Hankey also served a subpoena on Yvonne, Niami's ex-wife and co-principal of Debtor, seeking a wide array of documents in her possession relevant to this dispute. After receiving no response, Hankey

moved for a contempt order against Yvonne for her failure to respond to the subpoena. Yvonne appeared at the order to show cause hearing on December 9, 2025, and this Court continued the hearing to January 27, 2026, providing Yvonne an opportunity to coordinate with Hankey's counsel for a response to the subpoena before the new hearing date. Yvonne initially engaged in discussions with Hankey, and on December 19, 2025, Yvonne stated that she would search records and inform Hankey whether her old email files are still accessible. Hankey did not hear from Yvonne again up to and including the February 19, 2026, hearing, wherein the Court held Yvonne in contempt and sanctioned her for her failure to comply with Hankey's subpoena. (*Id.*, ¶ 33; Dkt. 401.)

Discovery also revealed that two of Niami's closest associates during the times relevant in this dispute were Camarena and Witkins, operating under Skyline Development, Inc. ("Skyline").[10] There are countless instances where Camarena (Yvonne's brother) and Witkins spoke to others, including Yogi (Englanoff) and Julien Remillard—Plaintiff Inferno Investment, Inc.'s ("Inferno") principal—on Niami's/Debtor's behalf. Hankey served a subpoena on Skyline and, after repeated attempts, managed to finally serve subpoenas on Camarena on October 30, 2025, and Witkins on November 19, 2025. (Steinberg Decl., ¶ 34–37) Both Camarena and Witkins responded by email stating they have no responsive documents despite Hankey's broad subpoenas, and Hankey never received a response from Skyline. (*Id.*) Due to the futility in its attempts to obtain relevant documents from the Niamis and their affiliates, Hankey recently shifted its approach to discovery, propounding third party discovery on the bases set forth below.

Based on the documents produced thus far in the action, Hankey has reason to believe there may be truth to Yogi's allegations that funds from Hankey's loans were misappropriated away from the Property. However, Hankey vehemently denies that any potential misappropriation was caused or allowed in any way by Hankey's acts or omissions. Instead, Hankey has reason to believe there may have been a coordinated effort to use the large loan from Hankey, intended to complete the improvements to the

---

[10] Skyline Development, Inc. is a d/b/a of Dunfanaghy Bay Ventures, LLC.

HANKEY CAPITAL, LLC'S OPPOSITION TO YOGI SECURITIES HOLDINGS, LLC'S MOTION FOR PARTIAL
SUMMARY JUDGMENT ON NINTH CLAIM FOR RELIEF AND TENTH CLAIM FOR RELIEF

1 | Property, as a "bailout package" for Niami's failed properties owned by non-Debtor entities—non-Debtor
2 | properties in which Hankey **did not** have a security interest, but in which Yogi did.

3 | Hankey's concerns about the use of loan proceeds gradually increased over time and prompted
4 | increased oversight. In an effort to mitigate any potential misappropriations, Hankey began disbursing
5 | money directly to vendors rather than to Skyline and Camarena, who ostensibly managed the construction
6 | at the Property. By some time in 2020, it appeared direct vendor payments may not fully resolve the issue,
7 | as vendors were seemingly padding invoices for money owed on other properties. (*See, e.g.*, Hankey
8 | Decl., Ex. 2 [5/18/2020, Hankey: "I feel situation goes beyond sending money direct. It appears some
9 | vendors have side deals to clear balances on other projects and apply the rest to Airole which always
10 | leaves us a dollar short."]; Bhakta Decl., Ex. 4 [HANKEY0047844] [7/31/2020, Plus: "Site Super has
11 | voiced slight concern that this is Niles last job and it is a possibility that subs are owed from previous
12 | jobs."].)

13 | Despite the circumstantial evidence that various vendors for the Property were owed money for
14 | other Niami related non-Debtor projects, the *sole* mechanic's lien on Niami's four non-Debtor properties,
15 | upon all of which Yogi had security interests, was for **less than $20,000**. Hankey has reason to believe
16 | this effect was caused by Niami who, in coordination with Yogi, worked to prevent mechanic's liens being
17 | perfected against non-Debtor properties and to pay vendors with money from Hankey's loan for work
18 | done for those non-Debtor properties. (*See* Steinberg Decl., Ex. 23 [1/6/2020, Englanoff: "Curious any
19 | money in airole to pay vendors like J and E?" Camarena: "There will be something for J&E but not full
20 | amount he says he's owed" … Englanoff: "Make sure these boys get paid with the next draw. Thank
21 | you."]; *id.* [Englanoff: "Any word on money for j and e? They keep calling me"]; *id.* [5/13/2020,
22 | Englanoff: "Need to talk to u about italian luxury and Andrea. Please call me[.]" Camarena: ". . . **Andrea's**
23 | **wife lien properties claiming Nile owes them money**" Englanoff: "**u need to get it off**…andrea owns the
24 | company or even 50%—he can sign the release" Camarena: "I've been trying to. There's more to it. Nile
25 | needs to address it[.] Bottom line though is they are desperate for money. Without at least some money
26 | they won't release it."] [emphasis added].) Additional discovery will be (and has been) propounded to
27 | shed light on Yogi's involvement in diverting Hankey loan funds for the benefit of non-Debtor properties.
28 | If monies from the Hankey loans were used to pay debts on other properties in which Yogi had a lien, that

32

would have resulted in greater payments to Yogi when those properties were sold, to the detriment of Debtor and its creditors. It also would have contributed to the failure of the Property to be completed, which was likewise detrimental for Debtor and its creditors.

Setting aside vendor payments, documents also show that Yogi may have diverted funds, vendors, and materials away from the Property intended to improve the Property for other unrelated purposes, potentially including improvements to the Hillcrest Property after its sale to Trousdale (Englanoff). *Id.* [4/10/2020, Englanoff: "Also, draw from hanky hit? I could use the $20k. Please LMK-thanks"]; *id.* [4/22/2020, Englanoff: "Hey Tony. You have an update on funding? Hope you are safe. Thanks"]. Thus, more discovery is necessary to understand the full extent of Yogi's inequitable conduct and how it affected the Property.

In sum, more discovery is needed to understand the flow of funds from Hankey's loan. Unable to recover the needed documents from Debtor, its principals, or their affiliates, Hankey has served forty-five subpoenas to vendors, banks, escrow companies, and others *i.e.*, anyone who might have documents that would help the parties piece together where the money went and whether any of the parties acted inequitably with respect thereto. (Steinberg Decl., ¶ 39.)

### (2) Expert Forensic Accounting

For over a year now, Hankey has made several requests for Yogi to join it in moving pursuant to Federal Rules of Evidence, Rule 706, for appointment of a neutral expert forensic accountant to trace the flow of funds from the various notes, entities, and projects. (Steinberg Decl., ¶ 40.) Yogi's counsel consistently stated this was under consideration, including as recently as January 21, 2026, but has never committed to supporting such motion. (*Id.*) In hindsight, it appears Hankey was strung along so that appointment of an expert would take place after this Motion was filed because Yogi directly benefited from, and acted in concert with respect to, Debtor's diversion of loan funds to non-Debtor properties upon which Yogi had a security interest. For example, existing discovery shows that at least some of the proceeds of the Yogi $30M Note were transmitted to non-Debtor entities. (Steinberg Decl., Ex. 13 [$613,360 wired to Contemporary Vista, LLC in 2019].) Yogi also received a security conveyance from Contemporary Vista, LLC, dated July 11, 2018, in connection with a Gulfstream Aerospace G-1159A airplane. (*Id.*, Ex. 6.)

1   In preparation for forensic examination, and due to the inadequacy of Debtor's documents, Hankey

2   subpoenaed and obtained Debtor's bank statements from JPMorgan Chase Bank, N.A. (successor to First

3   Republic Bank). (Steinberg Decl., ¶ 38.) Hankey is now also in the process of securing bank statements

4   for all non-Debtor accounts to permit a comprehensive tracing analysis. (*Id.*)

5   *(3) Depositions*

6   While the parties have had preliminary discussions about deposition scheduling, no party

7   depositions have occurred yet (one third-party deposition has occurred, which was unrelated to the claims

8   between Hankey and Yogi). (Steinberg Decl., ¶ 42.) While Hankey intends to depose Yogi and other

9   parties, depositions are still premature and should only be conducted with the benefit of a full documentary

10  record—or, at minimum, a clear understanding of what holes need to be filled (and thus the subject of

11  questioning).

12  **V.    CONCLUSION**

13  For the foregoing reasons, Yogi's Partial Motion for Summary Judgment should be denied.

14

15  DATED: March 3, 2026                    GREENBERG TRAURIG, LLP

16

17                                          By   */s/ Howard J. Steinberg*

18                                              Howard J. Steinberg
                                                Attorneys for Defendant and Cross-Claimant
19                                              Hankey Capital, LLC

20

21

22

23

24

25

26

27

28

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
Greenberg Traurig LLP, 1840 Century Park East, Suite 1900, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled (*specify*): **Hankey Capital LLC's Opposition to Yogi Securities Holdings, LLC's Motion for Partial Summary Judgment on Ninth Claim for Relief and Tenth Claim for Relief** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) March 3, 2026, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) March 3, 2026, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL (state method for each person or entity served)**: Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| March 3, 2026 | Terrine Pearsall | /s/ Terrine Pearsall |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

SERVICE LIST
In re Crestlloyd, LLC
Case No. 2:21-bk-18205-DS
Adv. No. 2:22-ap-01125-DS

**1.    To be Served by the Court Via Notice of Electronic Filing (NEF):**

Kyra E Andrassy     kandrassy@raineslaw.com,
bclark@raineslaw.com;csantiago@raineslaw.com
Todd M Arnold     tma@lnbyg.com
Leslie A Cohen     leslie@lesliecohenlaw.com,
jaime@lesliecohenlaw.com;camille@lesliecohenlaw.com
Ryan Coy     ryan.coy@blankrome.com, michelle.grams@blankrome.com
Max Fabricant     mfabricant@lavelysinger.com
Thomas M Geher     tmg@jmbm.com, bt@jmbm.com;tmg@ecf.courtdrive.com
David B Golubchik     dbg@lnbyg.com, dbg@lnbyg.com
Jonathan Gottlieb     jdg@lnbyg.com
John W Lucas     jlucas@pszjlaw.com, ocarpio@pszjlaw.com
John A Moe     john.moe@dentons.com,
kathryn.howard@dentons.com;derry.kalve@dentons.com;DOCKET.GENERAL.LIT.LOS@dent
ons.com
Nicholas David Moss     nmoss@molinolawfirm.com
Joseph M Rothberg     jmr@lnbyg.com, jmr.LNBYG@ecf.inforuptcy.com
Howard Steinberg     steinbergh@gtlaw.com, pearsallt@gtlaw.com;NEF-
BK@gtlaw.com;howard-steinberg-6096@ecf.pacerpro.com
United States Trustee (LA)     ustpregion16.la.ecf@usdoj.gov
Jessica Wellington     jwellington@bg.law, ecf@bg.law
Johnny White     JWhite@wrslawyers.com, jlee@wrslawyers.com
Jaime K Williams     jaime@lesliecohenlaw.com, jaime.williams@gmail.com


**2.    Served by United States Mail:**

Yvonne Niami
341 South Rodeo Drive
Beverly Hills, CA  90212-4206

N. Philanthropy LLC
Attn: Yvonne Niami
341 South Rodeo Drive
Beverly Hills, CA  90212-4206

1

Andre Mario Smith
7938 Broadway No. 1263
Lemon Grove, CA 91946

ACTIVE 719847544v1